# Exhibit A

# SEXUAL ASSAULT: CURRENT LITERATURE AND PERSPECTIVES[*]

## Barbara Ziv, M.D.

### Definitions and Statistics

According to the CDC, "Sexual violence involves a lack of freely given consent as well as situations in which the victim is unable to consent or refuse."[1] The CDC defines "Consent," "Inability to Consent," and "Inability to Refuse" in the following manner:

> **Consent:** *Words or overt actions by a person who is legally or functionally competent to give informed approval, indicating a freely given agreement to have sexual intercourse or sexual contact.*

> **Inability to Consent:** *A freely given agreement to have sexual intercourse or sexual contact could not occur because of the victim's age, illness, mental or physical disability; being asleep or unconscious; or being too intoxicated (e.g., incapacitation, lack of consciousness, or lack of awareness) through their voluntary or involuntary use of alcohol or drugs.*

> **Inability to Refuse:** *Disagreement to engage in a sexual act was precluded because of the use or possession of guns or other non-bodily weapons; or due to physical violence, threats of physical violence,* **intimidation or pressure; or misuse of authority (emphasis added)***.*

The Department of Defense commissioned the RAND National Defense Research Institute to independently assess instances of sexual assault, sexual harassment and gender discrimination in the military.[2] Over half a million active- and reserve-service members participated in the study, and the results were startling: approximately 1 percent of men, and nearly 5 percent of women experienced a sexual assault **within the previous year (emphasis added)**. Of these, 35 percent of the men, and 43 percent of the women were sexually penetrated. The rates of sexual harassment were predictably higher: 7 percent of men, and 22 percent of women were subjected to sexual harassment. Notably, in almost 60 percent of the cases, the perpetrator was a supervisor or unit leader of the victim. Not only were these individuals subject to unwanted sexual advances and/or assaults, 52 percent of the women also reported that they experienced retaliation, even if the offending behavior was not reported.

---

© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.

## Sexual Assault Myths

It is common knowledge that victims of sexual assault are often blamed by others, including by family, friends, acquaintances, and society at large, for the crimes to which they are subject. Often female victims of sexual assault are accused of dressing provocatively, behaving flirtatiously, putting themselves in compromising positions, or giving "mixed messages." Researchers have examined this phenomenon, and determined that there are societally held beliefs, "sexual assault myths," that serve to deny, trivialize or justify sexual violence exerted by men against women."[3] Lonsway, et al.[4] defined attitudes embodied in these fallacies, noting that they contain elements of denial of the incident(s), shifting of responsibility onto the victim, and minimizing the adverse consequences of sexual harassment.

While not everyone endorses all the erroneous views that form the basis for sexual assault myths, most members of society, including victims themselves, believe some of the stereotypes upon which they are created. These views lead to several problems for victims of sexual assault/harassment: unlike virtually any other group of crime victims, those who have been sexually assaulted or harassed are often held wholly or partially responsible for their victimization.[5, 6, 7, 8, 9]

Numerous studies have found that men are more likely to view women's character and/or behavior as contributing factors to sexual assault/harassment, citing women's dress, perceived resistance, substance use, physical appearance, race and/or relationship to the offender as elements relevant to the crime.[10 11 12 13 14] Men who are in social positions of influence, dominance, or prominence are more likely than other groups to make positive associations between power and sex. [15 16 17 18] Males who make a cognitive connection between power and sexuality hold attitudes tolerant of sexual offending. These beliefs can lead to situations in which men feel justified in their use of power and authority to physically or psychologically dominate a subordinate into a sexual encounter.

There is almost always a power differential between the sexual offender and the victim. In fact, studies have shown that as men become more powerful or influential in work situations, they become increasingly confident, assertive, and insensitive to the feelings of others. [19 20 21 22 23 24] This combination of factors can confer both psychological permission to a powerful man to abuse his position and narcissistic entitlement, which causes him to view his sexual advances as welcomed, regardless of the feelings of the target of his harassment.

Studies demonstrate that males are more likely than females to endorse attitudes that blame victims for the perpetrator's behaviors, and other studies suggest that there is limited gender bias in attributing blame to victims. However, there is scant literature that contradicts the notion that society negatively judges women who have been sexually assaulted or harassed. Further, in circumstances involving acquaintance sexual assault/harassment, victims are more likely to be

© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.

seen as sharing responsibility for the offense. [25] [26] [27] [28] [29] One hypothesis for these findings is that society accepts gender-scripted roles around sexual activity; it is acceptable for men to be sexual aggressors and women are responsible for holding both men and themselves in check.[30] [31] [32] This theory has been supported by research: individuals who endorse traditional gender role stereotypes blame victims and justify the sexual interactions more frequently, especially in cases of acquaintance sexual assault.[33] [34] [35] [36] [37]

Sexual assault myths include expectations of how a woman should behave during experiences of unwanted sexual attention/behavior. It is generally and widely believed that if a woman does not want sexual interaction with a male, she will fight back in verbal and/or physical ways. Further, if a woman is not physically restrained or if there is no weapon involved, she is expected to extricate herself from the situation immediately. These expectations do not conform to reality. Literature shows that only between six to 18 percent of women utilize aggressive physical resistance during a sexual assault. [38] [39] [40] Further, research suggests that aggressive verbal resistance, i.e. screaming, is also not utilized by the majority of women in cases of rape, occurring only in approximately 25 to 40 percent of cases.[41]  So, then, how do victims behave during a sexual assault?

Woodhams, et al.[42] conducted an analysis of behaviors displayed by victims as they were raped by strangers. Over 100 different victim behaviors were identified. The authors discussed their results:

> *The victims in our samples reported engaging in behaviors which seemed to provide the offender(s) with an opportunity to alter the course of his/their behavior of his/their own accord. This goal appeared to be achieved in different ways by, for example, disclosing something to the offender(s) to make the situation, or the victim herself, less attractive. This would include using a range of put-offs, such as telling the offender(s) she was menstruating. Such behaviors are partially face-saving, in that the victim is providing the offender(s) with the opportunity to desist in his/their behavior and is giving him/them a plausible reason to do so. He/they could therefore take the opportunity offered without losing face. An alternative strategy was for victims to invoke social conventions. This strategy tended to involve the use of verbal behaviors which ordinarily would evoke sympathy or empathy from the recipient or embarrassment for breaking social norms. Such behaviors included crying, confronting the offender(s) about his/their behavior, and drawing parallels between herself and women who might be in the offenders' lives…*

If women who are in a situation where they may be raped by a stranger do not actively fight back but use a wide variety of communications and behaviors to try to get out of the situation, it is not surprising that victims of acquaintance, institutional, workplace or acquaintance sexual assault/harassment rely even more on indirect means to avoid sexually aggressive behaviors. In these circumstances, the assailant often has the power to negatively impact the victim's livelihood, reputation, as well as other relationships that are important to the victim. All of this information is

3

© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.

simultaneously processed in real time as women are sexually assaulted or harassed. In these circumstances, a woman must weigh whether the violation of her body is ultimately less humiliating, degrading, and destructive to her life than is a situation where the offender will violate the essence of her life: her ability to earn a living, her position in society, and her sense of self. This judgment is made in seconds, when the victim is frightened, confused, and is in the midst of a traumatic experience. Obviously, decisions made under these conditions cannot truly be considered a choice.

Although under some circumstances, women simply "just say no" to men who are pursuing undesired sexual interaction, under many conditions, this blunt approach is not used. The reasons for this are complex: a woman may fear that a direct communication may anger a man; a woman may be concerned that the man would feel insulted; a woman may believe that the man is drunk or otherwise impaired and does not know what he is doing; a woman may not want to draw attention to the situation, hoping that she can change the dynamic without confrontation; a woman may believe that refusing was useless.[43] The explanations of the myriad ways in which women communicate sexual refusal messages are as varied as the relationships that led to the situation. Further, saying "no" outright violates long established cultural norms. [44]

Sexual refusals include combinations of direct non-verbal, indirect non-verbal as well as direct and indirect verbal cues. [45] Direct non-verbal interactions refer to behaviors such as turning away or moving a hand and indirect non-verbal communications can involve gestures such as crossing legs or refusing to make eye contact as well as even more subtle cues, "I showed signs of discomfort," "I didn't kiss them or touch them back," "I didn't act interested." Direct verbal refusal cues generally include some version of the word "no," but indirect statements are more complicated. These may contain components of timing, (e.g. pauses or delays in speech), as well as qualifying phrases, (e.g. "I don't know," "Well," "Maybe.") Often these less overt communications are followed by excuses or justifications (e.g., "I'm tired," "I have to be someplace," "I have my period.") for why the woman does not want the interaction to proceed rather than an outright rejection.[46] [47] [48]

In summary, there is no "typical" behavior of a woman who faces, or is in the midst of, sexual assault. In these traumatic situations, women may resort to learned patterns of behavior, such as being compliant and not wanting to offend, they may believe they are making choices about how to avoid the worst possible outcome, or they may merely be responding reflexively, without clear thought. What is equally clear from the data, is that most women do not fight back, either physically or verbally. What is less clear, is why in both criminal and civil allegations of sexual assault, the focus of investigations is on the victim's behavior rather than that of the perpetrator.

**Capacity to Consent**

4

© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.

As noted above, CDC, "Sexual violence involves a lack of freely given consent as well as situations in which the victim is unable to consent or refuse."[49] Consent in this context is dependent on capacity - a term related to an individual's neuropsychiatric ability capacity, or ability, to understand a situation and to make a reasoned response to that situation. Capacity is a fluid state, and a person's capacity may change depending on internal and external circumstances. Anything that impairs an individual's ability to understand risks, benefits and alternatives to the action in question, impedes or extinguishes his/her capacity to consent. Sexual assault is one such external circumstance; extremes of emotion triggers the hypothalamic-pituitary-adrenal axis.[50][51][52][53][54][55][56][57] Multiple neurotransmitters, neurohormones, and other circulating agents are activated, influencing the ability to reason and react with cognitive clarity. These neurological changes are responsible for the myriad, unanticipated behaviors of victims of sexual assault. Victims frequently describe periods of intense confusion at the onset of a sexual assault. Many things occur at once, the first being, "What is happening?" or "What just happened?" This initial discombobulation, combined with fear, typically persists for minutes and is followed by the reflexive thought, "What do I do?" Depending on the circumstances, (e.g. how long the incident persists, multiple external factors including, concern about the safety of others, the cognitive and physical state of the victim, etc.), the victim's attention and focus shifts repeatedly from internal to external factors. Similarly, and again depending on the specific and always unique situation, victims' cognitions and behaviors alternate between reflexive and deliberative. Only after the acute threat is over, do victims normally begin to process the event, sorting out all the stimuli and information that poured in during the assault. In summary, during an actual or threatened sexual assault, a victim does not have the cognitive capacity to consent.

Another definition of capacity is the power to do something. This aspect of capacity is one that is commonly overlooked and involves the consequences of saying no. If a man or woman may suffer physical, economic, social, reputational, occupational, or other harm if he/she refuses to submit sexual activity, he/she does not have the capacity to consent.

<u>Reporting of Sexual Assault</u>

Victims of sexual abuse are subject to intense scrutiny and judgement. Not only are they assessed on their appearance, but on their sexual identity (a subject covered extensively in the literature, but beyond the purview of this summary), their choices, and a wide variety of other issues. The process of being sexually victimized is debilitating, humiliating, and degrading. Its very nature makes women uncomfortable about verbalizing to others the acts that they are forced to endure. This is true of all types of sexual victimization but women who have experienced, and reported, sexual harassment are often doubted and portrayed as schemers who are lying in order to achieve a goal that would be unattainable by any fair means. This reaction serves as a powerful disincentive to reporting workplace sexual misconduct . Add to that mix, the knowledge that victims of sexual crimes are likely assaulted by someone they know, that sexuality is a private, intimate and delicate subject, and that personal details may become public, it is small wonder that most women do not

© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.

report sex crimes to police and/or to other authority figures, such as human resources and workplace managers/supervisors.

The National Violence Resource Center (NVRC) estimates that 63 percent of sexual assaults are not reported to police, making this the "most under-reported crime."[58] A paper analyzing victims of sexual assaults between 1995 and 2013 found that only between 20 and 32 percent of victims between the ages of 18 and 24 reported assaults to police.[59] Other literature finds that the rate of formal reporting of sexual assaults ranges between five and 35 percent.[60][61] Studies have also shown that victims of sexual assault similarly do not report the event to mandatory reporters, including physicians, counselors, teachers, or clergy.[62][63][64][65]

When a victim does decide to make a formal report of sexual misconduct, delayed reporting is the norm, not the exception. Thus, it has no bearing on whether an allegation is credible or not. The reasons for delayed or absent reporting are numerous; victims want to avoid the stigma that is associated with being sexually assaulted, they wish to avoid retaliation, they are hesitant to cause pain to others, including the perpetrator, and/or they do not trust the systems that are designed to protect them. [66][67][68][69][70]

While the discussion above reveals many reasons why women do not report sexual assault, other research has identified more nuanced disincentives to disclosure. Victims of sexual assault are members of society who carry some of the unsupported biases inherent in rape myths. It is not uncommon for women who have been sexually assaulted by someone known to them to question whether it constitutes a crime. Like others, victims tend to view sexual assault as an act perpetrated by a stranger.[71][72][73][74] The psychological consequences of sexual assault may further serve as a barrier to disclosure. Victims may "shut down" and avoid talking about the event. Further, if the victim disclosed information about the assault to a friend or family member and was blamed for the action of the perpetrator or is not believed, she is less likely to formally report the event. Even if a victim's account is believed or proven, women are criticized for not behaving in the manner that society expects. For most women, even alleging sexual misconduct permits intrusion into and judgment of their appearance, honesty, motivations, choices, and general conduct.

Given the serious, and profoundly detrimental negative consequences women experience simply as a result of reporting sexual misconduct, it is not surprising that silence is the norm, not the exception. A June 2016 report released by the U.S. Equal Employment Opportunity Commission titled "Select Task Force on the Study of Harassment in the Workplace" found:

> *Common workplace-based responses by those who experience sex-based harassment are to avoid the harasser, deny or downplay the gravity of the situation, or attempt to ignore, forget, or endure the behavior. The least common response to harassment is to take some formal action - either to report the harassment internally or file a formal legal complaint. Roughly three out of four individuals who experienced harassment never even talked to a*

© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.

> *supervisor, manager, or union representative about the harassing conduct. Employees who experience harassment fail to report the harassing behavior or to file a complaint because they fear disbelief of their claim, inaction on their claim, blame, or social or professional retaliation.*

The EEOC report detailed why victims' fears about reporting sexual assault/harassment are well-founded:

> *Employees who experience harassment fail to report the behavior or to file a complaint because they anticipate and fear a number of reactions - disbelief of their claim; inaction on their claim; receipt of blame for causing the offending actions; social retaliation (including humiliation and ostracism); and professional retaliation, such as damage to their career and reputation. The fears that stop most employees from reporting harassment are well-founded. One 2003 study found that 75% of employees who spoke out against workplace mistreatment faced some form of retaliation. Other studies have found that sexual harassment reporting is often followed by organizational indifference or trivialization of the harassment complaint as well as hostility and reprisals against the victim. Such responses understandably harm the victim in terms of adverse job repercussions and psychological distress. Indeed, as one researcher concluded, such results suggest that, in many work environments, the most "reasonable" course of action for the victim to take is to avoid reporting the harassment*

It is not uncommon in the days, weeks, months, or even years after an experience of sexual assault or harassment that a victim will downplay the seriousness of the event(s) and attempt to "move on." This coping strategy is not unique to victims of sexual misconduct: most people want to believe that they can overcome a negative experience, whether it has psychological, physical, economic, or social consequences. A reluctance to acknowledge the negative impact that sexual assault or harassment had on an individual neither implies that the event(s) was insignificant nor that it was consensual. Denial is not an uncommon defense mechanism and people who are hurting often "suffer in silence." Victims of sexual assault/harassment frequently describe themselves as putting on a false front to the world, allowing them to work and live in a manner that does not reveal inner conflict or struggle. They attempt to emotionally and psychologically cordon off the experience and push forward with their lives. Many victims believe the false narrative that the negative impact of sexual assault/harassment is less psychologically damaging when the perpetrator is known to the victim, contributing to both the reluctance to acknowledge the damage done and the hesitation to seek treatment.[75][76][77][78] Often it is only when they find themselves with emotional or behavioral problems that they cannot surmount, that victims reach out for help.

## Sequelae of Sexual Victimization

© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.

Erroneous beliefs about sexual assault serve to allow men to rationalize or justify their behavior and permit women to have a false sense of invulnerability. However, these wide-spread beliefs have profound and negative consequences for victims of both sexual abuse and sexual harassment. The studies regarding the psychological sequelae of rape are well known. What is less commonly understood is that unwanted sexual interactions of many types also cause both long- and short-term problems with emotion, self-image, productivity, cognition, physical health and economic well-being. Sexual harassment has been associated with posttraumatic stress symptoms,[79] [80] depression, somatic symptoms, and general psychological distress. [81] [82] [83] Not only does sexual harassment negatively impact psychological and physical health, research has shown that it can have far reaching impact on many aspects of a victim's life, including, job performance, job satisfaction and career opportunities. [84] [85] That these outcomes can be severe, and damaging, has been demonstrated in several meta-analytic studies. [86] [87] [88] More subtle problems are also seen in victims of sexual abuse and/or harassment. Self-blame, with resulting poor self-esteem, social isolation, avoidance of new situations, and difficulty maintaining relationships have also been identified these individuals.

Contributing to the false narrative of sexual assault is the unsupported, invalid idea that sexual assault is less psychologically damaging when the perpetrator is known to the victim.[89] [90] [91] [92] Experiences of sexual assault survivors who are blamed, doubted or victimized by authorities to whom they reach out for assistance have been well documented over decades. This negative experience has been characterized as a "second assault" or "secondary victimization," and has been noted to extend the trauma of sexual assault well beyond the instant offense. When victim's needs are not met, they suffer from more severe and more persistent physical and psychological problems than those who do not experience disbelief, scorn, shame and an inability to obtain services.

The psychological sequelae of rape are well known. What is less commonly understood is that unwanted sexual interactions of many types also cause both long- and short-term problems with emotion, self-image, productivity, cognition, physical health and economic well-being. Sexual harassment has been associated with posttraumatic stress symptoms,[93] [94] depression, somatic symptoms, anxiety disorders, agoraphobia and general psychological distress. [95] [96] [97] Further, even victims who do not develop a full-blown psychiatric disorder as a consequence of their experiences, frequently report mental health problems such as an anxiety or depressed mood, irritability, anger, and uncontrolled crying. Physical problems associated with sexual harassment include weight loss, fatigue, and gastrointestinal problems.[98] [99]

Not only does sexual harassment negatively impact psychological and physical health, research has shown that it can have far reaching impact on many aspects of a victim's life, including, job performance, job satisfaction and career opportunities. [100] [101] That these outcomes can be severe, and damaging, has been demonstrated in several meta-analytic studies.[102] [103] [104] More subtle problems are also seen in victims of sexual abuse and/or harassment. Self-blame, with resulting

© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.

poor self-esteem, social isolation, avoidance of new situations, and difficulty maintaining relationships have also been identified in these individuals. This is the likely explanation for the fact that many women either delay disclosure of sexual trauma, minimize the severity of the experience, or deny it completely. Further refusing to self-identify as a victim of sexual assault/harassment can insulate the individual from negative judgments of friends, colleagues, family members, lovers, and even strangers who may become aware of the event.

In a time when the adage, "Keep your friends close; keep your enemies closer" is an accepted truism, it is difficult to understand why victims continuing to have seemingly friendly contact with someone who has violated them is interpreted as a sign that "nothing happened." As discussed at length above, sexual assault and harassment causes women to suffer from self-esteem issues, depression, demoralization, self-doubt, embarrassment, and a wide array of other negative emotions. Is it really "intuitive" to believe that when a person has been violated in the most personal and private aspect of her life that she should be expected to also give up her job? Her relationships with others who are connected with the offender? Her position in her community? A job/career is, at a minimum, a means of supporting oneself, but often is something that has been hard won and is part of one's identity. Because offenders and victims often have the same group of friends or associates, an accusation of sexual misconduct almost always results in victims losing friends or colleagues who, for whatever reason, side with the offender. Further, allegations that one has been sexually victimized places a "scarlet letter" on the victim, labeling her in a way that forever changes her relationship to society. (This is one of the reasons that #MeToo gained such world-wide traction. Surviving sexual misconduct forces women out of some sectors of society, writ both large and small. The #MeToo movement allowed these women to join another community, diminishing the nearly inevitable sense of isolation that survivors experience.)

It is only reasonable that victims of abuse would attempt to salvage whatever they can - - from the relationship with the offender, including entertaining the possibility that there is some face-saving explanation of the experience, from work, or from colleagues. Further, many victims of abuse continue contact in order to minimize the possibility that further harm will ensue at the hands of the offender. Placating the individual, assuring them that there is no ill will, acting generously and in a friendly manner, pretending that nothing happened or even that the event was welcome and enjoyed, are all common, and expected, responses.

Sexual assault and harassment are dramatic and powerful demonstrations of dominance. As noted by researcher Paula McDonald, "Sexual harassment is one of a range of abusive or counterproductive workplace behaviours which have hierarchical power relations at their core."[105] Any woman who has been assaulted in the workplace, and it almost universally happens to women who are in a subordinate position to the offender, has learned a harsh truth about her powerlessness and, ultimately, her lack of value. While it is easy to cry, "But she didn't report it!" one only needs to review the experiences that the victims of Bill Cosby, Harvey Weinstein, or Matt Lauer endured when they reported abuse to understand the devastating consequences of accusing a powerful man.

© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.

Those victims had the support and corroboration of others who had similar experiences; consider what it is like for a lone victim to come forward with allegations against someone who is influential and respected in the world at large.

Decisions about how to behave in the aftermath of an unwanted sexual experience are not always, perhaps not even frequently, premeditated. The most common initial reaction is the wish to turn back time so that the assault could have been avoided. Women do not want to face the consequences of being a victim any more than a survivor of a car crash wishes to face the medical sequelae of an accident. Further, they do not want to have to ponder what lapses in judgment led them to trust their assailant or consider how little valued they must be if someone with whom they believed that they had a solid relationship would violate them. It is not possible for an act to be undone, all that can be hoped for is that a) there may be a face-saving explanation for the actions, and b) that there will be no negative consequences that result from the experience.

Seeking understanding is central to the human condition. Victims of acquaintance sexual misconduct almost always reach out to the offender via text, email, phone, or in person. The motivations for these communications are variable: some are looking for an apology; some want an understanding of the motivations of the perpetrator; for some it is an attempt to return a relationship to its baseline and others hope that the incident(s) did not merely mean that that they were debased as a sexual object, but that they are valued. The core of all of these transactions, however, is consistent – women are searching for a way to undo the damage.

The potential negative consequences for a woman who has been sexually assaulted or harassed extends beyond the psychological realm. Men who assault or harass women often utilize the differential power dynamic to further degrade the victim. These men can cause harm to the woman's personal and/or professional reputation, to their other relationships, and, if the perpetrator is in a position of professional authority, to the woman's ability to work in her chosen field. While individuals may overcome their personal psychological/emotional responses to sexual assault/harassment in time, especially if they enter therapy, the damage to areas outside of their control – like professional reputation – may be irreversible. Given this reality, continued interaction, especially friendly, positive, supportive, admiring contact, should be expected, not used as a way to discredit a victim.

Work is an essential part of personal identity, and sexual harassment or coercion in the workplace profoundly disrupts and distorts one's sense of self, leading to the possibility of long-term problems with health, depression, substance abuse, eating disorders, employment difficulties, and maintaining relationships. In fact, much literature has suggested that there is little difference between the long-term consequences of sexual assault and sexual harassment. Further, sexual harassment in the workplace is a form of discrimination. It can impact job opportunities, the manner in which one is perceived in the workplace, collegiality, colleague support, and other areas.

© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.

Although most research in workplace discrimination has focused on access discrimination (i.e., invalid differential access to jobs), there is growing evidence that treatment discrimination is often interpersonal in nature, and takes the form of verbal harassment, exclusion, microaggressions, bullying, and incivility.[106][107]Workplace discrimination may result in differences in pay, job status, and job type.[108] Perceived discrimination can lead to poor job attitudes (e.g., dissatisfaction) and negative job-related behaviors (e.g., withdrawal) in the form of increased sick days and decreased productivity.[109]

Exposure to workplace discrimination has been found to harm mental health from diminished psychological well-being and increased risk of psychological distress.[110] [111] [112] [113] In a meta-analysis, Pascoe  reviewed 110 studies on the effect of perceived discrimination on mental health. These papers showed that depressive symptoms, anxiety symptoms, posttraumatic stress symptoms, indicators of psychosis or paranoia, psychological distress, well-being, self-esteem, positive self-perceptions, life satisfaction, perceived stress, anger, positive and negative affect, happiness, perceived quality of life, and general mental health are all negatively impacted by discrimination.[114] Thus, ample evidence shows that discrimination is related to poorer physical and mental health.

One of the most consistent findings from the literature is that workplace harassment represents a potent interpersonal stressor, and as such it produces strain outcomes. Common to theories explaining the negative outcomes of strain is the understanding that stressors produce immediate physiological responses (e.g., increased heart rate and blood pressure), which may result in longer term strain.[115] A wide variety of negative physical health outcomes have been demonstrated in individuals who experience workplace harassment including hypertension, cardiovascular disease, diabetes, respiratory conditions, gastrointestinal conditions, neurologic conditions, as well as an increase in non-specific general medical problems. Chronic experiences of stress can also affect the levels of cortisol secreted in the body.  Sustained elevated levels of cortisol in the body are thought to be damaging to tissues and may lead to the dysregulation of biological systems.[116]

Adaptive coping responses are postulated to mitigate enduring psychological and physiological stress responses. Problem-oriented coping was also found to have a beneficial effect on distress, however, emotion/avoidance coping showed no benefit.  Subtle forms of discrimination may produce more stress because of their ambiguous nature. When an individual is subjected to subtle mistreatment, it may be unclear as to what underlies the behavior, and as a result, the individual may have difficulty deciding on a coping response.  Social support was more likely to buffer the relationship between perceived discrimination and negative mental health.

To combat these symptoms and the accompanying negative cognitions, sexual assault victims' behaviors in the aftermath of sexual assault is varied, some may retreat and isolate, some may deny the event(s), some may attempt to normalize the relationship with the perpetrator, and some may engage in self-destructive behaviors such as drinking, drug use or other risky behaviors. Eating

© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.

disordered, self-injurious, dangerous and/or suicidal behaviors are also seen. The length of time symptoms and maladaptive coping strategies persist is also variable, and depends on many factors, including the type and frequency of the assault(s), the relationship between the perpetrator and victim, and the victim's underlying psychological, medical, and social conditions.

Suicide is the most tragic consequence of sexual assault, and that children who are sexually abused are at higher risk for both attempted and completed suicide has been repeatedly demonstrated in the literature. There are fewer peer-reviewed articles focused on suicide in individuals who were sexually assaulted only as adults. Segal addressed this issue in college students, and concluded:

> *The general pattern was that mean RFL [Reason for Living] scores in the no victimization group were significantly higher than the mean scores in the sexual coercion and rape groups. An implication is that having a history of sexual victimization, especially sexual coercion and rape, limits one's later reasons for not committing suicide.*

It is estimated that 7.7 % of women and 14.6% of men who have been raped will have a medically-serious suicide attempt.[117] [118]

## Conclusion

The above discussion provides an overview of issues related to sexual assault of sexually mature females. Clearly, there are aspects of sexual assault that have not been addressed, such as medical problems following sexual assault, victims with cognitive or physical limitations, or case specific scenarios. However, matters that are present in most cases of sexual assault and common misperceptions about sexual assault have been reviewed.

Barbara Ziv, M.D.
April 6, 2023

© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.

[1] https://vetoviolence.cdc.gov/sites/all/themes/veto_bootstrap/assets/sv-landing/SV-MediaGuide-508c.pdf

[2] https://www.rand.org/pubs/research_briefs/RB9841.html

[3] Bohner, G., Reinhard, M., Rutz, S., Sturm, S., Kerschbaum, B., & Effler, D. (1998). Rape myths as neutralizing cognitions: Evidence for a causal impact of anti-victim attitudes on men's self-reported likelihood of raping. *European Journal of Social Psychology*, 28, 257–268.

[4] Lonsway, K. A., Cortina, L. M., & Magley, V. J. (2008). Sexual harassment mythology: Definition, conceptualization, and measurement. *Sex Roles*, 58, 599–615.

[5] Amir, M. (1971). Patterns in forcible rape. Chicago: University of Chicago Press.

[6] Curtis, L. A. (1974). Victim precipitation and violent crime. *Social Problems*, 21, 594−605.

[7] Goldner, N. S. (1972). Rape as a heinous but understudied crime. *Journal of Criminal Law, Criminology and Police Science,* 63, 402−407.

[8] Schultz, L. G. (1968). The victim–offender relationship. *Crime and Delinquency*, 14, 135−141.

[9] Wood, P. L. (1973). The victim in a forcible rape case: A feminist view. *American Criminal Law Review*, 2, 335−354.

[10] Calhoun, L. G., Selby, J.W., &Warring, L. J. (1976). Social perception of the victim's causal role in rape: An exploratory examination of four factors. *Human Relations*, 29, 517−526.

[11] Luginbuhl, J., & Mullin, C. (1981). Rape and responsibility: How and how much is the victim blamed? *Sex Roles,* 7, 547−559.

[12] Shaver, K. G. (1970). Defensive attribution: Effects of severity and relevance on the responsibility assigned for an accident. *Journal of Personality and Social Psychology*, 14, 101−113.

[13] Kruelwitz, J. E. (1981). Sex differences in evaluations of female and male victims' responses to assault. *Journal of Applied Social Psychology*, 11, 460−474

[14] Kruelwitz, J., & Payne, E. (1978). Attributions about rape: Effects of rapist force, observer sex and sex role attitudes. *Journal of Applied Social Psychology*, 8, 291−305.

[15] Bargh, J. A., Raymond, P., Pryor, J. B., & Strack, F. (1995). Attractiveness of the underling: An automatic power/sex association and its consequences for sexual harassment and aggression. *Journal of Personality and Social Psychology*, 68, 768–781.

© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.

[16] Greenwald, A. G., Banaji, M. R., Rudman, L. A., Farnham, S. D., Nosek, B. A., & Mellott, D. S. (2002). A unified theory of implicit attitudes, stereotypes, self-esteem, and self-concept. *Psychological Review*, 109, 3–25.

[17] Mussweiler, T., & Forster, J. (2000). The sex/ aggression link: A perception– behavior dissociation. *Journal of Personality and Social Psychology*, 79, 507–520.

[18] Sanchez, D. T., Crocker, J., & Boike, K. R. (2005). Doing gender in the bedroom: Investing in gender norms and the sexual experience. *Personality and Social Psychology Bulletin*, 31, 1445–1455.

[19] Anderson, C. and Berdahl, J.L. (2002), "The experience of power: examining the effects of power on approach and inhibition tendencies", *Journal of Personality and Social Psychology*, Vol. 83 No. 6, pp. 13-62.

[20] Galinsky, A., Gruenfeld, D.H., Magee, J.C. and Whitson, J.A. (2009), "Power reduces the press of the situation: creativity, conformity, and dissonance", *Journal of Personality and Social Psychology*, Vol. 95 No. 6, pp. 1450-1466.

[21] Lammers, J., Galinsky, A.D., Gordijn, E.H. and Otten, S. (2012), "Power increases social distance", *Social Psychological and Personality Science*, Vol. 3 No. 3, pp. 282-290.

[22] Magee, J.C., Galinsky, A.D. and Gruenfeld, D.H. (2007), "Power, propensity to negotiate, and moving first in competitive interactions", *Personality and Social Psychology Bulletin*, Vol. 33 No. 2, pp. 121-200.

[23] Keltner, D., Gruenfeld, D.H. and Anderson, C. (2003), "Power, approach, and inhibition", *Psychological Review*, Vol. 110 No. 2, pp. 265-284.

[24] Eastwick, P.W., Wilkey, B.J., Finkel, E.J., Lambert, N.M., Fitzsimons, G.M., Brown, P.C. and Fincham, F.D. (2013), "Act with authority: romantic desire at the nexus of power possessed and power perceived", *Journal of Experimental Social Psychology*, Vol. 49 No. 2, pp. 267-271.

[25] Bell, S. T., Kuriloff, P. J., & Lottes, I. (1994). Understanding attributions of blame in stranger rape and date rape situations: An examination of gender, race, identification and students' social perceptions of rape victims. *Journal of Applied Social Psychology*, 24(19), 1719−1734.

[26] Frese, B., Moya, M., & Megias, J. L. (2004). Social perception of rape: How rape myth acceptance modulates the influence situational factors. *Journal of Interpersonal Violence,* 19(2), 143−161.

[27] Ben-David, S., & Schneider, O. (2005). Rape perceptions, gender role attitudes, and victim-perpetrator acquaintance. *Sex Roles*, 53, 385-399.

[28] Rebeiz, M. J., & Harb, C. (2010). Perceptions of rape and attitudes toward women in a sample of Lebanese students. *Journal of Interpersonal Violence,* 25, 735-752.

© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.

[29] Simonson, K., & Subich, L. M. (1999). Rape perceptions as a function of gender-role traditionality and victim-perpetrator association. *Sex Roles*, 40, 617-634.

[30] Abrams, D., Viki, G. T., Masser, B., & Bohner, G. (2003). Perceptions of stranger and acquaintance rape: The role of benevolent and hostile sexism in victim blame and rape proclivity. *Journal of Personality and Social Psychology*, 84, 111-125.

[31] Buddie, A. M., & Miller, A. G. (2001). Beyond rape myths: A more complex view of perceptions of rape victims. *Sex Roles*, 45, 139-160.

[32] Jozkowski, K. N., & Peterson, Z. D. (2013). College students and sexual consent: Unique insights. *Journal of Sex Research*, 50, 517-523.

[33] Grubb, A. R., & Harrower, J. (2009). Understanding attribution of blame in cases of rape: An analysis of participant gender, type of rape and perceived similarity to the victim. *Journal of Sexual Aggression*, 15, 63–81.

[34] Grubb, A. R., & Turner, E. (2012). Attribution of blame in rape cases: A review of the impact of rape myth acceptance, gender role conformity and substance use on victim blaming. *Aggression and Violent Behavior*, 17, 443–452.

[35] White, S., & Yamawaki, N. (2009). The moderating influence of homophobia and gender role traditionality on perceptions of male rape victims. Journal of Applied Social Psychology, 39, 1116–1136.

[36] Yamawaki, N., & Tschanz, B. T. (2005). Rape perception differences between Japanese and American college students: On the mediating influence of gender role traditionality. *Sex Roles*, 52, 379–392.

[37] Talbot, K. K., Neill, K. S., & Rankin, L. L. (2010). Rape-accepting attitudes of university undergraduate students. *Journal of Forensic Nursing*, 6, 170–179.

[38] Block, R., & Skogan, W. G. (1986). Resistance and nonfatal outcomes in stranger-to- stranger predatory crime.

[39] Cohen, P. B. (1984). Resistance during sexual assaults: Avoiding rape and injury. *Victimology: An International Journal*, 9, 120–129.

[40] Wright, R., &West, D. J. (1981). Rape: A comparison of group offenses and lone assaults. *Medicine, Science and the Law,* 21,  25–3

[41] Porter, L. E., & Alison, L. J. (2006). Examining group rape: A descriptive analysis of offender and victim behavior. *European Journal of Criminology*, 3,  357–381.

[42] Woodhams, J., Hollin, C. R., Bull, R. & Cooke, C. (2012). Behavior displayed by female victims during rapes committed by lone and multiple perpetrators. *Psychology, Public Policy and Law*, 18, 415–452.

[43] Canan, S. N., Jozkowski, K. N., & Crawford, B. L. (2016). Sexual assault supportive attitudes: Rape myth acceptance and token resistance in Greek and non-Greek college students from two university samples in the United States. *Journal of Interpersonal Violence*, 1–29.

[44] Kitzinger, C. & Frith, H. (1999). Just say no? The use of conversation analysis in developing a feminist perspective on sexual refusal. *Discourse and Society*, 10, 293–316.

[45] Marcantonio, T. L., Jozkowski, K. N., & Lo, W. J. (2018a). Beyond "just saying no": A preliminary evaluation of strategies college students use to refuse sexual activity. *Archives of Sexual Behavior*, 47, 341–351.

[46] Beres, M. A. (2010). Sexual miscommunication? Untangling assumptions about sexual communication between casual sex partners. *Culture, Health & Sexuality*, 12, 1–14.

[47] Byers, E. S. (1988). Effects of sexual arousal on men's and women's behavior in sexual disagreement situations. *Journal of Sex Research*, 25, 235–254.

[48] O'Byrne, R., Rapley, M., & Hansen, S. (2006). "You couldn't say "No", could you?': Young men's understandings of sexual refusal. *Feminism & Psychology*, 16, 133–154.

[49] https://vetoviolence.cdc.gov/sites/all/themes/veto_bootstrap/assets/sv-landing/SV-MediaGuide-508c.pdf

[50] Von Werne Baes C, Tofoli SMC, Martins CMS, Juruena MF. Assessment of the hypothalamic-pituitary-adrenal axis activity: glucocorticoid receptor and mineralocorticoid receptor function in depression with early life stress – a systematic review. *Acta Neuropsychiatr* 2011;24:4–15.

[51] Wulsin AC, Herman JP, Solomon MB. Mifepristone decreases depression-like behavior and modulates neuroendocrine and central hypothalamic-pituitary-adrenocortical axis responsiveness to stress. *Psychoneuroendocrinology* 2010;35:1100–1112.

[52] Vreeburg SA, Hoogendijk WG, van Pelt J, et al. Major Depressive Disorder and Hypothalamic-Pituitary-Adrenal Axis Activity: Results From a Large Cohort Study. *Arch Gen Psychiatry*. 2009;66(6):617-626.

[53] Salvat-Pujol, Labad, Urretavizcaya, De Arriba-Arnau, Segalàs, Real, . . . Soria. (2017). Hypothalamic-pituitary-adrenal axis activity and cognition in major depression: The role of remission status. *Psychoneuroendocrinology, 76*, 38-48.

[54] Rubin, Robert T., Dinan, Timothy G., & Scott, Lucinda V. (2002). The Neuroendocrinology of Affective Disorders-97. In *Hormones, Brain and Behavior, Five-Volume Set* (pp. 467-514).

**© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.**

[55]Csabafi, Jászberényi, Bagosi, Lipták, & Telegdy. (2013). Effects of kisspeptin-13 on the hypothalamic-pituitary-adrenal axis, thermoregulation, anxiety and locomotor activity in rats. *Behavioural Brain Research, 241*(1), 56-61.

[56] Spencer, Xu, Clarke, Lemus, Reichenbach, Geenen, . . . Andrews. (2012). Ghrelin Regulates the Hypothalamic-Pituitary-Adrenal Axis and Restricts Anxiety After Acute Stress. *Biological Psychiatry, 72*(6), 457-465.

[57] Reeves, J., Fisher, A., Newman, M., & Granger, D. (2016). Sympathetic and hypothalamic-pituitary-adrenal asymmetry in generalized anxiety disorder. *Psychophysiology, 53*(6), 951-957.

[58] https://www.nsvrc.org/sites/default/files/publications_nsvrc_factsheet_media-packet_statistics-about-sexual-violence_0.pdf

[59] Sinozich, S. & Langton, L. (2014). Rape and sexual assault victimization among college-aged females, 1995-2013. U.S. Department of Justice, Bureau of Justice Statistics, 1-20.

[60] Stein, R. E., & Nofziger, S. D. (2008). Adolescent sexual victimization: Choice of confidant and the failure of authorities. *Youth Violence and Juvenile Justice*, 6,158–177.

[61] Truman, J. L. & Langton, L. (2014). Criminal victimization, 2013. U.S. Department of Justice, Bureau of Justice Statistics, 1-19.

[62] Kogan, S. M. (2004). Disclosing unwanted sexual experiences: Results from a national sample of adolescent women. Child Abuse and Neglect, 28, 147-165.

[63] Langan, P. A., Schmitt, E. L., & Durose, M. R. (2003). Recidivism of sex offenders released from prison in1994. Washington, DC: US Department of Justice, Bureau of Justice Statistics.

[64] Rennison, C. M. (2002). Rape and sexual assault: Reporting to police and medical attention, 1992-2000. Washington, DC: US Department of Justice, Office of Justice Programs

[65] Truman, J. L. & Langton, L. (2014). Criminal victimization, 2013. U.S. Department of Justice, Bureau of Justice Statistics, 1-19.
[66] McGregor, M. J., Wiebe, E., Marion, S. A., & Livingstone, C. (2000). Why don't more women report sexual assault to the police? *CMAJ, 162*(5), 659–660.

[67] Belknap, J. (2010). Rape: Too hard to report and too easy to discredit victims. *Violence Against Women, 16*(12), 1335– 1344.

[68] Carbone-Lopez, K., Slocum, L. A., & Kruttschnitt, C. (2016). "Police wouldn't give you no help": Female offenders on re- porting sexual assault to police. *Violence Against Women, 22*(3), 366–396.

**© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.**

[69] Whiting JB, Pickens JC, Sagers AL, PettyJohn M, Davies B. Trauma, social media, and #WhyIDidntReport: An analysis of twitter posts about reluctance to report sexual assault. *J Marital Fam Ther*. 2021;47:749–766.

[70] Adefolalu, A. O. (2014). Fear of the perpetrator: A major reason why sexual assault victims delayed presenting at hospital. *Tropical Medicine & International Health*, *19*(3), 342–347.

[71] Fisher, B. S., Daigle, L. E., Cullen, F. T., & Turner, M. G. (2003). Acknowledging sexual victimization as rape: Results from a national-level study. *Justice Quarterly*, 20, 535-574.

[72] Koss, M. P. (1985). The hidden rape victim: Personality, attitudinal, and situational characteristics. *Psychology of Women's Quarterly*, 9, 193-212.

[73] Layman, M. J., Gidycz, C. A., & Lynn, S. J. (1996). Unacknowledged versus acknowledged rape victims: Situational factors and posttraumatic stress. *Journal of Abnormal Psychology*, 105, 124-131.

[74] Muehlenhard, C. L., Powch, J. G., Phelps, J. L., & Giusti, L. M. (1992). Definitions of rape: Scientific and political implications. *Journal of Social Issues*, 48, 417-432.

[75] Newcombe, P. A., Van Den Eynde, J., Hafner, D., & Jolly, L. (2008). Attributions of responsibility for rape: Differences across familiarity of situation, gender, and acceptance of rape myths. *Journal of Applied Social Psychology*, 38, 1736-1754.

[76] Simonson, K., & Subich, L. M. (1999). Rape perceptions as a function of gender-role traditionality and victim- perpetrator association. *Sex Roles*, 40, 617-634.

[77] Yamawaki, N., Darby, R., & Queiroz, A. (2007). The moderating role of ambivalent sexism: The influence of power status on perception of rape victim and rapist. Journal of *Social Psychology*, 147, 41-56.

[78] Black KA, Gold DJ. Gender differences and socioeconomic status biases in judgments about blame in date rape scenarios. *Violence*. 2008

[79] Avina, C., & O'Donohue, W. (2002). Sexual harassment and PTSD: Is sexual harassment diagnosable trauma? *Journal of Traumatic Stress*, 15, 69–75.

[80] Ho, I. K., Dinh, K. T., Bellefontaine, S. A., & Irving, A. L. (2012). Sexual harassment and posttraumatic stress symptoms among Asian and White women. *Journal of Aggression, Maltreatment & Trauma*, 21, 95–113.

[81] Palmieri, P. A., & Fitzgerald, L. F. (2005). Confirmatory factor analysis of posttraumatic stress symptoms in sexually harassed women. *Journal of Traumatic Stress*, 18, 657–666.

[82] McDermut, J. F., Haaga, D. A, & Kirk, L. (2000). An evaluation of stress symptoms associated with academic sexual harassment. *Journal of Traumatic Stress*, 13, 397–411.

[83] Roosmalen, E. V., & McDaniel, S. A. (2008). Sexual harassment in academia: A hazard to women's health. *Women and Health*, 28, 33–54.

[84] Lapierre, L. M., Spector, P. E., & Leck, J. D. (2005). Sexual versus nonsexual workplace aggression and victims' overall job satisfaction: A meta-analysis. *Journal of Occupational Health Psychology*, 10, 155– 169.

[85] Shannon, C. A., Rospenda, K. M., & Richman, J. A. (2007). Workplace harassment patterning, gender, and utilization of professional services: Findings from a US national study. *Social Science & Medicine*, 64, 1178–1191.

**© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.**

[86] Chan, D., Chun, B., Chow, S., & Cheung, S. (2008). Examining the job related, psychological and physical outcomes of workplace sexual harassment: A meta-analytic review. *Psychology of Women Quarterly*, 32, 362–376.

[87] Bowling, N., & Beehr, T. (2006).Workplace harassment from the victim's perspective: A theoretical model and meta-analysis. *Journal of Applied Psychology*, 91, 998–1012.

[88] Willness, C. R., Steel, P., & Lee, K. (2007). A meta-analysis of the antecedents and consequences of workplace sexual harassment. *Personnel Psychology*, 60, 127–162.

[89] Newcombe, P. A., Van Den Eynde, J., Hafner, D., & Jolly, L. (2008). Attributions of responsibility for rape: Differences across familiarity of situation, gender, and acceptance of rape myths. *Journal of Applied Social Psychology*, 38, 1736-1754.

[90] Simonson, K., & Subich, L. M. (1999). Rape perceptions as a function of gender-role traditionality and victim-perpetrator association. *Sex Roles*, 40, 617-634.

[91] Yamawaki, N., Darby, R., & Queiroz, A. (2007). The moderating role of ambivalent sexism: The influence of power status on perception of rape victim and rapist. Journal of *Social Psychology*, 147, 41-56.

[92] Black KA, Gold DJ. Gender differences and socioeconomic status biases in judgments about blame in date rape scenarios. *Violence*. 2008

[93] Avina, C., & O'Donohue, W. (2002). Sexual harassment and PTSD: Is sexual harassment diagnosable trauma? *Journal of Traumatic Stress*, 15, 69–75.

[94] Ho, I. K., Dinh, K. T., Bellefontaine, S. A., & Irving, A. L. (2012). Sexual harassment and posttraumatic stress symptoms among Asian and White women. *Journal of Aggression, Maltreatment & Trauma*, 21, 95–113.

[95] Palmieri, P. A., & Fitzgerald, L. F. (2005). Confirmatory factor analysis of posttraumatic stress symptoms in sexually harassed women. *Journal of Traumatic Stress*, 18, 657–666.

[96] McDermut, J. F., Haaga, D. A, & Kirk, L. (2000). An evaluation of stress symptoms associated with academic sexual harassment. *Journal of Traumatic Stress*, 13, 397–411.

[97] Roosmalen, E. V., & McDaniel, S. A. (2008). Sexual harassment in academia: A hazard to women's health. *Women and Health*, 28, 33–54.

[98] Cantisano, G. T., Doḿinguez, J. F. M., & Depolo, M. (2008). Perceived sexual harassment at work: Meta-analysis and structural model of antecedents and consequences. *The Spanish Journal of Psychology, 11,* 207–218.

[99] Willness, C. R., Steel, P., & Lee, K. (2007). A meta-analysis of the antecedents and consequences of workplace sexual harassment. *Personnel Psychology, 60,* 127–162

[100] Lapierre, L. M., Spector, P. E., & Leck, J. D. (2005). Sexual versus nonsexual workplace aggression and victims' overall job satisfaction: A meta-analysis. *Journal of Occupational Health Psychology*, 10, 155–169.

[101] Shannon, C. A., Rospenda, K. M., & Richman, J. A. (2007). Workplace harassment patterning, gender, and utilization of professional services: Findings from a US national study. *Social Science & Medicine*, 64, 1178–1191.

**© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.**

[102] Chan, D., Chun, B., Chow, S., & Cheung, S. (2008). Examining the job related, psychological and physical outcomes of workplace sexual harassment: A meta-analytic review. *Psychology of Women Quarterly*, 32, 362–376.

[103] Bowling, N., & Beehr, T. (2006).Workplace harassment from the victim's perspective: A theoretical model and meta-analysis. *Journal of Applied Psychology*, 91, 998–1012.

[104] Willness, C. R., Steel, P., & Lee, K. (2007). A meta-analysis of the antecedents and consequences of workplace sexual harassment. *Personnel Psychology*, 60, 127–162.

[105] McDonald, P. (2012), Workplace Sexual Harassment 30 Years on: A Review of the Literature. International Journal of Management Reviews, 14: 1-17.

[106] Raver, J. L., & Nishii, L. H. (2010). Once, Twice, or Three Times as Harmful? Ethnic Harassment, Gender Harassment, and Generalized Workplace Harassment. *Journal of Applied Psychology*.

[107] Schneider, K. T., Hitlan, R. T., & Radhakrishnan, P. (2000). An examination of the nature and correlates of ethnic harassment experiences in multiple contexts. *Journal of Applied Psychology*, 85(1), 3–12.

[108] Goldman, B. M., Gutek, B. A., Stein, J. H., & Lewis, K. (2006). Employment Discrimination in Organizations: Antecedents and Consequences. *Journal of Management*, 32(6), 786–830

[109] Kendrich, M., Woodword, P., & Richman, J. A. (2002). The Structure of Harassment and Abuse in the Workplace: A Factorial Comparison of Two Measures. *Violence and Victims*, 17(4), 491–505

[110] Bhui, K., Stansfeld, S., McKenzie, K., Karlsen, S., Nazroo, J., & Weich, S. (2005). Racial/ethnic discrimination and common mental disorders among workers: Findings from the EMPIRIC study of ethnic minority groups in the United Kingdom. *American Journal of Public Health*

[111] Noor, N. M., & Shaker, M. N. (2017). Perceived workplace discrimination, coping and psychological distress among unskilled Indonesian migrant workers in Malaysia. *International Journal of Intercultural Relations*

[112] Banerjee, R. (2008). An examination of factors affecting perception of workplace discrimination. *Journal of Labor Research*

[113] Rospenda, K. M., Richman, J. A., & Shannon, C. A. (2009). Prevalence and mental health correlates of harassment and discrimination in the workplace: Results from a national study. *Journal of Interpersonal Violence*

[114] Pascoe, E. A., & Smart Richman, L. (2009). Perceived discrimination and health: a meta-analytic review. *Psychological Bulletin*, 135(4), 531–55

**© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.**

[115] Kahn, R. L. (2001). Stress in Organizations, Psychology of. *International Encyclopedia of Social & Behavioral Sciences, Pp.15179-15184*. Elsevier Ltd.

[116] Miller, G. E., Chen, E., & Zhou, E. S. (2007). If it goes up, must it come down? Chronic stress and the hypothalamic-pituitary-adrenocortical axis in humans. *Psychological Bulletin*, *133*(1), 25–45

[117] Tomasula JL, Anderson LM, Littleton HL, Riley-Tillman TC. The association between sexual assault and suicidal activity in a national sample. Sch Psychol Q. 2012;27(2):109–119.

[118] Chen LP, Murad MH, Paras ML, et al. Sexual abuse and lifetime diagnosis of psychiatric disorders: systematic review and meta-analysis. Mayo Clin Proc. 2010;85(7):618–629.

**© 2023 This memorandum may not be reproduced or disseminated without the expressed, written consent of its author, Barbara Ziv, M.D.**