# Exhibit C

1          UNITED STATES DISTRICT COURT
           MIDDLE DISTRICT OF FLORIDA
2             JACKSONVILLE DIVISION
3
4    VANESSA TREMINIO,
5             Plaintiff,
6
      -vs-            Case No:  3:22-cv-174-MMH-PDB
7
8    CROWLEY MARITIME CORPORATION;
     and JUAN EMILIO BLANCO,
9
              Defendants.
10   _____
11            Videotaped Deposition of
                 VANESSA TREMINIO
12
               Taken on behalf of
13       Defendant Crowley Maritime Corporation
14                 Pursuant to
         Notice of Taking Video Deposition
15
16   DATE TAKEN:  Monday, March 27, 2023
     TIME:        9:01 a.m. - 5:32 p.m.
17   PLACE:       Riley Reporting & Associates, Inc.
                  1300 Riverplace Boulevard, Suite 610
18                Jacksonville, Florida  32207
19
         Examination of the witness taken before:
20                Renee B. Farhat
           Registered Professional Reporter
21
22
     _____
23       RILEY REPORTING AND ASSOCIATES, INC.
         1300 RIVERPLACE BOULEVARD, SUITE 610
24          JACKSONVILLE, FLORIDA  32207
                 (904) 358-1615
25            info@rileyreporting.com

1       A P P E A R A N C E S
2       ADRIA G. NOTARI, Esquire,
           MICHELLE E. DURIEUX, Esquire (via Zoom),
3           Notari Law, P.A.
            1820 Southwest 14th Court
4           Fort Lauderdale, Florida 33312
            anotari@notarilaw.com
5           michelle@notarilaw.com
     -and-
6       J. RYAN MELOGY, Esquire,
           Maritime Legal Solutions, PLLC
7           276 Fifth Avenue, Suite 704-1454
            New York, New York 10001
8           maritimelegalsolutions@pm.me
9           appearing on behalf of Plaintiff.
10      KELLY DEGANCE, Esquire
           SAMANTHA GIUDICI BERDECIA, Esquire,
11          Alexander, DeGance, Barnett, P.A.
            1500 Riverside Avenue
12          Jacksonville, Florida 32204
            kelly.degance@adblegal.com
13          samantha.giudici@adblegal.com
     -and-
14      REECE B. ALFORD, Esquire,
           Crowley Maritime Corporation
15          9487 Regency Square Boulevard
            Jacksonville, Florida 32225
16
            appearing on behalf of
17          Defendant Crowley Maritime Corporation.
18      CHARLES MICHAEL WILLIAMS, Esquire,
           Law Office of C. Michael Williams
19          1710 Shadowood Lane, Suite 220
            Jacksonville, Florida 32207
20          seemichaelwilliams@gmail.com
21          appearing on behalf of
            Defendant Juan Emilio Blanco.
22
        ALSO PRESENT:
23      Francheska M. Bensan, VP, HR Business
           Partnering People & Culture, Crowley
24         Maritime Corporation
25      Jacques Barbe, Videographer

1              I N D E X
2       WITNESS                          PAGE
3       VANESSA TREMINIO
4           Direct Examination by Ms. DeGance . . . . . . 7
5           Cross-Examination by Ms. Notari . . . . . . . 310
6           Redirect Examination by Ms. DeGance . . . . . 322
7
8                    - - -
9
10         DEFENDANT CROWLEY'S EXHIBITS
11      Number     Description      For Identification
12      Exhibit 1  Crowley Code of Conduct        25
13      Exhibit 2  Position Summary               39
           Lead Inland Transportation
14
        Exhibit 3  Travel Itinerary, September 2017    98
15
        Exhibit 4  Travel Itinerary, November 2017    114
16
        Exhibit 5  Email Re            190
17         Job Posting: Coordinator Accounting
18      Exhibit 6  Messages Between Ramirez & Treminio  204
19      Exhibit 7  Email Re Vanessa's Rose       207
20      Exhibit 8  Email Exchange Re One on One    209
21      Exhibit 9  Email Re          214
           Conversation with Treminio, Vanessa
22
        Exhibit 10  Email Re One on One        218
23         Meeting Minutes/Comments
24      Exhibit 11  Email Exchange Re VAT Performance  219
           And 11/13/20 Potential Bond Claim
25

1       DEFENDANT CROWLEY'S EXHIBITS (cont'd)
2       Number     Description      For Identification
3       Exhibit 12  Email Exchange Re Important:     221
           RSM Team Tasks-Roles &
4          Responsibilities Document-Due EOB
5       Exhibit 13  Email Re 12/8/2020           221
           Sr Specialist Role Concerns Feedback
6
        Exhibit 14  Email Exchange Re 12/8/2020    223
7          Sr Specialist Role Concerns Feedback
8       Exhibit 15  Email Re Promo/Transfer Form   225
           (Supervisor, Accounting/GPS)
9
        Exhibit 16  Email Re Case of Sexual Assault   229
10
        Exhibit 17  Messages Between Treminio & Campos  231
11
        Exhibit 18  Email Exchange Re Att.        236
           Arthur LaMoureaux **CASO 2017**
12
13      Exhibit 19  Messages Between           238
           Treminio & Claudia Moran
14
        Exhibit 20  Email Exchange Re 1:1        239
15         Vanessa Treminio
16      Exhibit 21  Email Re Solicitud de        242
           Asistencia Educacional
17
        Exhibit 22  Email Re Notificacion        247
18         Terminacion de Contrato
19      Exhibit 23  Email Exchange with          259
           Mayora & Mayora
20
        Exhibit 24  Messages between Treminio     273
21         & Ayesha Diaz
22      Exhibit 25  Message to Jose Mario        293
23      Exhibit 26  Message to Claudia Kattan     294
24      Exhibit 27  Email Exchange Re Job Posting:   300
           Specialist, Accounting
25
        Exhibit 28  Code of Conduct in Spanish     301

1       DEFENDANT CROWLEY'S EXHIBITS (cont'd)
2       Number     Description      For Identification
3       Exhibit 29  Email Re Sexual Abuse Crime    302
           Suffered in Crowley Maritime Corporation
4
        Exhibit 30  Email Re Continuidad Case     305
5          Vanessa Treminio
6       Exhibit 31  Indemnisations              306
7       Exhibit 32  Interrogatories             308
8
9                    - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1     THE VIDEOGRAPHER:  Good morning.  Jacques
2  Barbe, videographer.  We're now on the video
3  record.
4     Please be aware the microphones are sensitive
5  and can pick up whispering, private
6  conversations, and cellular interference.  Please
7  silence all cell phones and place them away from
8  the microphone, as they can interfere with the
9  deposition audio.
10     Audio and video recording will continue to
11  take place unless all parties agree to go off the
12  record.
13     We're here recording live and as a remote
14  proceeding for the video deposition of Vanessa
15  Treminio.  The time is 9:01 a.m.  The date is
16  Monday, March 27th, 2023.
17     Would all counsel please state their
18  appearance for the record, and the witness will
19  be sworn in.
20     MS. NOTARI:  Adria Notari on behalf of the
21  plaintiff, Vanessa Treminio, together with
22  co-counsel for the plaintiff, Ryan Melogy, and
23  appearing by Zoom, Michelle Durieux.
24     MS. DEGANCE:  And I'm Kelly DeGance on behalf
25  of the defendant.  And with me is Samantha

1  Berdecia, who is a partner in my office; Reece
2  Alford, general counsel at Crowley; and
3  Francheska Bensan, who is vice president of human
4  resources at Crowley.
5     THE COURT REPORTER:  Can you raise your right
6  hand, please, ma'am.
7     THE WITNESS:  (Complies.)
8     THE COURT REPORTER:  Do you solemnly swear
9  the testimony you're about to give will be the
10  truth, so help you God?
11     THE WITNESS:  I do.
12        VANESSA TREMINIO,
13  having been produced and first duly sworn as a
14  witness on behalf of Defendant Crowley Maritime
15  Corporation, and after responding "I do" to the
16  oath, testified as follows:
17        DIRECT EXAMINATION
18  BY MS. DEGANCE:
19  Q  Good morning.
20  A  Good morning.
21  Q  So we met off record, but I'm Kelly DeGance.
22  And I'm going to be asking you some questions today;
23  okay?
24  A  Okay.
25  Q  So just to get started, I just want to kind

1  of cover some ground rules.
2     Have you ever taken -- ever had your
3  deposition taken before?
4  A  No.
5  Q  Okay.  I'm going to kind of explain how it's
6  going to go.
7     Would you start out by stating and spelling
8  your name.
9  A  My full name or my last name?
10  Q  Your full name.
11  A  My name is Vanessa Alexandra Treminio
12  de Parada.
13     And now I need to spell it?
14  Q  Spell your last name.
15  A  T-r-e-m-i-n-i-o.
16  Q  And then you said a name after that?
17  A  Okay.  D-e and then P-a-r-a-d-a.
18     THE COURT REPORTER:  G?
19     MS. NOTARI:  D, as in Delta.
20  BY MS. DEGANCE:
21  Q  Is it okay if I call you Ms. Treminio?
22  A  Yes.
23  Q  So I'm going to be asking you some questions,
24  and I would ask that you give me verbal answers,
25  because we have a court reporter who's transcribing

1  everything.  So it's important, for example, to say
2  yes or no versus uh-huh or uh-uh so that she can
3  transcribe what we're saying.
4     I will try to let you finish your answers
5  before speaking, and I would ask that you let me
6  finish my questions, just so we're not talking over
7  each other; okay?
8     We can take a break at any time.  I'll
9  generally take a break about every hour.  But if you
10  need to take a break at any time, just please say
11  so.  I'm happy to take a break.  I would just ask
12  that if we have a question pending, that you answer
13  the question before we take a break; okay?
14  A  Okay.
15  Q  Are you taking any medication this morning
16  that would impact your ability to understand my
17  questions?
18  A  No.
19  Q  You traveled here today for your deposition;
20  is that correct?  Or you traveled here for your
21  deposition today?
22  A  Correct.
23  Q  And when did you arrive in Jacksonville?
24     MS. NOTARI:  Objection to form.
25  BY MS. DEGANCE:

1    Q    What day did you arrive in Jacksonville for
2  your trip for the deposition?
3    A    On Friday night.
4    Q    Okay.  If I ask you a question and you don't
5  understand what I'm asking, just ask me to rephrase
6  it.  But if you answer it, I'm going to -- I'm going
7  to assume that you understood it; okay?
8         So you arrived Friday night in Jacksonville.
9  Did anyone travel with you on your flight over from
10  home?
11    A    Who specifically?
12    Q    Did anybody travel with you?
13    A    In the plane?
14    Q    Yes.
15    A    There was a lot of people.
16    Q    Anybody travel with you, accompany you from
17  home that you know?
18    A    No.
19    Q    No?
20    A    No.
21    Q    Okay.  And you live in El Salvador --
22    A    Correct.
23    Q    -- is that correct?
24         Were you born there?
25    A    Yes.

1    Q    And you're a citizen of El Salvador?
2    A    Yes.
3    Q    When is your return flight to El Salvador?
4  What day?
5    A    I don't know.
6    Q    You don't know what day you're scheduled to
7  fly home?
8    A    No.
9    Q    When you purchased your airplane ticket, did
10  you buy a round-trip ticket or a one-way to come
11  over here for your deposition?
12    A    I'm not sure.
13    Q    Did you make the flight arrangements
14  yourself?
15    A    I did not.
16    Q    So your testimony is you don't know when
17  you're scheduled to fly home to El Salvador?
18    A    No.
19    Q    You don't know how many days you're staying
20  here in Jacksonville?
21    A    No.
22    Q    What did you do to prepare for your
23  deposition today?
24    A    Can you be a little bit more specific?
25    Q    You knew that you were having a deposition

1  today; correct?
2    A    Correct.
3    Q    So in preparation for it, did you meet with
4  anybody?
5    A    I'm not sure if I understand correctly what
6  you're asking for.
7    Q    Okay.  Did you review any documents in
8  preparation for coming here today for your
9  deposition?
10    A    No.
11    Q    Did you have any meetings with anybody
12  besides your attorneys --
13    A    No.
14    Q    -- to discuss your deposition today?
15    A    No.
16    Q    And I assume you met with your attorneys;
17  correct?
18    A    Correct.
19    Q    And when did you meet with them to prepare
20  for your deposition today?
21    A    I saw them since the day I was here.
22    Q    Which was Friday night?
23    A    Correct.
24    Q    And I don't want to know anything that
25  you-all discussed, but how many times did you meet

1  with them?
2    A    I'm not sure.
3    Q    You flew in Friday night; right?
4    A    Correct.
5    Q    And you don't recall how many times you met
6  with your attorneys since then?
7    A    But when you said I met with them --
8    Q    Correct.
9    A    -- what -- to do specifically what?  Because
10  I'm in charge -- well, they are in charge of me, so
11  I have to be with them.
12    Q    Of course.  Absolutely.
13    A    I'm alone.
14    Q    I understand that.  I'm just asking:  How
15  many times did you meet with them prior to your
16  deposition?
17    A    I was with them --
18    Q    The whole time?
19    A    You can say that.
20    Q    Okay.  Since Friday night?
21    A    Yes.
22    Q    Are you all staying at the same hotel?
23    A    I do with one of them.
24    Q    Okay.  Which one?
25    A    With Adria.

1   Q   And have you -- when you met with them to
2   prepare for your deposition, was anyone else
3   present?
4   A   No.
5   Q   Just Ms. Notari and Mr. Melogy?
6   A   Correct.
7   Q   And you testified you haven't reviewed any
8   documents to prepare for your deposition today?
9   A   Correct.
10   Q   Other than the name that you stated at the
11   beginning of this deposition, have you ever gone by
12   any other names?
13   A   De Parada is my married name.  But I -- my
14   single name used to be Vanessa Alexandra Treminio
15   Castro.
16   Q   And spell the last name.  Castro?
17   A   C-a-s-t-r-o.
18   Q   And your married name is -- say it one more
19   time for me.
20   A   De Parada.
21   Q   De Parada.
22       When did you get married?
23   A   In 2019.
24   Q   Were you married before then?
25   A   No.

1   Q   That was your first marriage?
2   A   Correct.
3   Q   And what is your current residential address?
4   A   It is ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
5   ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
6   Q   Okay.  And so we're going to -- when we go
7   off the record, maybe you can spell that for the
8   court reporter.  You don't need to do it right now.
9   But when you go off the record, you'll have to spell
10   that; okay?
11   A   Okay.
12   Q   How long have you lived at that residence?
13   A   Approximately 15 years.
14   Q   You've lived in the same home for 15 years?
15   A   I have.  Well, that is my parents' house.  So
16   I used to live there with them.  Then I got married.
17   I went to another house for approximately three
18   years.  And then I came back because the house was
19   empty.  So I -- now I'm returning to my parents'
20   house.
21   Q   Okay.  And who lives there with you?
22   A   My husband, my two boys, and my sister.
23   Q   Okay.  How old are your two boys?
24   A   One is ten years old, and the youngest one is
25   three.

1   Q   In what year -- so the 10-year-old was born
2   in what year?  2003?
3   A   2013.
4   Q   Sorry.  2013?
5       And the three-year-old, what year was he
6   born?
7   A   2020.
8   Q   Do you have any plans to move anytime soon?
9   A   Not that I know.
10   Q   And you said your sister lives with you as
11   well?
12   A   Correct.
13   Q   How many siblings do you have?
14   A   With my sister, I have two more.
15   Q   You have a sister and then --
16   A   Two others.
17   Q   So there's four girls in your family?
18   A   We are, counting me, two girls, two boys.
19   Q   Okay.  So you have one sister and two
20   brothers?
21   A   Correct.
22   Q   And your sister who lives with you, does she
23   work for Crowley?
24   A   Correct.
25   Q   What's your date of birth?

1   A   ▇▇▇▇▇▇▇▇▇▇▇▇▇
2   Q   Ms. Treminio, do you have a cell phone?
3   A   I do.
4   Q   And what's your cell phone number?
5   A   With the area code?
6   Q   Yes, ma'am.
7   A   ▇▇▇▇▇▇▇▇▇
8   Q   And how long, approximately, have you had
9   that cell phone number?
10   A   I think -- I don't know.  It has been so
11   long.
12   Q   So you've had that number for a long time?
13   A   Yes.
14   Q   Do you recall having any other cell phone
15   number?
16   A   If I know the number?
17   Q   Well, approximately how long ago would you
18   say you had, maybe, a different cell phone number?
19   A   I cannot recall.
20   Q   And is that the only cell phone number that
21   you have right now?
22   A   Correct.
23   Q   Who is your cellular phone company, the
24   carrier, where you pay your cell phone bills?
25   A   Claro El Salvador.

1    Q    And we'll have to spell that as well.
2    A    Do you want me to spell it?
3    Q    Yeah.  Go ahead.
4    A    C, as in Charlie; L, as in lion; A, as in
5    apple; R, as in Romeo; O, as in Oscar; then
6    El Salvador.
7    Q    Okay.  Thank you.
8         Would you briefly tell me about your
9    educational background.  Where did you go to -- I
10   don't know if the schools are the same as in the
11   United States.  But tell me about your schooling.
12   A    I did my bachillerato in Colegio Santa Ines.
13   And then I graduated in 2008.  Then I have a
14   bachelor's degree in business administration.  And I
15   recently got the master's degree in logistics and
16   management operation.
17   Q    Where did you obtain your bachelor's degree?
18   A    In Bircham University.
19   Q    And how do you spell Bircham?
20   A    B, as in boy, i-r-c-h-m-a-n {sic}.
21   Q    And what year did you obtain your bachelor's
22   degree?
23   A    The bachelor's, I cannot recall the exact
24   date.
25   Q    Okay.

1    A    But my master's degree, I got it November of
2    last year.
3    Q    November of 2022?
4    A    Correct.
5    Q    Where did you earn your master's degree?
6    A    What do you mean?
7    Q    At what school or university?
8    A    Bircham University.
9    Q    Same one?
10        So you obtained your bachelor's degree and
11   master's degree both at Bircham?
12   A    Correct.
13   Q    And where is Bircham?
14   A    It's a Spain university.
15   Q    It's in Spain?
16   A    Correct.
17   Q    So was this an online program?
18   A    They have a location in El Salvador.
19   Q    And then in 2008, was that the equivalent of,
20   like, a high school diploma?
21   A    I'm not sure how high school is here, but
22   it's -- when you go to school, it's the last degree
23   that you can get --
24   Q    Before you go to --
25   A    -- so you can go to university.

1    Q    Okay.  Thank you.
2         Any other degrees or schooling other than
3    what you mentioned?
4    A    No.
5    Q    Before coming to work at Crowley, which we're
6    going to talk about today, where did you work?
7    A    I used to work in a lot of contact centers.
8    Q    So what are contact centers?
9    A    I don't know if you guys know them by call
10   centers.
11   Q    And so what types of job duties did you have
12   working in contact centers?
13   A    Receiving customer calls to handle disputes.
14   Q    And approximately how long did you work in
15   different contact centers before coming to join
16   Crowley?
17   A    I cannot recall.
18   Q    How old were you when you started working at
19   Crowley?
20   A    Around 20 or 21 years old.
21   Q    When you started working for Crowley, had you
22   already earned your bachelor's degree?
23   A    No.
24   Q    So you earned your bachelor's degree after
25   you started working for Crowley?

1    A    Correct.
2    Q    And did you take your classes at Bircham for
3    your bachelor's degree in person or online?
4    A    Part in person, and then, due to the
5    pandemic, I had to finish online.
6    Q    Did you earn your bachelor's degree at some
7    point during the pandemic?
8    A    No.  The bachelor's degree was fully in
9    person.
10   Q    It was -- it was in person?
11   A    The bachelor's degree was.
12   Q    And you said before you don't remember when
13   you earned your bachelor's degree?
14   A    It had to be something between 2020,
15   approximately, because I can't remember.
16   Q    Do you remember approximately how long it
17   took you to earn your master's degree?
18   A    Approximately two years.
19   Q    When did you first begin your employment with
20   Crowley?
21   A    March 2012.
22   Q    And was that with Crowley Shared Services?
23   A    It was for Crowley.
24   Q    Okay.
25   A    I don't know the legal entity.  I just know

6 (Pages 18 - 21)

1  Crowley.
2      Q   And was it in San Salvador?
3      A   Correct.
4      Q   And what role was your very first job with
5  Crowley?
6      A   I started as a credit and collections
7  coordinator.
8      Q   And as a credit and collections coordinator,
9  generally what were your job duties?
10      A   I was in charge of reviewing and sending
11  customer statements to make sure that the payments
12  were coming on time to the company from customers
13  and, in case we would experience a delay, contact
14  the customer to see if they used to have a dispute
15  so I can get another department involved so we can
16  solve it and then they can make the payment.
17      Q   And when you first started with Crowley in
18  2012, who was your supervisor, your direct
19  supervisor?
20      A   Adelaida Mendez.
21      Q   I'm sorry.  Can you spell that name?
22      A   Okay.  I'll do my best.
23      Q   It's okay.
24      A   A-d-e-l-a-i-d-a.
25      Q   D-a?

1      A   D-a.  Adelaida.
2      Q   And then last name?
3      A   M-e-n-d-e-z.
4      Q   Mendez?
5      A   Correct.
6      Q   Sounds prettier when you say it.
7          And approximately how long was Ms. Mendez
8  your supervisor?
9      A   I was -- I was in credit and collections
10  about -- approximately three years.
11      Q   When you first started with Crowley, when you
12  very first started your first job, do you remember
13  anyone -- meeting with anyone from human resources,
14  you know, to go over some of your new-hire
15  paperwork?
16      A   I don't recall.  No, I don't recall seeing
17  someone at human resources.
18      Q   Do you remember receiving any type of
19  paperwork on, maybe, one of your first days that you
20  had to fill out for things like taxes and forms like
21  that?
22      A   I do.
23      Q   Do you remember who you met with to perform
24  that function?
25      A   The person that gave me the papers?

1      Q   Correct.
2      A   I cannot recall the name, but it was the
3  receptionist at that time.
4      Q   At the office?
5      A   Correct.
6      Q   And that receptionist was in the same
7  building where you were working?
8      A   Where I was about to work?
9      Q   Correct.
10      A   Yes.
11      Q   In your first job with Crowley, where --
12  describe your work space.  Did you work in a
13  cubical?  Did you have an office?  Just describe
14  where you worked.
15      A   In Crowley, we have -- we used to have --
16  well, I used to have a cubical.
17      Q   So you were in a cubical.  And I'm assuming
18  Crowley had an office building, is that right, or a
19  floor?  Describe Crowley's office generally.  Was it
20  a building?
21      A   It was a two-floor building.
22      Q   So it was a two-story building?
23      A   Yeah.  I think the correct word is building.
24  It's just a building where only Crowley employees
25  were working.

1      Q   Okay.  So only Crowley employees were working
2  in the building.  And there were two floors to the
3  building?
4      A   Correct.
5      Q   And you were in a cubical when you started?
6      A   Correct.
7      Q   What floor were you on?
8      A   The second floor.
9      Q   Do you recall whether you received an
10  employee handbook when you started?
11      A   An employee --
12      Q   Any type of handbook, company handbook?
13      A   What do you mean about it?
14      Q   Well, let me show you this.  We'll mark this
15  as Defendant's Exhibit No. 1.  And I'm going to ask
16  you if you've seen this before.
17          MS. DEGANCE:  And there's an English version
18      and a Spanish version, and we're going to use --
19      they will be Composite Exhibit 1.  I'm going to
20      ask her about both.
21          (Defendant Crowley's Exhibit No. 1 was marked
22      for identification.)
23  BY MS. DEGANCE:
24      Q   So take a look at these two documents.  One's
25  in English and one's in Spanish.

1  A  Okay.
2  Q  And tell me if that's a document you recall
3  receiving during your employment or at the beginning
4  of your employment.
5  A  Maybe. I'm not sure that I received it when
6  I got hired, but maybe I saw it later on. I cannot
7  recall, to be honest.
8  Q  During your employment with Crowley, did you
9  have access to the company's intranet site?
10  A  Yes.
11  Q  And you had a company email?
12  A  Provided by Crowley? Like a corporate email?
13  Q  Correct.
14  A  To communicate with customers?
15  Q  Yes.
16  A  I did.
17  Q  And as part of your job, did you have access
18  to a company computer?
19  A  Yes.
20  Q  And could you access -- did Crowley have a
21  site that you could go to as an employee to access
22  certain documents or that sort of thing?
23     MS. NOTARI: Objection to form.
24  BY MS. DEGANCE:
25  Q  Company-related documents?

1  A  What type of documents do you mean?
2  Q  So, for example, like the code of conduct or
3  the employee handbook, were you aware that there was
4  a site -- an intranet site you could go to, a
5  Crowley site for employees, where you could access
6  the type of company documents like the ones in front
7  of you?
8  A  Yes.
9  Q  And did you have access to that site?
10  A  Yes.
11  Q  Were you familiar, when you were at Crowley,
12  of what's called the EthicsPoint Hotline?
13  A  I was.
14  Q  So you were aware of what that was?
15  A  Yes.
16  Q  In your very first job with Crowley, was
17  there any business travel required? Did you have to
18  travel for business at all in your very first job in
19  2012?
20  A  When I first started as a credit and
21  collections?
22  Q  Correct.
23  A  Credit and collections, no.
24  Q  How long, approximately, if you remember,
25  were you in that credit and collections role?

1  A  Approximately three years.
2  Q  And at some point did you move to a different
3  role within Crowley?
4  A  Correct.
5  Q  Do you remember what the next role was that
6  you -- that you assumed at Crowley?
7  A  I was working for customized brokers.
8  Q  Were you -- was it called something like a
9  specialist import role?
10  A  I don't recall the position, but it was
11  something about import.
12  Q  And how did your job differ? What did you do
13  in that role?
14  A  For customized, I was in charge of preparing
15  custom documents for clients to be able to take out
16  the cargo on time and avoid delays on customs.
17  Q  Okay. And who was your supervisor when you
18  were in that role?
19  A  My boss was Fernando Lievano.
20  Q  And how long was Fernando Lievano your
21  supervisor?
22  A  Approximately less than two years.
23     (Attorney C. Michael Williams entered the
24     conference room.)
25  BY MS. DEGANCE:

1  Q  When you were in that role, how were you
2  paid? Were you paid by a salary or were you paid
3  per hour?
4  A  I had a salary.
5  Q  You were paid salary? Do you recall what the
6  salary was?
7  A  I cannot.
8  Q  Okay. That's okay.
9     And did you ever complain when you were in
10  that role that you weren't being paid properly?
11     MS. NOTARI: Objection to form.
12  BY MS. DEGANCE:
13  Q  Did you have any complaints about your -- did
14  you make any complaints about your pay to Crowley
15  when you were in that role?
16  A  I don't remember.
17  Q  Did your role at some point change again; do
18  you recall?
19  A  Which specific time are you asking?
20  Q  Did you move at some point into a specialist
21  import role or inland transportation?
22  A  You're asking me about inland?
23  Q  No. I'm asking you if you moved from that --
24  the role that we just talked about where Fernando
25  was your supervisor. Didn't you then move to

1 another role within Crowley?
2   A  Correct.
3   Q  And was that around September 2014?
4   A  After customized broker, I was moved to
5 inland in 2017.
6   Q  Okay. So that wasn't until 2017?
7   A  Correct.
8   Q  Okay. So when you were in the customized
9 broker role, you said that you didn't think you
10 traveled at all for your job?
11   A  No. I did that for -- I told you that for
12 credit and collections.
13   Q  And so what about in the import role? Did
14 you travel at all for your job?
15   A  I'm sure that I traveled once, but I cannot
16 recall if I did more trips with them.
17   Q  And do you recall taking a business trip on
18 or around -- it was August 17th, 2015, and you went
19 from El Salvador to Miami?
20   A  I do.
21   Q  Okay. You remember that. Is that the trip
22 that you were thinking about?
23   A  Correct.
24   Q  What was -- and who was your supervisor at
25 that time? Was it Fernando?

1   A  Fernando was my manager.
2   Q  Okay. Was he your direct supervisor?
3   A  I don't recall at what time Bessie Vallejos
4 became my supervisor. But most of my direct
5 communications was with Fernando Lievano, due to the
6 type of work I was doing.
7   Q  What was the purpose of the business trip to
8 Miami in 2015?
9   A  They took us to bring the process -- or take
10 the process to El Salvador from Miami's office for
11 the customs part.
12   Q  And so what were you -- so explain that a
13 little bit more.
14     So you were asked to go to Miami. And what
15 were you going to do while you were there?
16   A  I was requested to go with other peers for
17 customs training in Crowley so we were able to go
18 back to El Salvador and implement the department
19 there.
20   Q  Okay. So you came to Miami to -- you were
21 given some training in Miami?
22   A  I was given a training. Yes.
23   Q  And who -- who came to you and told you
24 would be going on that business trip in 2015?
25   A  I was told by Fernando and, if I'm not

1 mistaken, also by Kyra Roca.
2   Q  Did you have any objection to going on that
3 particular trip?
4   A  No.
5   Q  And explain -- when you go on a business trip
6 with Crowley -- or for Crowley, doesn't Crowley have
7 some type of travel department that helps coordinate
8 the travel?
9   A  At that time, I'm not sure.
10   Q  Do you remember when you took that 2015 trip
11 whether you had to arrange the flights and
12 reservations or whether Crowley did it for you?
13   A  It was did by Jennifer Lainez.
14   Q  How do you spell that?
15   A  Yes. L-a-i-n-z {sic}.
16   Q  And who was that?
17   A  She was -- I don't recall her title, but she
18 was the assistant of -- I cannot recall the name of
19 the person in Miami that she was working for.
20   Q  And so she arranged your travel for you?
21   A  Correct.
22   Q  Did she make your flight arrangements for
23 you?
24   A  She did.
25   Q  Did the company pay for the flight directly,

1 or did you have to pay for it and get reimbursed
2 from the company?
3   A  They did it.
4   Q  They did it directly?
5     Did she also make your hotel reservations in
6 Miami?
7   A  I cannot recall if she was -- if it was her
8 or the travel department. I'm not sure. I was just
9 given through email, but I cannot recall --
10   Q  Okay.
11   A  -- who that email came from.
12   Q  Right. But in any event, someone within
13 Crowley made the travel arrangements for you?
14   A  Correct.
15   Q  And did Crowley also choose which hotel you'd
16 be staying at while you were there?
17   A  Correct.
18   Q  Did you rent a car while you were in Miami on
19 that 2015 trip?
20   A  Me, personally?
21   Q  Uh-huh.
22   A  I did not.
23   Q  Did Crowley arrange for a rental car for you?
24   A  They did for the person that was in charge of
25 us.

1    Q   Okay.  So you traveled with someone else from
2   Crowley on that trip?
3    A   I did.
4    Q   Do you remember who you traveled with?
5    A   Fernando Lievano.  So he rented the car.
6   Denisse Mancia, Cesar Herrera, Andrea -- I can't
7   recall her last name and -- those are the people
8   that are on top of my...
9    Q   In your department?
10    A   Yes.  They are part of the customized broker.
11    Q   Okay.  And so this was the 2015 trip; right?
12    A   Right.
13    Q   So when you would travel -- well, let me ask
14   you this:  Do you have a United States passport?
15    A   I have a visa.
16    Q   Okay.  You have a visa, and then you have a
17   passport from El Salvador?
18    A   Correct.
19    Q   When you would travel for business, what
20   types of expenses would Crowley actually reimburse
21   you for?
22    A   The ones that I can recall, the ones allowed
23   was food, snacks, and personal items.  For example,
24   if you forgot your toothpaste, I think is the name;
25   right?  Or maybe if you want shampoo.  So those

1   types of personal items.
2    Q   Did you own a personal vehicle at the time?
3    A   Where?
4    Q   Back in 2015 in El Salvador, did you own a
5   car?
6    A   Mine?
7    Q   Yes.  Did you have a car?  You owned --
8    A   I did.
9    Q   Is that a car that Crowley paid for, or no?
10    A   No.
11    Q   So you paid for your own car?
12    A   Yes.
13    Q   Would Crowley ever pay for your gas while you
14   were in El Salvador?
15    A   You can say it like that.
16    Q   And so how were you able to -- how was
17   Crowley paying -- under what circumstances was
18   Crowley paying for your gas in El Salvador?
19    A   Okay.  There was a time where we used to be
20   in Export Salva.  And the road was getting fixed.
21   So they were encouraging employees to get --
22   carpooling with each other.  And our entrance time
23   at that situation was 5:00 a.m.  So we needed to
24   pass by that road prior to 4:30 in the morning so we
25   could be -- or, I think, 4:00 -- or between 4:00 and

1   4:30.  And if you were doing carpooling, Crowley
2   used to offer you money for it, because we used to
3   spend a lot of time in traffic.
4    Q   Okay.  And was this carpooling to and from
5   the office?
6    A   From your house to your office.
7    Q   And so what would -- and did you carpool?
8    A   I did.
9    Q   Okay.  Around what time period was this that
10   Crowley was providing this payment if you carpooled?
11    A   I cannot recall.
12    Q   And what specifically was Crowley paying you?
13   I mean, were you being paid for mileage?  Were you
14   being paid for gas?  How was that working?
15    A   It was a type of a bonus.
16    Q   Okay.
17    A   I cannot recall if it was around a $50 bonus.
18    Q   So if --
19    A   It could be more.
20    Q   So if you participated in this carpool around
21   this time, you would get some type of bonus for it?
22    A   Correct.  I'm not sure if every employee
23   applied for that bonus, even the ones that were not
24   able to do carpooling.  But for me and the persons
25   that I was traveling with every day, all of us,

1   we -- we had access to it.
2    Q   But when we're talking about business travel
3   out of the country, right, to the United States,
4   Crowley would reimburse you just for food and any
5   necessities, like toothpaste, that type of thing,
6   that you needed?
7    A   To me personally?
8    Q   Correct.
9    A   Yes.  Because since I was not renting a car,
10   no gas was needed.
11    Q   Right.  And when you traveled with Crowley,
12   you said you had an El Salvador passport and then a
13   visa; correct?
14    A   Correct.
15    Q   And when you traveled, would you hang onto
16   your passport and your visa during your entire trip?
17    A   Here in the U.S.?
18    Q   Correct.
19    A   Yes.
20    Q   Did you eventually move -- I think you
21   mentioned it earlier.  You eventually moved from
22   that import role into a specialist land
23   transportation in the inland department; is that
24   right?
25    A   No.

1   Q   Okay. Where did you -- in 2017, May 2017
2   specifically, what role did you move into?
3   A   I was degraded to -- I don't know if that's
4   the proper word. But instead of being a specialist,
5   I was moved to the inland department as a
6   coordinator. So one level down.
7   Q   So you're saying it was a demotion?
8   A   Demotion. Thank you.
9   Q   Okay. Land -- say that again. Land
10  specialist --
11  A   Inland coordinator.
12  Q   Inland coordinator. And that was in
13  May 2017?
14  A   Yes. I cannot recall if it was May, but it
15  was between May and June.
16  Q   And did anyone explain to you why you were
17  being demoted?
18  A   Customized brokers took the work back to the
19  U.S. due to customs regulations, and basically the
20  department needed to be transferred back again to
21  the United States. So they said, "We will try to
22  relocate it in other departments and, if not, we
23  will let you go."
24  Q   Okay. And then you were relocated?
25  A   I was relocated.

1   Q   And just going back for a minute, you started
2   at Crowley in 2012; correct?
3   A   Correct.
4   Q   So did you have your first child while you
5   were working for Crowley?
6   A   Correct.
7   Q   And you took maternity leave?
8   A   I did.
9   Q   And did you have any issue with that, as far
10  as being able to come back to your job?
11  A   I cannot recall.
12  Q   But you came back to work after having the
13  baby and taking time off?
14  A   Correct.
15  Q   Okay. And I'm going to show you a job
16  description that we'll mark as Defendant's Exhibit
17  No. 2.
18      (Defendant Crowley's Exhibit No. 2 was marked
19      for identification.)
20  BY MS. DEGANCE:
21  Q   And I want to ask you if you have seen this
22  before. Take a look at it.
23      And this is -- it says "Lead Inland
24  Transportation." Do you see that?
25  A   I do.

1   Q   And so is this the job that you were just
2   describing that you began in 2017?
3   A   No, because you can see that the title says
4   "lead." And I was a lead -- that was my last
5   position in Crowley.
6   Q   Okay. So this was your last position in
7   Crowley?
8   A   Correct.
9   Q   And so when you started out in the inland
10  transportation role, you were a coordinator, which
11  is below a lead?
12  A   Like, the first level of the organization.
13  Q   And do you recall in what year you became a
14  lead?
15  A   I cannot recall exactly, because, to get into
16  lead, I had to be inland coordinator. Then they
17  moved me to the DFTS team. And there I think the
18  name of -- it was something about senior specialist
19  or lead. I don't know if it was lead. And then I
20  went back to lead on transportation.
21  Q   So this was your final role?
22  A   I cannot recall -- now that I was talking, I
23  cannot recall if this one was the last one, because
24  they changed my title because -- due to a
25  reorganization or something like that. My salary

1   didn't change, but my title did. So I cannot recall
2   if it was this one or senior specialist
3   transportation.
4   Q   But at some point you did work as a lead in
5   inland transportation?
6   A   I did.
7   Q   Okay. And during the time you worked in this
8   role, lead inland transportation, if you'd just take
9   a quick look, does this -- were these your general
10  responsibilities, would you say, that are listed
11  here?
12  A   Can I review it?
13  Q   Yes. Absolutely. Take your time.
14  A   (Reviewing document.)
15      It seems like it.
16  Q   Okay. And you said that you worked -- you
17  worked first as a coordinator, and then you moved to
18  DFTS, and then you moved to lead. You know, you had
19  a progression, is that right, of different jobs?
20  A   I wasn't sure that it was -- I know that it
21  was inland, DFTS, and then go back to inland. That
22  was my last position, in inland. But I cannot be
23  sure the titles.
24  Q   Okay. And do you recall who -- who made the
25  decision -- or are you aware of who decided that you

1 were going to move to DFTS and then -- do you know?
2 A No.
3 Q Who was your supervisor when you started as a
4 coordinator in inland transportation in 2017?
5 A Juan Blanco.
6 Q And did Juan -- were you still at the time
7 working in that two-story Crowley building that we
8 talked about earlier?
9 A We moved from that office to one located in
10 San Salvador.
11 Q And do you recall about when that move was?
12 A I cannot recall.
13 Q When you started in this inland
14 transportation role in 2017, had you already moved
15 to the other building?
16 A I did.
17 Q And describe that for me. Was -- did Crowley
18 occupy that entire building?
19 A As far as I can remember, Crowley employees
20 in that building were floor numbers three, four, and
21 five. The rest of the floors belongs to other
22 companies.
23 Q Okay. And what floor -- when you were in
24 this inland transportation role as a coordinator,
25 what floor were you on?

1 A The fifth.
2 Q Were you on the fifth floor, then, for the
3 remainder of your employment at Crowley?
4 A Yes.
5 Q Were you in -- describe your workspace. Was
6 it a cubical? Did you have an office?
7 A Cubical.
8 Q It was a cubical.
9 And did Juan Blanco have a workstation or
10 workspace in that same building?
11 A Yes.
12 Q And where -- did he have an office or a
13 cubical?
14 A Cubical.
15 Q Where was his cubical in relation to yours?
16 A All -- when you have teams in Crowley,
17 basically you sit almost in the same area. But I
18 cannot recall where he was sitting.
19 Q Was he on -- was his workspace on the same
20 floor as yours?
21 A Yes.
22 Q So you were both on the fifth floor?
23 A Yes.
24 Q How much contact would you typically have
25 with Juan Blanco throughout your workday?

1 MS. NOTARI: Objection to form.
2 BY MS. DEGANCE:
3 Q At the beginning, when you first started as a
4 coordinator, right, and you first started reporting
5 to Juan Blanco, how much interaction would you have
6 with him during the workday; meaning, how often
7 would you see him in the course of a workday,
8 generally?
9 A My work hours?
10 Q No. How often -- I want to know how often
11 you interacted with Juan Blanco. In other words,
12 did you work with him directly every day? How often
13 did you see him?
14 A When it was needed.
15 Q Okay.
16 A Because he was my immediate --
17 Q Supervisor?
18 A Correct.
19 Q And so would you say that you saw him on a
20 daily basis?
21 A Probably.
22 Q Okay. And do you recall -- when you first
23 started as a coordinator, do you recall who Juan
24 Blanco's supervisor was?
25 A No.

1 Q You don't know who Juan Blanco reported to?
2 A No. You should ask him.
3 Q Okay. But I'm asking you right now. You
4 don't know?
5 A My -- in my knowledge, I don't know.
6 Q Okay. When you --
7 A Prior to inland? Prior to inland; right?
8 No, I don't know.
9 Q No. I'm saying -- no. When you worked for
10 him, when you began working for him in inland --
11 A Uh-huh.
12 Q -- do you have any knowledge of who his
13 supervisor was?
14 A Oh, yeah. The manager was Jose Lopez.
15 Q And as far as you know, okay, was Jose
16 Lopez -- did Jose Lopez continue to be the manager
17 through the end of Mr. Lopez's employment -- or
18 Mr. Blanco's employment, I guess?
19 A I cannot recall.
20 Q You don't know if Jose Lopez stayed the
21 manager over Juan Blanco throughout the remainder of
22 Juan Blanco's employment?
23 A I cannot recall who went out first. So --
24 but I knew that my supervisor in El Salvador was
25 Juan Blanco, and we didn't have a manager there.

1 The manager was located in the Jacksonville
2 corporate office. So it was Jose Lopez.
3 Q Did you -- back when you worked for inland
4 transportation, did you have any contact with Jose
5 Lopez in your role?
6 A I did.
7 Q Okay. How often would you communicate, would
8 you say, with Jose Lopez?
9 A Not that -- very often.
10 Q Did Mr. Lopez come to your office in
11 San Salvador ever?
12 A I have in the top of my mind once. I'm not
13 sure if he did more travel.
14 Q But you remember seeing him one time at your
15 office?
16 A Correct.
17 Q How many times -- how many times have you met
18 Jose Lopez in person?
19 A I cannot recall. I met him once, I'm sure,
20 in El Salvador, and I'm sure once in the United
21 States. But it could be many others. I don't
22 recall.
23 Q You don't remember?
24 A Yeah. But I'm sure about two.
25 Q Okay. How was your -- so let's go back to

1 when you first started reporting to Juan Blanco.
2 A Okay.
3 Q How was your relationship with him?
4 A It was professional from my side. I tried
5 to. And our -- our interactions were most of the
6 times about work-related stuff.
7 Q During the time you worked in inland
8 transportation -- and I'm talking about prior to
9 November 2017; okay? -- did you ever socialize with
10 Juan Blanco?
11 A What do you mean "socialize"?
12 Q Have you ever been out to lunch with him?
13 Had you ever gone out to lunch with him?
14 A By myself?
15 Q Well, let's start out with by yourself.
16 A Not that I recall.
17 Q What about with a group of people?
18 A It's a practice very often in Crowley.
19 Q And what about after work? Had you ever been
20 out with Juan Blanco for drinks with a group of
21 people?
22 A Yes.
23 Q How often would you say?
24 A Just for -- the time I can remember, it was
25 for his birthday.

1 Q How many times for his birthday? One year?
2 More than one year?
3 A I only went to one that he requested
4 permission for -- to take us out early. So they let
5 us be out of the office to go to celebrate his
6 birthday approximately two or three hours before our
7 work shift was ended.
8 Q Do you recall when that was, approximately
9 what year?
10 A I cannot recall.
11 Q It was prior --
12 A No. The year, it had to be in 2017.
13 Q 2017?
14 Do you know what month his birthday was?
15 A No.
16 Q So the only time you've been out for drinks
17 after work with Juan Blanco and a group was that one
18 time?
19 A In El Salvador?
20 Q Correct.
21 A In El Salvador, that's the one that I have in
22 the top of my mind. I do not recall if we did
23 another celebration or team gathering. They used to
24 call it bonding activities.
25 Q Do you recall where that birthday celebration

1 was?
2 A I don't recall the name. I think it was
3 something about Aloha, I think, but I will not be
4 100 percent sure that that was the name.
5 Q And you don't recall when in 2017 that was?
6 A No.
7 Q Have you ever been out for drinks with just
8 you and Juan Blanco?
9 A Just me and him in San Salvador?
10 Q Correct.
11 A No.
12 Q What about in the United States?
13 A By ourself, I don't think so.
14 Q And you don't remember ever going -- and
15 you've never been to lunch with him by yourself?
16 A Not that I recall.
17 Q Not in America. I'm talking about in
18 El Salvador.
19 A Not that I recall.
20 Q Have you ever been to his house?
21 A Which house?
22 Q In El Salvador?
23 A No.
24 Q Have you ever -- was he married at the time
25 in 2017?

1    A   I think he was in the middle of the divorce
2    process, but you should ask him.
3    Q   I will.
4    A   But as far as what's my understanding, it was
5    that he was getting into a divorce or he was
6    divorced, because he was in a relationship with --
7    in a formal relation with the lady that he had an
8    affair with when he was on procurement.  That's
9    why...
10   Q   Okay.  Had you ever met -- have you ever met
11   his wife?
12   A   His first wife?
13   Q   The wife that you said he was going through a
14   divorce with.
15   A   Personally, no.
16   Q   Have you ever met the woman that he was
17   seeing from procurement?
18   A   Yes.
19   Q   Okay.  Do you know her?
20   A   I saw her in Crowley's office.  Yes.
21   Q   Did you work with her?
22   A   No.
23   Q   So you didn't know her from work?
24   A   I didn't work directly with her, but we were
25   in the same building.  She was located on the fourth

1    floor.
2    Q   What's her name?
3    A   Carolina Zelada.
4    Q   Carolina Zelada?
5    A   Correct.
6    Q   So you just met her one time, you said?
7        MS. NOTARI:  Objection to form.
8    BY MS. DEGANCE:
9    Q   What did you say?  How many times have you
10   met her?
11   A   I cannot recall the times, because it's --
12   like, you are in an office.  You can see her when
13   you are in the cafeteria or grabbing some coffee
14   from the cafeteria.  So it could be multiple times.
15       And I was able a few times to speak with her.
16   She was part of the procurement team, as my sister.
17   So when I was going to my sister's desk, I was like,
18   "Hi.  How are you?" like everybody else.
19   Q   Your sister works on the procurement team,
20   too, or did at the time?
21   A   She's still there, I think.
22   Q   And in that -- did she work in that same
23   building with you in San Salvador?
24   A   Correct.
25   Q   And you were on the fifth floor.  What floor

1    was she on?
2    A   She was on the fourth floor.
3    Q   And do you know whether she -- was she
4    friends with Carolina Zelada?
5    A   I don't know.
6    Q   Have you ever talked with your sister about
7    Carolina Zelada?
8    A   Probably.
9    Q   In what way?
10   A   What do you mean?  What specifically do you
11   want to know?
12   Q   Well, I'm just asking -- I mean, you said
13   that you've, you know, run across Carolina Zelada at
14   work.  I'm just wondering what conversations you had
15   that you recall with your sister about her?
16   A   What I can recall about Carolina is that she
17   was a very sweet person.
18   Q   And so you said you've never been to Juan
19   Blanco's home; correct?
20   A   Correct.
21   Q   Has he ever been to your home?
22   A   No.
23   Q   Has he ever met your husband?
24   A   I don't know.
25   Q   You don't know if he's met your husband?

1    A   No.
2    Q   So your husband also works for Crowley;
3    correct?
4    A   Correct.
5    Q   And does your husband -- in what department
6    does he work?
7    A   Right now, I just know that he's an analyst,
8    but I don't -- I don't know the name of the
9    department.
10   Q   Back in 2017, what was his job?
11   A   My understanding is that -- at that time,
12   documentation.
13   Q   Did he work in the same building in
14   San Salvador that you worked in?
15   A   Yes.
16   Q   And what floor did he work on?
17   A   Fifth.
18   Q   He was on the fifth floor with -- same
19   floor as you?
20   A   Correct.
21   Q   And where was his workspace in relation to
22   yours?
23   A   What do you mean?
24   Q   In other words, you had a cubical; correct?
25   A   Correct.

1    Q   Did he have a cubical as well?
2    A   Correct.
3    Q   And where was his cubical in relation to
4  yours?
5    A   We were in the same office, but I cannot
6  recall, like, the distance or something.
7    Q   Did you meet your husband at work?
8    A   You can say that.
9    Q   How did you guys meet?
10   A   I met him -- I saw him a few times prior,
11  like, walking by on malls or -- I cannot recall the
12  places.
13       But he was like, "Oh, that is Roberto.
14  Roberto is on my" -- I have a Facebook friend that
15  used to post -- post photos with him.
16       So he was like, "Oh, he's the boyfriend
17  of..."
18       So it was like when he arrived to Crowley, I
19  knew him by photos, or just to look at him as a
20  coincidence.
21   Q   Coincidence?
22   A   Coincidence.  Thank you.
23   Q   What year did he start working for Crowley?
24   A   Approximately?
25   Q   Approximately.

1    A   I'll say between 2015 or 2016.
2    Q   What year did you start dating?
3    A   Until 2018.
4    Q   You started dating in 2018?
5    A   Correct.
6    Q   And got married in 2019?
7    A   Correct.
8    Q   What's his name?
9    A   Roberto Parada.
10   Q   When you were in the inland transportation
11  job, right, that we have been talking about in 2017,
12  were you paid by salary or hourly?
13   A   Salary.
14   Q   And do you recall when you first started as a
15  coordinator in that job what you were paid?
16   A   No.
17   Q   Did you receive any raises over the course of
18  the time that you were in inland transportation?
19   A   I cannot recall when the promotions were.
20   Q   Did you ever make any complaints to Crowley
21  about how much you were being paid during the time
22  you worked in inland transportation?
23   A   I cannot recall.
24   Q   You don't recall if you did or not?
25   A   No.

1    Q   Did you receive benefits from Crowley when
2  you were in the inland transportation jobs?
3       MS. NOTARI:  Objection to form.
4  BY MS. DEGANCE:
5    Q   In other words, did you receive any type of,
6  you know, employment benefits, like health -- did
7  you receive health insurance?
8    A   I did.
9    Q   Okay.  Did you have any other type of
10  benefits?  Dental insurance?
11   A   The insurance that Crowley provide --
12  provided in El Salvador at that time I think
13  included dental and vision.
14   Q   Okay.  Did you receive any type of -- were
15  you reimbursed for any type of gym membership during
16  that time?
17   A   Possible.
18   Q   Through Crowley?
19   A   They had a program about wellness.  So it
20  could be.
21   Q   Did they have any type of 401(k) or
22  retirement plan that you could contribute to?
23   A   Not that I know.
24   Q   Did they provide any type of education
25  benefits?

1    A   Yes.
2    Q   And explain what those were.
3    A   The one that I used was to -- they helped
4  you -- I cannot recall the percentage.  But if you
5  have good grades, you can -- at the end of your
6  semester, you can submit a reimbursement once you
7  have your grades.
8    Q   Okay.  And so did they -- did you take
9  advantage of that program?
10   A   I did.
11   Q   In receiving your bachelor's degree?
12   A   Yes.
13   Q   And also your master's degree?
14   A   No.
15   Q   Just your bachelor's degree?
16   A   Correct.
17   Q   And how much of your tuition would you say
18  Crowley reimbursed you for when you earned your
19  bachelor's degree?
20   A   It was -- I cannot recall the exact amount,
21  but I was almost in the middle of my career when
22  they implemented these benefits.  So it was -- if
23  I -- if I need to say, it would be half or less than
24  half of my career.  But I cannot recall or say
25  approximately how much was it.

1   Q  Were you already -- is that because you were
2 already halfway through your schooling when they
3 implemented the program?
4   A  Correct.
5   Q  Did they reimburse you for all of the courses
6 that you submitted for reimbursement?
7   A  Which -- which courses?
8   Q  In other words, did they ever deny you
9 reimbursement when you submitted a course or
10 submitted your -- they would reimburse you, right,
11 for classes that you took? In other words, give you
12 the money back?
13   A  Half of the money back.
14   Q  Right. Right. They gave you half of it back
15 because you were already halfway through the
16 program?
17   A  No.
18   Q  Okay. So was Crowley's program that they
19 would pay for half of your tuition?
20   A  The way it used to work, as far as my
21 understanding, was that, for example, you have to
22 pay a hundred dollars per month. Crowley will pay
23 50 and you, as the student, need to pay the other
24 50.
25   Q  So Crowley paid for half of your tuition for

1 your bachelor's degree?
2   A  They paid half or less than half of my -- of
3 the half of my career.
4   Q  Right. Okay. So Crowley implemented the
5 program about halfway through your schooling for
6 your bachelor's degree; right?
7   A  Can you say that again?
8   Q  You had already completed about half of your
9 coursework for your bachelor's degree when Crowley
10 first implemented that education program?
11   A  I don't know when they implemented. But for
12 me, it works like that -- worked like that.
13   Q  And then for the second half of your program,
14 you would submit the classes you took, and they
15 would pay you half of the tuition; is that right?
16   A  Crowley paid half of my -- of -- yeah, half
17 and half.
18   Q  Did you ever make any complaints to Crowley
19 that you felt like you were being underpaid?
20   A  I cannot recall.
21   MS. DEGANCE: We've been going about an hour.
22 Why don't we just take a quick break; okay?
23   THE VIDEOGRAPHER: We'll go off the record,
24 10:06.
25   (Brief break.)

1   THE VIDEOGRAPHER: We're back on the record,
2 10:17.
3 BY MS. DEGANCE:
4   Q  So you testified that at the beginning --
5 well, first let me ask you this: You worked in the
6 inland transportation department, right, and you
7 started out, it sounds like, as a coordinator. And
8 then you said you moved to DFTS and then you
9 moved -- you were a lead at some point; is that
10 right?
11   A  I was promoted to lead. Yes.
12   Q  Do you recall how many times you were
13 promoted once you moved to inland transportation?
14   A  In -- one, I think. I'm not sure.
15   Q  One?
16   A  Yes. Because when they changed my title -- I
17 cannot recall which one came first -- it was not a
18 promotion, because I didn't get a different salary.
19   Q  Okay.
20   A  It was just the name -- the changed name.
21   Q  And then at some point did you receive a
22 promotion where you did receive an increase in
23 salary?
24   A  I did.
25   Q  And you think that that was only one time?

1   A  After inland, I think so.
2   Q  Okay. So you testified that when you first
3 started reporting to Mr. Blanco, your
4 relationship -- you described it as being
5 professional; is that right?
6   A  From my part, I tried my best to.
7   Q  At some point did your relationship with him
8 change?
9   A  I tried to keep it as professional as I could
10 because, before he was my supervisor, I was able to
11 witness behaviors that were not appropriate.
12   Q  Okay. And approximately when did you witness
13 these behaviors that you're describing?
14   A  When I was in customized brokers, inland
15 department and customized brokers were almost
16 sitting next to each other.
17   Q  So before you began reporting to him?
18   A  Yes.
19   Q  Okay. And what types of behaviors did you
20 witness?
21   A  He used to use bad language to express
22 personal and work-related things to his team
23 members. And he also used to say a lot of sexual
24 comments to -- most of them women on his team.
25   Q  Anything else?

1    A  Two guys as well.  He was making fun of the
2 sexuality preference of other peoples, let call it,
3 like men.
4    Q  Okay.  Anything else?
5    A  Well, I knew that it was well-known in the
6 office that he was a married guy, that -- people
7 used to say that he was transferred from the
8 procurement team to the inland due to the affair
9 relation that he had with one of his peers.
10    Q  The one that we talked about earlier?
11    A  The one that I think is his wife now.
12    Q  Right.  Okay.  Anything else?
13    A  I also saw that -- well, it was well-known
14 gossip that it was one lady that was in his
15 department that raised a flag about being
16 uncomfortable due to the sexual comments of him, and
17 another -- and one of his closest friends that was
18 on the team.
19       And people used to say that she got fired
20 because she escalated the situation.  And I was able
21 to witness that after this lady got fired, he mocked
22 about -- that he ended up firing her because she was
23 not willing to collaborate.
24    Q  What was her name?
25    A  Lya Santamaria.

1    Q  Lya Santamaria?
2    A  Uh-huh.
3    Q  And what is the name of his friend that you
4 said he made comments -- you said he made comments
5 to a friend on the team?
6    A  I knew him by Mario, but I cannot recall his
7 last name.
8    Q  And that was Mr. Blanco's friend?
9    A  Correct.
10    Q  And you said -- okay.  So just to recap, you
11 said that prior to reporting to him you were aware
12 that he used bad language to his team members;
13 right?
14    A  Correct.
15    Q  Did you witness that, or is that something
16 that you heard about?
17    A  No.  I was a witness of that situation.
18    Q  Okay.  So you'd seen him use bad language?
19    A  Correct.
20    Q  And then you said he also would make sexual
21 comments to both women and men.
22       Is that something you witnessed prior to
23 reporting to him, or is that something you heard
24 about?
25    A  I witnessed that type of comments.

1    Q  Okay.  And you said it was well-known that he
2 was married and tran- -- and you said he was --
3 you'd heard he was transferred from procurement
4 because he was dating the woman who is now his wife?
5    A  Correct.  That is what I heard.
6    Q  And then you talked about Lya Santamaria.
7       What specifically did you witness with
8 respect to her?
9    A  She was sitting near to me.  So the last
10 thing I saw from her is that Juan took her to a
11 meeting and she never came back.
12       When he came back that day after the meeting
13 was done, he starts saying -- he said it in Spanish.
14 Do you want me to say it in Spanish or do my best to
15 translate?
16    Q  Try to translate, if you can.
17    A  Okay.  He said --
18       MS. NOTARI:  Do you mind if she says both?
19       MS. DEGANCE:  Yeah.  Go ahead.  You can --
20       MS. NOTARI:  Because some things you lose in
21 translation.
22 BY MS. DEGANCE:
23    Q  You can say it in Spanish.  And then try to
24 translate it for us.
25    A  He went into the department and he was -- he

1 did this:  (Answering in Spanish.)
2       So, basically, what he said was, "Okay,
3 bitches.  The next one that is not willing to
4 collaborate is gone.  No exceptions."
5       So we were, like, okay, kind of shocked,
6 because we were in customized brokers.  And I had my
7 manager near, so I was --
8    Q  I'm sorry.  Who was your manager?  And I'm
9 not trying to interrupt you.
10    A  At that time it was Fernando Lievano.
11       So I was wondering if he will say something,
12 but I don't know because at the end of the day they
13 could have a private meeting where he can approach
14 and say, "You know what?  I don't think this is
15 appropriate."  But I don't know.
16       But for me it was kind of shocking because he
17 was doing it at the office, and he -- he said that
18 to his team members.  So, for me, it was shocking.
19 That's the first time that I was completely
20 speechless.
21       Because he used to say another type of
22 comments, but it was like, "This guy"; right?  It
23 was just disgusting.  It was -- felt like -- as a
24 woman, you kind of feel, like, uncomfortable
25 about -- hearing that a man is referring to other

1 women when they are not around.
2     Let's say that they were going into the
3 bathroom or going to lunch, so they were standing up
4 and going. And at that time, if he was standing --
5 because what I can recall is that he used to be
6 standing quite a time. So it was like if a lady for
7 some reason stands up and went out of the cubical,
8 he used to say very nasty comments about these
9 ladies.
10   Q  When you say that he said the next person who
11 fails to collaborate -- you said he mentioned the
12 word "collaborate"; right? Do you know what he
13 meant by that?
14   A  I saw Lya cry once because she was telling
15 two other person -- I don't recall who that person
16 is, but it was sitting next to her. I don't know if
17 that was a coworker of hers, or maybe it was
18 something -- someone that was missing on the chair
19 and friend of hers came out.
20     And she started saying that she was getting
21 tired about being mocked for her -- she had a bad
22 experience with a sex tape. So in the team, Juan
23 used to say to them that -- to rub his nipples and
24 start mocking about Lya, saying, "This is the life
25 that I deserve." Because, according to what I heard

1 in Crowley, that's what she used to say in the
2 video.
3     I never saw the video, but I remember that,
4 when she got hired, we were at Export Salva, our
5 first building, and in the chat of the corporation,
6 they started to send the link, to share the link.
7   Q  So the sex tape had nothing to do with Juan
8 Blanco; correct?
9   A  No. He was just mocking about her words so
10 she could -- my understanding was that he wanted to
11 let her know that he saw the video. And it was
12 really painful for her. So she was escalating that
13 situation because Mario used to mock about that,
14 too, with Juan. And that day she was crying a lot
15 and saying that she felt like it was not the proper
16 way for a supervisor to act and that she will be
17 escalating. So...
18   Q  Did you report any of these things that you
19 just described to HR or anyone at Crowley: the bad
20 language, the sexual comments, that sort of thing,
21 any of the things you just described, did you --
22 before you were reporting to Mr. Blanco?
23   A  What I remember I did is that -- we used to
24 have conversation as the customized brokers team
25 with Fernando Lievano and Bessie. And it was kind

1 of like, "Boss, can you request him not to be so
2 loud?" "Can you tell them -- can you tell him that
3 we are handling customs calls and they can hear if a
4 customer -- if a customs agent is able to speak
5 Spanish, they're going to understand what he's
6 saying. So can you please tell him to be quiet?"
7     That's the type of escalation that I did.
8 But for me to go to human resources, no, because at
9 that point it was not direct to me. Did I feel
10 uncomfortable? Of course. I'm a woman. But it was
11 not something I needed to do. It was something that
12 you, as the victim, need to go and raise your hand
13 and say, hey, this is happening. Right?
14   Q  Okay. So once you started reporting to him,
15 right, to Juan Blanco, was the first time that
16 you felt like he was unprofessional towards you?
17   A  Directly to me?
18   Q  Correct.
19   A  To be honest, it was one time I was already
20 on his team, and I was in the cafeteria. He was
21 with his current wife. I don't know if it's his
22 current wife, but with Carolina. So she was in the
23 Crowley El Salvador office, so you can have a
24 picture.
25     We had two vending machines. So she was in

1 one of the vending machines and I was in the other
2 one. So I was trying to see which items I was
3 getting for a snack, because I was hungry.
4     And she was -- she was taking out a soda can.
5 So I remember that they were sitting next -- he was
6 sitting in one of the tables near to the vending
7 machine. And Carolina bent over. I don't know if
8 that's the word, like, for picking up the can. And
9 he said in Spanish (answering in Spanish).
10     And he said (answering in Spanish).
11   Q  Okay. So you have to translate that.
12   A  So he said -- when she was bending over, he
13 said, "Fuck. That ass is so big as an ass mule --
14 mule ass." And, "Shit. I'm worried about my dick
15 getting stick in the middle of that way."
16     And I was like -- I was shocked because he
17 was my supervisor. He was telling something to her
18 lady -- I don't know how to call it -- at that time.
19     And I was like, okay. I felt so -- I just,
20 even to remember, so disgusted. I wanted to say
21 something, like, "Hello. Why did you say that?"
22     But since he was my supervisor and I
23 experienced the Lya experience about getting fired
24 and I don't know if at the end of the day it was
25 true she was fired due to retaliation, I decided to

1 stay quiet.
2    But for me, that was the first moment I felt
3 uncomfortable, because he saw me, that I was
4 standing next to Carolina. So at some point I felt
5 like he was disrespecting me as well, because he
6 knew that I was able to hear him.
7    Q   Approximately when was that?
8    A   I don't know the exact dates, but it could be
9 my -- approximately my first month that I was with
10 him -- prior to my first month, because that was the
11 experience that I have, like, here (indicating).
12    Q   And did you report that to anyone within
13 Crowley and to HR?
14    A   No, because it was not directed to me.
15    Q   So when was the first time that something was
16 directed to you by Juan Blanco that was
17 unprofessional or inappropriate?
18    A   He used to say, like, a lot of comments. I
19 was in a chat group that he created for the inland
20 department. And he used to say to all of us,
21 because all the team was included on the chat -- it
22 was like (answering in Spanish).
23    That means whore Fridays or -- I'm trying to
24 do my best to translate the bad words. I'm so
25 sorry.

1    He used to say as well, "Today is Friday, so
2 Luis can go and look for a she-male that he likes."
3    Q   Who were on these chats?
4    A   We were -- all team members, we are -- we
5 were in that chat because that was a communication.
6    And he used to say -- when you do something
7 good, he used to say -- in order to congratulate
8 you, he used to say (answering in Spanish).
9    So he used to say, "You did a great job. Now
10 you deserve the Vitamin D, the vitamin of my dick,"
11 and he used to grab his crotch. And it was like,
12 man...
13    Q   Did you ever report any of that behavior?
14    A   I did not.
15    Q   Okay.
16    A   At that -- at that point I did not because he
17 used to say that to everybody. So it was like,
18 okay, other managers, supervisors are able to hear
19 him. And if they don't report him as Crowley
20 authorities, why -- why is it my duty to do it?
21    I wanted to do it, but I was scared. Because
22 if a manager is not willing to raise a flag for
23 something like that, why a coordinator needs to act
24 different?
25    Q   Which managers witnessed those -- that

1 behavior?
2    A   I remember that at that time -- I don't
3 recall if it was accounts payable that it was near
4 to us, and also bookings department.
5    So he was not speaking, like -- he was not
6 whispering things. So I have no proof that they
7 were able to hear him. But if I was able to hear
8 him, I think much people could.
9    So I was like, why should I do something if
10 there are a lot of supervisors and managers around
11 me?
12    And we had also conference rooms near to each
13 other -- near to us. So another managers or
14 supervisors used to come to this conference room to
15 have meetings with their teams. So...
16    Q   And these messages that you referenced, did
17 you retain any of those, or were they all deleted?
18    A   They were all deleted.
19    Q   In your amended complaint, you make an
20 allegation about something that occurred with
21 Mr. Blanco on an elevator.
22    A   Correct.
23    Q   First -- I want to ask you about that, but,
24 first, approximately when did that happen?
25    A   The elevator situation happened -- I don't

1 have the date clear in my mind. But the elevator
2 situation happened before my travel with him.
3    Q   Okay.
4    A   Let's say a few -- a few weeks after my
5 travel with him -- before, before. Sorry. Before.
6    Q   Before the first time you traveled with him?
7    A   Uh-huh.
8    Q   Okay. So the elevator situation happened a
9 few weeks before you ever had to travel with him for
10 work?
11    A   It's my understanding that -- I think that I
12 did a travel prior with him and Luis Santamaria.
13 But that travel, he was focused on mocking about
14 Luis, so I was o- -- not okay, because I don't think
15 you are ever okay with a man that is capable or have
16 the capabilities of bringing stuff like that.
17    But that trip, I remember that the one that
18 suffered the most, it was Luis Santamaria.
19    Q   Okay. I'm going to ask you about that trip
20 in a minute. But, first, I want to talk to you
21 about the elevator.
22    So tell me everything you remember about that
23 event on the elevator.
24    A   Okay. So I was in the inland department
25 and --

1 Q What role were you in?

2 A Inland coordinator.

3 Q You were the coordinator, then?

4 A Yes.

5 Q Okay.

6 A And I remember that he approached to me and

7 say (answering in Spanish).

8 "My friend," something like that, "I wanted

9 to let you know that I'm asking for approval for a

10 trip for you, Luis, and myself. I don't have the

11 approval yet, but I'm just giving you a heads-up in

12 advance so you can prepare who's going to take care

13 of your kid while you are gone."

14 And I was like, "Okay."

15 Then a few weeks -- a few weeks later --

16 Q But before the trip with Luis?

17 A I think the trip with Luis was before to this

18 situation, because when he told me about -- that he

19 was waiting for an approval, it was approximately a

20 month prior to my trip.

21 So after that, it was a couple of -- of weeks

22 that I remember that I -- I went down for a

23 cigarette to --

24 Q And I don't mean to interrupt you. But a

25 couple weeks after what? A couple weeks after the

1 conversation where he said the trip's not approved

2 or a couple weeks after the first trip?

3 A No. He said -- one month -- let's say

4 that -- in February, just an example.

5 Q Okay.

6 A Because I know that due to the language

7 barrier it's kind of hard for me.

8 Q I appreciate it.

9 A Let's say that he told me in February this

10 year, "Vane, I need for you to be prepared because

11 I'm think -- I'm waiting for an approval because I'm

12 asking for you, Luis, and myself to go on a trip.

13 So I'm just giving you a heads-up so you can be

14 prepared and see who's going to take care of your

15 kid."

16 Q Okay.

17 A Let's say that that was on February,

18 the second -- the last two weeks of February. So he

19 came back on the first week of March of this year.

20 And he said that the trip was approved and I should

21 be waiting for two weeks, something like that.

22 "You should be waiting for your travel

23 itinerary. It will be sent to your email."

24 I was like, "Okay."

25 So -- should I move to the situation?

1 Q Okay. So that was -- so he tells you the

2 trip's approved; right?

3 So then what happens next? Does the trip

4 happen next, or does the elevator incident happen

5 next?

6 A The elevator incident happened.

7 Q Okay. So he tells you the trip is approved;

8 right? And then the elevator incident, and then you

9 went on the actual trip?

10 A Correct.

11 Q Okay. So let's talk about the elevator

12 incident.

13 So tell me now everything that you remember.

14 A I remember that I was going for a cigarette.

15 Q A cigarette?

16 A Correct.

17 So I went to the first floor, outside. It

18 was kind of like in the smoking area.

19 So I went down by myself and --

20 Q What time of day?

21 A It was between -- I don't recall the time,

22 but if I need to say between hours, it could be

23 between 10:00 and 1:00 p.m.

24 And I remember I went down. I finished

25 smoking. And he was coming from getting lunch.

1 That's why I -- I think it was between 11:00 and

2 1:00, because he was -- he used to take his lunch

3 very early.

4 And he was returning back, and we gathered

5 together in the elevator to go to the fifth floor.

6 And we were standing waiting for the

7 elevator, and I remember that he said -- you want me

8 to say it in Spanish first?

9 Q I want -- I need it in English, but if you

10 prefer to say it in Spanish first and then English,

11 that's fine.

12 A Okay.

13 Q Did he speak to you in Spanish?

14 A In Spanish, always.

15 Q If you want to say it in Spanish first but

16 then translate it, that's fine.

17 A He said (answering in Spanish).

18 I don't remember the amount of money.

19 (Answering in Spanish.)

20 And I was like --

21 Q So what does that mean, first, before you go

22 into your --

23 A So he said, "Vane, my friend,

24 congratulations. I saw that you just billed a

25 certain amount of money. So now you deserve the

1  Vitamin D, the vitamin of my dick."
2      And I was like, "Okay."
3      The elevators -- next thing I remember is
4  that the elevators -- that elevator is slow. So it
5  was opening up the doors.
6      And we went up in the elevator, and he
7  grabbed my boob and shake it like he was shaking
8  somebody's hand.
9   Q  With one of his hands?
10  A  With one of his hands.
11     And...
12  Q  Take your time. Do you have some tissue?
13  A  I'm so sorry.
14  Q  Take your time. It's fine.
15     Take your time. It's all right.
16  A  At that point I felt terrified because he
17  shake it so hard.
18     And the next thing I can remember is that I
19  immediately -- because we were going to the fifth
20  floor, so the fifth floor button was on.
21     And what I did next is I immediately pushed
22  button No. 3. I knew that on floor No. 3 was human
23  resources' cubicles.
24     So I pushed the button, waiting for the
25  elevator to -- not to take me to the fifth floor

1  because I push it too late or something. And thank
2  God that the elevator -- he listened to me, I think.
3   Q  What do you mean he listened to you?
4   A  No. The elevator, like --
5   Q  The elevator listened to you?
6   A  Uh-huh.
7   Q  Okay. Go ahead.
8   A  Like, okay, she wanted to go out; right?
9      So the elevator doors were open, and I
10  remember that I stood in the middle of -- well, in
11  the line of the elevator and the floor.
12     I looked at him and I said, "Dude, you're so
13  wrong with me. You cannot do this to me." And I
14  went out.
15  Q  Okay. Before you move on, did he say
16  anything to you?
17  A  He was --
18  Q  You said he grabbed you. And did he say
19  anything at all?
20  A  The conversation that we had, it was while we
21  were waiting for the elevator.
22  Q  Right.
23  A  And when he shake my breast, he didn't say
24  anything. He was just laughing -- I don't know --
25  laughing. Because he was not like ha-ha-ha-ha. He

1  was like (demonstrating).
2      So --
3   Q  And you didn't say anything until you got off
4  the elevator?
5   A  Yeah. I got so scared. I couldn't. I was
6  in shock. I was --
7   Q  I understand.
8   A  No.
9   Q  So you get off on 3 and you turn to him and
10  he's still on the elevator; right?
11  A  Yes.
12  Q  And you said to him -- say that again.
13  A  That -- I told him in Spanish, but basically
14  I told him, "Dude, you're so wrong with me. I'm not
15  that type of -- I'm not that type of girl."
16     And I remember that I went to the third floor
17  office. I looked for the manager, the HR manager.
18  Q  Who's that?
19  A  Jacqueline Nájera.
20     I told her, "Jackie, I need to speak with
21  you."
22     She was sitting in her cubical working. And
23  she said, "Yes, of course. Just give me a few
24  minutes. Wait for me in the conference room."
25     So that's what I did. I waited for her. I

1  was able to see that she was still sitting on her
2  desk because, the door, I left it open so she could
3  go in.
4      And she took a few minutes. I don't know how
5  long I was waiting because I was not checking my
6  time.
7      But eventually she came out -- she came into
8  the room. She brought her laptop with her. She was
9  sitting in front of me. And I told her what had
10  just happened. I told her, "Jackie, Emilio" --
11  because that's how we knew him -- "Emilio just shake
12  my breast, and I want to put a formal claim against
13  that."
14     And she said, "Where'd that happen?"
15     I was like, "In the elevator just now."
16     And the next thing I can recall is that --
17  Q  Take your time.
18  A  I'm so sorry.
19  Q  You don't need to be sorry. Take your time.
20  If you need a break at all --
21  A  No.
22     What she said is, "Vanessa, the elevator's
23  cameras do not work."
24  Q  The elevator cameras?
25  A  Do not work.

1    And I was like, "Okay."
2    And I was like, "But I'm telling you that he
3 just shaked my breast."
4    And she was like, "Yeah, but you're not able
5 to prove it. So it will be your words against
6 him -- your word against him."
7    And I was like, "Yeah, but I want to put a
8 formal claim about that situation."
9    And I told her, "If you're not going to do
10 anything for me, at least can you stop the trip that
11 I have with him? I have an upcoming trip with him.
12 So can you make it stop?"
13    And she said that it was in my contract that
14 when the company requires, I was needed to travel.
15    And she said, "Vanessa, you know how much
16 upper management loves Juan Emilio. And you need to
17 think about the culture that we live, what people is
18 going to say here in El Salvador if they find out.
19 They're going to say that it was your fault, that
20 you provoked him."
21    And I was in shock, totally shocked, because
22 that's not the type of answer that you want from
23 your human resources manager, and even more when
24 she's a woman.
25    So I don't know what face I had at that time.

1 And she started threatening me about -- or saying,
2 "Vanessa, you need to think about that you are a
3 single mom. You need to think about what you're
4 going to say to your kid if you go without a job,
5 unemployed, what you're going to say to your kid
6 when he gets hungry, what you're going to say to
7 your kid when he needs something and you're not able
8 to provide it or you get -- or you go homeless."
9    And I didn't say anything. I was just
10 shocked, terrified, because I had never experienced
11 someone talking to me like that. I couldn't believe
12 the words. For me it was unbelievable.
13    And I remember -- I remember she told me -- I
14 requested again, "Can you make that trip go away,
15 because I don't -- I don't feel safe?"
16    And she said that she already told me that
17 when the company needed for me to travel, if I was
18 not willing to do that trip, I was violating my
19 contract and that I had two options, either
20 voluntarily put in my resignation letter or they
21 could fire me because I was violating the contract.
22    And she said, just want -- she threatened me
23 about blacklisting me, I think is the word. And she
24 said, "Either -- either/or. So you take option A or
25 option B."

1    Q   And, I'm sorry, when you say she blacklisted
2 you, what did she specifically say?
3    A   She said that I needed to consider that
4 either I was putting in my voluntary resignment
5 letter because I was not willing to do the trip, or
6 if they -- if I was fired due to the contract
7 violation, that she will -- she will make sure that
8 when other companies call to ask a reference about
9 me, she will make sure that I will not be able to
10 get another job, that they will -- that Crowley will
11 be providing bad feedback.
12    So at that point, the conversation ended.
13 And, basically, she told me, "You let me know what
14 your decision will be."
15    Q   How long did the conversation last?
16    A   I was not taking the time, but it felt like
17 forever, because I was, like, in another dimension,
18 I think. I couldn't believe it.
19    Q   Did you know Jacqueline Nájera before that?
20    A   She was the HR manager, so I saw her
21 previously.
22    Q   Had you had any interactions with her about
23 anything before? I mean, had you met with her about
24 any HR-related topics or issues before?
25    A   Possibly. Not issues, but maybe if I had a

1 human resources question or just finding her in the
2 hall, saying hi.
3    Q   So you hadn't made any complaints to her
4 before, but you had seen her before in an HR
5 capacity?
6    A   We were in the same office. Yeah.
7    Q   Did you -- how would you -- I mean, did she
8 have -- did you perceive, before this event, that
9 she didn't like you for some reason, or no?
10   A   No.
11   Q   Okay.
12   A   No. It was -- before that conversation, she
13 seemed to me like a normal person, a normal HR
14 person. Yeah. Yes.
15   Q   During the meeting, did you expose your
16 breast or show her your breast in any way?
17   A   Yes, I did.
18   Q   Okay. Why did you do that?
19   A   Because she was continuing to say that it
20 will be my word against him and that I needed to
21 remember -- I remember that I didn't show my breast
22 until she said, "You need to think about -- more
23 about your son, about how do you want your son to
24 remember his mommy? Do you want him to recognize
25 his mommy because she is a high-performer employee,

1 or do you want him to recognize you because you got
2 fired for a claim that you were not able to prove?"
3     So I got so frustrated at the time that I
4 took my shirt and I pull it down so she could see
5 the fingerprints that he left on my -- on my breast.
6     Q  So --
7     A  And she was like, "Okay, you can
8 (demonstrating)."
9     She didn't even say put your T-shirt back up.
10 She was like, "Okay."
11     Q  So what type of marks did you have on you at
12 that moment?  Because it was right after the event;
13 right?
14     A  Uh-huh.
15     Q  What marks did you have on you?
16     A  I had -- the only one that I was able to see,
17 like, right away, it was this finger (indicating).
18     So he -- when he grabbed my boob, he did this
19 (demonstrating), but kind of like -- not like open
20 hand.  It was like grabbing it.
21     So -- I'm a very sensitive-skinned lady.  So
22 if you touch my breast like that, of course I'm
23 going to have some type of mark.  So it was not a
24 bruise at the time, but it was red.  So I had red
25 fingerprints on my breast.

1     Q  So it was like red fingerprints?
2     A  Correct.
3     Q  So you weren't scraped or anything like that;
4 right?
5     A  No.
6     Q  It was a red, sort of, fingerprint or mark.
7     Did you -- did you take any photos of it?
8     A  I did not.  And the reason why I didn't is
9 because, basically, my HR manager threatened me
10 about blacklisting me to other companies.  If
11 Crowley at that time had the power to do that, I
12 didn't knew.  So, for me, what she just told me, it
13 was terrifying, scary, it was disappointed, made me
14 feel powerless.  So I decided to leave the
15 conference room and go back to my desk.
16     And if that is not enough, when I went from
17 the third floor --
18     Q  So I don't want to interrupt you, but I want
19 to ask you one question before we leave that
20 meeting.
21     A  Okay.
22     Q  Do you have any idea why she would have
23 reacted that way towards you?  I mean, she's in HR
24 and you're making a complaint and she's threatening
25 your job.

1     A  I was very surprised, to be honest with you.
2 I was not expecting that reaction.
3     Q  All right.  So tell me, then, what did you do
4 immediately after leaving that office with her?
5     A  I stand up, opened the conference room.  I
6 went and took the elevator from floor No. 3 to 5.  I
7 walked down into the hall, and I found Juan -- I
8 don't know if leaning is the right word.  Like, my
9 cubical has two parts, like divisions.  So he was
10 leaning like this, like (demonstrating), raising his
11 eyebrows.
12     So I was like, "Okay."
13     I took my -- I sat down on my chair, and he
14 was still there.  And he went and said in Spanish
15 (answering in Spanish).
16     Q  What does that mean?
17     A  He said, "Hi, Vane, my friend, my friend,
18 what did you gain by going into human resources?
19 What Jackie told you?"
20     And I was, like, shocked because it was like
21 what are you doing here, right, in my head.  I
22 couldn't say anything.
23     And he said, "You need to be a little bit
24 smarter."
25     He said (answering in Spanish).

1     So, basically, what he was saying was, "Vane,
2 you need to think about -- a little bit more about
3 your son, because if you are with no job, you will
4 not be able to give food to your kid.  So what the
5 heck?"
6     And he also mentioned that I knew how was him
7 as an enemy and that I knew that I didn't want that
8 for myself.
9     While he was saying this about my kid, I
10 remember that he grabbed this arm, and he was
11 like -- this is my arm.  So he was like, (answering
12 in Spanish).
13     So I was like terrified, because it was like,
14 "What are you doing here?  Why do you keep touching
15 me?  You're hurting me."
16     And he said, "I'm going to make sure if you
17 don't start to collaborate that you are not allowed
18 to have another job because we're going to say that
19 you had a poor performance not only in the companies
20 that are calling, also to internal clients."
21     And I was like -- I couldn't say anything.
22 And he was like (demonstrating), "Think about it,"
23 and left.  And he was laughing, not like ha-ha-ha,
24 but like (demonstrating).
25     And I was like, "Okay."

23 (Pages 86 - 89)

1      And I think he went to his desk.  But at that
2  moment I remember that I saw my computer.  I was not
3  able -- not even to unlock it because my brain was
4  trying to process everything that happened.
5      Because I was like, "Okay.  I'm coming from
6  HR.  Now I found him here."
7      So my understanding at that point, or what I
8  thought is, okay, so maybe what Jacqueline was
9  typing, it was not a report.  Maybe she was telling
10  him what I told her because, basically, the words
11  were the same.  And...
12   Q  So let me ask you this:  You testified
13  earlier that there are -- you know, you're in an
14  open space.  There are cubicles.  Accounts payables
15  is around you.  There are other departments around
16  you.
17      Did anybody witness -- was there anybody
18  around when he came to your desk and spoke to you?
19   A  I think so.  It was during working hours,
20  so -- but nobody approached to me and say, "Vanessa,
21  are you okay," or nothing.  Not that I recall.  I
22  was focused on my mind to try to unlock my computer
23  because I was shaking.  I was nervous.  I was trying
24  to understand at that point.  I was not seeing if
25  people were looking at me or if they were witness.

1   Q  So you don't know if anyone overheard him?
2   A  That they approached me and said, "Hey, I saw
3  what he just done to you"?  No.
4   Q  Did you show the mark on your breast to
5  anyone else?
6   A  Just Jacqueline.
7   Q  Did you -- did you continue working the rest
8  of that day?
9   A  I did.
10   Q  You stayed -- you stayed and finished the
11  workday?
12   A  Correct.
13   Q  After speaking to Jacqueline, did you
14  disclose it to anyone else that day?
15   A  I did not.
16   Q  Okay.  And this was -- this was in 2017;
17  right?
18   A  Correct.
19   Q  Okay.  So you weren't --
20   A  Prior to my trip.
21   Q  So you weren't dating Robert yet, correct,
22  your husband?  Is that his name?
23   A  Yeah.  Roberto.
24   Q  Roberto, were you dating him at that point?
25   A  No.  We were friends.

1   Q  Did you tell -- did you tell -- so you said
2  you didn't tell anyone about what happened?
3   A  The only person that noticed -- that
4  approached me after that event -- like, I cannot
5  recall if it was -- but it was a couple of days
6  later.  I remember one of my peers was walking,
7  because -- on the hallway.  And she was like,
8  (answering in Spanish).
9      "Vane, what do you have on your arm?"
10      And I was like, "Oh" -- I don't know why, but
11  I was so nervous that I don't know why I told her,
12  "Oh, it's because I have sugar issues and I get
13  bruises all of a sudden."
14   Q  You have what issues?
15   A  I have blood sugar issues.  That's what I
16  told her.  I don't have blood sugar issues.
17   Q  When was this, Ms. Treminio?  Was it the same
18  day or a couple of days --
19   A  No.  I think -- if I have to say, it might
20  be, like, between two or -- less than five days
21  after the situation happened.
22   Q  Did you have a bruise on your arm?
23   A  I did.  I had the fingerprints.
24   Q  Okay.  You had fingerprints on your arm?
25   A  (Nods head.)

1   Q  And you didn't take any photos?
2   A  No.
3   Q  Who was that coworker?
4   A  Her name was Wendy Ponce.
5   Q  Can you spell her last name the best you can?
6   A  P-o-n-c -- n -- P-o-n-c-e.
7   Q  Wendy Ponce?
8   A  Ponce.
9   Q  And so you told her a couple days after;
10  correct?
11   A  Yeah, because she was walking by.  I was
12  working.  And she said, (answering in Spanish).
13      And I was like -- I don't know why I had that
14  reaction.  But it was like, "Oh, it's because I have
15  sugar issues, and I get bruises for nothing all the
16  time."
17      And she was like, "Let me know if you need to
18  speak."
19      And she left.  So at that point, it was
20  nothing else for me to do.
21   Q  Did you tell your sister about the event?
22   A  I did not.
23   Q  Why not?
24   A  Because I didn't want for her to take it
25  personally, because, at the end of the day, we're

1 family. And I know that she has a good career in
2 Crowley, and I didn't want her perception of the
3 company changed because of the events that I had.
4    Q  Is your sister older or younger than you?
5    A  Younger.
6    Q  She's younger?
7    A  Yes.
8    Q  Do you know when she started working at
9 Crowley?
10    A  I cannot recall.
11    Q  Was it before you or after you?
12    A  After me.
13    Q  So you didn't tell her.
14      Did you call the EthicsPoint Hotline and
15 report it, or no?
16    A  That event?
17    Q  Uh-huh.
18    A  I did not.
19    Q  Did you -- did you report it to -- I know you
20 went to Jacqueline Nájera, but did you report it to
21 anyone else at Crowley?
22    A  I did not.
23    Q  So just Jacqueline?
24    A  Correct.
25    Q  Did you -- did you make any efforts -- did

1 you start looking for another job at that point, or
2 were you committed to still working at Crowley?
3    A  My compromise with Crowley at that time, it
4 was -- I was a very loyal employee, and I wanted to
5 stay there, because, in a country like El Salvador,
6 it's not that common that you can have opportunities
7 to work in an international company as Crowley and
8 get the work experience that they give you.
9      So, for me, leaving and taking the risk
10 that -- the threats of Jacqueline and Juan about
11 blacklisting me, they were not an option, because,
12 at the end of the day, they were right. I needed
13 to -- I was the only one -- because they were right
14 about me being a single mom. And I was the only one
15 providing for my kid.
16      So if they blacklisted me, how -- I started
17 thinking how long it will last? How am I going to
18 do with my kid? I cannot be another charge to my
19 parents or to my sister. I have been teached since
20 I was little that you need to fight for your own
21 things. You need to work for it, not -- yeah. It
22 was my son. It was my responsibility. So I didn't
23 want to take the risk.
24    Q  Okay. So you said in El Salvador, is it -- I
25 know that you were worried about being blacklisted,

1 but is the -- is it hard to find jobs like the job
2 you had at Crowley?
3    A  Yes.
4      MS. NOTARI: I know there's no question
5 pending. Do you want to take a break, or do you
6 want to --
7      MS. DEGANCE: Yeah. Let's see what time it
8 is.
9      Yeah, we can take one, if you'd like. It's
10 up to you.
11      MS. NOTARI: Do you want to take a break?
12      THE WITNESS: No.
13      MS. DEGANCE: You want to take a few-minute
14 break?
15      MS. NOTARI: You want to keep going?
16      MS. DEGANCE: Are you sure?
17      THE WITNESS: I'm so sorry. I apologize.
18      MS. DEGANCE: You do not need to apologize.
19      THE WITNESS: I know that my English is --
20      MS. DEGANCE: You're doing fine.
21      THE WITNESS: -- not my native language and
22 that sometimes it's hard to understand my
23 English.
24      MS. DEGANCE: You're doing fine.
25      THE WITNESS: And if I'm crying, I'm giving

1 you twice the issues, so I apologize for that.
2      MS. DEGANCE: You're doing fine. If you want
3 to take a few minutes, we can.
4      THE WITNESS: No.
5      MS. DEGANCE: Okay. We'll go a little bit
6 more, and then we'll take a break.
7      MS. NOTARI: Thank you.
8      THE WITNESS: Okay.
9      MS. DEGANCE: You let me know --
10      THE WITNESS: Thank you.
11      MS. DEGANCE: -- though, anytime.
12 BY MS. DEGANCE:
13    Q  Okay. So you decided you weren't going to
14 look for another job, and so you continued working
15 there?
16    A  Yes.
17    Q  All right. So it looks like your first
18 business trip when you were reporting to Mr. Blanco
19 was in September 2017. Do you remember that?
20    A  I think that's the trip that I was telling
21 you about with Luis; right?
22    Q  Yes.
23    A  I don't recall the dates, but I did a trip
24 prior with him.
25    Q  Okay. So do you recall when that trip was in

1  relation to this elevator event?
2     A  It was prior to the elevator event.
3     Q  So you went on the trip first, and the
4  elevator event was after?
5     A  Correct.
6     Q  Okay.  Let's talk about that trip for a
7  minute.  I'm going to show you a document we'll mark
8  as Defendant's Exhibit No. 3.
9        (Defendant Crowley's Exhibit No. 3 was marked
10    for identification.)
11 BY MS. DEGANCE:
12    Q  So take a look at that document -- thank
13 you -- this one right here.  I just want to ask you
14 about this trip.
15       So it looks like originally -- do you recall
16 that originally the trip was scheduled from
17 September 4th to September 15th, 2017?  And then it
18 was cut short.  You came back early.
19    A  Due to the hurricane?
20    Q  I was going to ask you, but --
21    A  Yeah, I think so.
22    Q  Okay.  So how did you first learn that you'd
23 be going on this business trip?  Was it how you
24 described --
25    A  Which?

1     Q  -- when Mr. Blanco told you?
2        We're talking about the September -- right
3  now, the September 2017 trip.
4     A  I don't have the dates clear in my mind, so
5  can you please, like -- I don't know if this was the
6  second trip.  I remember that I did a small trip to
7  Jacksonville.  And if I'm not mistaken, there was a
8  hurricane situation in Jacksonville.  And the safety
9  department recommended to all employees that they
10 needed to be returned to their origin country.
11    Q  Okay.  That's possible.
12    A  And then we went a second time.  And that
13 time I think it was with -- with Luis.  Or I don't
14 know if -- if it was this one.  I cannot recall.
15    Q  Okay.  So it looks like on this trip -- if
16 you look at this itinerary, maybe this will refresh
17 your recollection on the details.  It looks like --
18 you tell me.  It looks like you flew from
19 San Salvador to Miami on September 4th.  That's what
20 your itinerary says; right?
21    A  (Nods head.)
22    Q  And then look at the bottom.  It looks like
23 you had a car rental.  Do you see that, in Miami?
24 Do you see the Hertz Car Rental?
25    A  Correct, but this -- I think I remember this

1  time.  It was the time that we drove from Miami to
2  Jacksonville.  And it was Luis there.
3     Q  Okay.
4     A  And -- but the car was not rented under my
5  name, I think, because the one that was in charge or
6  responsible for that car was Juan.  He was always
7  driving.
8     Q  Okay.  So you flew in -- but you recall
9  flying in -- flying from San Salvador to Miami;
10 correct?
11    A  From San -- yes.
12    Q  Okay.  And -- so that was going to be one of
13 my questions.  Who from Crowley -- okay.  Who came
14 on that business trip from San Salvador with you?
15    A  We flew from San Salvador to Miami.
16    Q  And who is "we"?
17    A  Luis, myself, and Juan.
18    Q  Okay.  What's Luis's last name?
19    A  Luis Santamaria.
20    Q  So Luis Santamaria, Juan Blanco, and you all
21 fly, and you were on the same flight; correct?
22    A  I cannot recall in the same flight, but I --
23 we rented a car.
24    Q  And you rented a car in Miami and drove to
25 Jacksonville; correct?

1     A  Correct.
2     Q  And you just testified you believe Mr. Blanco
3  actually drove the car?
4     A  He was in charge of driving from Miami to
5  Jacksonville.  Yeah.
6     Q  And were the three of you in the car
7  traveling from Miami to Jacksonville?
8     A  Correct.
9     Q  What were you told about the reason for the
10 trip?
11    A  It was a business trip.  So my understanding
12 was that it was a training.
13    Q  So when you came to Jacksonville in
14 September, you think it was here for you to receive
15 some type of training?
16    A  Correct.
17    Q  Do you remember what type of training it was?
18    A  It had to be something with the DFTS, because
19 they were litigating.  I'm not sure if that's the
20 proper word.  But they were litigating the DFTS
21 contract.
22    Q  And so what were you being trained to do?
23    A  I cannot recall.
24    Q  So you don't remember what they were training
25 you to be able to do when you were in Jacksonville?

1    A   No.  I think it was -- we were doing some
2  testings, and that's it.
3    Q   Now, on this trip -- this was before the
4  elevator event?
5    A   Yes.
6    Q   So did you express to anyone that you didn't
7  want to go on this trip?
8    A   On this trip?
9    Q   Correct.
10    A   No.
11    Q   How did you get to the airport in
12  San Salvador to fly over to Miami?  How did you get
13  from your house to the airport?
14    A   I cannot recall if I used one of the taxis
15  that used to have business with Crowley or if
16  someone at my family took me.
17    Q   And it looks like, on this itinerary, you
18  were supposed to stay until the 15th, but I believe
19  you returned early.  Do you recall that?
20    A   I cannot recall --
21    Q   September 7th.
22    A   -- if this was the same as the hurricane
23  alert.  I don't recall dates, to be honest.
24    Q   Okay.
25    A   I can remember the events of the trips, but

1  not the dates.
2    Q   If you flip to the second page of that
3  document, it looks like you stayed at -- did you
4  stay at the Courtyard Jacksonville?
5    A   I cannot recall.  Maybe.
6    Q   Okay.  You don't remember what hotel you
7  stayed at?
8    A   No.
9    Q   And then do you see how it says Thursday,
10  September 7th, 2017?  It looks like you had an
11  itinerary to fly back.
12    A   Where?
13    Q   September 7th, do you see (indicating)?
14    A   Oh, okay.
15    Q   Do you recall whether you flew back on the
16  7th?
17    A   I -- I don't recall.
18    Q   You don't know?
19    A   No.
20    Q   When you would go to Jacksonville for
21  training on this trip, where did the training take
22  place?
23    A   In Jacksonville's corporate office of
24  Crowley.
25    Q   At Regency?

1    A   Regency.
2    Q   You would fly in and stay at this hotel and
3  then go over to the Regency office for training?
4    A   Say that again.
5    Q   You would fly in.  And then stayed at,
6  apparently, this Courtyard Jacksonville.  And then
7  you would drive over to the Regency office with Luis
8  and Juan for the training?
9    A   I don't recall if the same day we went to the
10  office.  But usually what we used to do -- because
11  Crowley is in charge of your itinerary and more, if
12  you're going with your boss.
13         Usually how it works is that you go to --
14  from the airport to the hotel.  If it's late, you
15  don't have to go to the office.  You wait until the
16  next day.  And it's basically from the hotel to
17  Crowley's Regency office, unless that they -- there
18  is a dinner invitation from bosses or whoever at the
19  company or if you have friends.  But I didn't at the
20  time.
21    Q   Okay.  So you don't have any family in the
22  United States?
23    A   In the United States?
24    Q   Yes.  Do you have family in the United
25  States?

1    A   I do.
2    Q   What family members live in the United
3  States?
4    A   I have my grandmother and currently my mom
5  and one of my brothers.
6    Q   Where do they live?  What city?
7    A   My mom and my brother, they are in
8  California.  And my grandma lives in Miami, Florida.
9    Q   How many times have you been to the United
10  States -- how many times had you been to -- do you
11  travel to the United States often?
12    A   With Crowley?
13    Q   No, just generally.
14    A   I don't like to travel.
15    Q   Okay.  How many times had you been to the
16  United States in 2017?
17    A   I cannot recall the exact amount.
18    Q   Would you say -- well, how long has your
19  mother lived in the United States?
20    A   She has been living in California less than
21  six months.
22    Q   Okay.  What about your grandmother?
23    A   She has been in Florida for a long time.
24    Q   How long?
25    A   I cannot recall.  Since I was little.

1   Q   So she's lived in the United States, in
2   Miami, since you were little?
3   A   I don't know if in Miami all the time.  But
4   as far as -- it's my understanding, or as far as I
5   can remember, in Miami.
6   Q   What's your grandmother's name?
7   A   Maria Rivas.
8   Q   Rivas?
9   A   Uh-huh.
10  Q   Can you spell that?
11  A   R-i-v-a-s.
12  Q   Is your grandmother a U.S. citizen?
13  A   I think so.
14  Q   Have you ever come to visit her?
15  A   When I was little, with my parents.
16  Q   Is it your mom's mom?
17  A   Correct.
18  Q   And your mom lives in California now?
19  A   Correct.
20  Q   What made her move to California?
21  A   She had the -- I don't know.  She came
22  because my grandma put some papers, and they said,
23  "Oh, you have such amount of time to go to" --
24  Q   Okay.
25  A   So I think it's residency.  She's not a --

1   Q   She's helping her get her residency?
2   A   -- U.S. citizen.
3   Q   Okay.  And then who else did you say lives in
4   the United States?
5   A   My brother.
6   Q   Did your brother move over with your mom?
7   A   Yes, because he's a minor.
8   Q   How old is your brother?
9   A   16.
10  Q   So he moved over here six months ago as well?
11  A   Correct.
12  Q   Okay.  So going back to this trip, it looks
13  like you knew back on the 7th.  So when you were in
14  the U.S. on this trip, right, when you flew into
15  Miami, did you see your grandmother, or no?
16  A   No.
17  Q   When's the last time you saw her?
18  A   I cannot recall.
19      This trip, it was coming straight from the
20  airport to Jacksonville, because Juan told us that
21  it was kind of a long trip driving.
22  Q   So let's talk about when you were on this
23  trip.  Did you have any -- did you eat any meals
24  with Juan Blanco while you were on this business
25  trip?

1   A   I was doing a business trip, so, basically, I
2   had no other way to move around.
3   Q   Right.
4   A   So if he wanted to take a lunch at the place
5   he wanted, I needed to go because I was carpooling
6   with him.
7   Q   Okay.  And so it looks like, based on his
8   expense reports, that on September 4th somebody --
9   he and other people had a meal at Bubba Gump Shrimp.
10  Do you remember eating there?
11  A   I think so.
12  Q   Was Luis with you?
13  A   I think so.
14  Q   Okay.  What about -- do you recall having a
15  meal at Mellow Mushroom on that business trip?
16  A   Where?
17  Q   It's a pizza place called Mellow Mushroom.
18  A   I do not recall.
19  Q   What about an Italian restaurant called Brio?
20  A   I cannot recall.
21  Q   You actually submitted an expense
22  reimbursement.  So you ate at Brio on September 5th.
23  A   Yeah, it's possible.  I don't recall every
24  single place that I ate during my business trip.  It
25  was just, "Okay.  If you guys are hungry, let's go."

1   So...
2   Q   So would the three of you on this trip
3   typically eat together since you had one car?
4   A   Yes.
5   Q   When you-all would go out to eat -- and I'm
6   talking specifically about the September trip --
7   would you drink alcohol?
8   A   I cannot recall.
9   Q   So you don't remember?
10  A   No.
11  Q   You didn't make any complaints to the company
12  about that trip with Mr. Blanco, did you?
13  A   I did not.
14  Q   And there was nothing on that trip that you
15  felt like was inappropriate on his behalf?
16  A   Direct to me, no.  He was focusing -- in that
17  trip, he focused on Luis.
18  Q   Luis Santamaria?
19  A   Correct.
20      He was making -- he was always making fun of
21  his sexuality.  It was not because Luis confirmed
22  that -- his sexuality, but he was always mocking
23  about Luis.
24      And I remember that we were at the hotel --
25  because he used to say, "If you want your expenses

1  approved, you need to get some beers. If not, fuck
2  you-all. I'm not going to approve those expenses,
3  and you'll have to put your money and pay back to
4  Crowley."
5       So in order for -- for us to do this, he used
6  to say -- I don't recall on which trip, but I
7  remember that the expenses tickets, some of them,
8  they were from Walmart, and we needed to pay with a
9  card.
10      So instead of putting the ticket details so
11 Crowley could see what we got, it was just the total
12 amount, because it was my understanding that
13 Crowley, in a business trip, does not allow you
14 to -- or they don't reimburse if you are getting
15 alcohol. I think it's -- if I'm -- if I don't
16 recall incorrectly, I think I saw in one of the
17 documents that it's one or two alcoholic drinks that
18 Crowley allows.
19   Q  Okay. So let me ask you this: When you --
20 so you returned from that trip. Why did you -- so
21 your trip, again, was, according to that itinerary,
22 September 4th to September 7th.
23      My question is -- it looks like you submitted
24 a receipt for gas reimbursement for your fuel on
25 September 3rd, which was the day before you left.

1  Do you know why you would have done that?
2    A  Yeah, because sometimes you can -- even
3  though the supervisor has a corporate card, at the
4  end of the day, he's the one that approved the
5  expenses. So if he was paying meals, it could be,
6  like -- how can I say? And I'm trying to translate
7  it before in my head.
8       Like, "Okay. I paid for this meal using
9  Crowley's money. You haven't spent that much money,
10 so put the gas -- because I already paid for
11 everybody's meal, so put the gas for everybody."
12      It was kind of like --
13   Q  Put the gas for everybody for what?
14   A  For going around between the hotel or going
15 for food or --
16   Q  That would be on the trip --
17   A  -- the office.
18   Q  -- right? That would be during the trip with
19 the rental car gas? Is that what you're talking
20 about?
21   A  Yes.
22   Q  But I'm asking you -- it looks like in
23 San Salvador you put in reimbursement for gas --
24   A  Aah.
25   Q  -- for your own car.

1       On September 3rd, you put in a reimbursement
2  for, like, $15.30, and then --
3       MS. NOTARI: Objection to form.
4  BY MS. DEGANCE:
5    Q  So why would you have done that?
6    A  Because if you -- when you do a trip, either
7  you can take one of the Crowley's taxi companies,
8  that you just say, "Hey, this is Vanessa. I'm a
9  Crowley employee," and they take you, or what you
10 can do is -- I don't recall the exact amount of
11 money. But if you use your own car to go, either
12 somebody else is driving -- let's say my sister, for
13 example -- you have -- you are allowed to get gas
14 money --
15   Q  Okay.
16   A  -- to compensate that you are spending your
17 gas to move from your house to the airport.
18   Q  Okay. So that's why gas charges were
19 approved the day before you left and also after you
20 got back?
21   A  Correct.
22      MS. DEGANCE: All right. Why don't we take a
23 quick break.
24      THE VIDEOGRAPHER: Go off the record, 11:32.
25      (Brief break.)

1       THE VIDEOGRAPHER: We're back on the record,
2  11:50.
3  BY MS. DEGANCE:
4    Q  So before we went on the break, we were
5  talking about your September 2017 business trip;
6  right?
7       So when you -- so you came back from that
8  trip. It looks like you came back around the 7th of
9  September. Do you recall the next business trip you
10 took with -- for Crowley in your position? Was it
11 the November one?
12   A  I cannot recall, to be honest.
13   Q  Okay.
14   A  I did multiple times with Crowley, so it's
15 kind of difficult for me to locate which my next
16 trip was or how many I did.
17   Q  Okay. So after the elevator event that you
18 described, right, do you recall -- do you recall
19 that your next business trip after that with
20 Mr. Blanco was that November 2017 trip?
21   A  I cannot recall if it was the next one. But
22 after the elevator situation, the next coming trip,
23 it was the most significant to me.
24   Q  Okay. So it would have been the
25 November one. We'll talk about that one next; okay?

29 (Pages 110 - 113)

1   A  Okay.
2   Q  So I'm going to show you a document we'll
3  mark as Defendant's Exhibit No. 4. And it's a
4  travel itinerary, actually, that you produced --
5  that your lawyer produced in this case.
6     (Defendant Crowley's Exhibit No. 4 was marked
7  for identification.)
8  BY MS. DEGANCE:
9   Q  So let me show this to you. So take a --
10  A  Can I --
11  Q  We're done with that one. Thank you. Just
12  put it right there and take a look at this one.
13     So before we get to that, I want to talk
14  about this trip, November -- the November 2017 trip.
15  And this is the trip where you allege that
16  Mr. Blanco sexually assaulted you, so just to let
17  you know what trip I'm asking you about; okay?
18     How did you first learn that you were going
19  on that business trip with him in November 2017?
20  A  It was -- the first notification was -- I
21  cannot recall or give you a specific date, but it
22  was prior to knowing about this trip. And it was --
23  I cannot recall when did I knew about this exactly.
24  Q  Do you --
25  A  But I know that I received a verbal that they

1  were asking for an approval. Then the elevator
2  came. And I think when the elevator situation
3  happened, I already knew that -- I had the
4  confirmation. I don't know if by email. But I knew
5  that the trip, it was an upcoming trip --
6  Q  So it had already --
7  A  -- for sure, not an approval anymore.
8  Q  So it was already planned -- the trip was
9  already in the works before the elevator incident;
10  in other words, you were already aware that you were
11  going to be going on this trip?
12  A  Yes.
13  Q  Okay. And do you remember who first told you
14  about the trip, the November 2017 trip?
15  A  Juan Blanco.
16  Q  Okay. And did he tell you the reason? Were
17  you aware of the reason for the trip?
18  A  If I remember correctly, it was something
19  about the DFTS. It had to be something about DFTS
20  or inland training, because at the end of the day he
21  was handling both.
22  Q  At the time what was your knowledge of what
23  the DFTS contract was?
24  A  My understanding at that time, it was -- that
25  it was -- they were fighting litigation or that they

1  wanted litigation about handling military cargo
2  shipments or movements, so, in other words, that
3  Crowley will be in charge -- was in charge of moving
4  military cargo.
5  Q  And you said it was a training -- it was
6  likely a training trip, where you come over and
7  train?
8  A  Yes.
9  Q  So in November 2017, what type of training
10  did you receive that had to do with the DFTS
11  contract?
12  A  Which one?
13  Q  In November, the November trip that we're
14  talking about, what type of training, right, were
15  you given related to DFTS?
16  A  I cannot recall if it was training or we
17  were -- I don't know if testing is the right word,
18  but we were, like, improving stuff or testing ERP.
19  I cannot recall. But it was for a business trip.
20  Q  So when we talked earlier about your
21  different roles, you said at one point you did some
22  work on the DFTS contract; right?
23  A  Correct.
24  Q  And so describe -- what was the work that you
25  personally performed that was related to the DFTS

1  contract?
2  A  If I remember correctly, it was in 2018 that
3  I started fully as a -- in DFTS. And I was in
4  charge of indexing. That basically is doing an
5  audit process.
6  Q  A what?
7  A  An auditing process of the documents that we
8  received after a cargo is received or delivered.
9  Q  So when you say "an auditing process," what
10  specifically were you doing with the documents?
11  A  I was reviewing that the signature of someone
12  in the -- I don't know if in the U.S. Government,
13  but someone with authority, if the signature was
14  good, if we had everything we needed to process -- I
15  don't recall if they were payments.
16     But, basically, my job was making sure that
17  the documents, I have them completely, the proof of
18  delivery, and to see if we were missing some --
19  something, for example, like a signature. You were
20  not able to continue the process of the DFTS -- DFTS
21  contract -- the DFTS process without a signature,
22  just to give you an example.
23  Q  So using that example, if you found a
24  document, for example, that didn't have a signature,
25  then what was your job? What would you have to do?

1    A   Either you could say to your supervisor,
2  "Hey, I'm missing this document," or put it on
3  dispute on the system.
4       So I cannot recall if there was a department
5  in charge about communicating and saying, "Can you
6  resend this POD?"  But, basically, in a generic way
7  it was like that.
8    Q   So you'd alert your supervisor or somebody so
9  that the document could then be signed?
10   A   Put it as rejected, if I'm not incorrect.  It
11  happened a lot of time ago, and I'm doing a lot of
12  stuff.
13   Q   Okay.  Was anyone else traveling with you
14  from San Salvador to Jacksonville from Crowley on
15  that November 2017 trip?
16   A   I think this was the trip that Evelyn
17  Vasquez.
18   Q   So Evelyn, and what's her last name?
19   A   Vasquez.
20   Q   V-a-s-q-u-e-z?
21   A   Correct.
22   Q   And Juan Blanco; correct?
23   A   I --
24   Q   I'm sorry.  You're right.  He didn't travel
25  over with you.

1    A   Yeah.  No.  That's what I was about to say.
2  I think he was already here.  But I'm not sure.  I
3  just know for sure that I traveled with Evelyn --
4    Q   Right.
5    A   -- from San Salvador to Jacksonville.
6    Q   Okay.  So you and Evelyn traveled over
7  together on or around November 5th, 2017; does that
8  sound correct?
9    A   Correct.
10   Q   And if you look at the -- Exhibit 4 in front
11  of you, you see it's an itinerary for Sunday,
12  November 5th, 2017, the initial flight at the top --
13   A   Correct.
14   Q   -- right?
15      Okay.  And Mr. Blanco, it's my understanding,
16  was already in Jacksonville?
17   A   I think so.
18   Q   And so you fly over.  And then when you
19  landed in Jacksonville -- well, first of all, you
20  mentioned earlier, you told Jacqueline Nájera that
21  you did not want to go on this trip; is that right?
22   A   Right.
23   Q   Did you tell anyone else within Crowley that
24  you did not want to attend the trip?
25   A   I think at that time I did what I'm supposed

1  to did, just escalating with my human resources.
2  And at the end of the day, Crowley asked you to
3  respect the levels of -- on escalation.
4       So, first, if you have an issue, you need to
5  go to your supervisor.  As far as my understanding
6  was, first you need to go to your supervisor, then
7  human resources, and then ethics, I think.
8       So at that time, since my aggressor was my
9  supervisor, he was not an option to say, "Hey, you
10  grabbed my breast and I feel offended and I don't
11  want to go on a trip with you."
12      I did the Jacqueline thing because it was
13  human resources, and -- yeah.
14   Q   So you -- so outside of Jacqueline, you
15  didn't tell anyone else that you didn't want to go
16  on the trip, is that correct, within Crowley?
17   A   Yes.
18   Q   Okay.  And with Jacqueline, did you ever send
19  her or put anything in writing regarding your
20  complaint about what happened in the elevator, or
21  was it just the conversation you described?
22   A   I had conversations with her.  The first one,
23  the same day that he grabbed my boob, I remember
24  writing communication about me asking her to
25  reconsider the decision of helping me.  I cannot

1  recall the tool that I used.
2    Q   Okay.  When was that, approximately?
3    A   Just near to the trip, but I cannot recall
4  exactly the date.
5       And I didn't -- I remember that I didn't get
6  a response from her back.  But I was able to find
7  her on the hallway -- right?  That's the right word
8  for it?  I'm so sorry -- because I was going to the
9  bathroom.  And she as human resources, she used to
10  walk around departments.  So it was a coincidence
11  that we met.  I was going to the bathroom, and she
12  was coming into the fifth floor.
13      And I remember she told me, "Please make sure
14  don't -- do not ever again put anything in writing
15  about your supposed assault."
16   Q   Had you put something in writing at that
17  point?
18   A   I think she considered that what I told her
19  in writing that if she could reconsider the decision
20  of sending me on that trip -- maybe she thought that
21  I was trying to save my back or something like that.
22   Q   So you did put that in writing?
23   A   I did.
24   Q   Okay.  In an email?
25   A   I cannot recall the tool that I used.

1    Q   It could have been an email, or it could have
2 been a message?
3    A   It could be by cell phone, or we had
4 different tools at Crowley, such as email, the
5 corporate chat.  So I cannot recall because --
6    Q   How -- go ahead.
7    A   Since I was -- when you do a travel, it's
8 recommended for you to have your human resources
9 phone number, as far as my understanding, in your
10 cell phone, just in case that you have an emergency.
11 And you also have to have a contact of a travel
12 person, just in case something happens.
13    Q   Have you ever texted Jacqueline Nájera?
14    A   I cannot recall.
15    Q   Have you checked your phone to see -- as part
16 of this case, to see whether you ever texted her?
17 Don't check now, but I'm just asking.
18    A   No.  I didn't bring my cell phone.
19       I haven't checked, but I don't think so.
20    Q   Okay.
21    A   It's from many years ago, so I don't think
22 they would be saved or anything.
23    Q   Okay.  So you mentioned it to her twice, once
24 when you met with her right after the elevator event
25 and then once you wrote something to her, and she

1 made --
2    A   That was -- that was two.  And there was a
3 third one, that I was going to the cafeteria and she
4 was walking down -- I think she didn't take the
5 elevator, or maybe she was coming from the fourth
6 floor.
7       But what I can recall is that I was going in
8 the hall to go to the cafeteria.  And the cafeteria
9 door and the stairs to come from the fourth floor to
10 the fifth floor was like in this position, like the
11 door here.
12       So when I saw her, I felt, like, a big need.
13 And I almost begged her -- well, not almost.  I
14 begged her.  The only thing I think I was missing is
15 to bend over myself and to say -- I remember that I
16 told her that -- "Can you please, please, please
17 reconsider about helping me not to go into this
18 trip?  I don't want to lose my job, but I don't want
19 to go either."
20       That's when it came up to my mind that I
21 advocate -- I don't know if that's the proper word.
22    Q   You what?
23    A   Advocate --
24    Q   Advocate?
25    A   -- myself to the first corporate value at

1 Crowley, that is safety.  Safety first.
2       So I remember that I told her that one of the
3 corporate values was safety and that I didn't feel
4 safe about going with him, that if she was able to
5 reconsider her decision to help me out instead of
6 being -- threatening me about losing my job because
7 I really wanted to stay there.
8       And that day I felt like she was mad, because
9 she was like, "Vanessa, I already told you either
10 you go to the trip or you will get fired.  End of
11 the discussion."
12       So I was like, okay, at least I tried.  But I
13 almost knew that her answer will be a negative
14 answer to me.
15    Q   So you didn't -- so you never -- just to make
16 sure I'm clear, you never asked anybody in
17 operations, like over Juan Blanco, whether, you
18 know, you could skip the trip?  You just asked HR;
19 correct?
20    A   Just HR.
21    Q   Okay.  So those were the three times that you
22 mentioned something to her; is that right?
23    A   Correct, the ones that I can recall.  But I
24 think those three.
25    Q   Do you recall how far ahead of time -- how

1 far in advance of you flying over to Jacksonville
2 did Mr. Blanco fly over?
3    A   I cannot recall, to be honest.  But the only
4 thing that I'm sure is that he was -- he was not
5 there to fly with Evelyn and myself.  That's the
6 only thing.
7    Q   Did you have any communications with
8 Mr. Blanco after he left San Salvador for the
9 Jacksonville trip, but before you actually arrived
10 in Jacksonville?
11    A   Probably.
12    Q   Do you recall --
13    A   He was my supervisor, so...
14    Q   Do you recall any of those conversations?
15    A   I do not recall.
16    Q   Were you friends -- would you say that Evelyn
17 Vasquez was a friend of yours?
18    A   At that time we were teammates, but not close
19 as friends.
20    Q   When you say "at that time," did you become
21 friends after that?
22    A   I did.
23    Q   Okay.  Are you currently friends with her?
24    A   If I see her, I say hi and I'm -- I'll be
25 really glad to see her.  But it's not like we are

1 best friends and we are hanging out to get coffee,
2 just saying.
3    Q  When is the last time you spoke with her?
4    A  I don't recall, but I'll say a year. I
5 haven't spoke with her in a while.
6    Q  But on this trip, you were not yet friends
7 with her. You were just colleagues?
8    A  We were friendly, but not friends, because
9 friends, to me, is a huge word.
10   Q  So once you landed in Jacksonville, how did
11 you get from the airport -- I'm assuming you went to
12 the hotel first?
13   A  I don't recall.
14   Q  And you don't remember how you got from the
15 airport to the hotel?
16   A  I don't recall either.
17   Q  Because it doesn't show -- if you look at
18 your itinerary, I don't see a car rental; correct?
19   A  Maybe someone picked us up. And by
20 "someone," I think it was Juan. Because at the end
21 of the day, he was the supervisor, so he needed to
22 take responsibility about Evelyn and myself.
23   Q  Do you recall whether Mr. Blanco picked you
24 up?
25   A  No, I cannot recall. That is my

1 understanding or...
2    Q  Do you recall arriving at the hotel and
3 checking in?
4    A  I do not recall.
5    Q  So we have your travel records that shows --
6 and there's an itinerary in front of you. It looks
7 like you were booked at the Courtyard Marriott?
8    A  Correct.
9    Q  You see that?
10   A  Yes.
11   Q  And it looks like, on the first page -- if
12 you just look at first page first, do you see where
13 it says "Hotel, November 5th"?
14   A  Correct.
15   Q  Okay. And it says, "Please use credit card
16 in record."
17      Do you see that?
18   A  Correct.
19   Q  So did Crowley's travel department -- had
20 they already put a credit card down for your hotel?
21   A  It was my understanding at that point,
22 according to Juan told me, that it was -- that the
23 card that it was on the record was the corporate
24 card. But I don't know if he meant -- I don't know
25 if in Crowley -- I never had one -- that it was a

1 global card or it was his card.
2    Q  So when you checked -- you don't have any
3 memory about checking in?
4    A  What do you mean?
5    Q  Checking in at the hotel, when you get to the
6 hotel and you go to the desk and you give them your
7 name and you get your key.
8    A  Oh, yes.
9    Q  You remember that.
10      Okay. So you got to the hotel. And so tell
11 me about that. Did you go to the desk and give your
12 name?
13   A  I think so.
14   Q  And you didn't have to give them a credit
15 card; correct?
16   A  I did not.
17   Q  How many keys -- do you remember how many
18 room keys you obtained?
19   A  Two.
20   Q  Did you give a key to anyone else?
21   A  I did not.
22   Q  Do you recall what room you were in?
23   A  I do not.
24   Q  Do you recall what floor you were on?
25   A  I do not.

1    Q  Do you have any knowledge where Mr. Blanco's
2 room was?
3    A  He was on the first floor.
4    Q  How do you know that?
5    A  Because I remember that when we went back
6 from work, he used to go -- the doors were open, and
7 he would make a right, and Evelyn and myself will go
8 left to wait for the elevator.
9    Q  And so he didn't take the elevator?
10   A  No.
11   Q  Do you recall if Evelyn was on the same floor
12 as you?
13   A  Correct. She was -- her room was in front of
14 mine.
15   Q  When you say "in front of," was she right
16 next door to you or right across the hall from you?
17   A  There was my door, the hall, and her room.
18   Q  So she was right across the hall from you?
19   A  Correct.
20   Q  And you don't remember what floor that was?
21   A  I do not.
22   Q  When you arrived -- it looks like your flight
23 over was at 7:10 in the morning and you arrived at
24 Jacksonville, it looks like, sometime -- at
25 3:00 p.m.

1    Do you see that?
2    A  Correct.
3    Q  And it was on a Sunday.  So you didn't have
4  to work that day that you arrived; is that right?
5    A  Right.
6    Q  So when did you actually begin working on
7  that trip?
8    A  I think Monday.
9    Q  So the next day?
10    A  Correct.
11    Q  And describe your workdays while you were on
12  the trip.  Where were you all -- where were you
13  working physically, what location?
14    A  At the Regency office in Jacksonville.
15    Q  Okay.  So that next morning, how did it work?
16  Would you-all -- would you get up and meet at a
17  certain time?  Would you have breakfast together?
18  Just kind of tell me how your day went that first
19  day, on Monday.
20    A  I don't recall if we had breakfast, but I
21  remember that we used to gather outside next -- not
22  next to the pool, because there was a pool, there
23  was a door, and there was, like, the street.  Not
24  the street where cars go; the street that leads you
25  to the parking lot.

1    So there was a trash can near to this door
2  and near to the pool -- the pool door.  And we used
3  to gather together there while -- I can recall most
4  of the times Juan was waiting for Evelyn and myself
5  with a coffee and cigarette.
6    Q  Would you and Evelyn meet for breakfast in
7  the mornings on this trip?
8    A  I cannot recall.
9    Q  Did you plan with Evelyn, since you were
10  right across the hall from each other, to get each
11  other before you went downstairs, or no?
12    A  No, not that I recall.
13    Q  And so on that first day, which was Monday,
14  you would -- you met downstairs out by the --
15  outside; right?
16    A  Right.
17    Q  And then did Mr. Blanco drive you-all to the
18  Regency office?
19    A  He did to me and Evelyn.  We were the three
20  of us in the car.
21    Q  And when you got to the Regency office, where
22  was your -- you were undergoing training; is that
23  right?
24    A  I think so.  I don't recall the purposes of
25  the business trip, but it was a business trip

1  because Crowley was paying.
2    Q  Where -- once you got to the Jacksonville
3  office -- I know it's a pretty large building --
4    A  Correct.
5    Q  -- right?
6    -- where would you go to actually conduct
7  your work?
8    A  Since Juan knew very well the office, we were
9  just following him.  And I cannot recall where the
10  inland department was at the time.  But what I know
11  is that we used to go and leave our stuff in
12  cubicles, that it was -- that they were near to Jose
13  Lopez.
14    So I'm not sure if the rest of the inland
15  department were sitting next to Jose, but it was a
16  big space with cubicles available for us as a
17  visit- -- visitors to go and sit there.
18    Q  So you would leave your stuff, and where
19  would you go?
20    A  I think it was a conference room there where
21  we received the trainings.  But I can also recall
22  that I used to go to the cubical to get some work
23  done so we don't accumulate the work while we were
24  there.
25    Q  Do you -- do you remember who gave the

1  training?  Was it a live person or was it online?
2    A  No.  I don't recall exactly, to be honest.  I
3  don't want to guess.
4    Q  Do you recall -- so who was in the training
5  with you?  It was Evelyn, right, you?  Was
6  Mr. Blanco in the training?
7    A  Correct.
8    Q  Was anyone else in the training?
9    A  Jose as well some of the times.  And I cannot
10  recall if any other persons.
11    Q  Do you know -- or did you at the time know
12  anyone else in the Jacksonville office besides Jose
13  Lopez?
14    A  I worked with a few -- when you're at
15  Crowley, you're able to work with multiple
16  departments.  So I might knew the names, but not the
17  faces.  And the one that I looked for, it was
18  Rosandra Sanchez.  And -- but we didn't hang out or
19  something.  It was just for me to be able to meet
20  her in person.
21    Q  So you met her in person?
22    A  Correct.
23    Q  Do you recall meeting with anyone else?
24    A  I think it was Glenda Oreamuno, if -- I don't
25  recall if that's her last name, but Glenda.  And I

1 think Elizabeth Kinder was there, too.
2   Q   Elizabeth who?
3   A   Kinder.
4   Q   K-i-n --
5   A   K-i-n-d-e-r.
6   Q   And what's -- do you know Glenda's last name?
7   A   O-r-e-a-m-u-n-d-o, if -- I don't know if
8 that's how it's spelled, but...
9   Q   That's okay.
10       When you were on this trip and you would go
11 to the Jacksonville office together, would you then
12 all go out for lunch each day?
13   A   Correct. We were always together, lunch,
14 dinner. We were going from the hotel to Crowley,
15 Crowley to the hotel, or maybe, if we want to stop
16 by by a Walmart to get snacks or water or whatever
17 thing, it will be always together, because there was
18 no other way, unless that you, as an employee, wants
19 to pay from your own pocket an Uber. And for an
20 El Salvadorian to pay for an Uber here in the U.S.,
21 it's kind of expensive, so it's not an option.
22   Q   So you would each lunch and dinner together.
23 And would it be the three of you each time?
24   A   I cannot recall if we were the three all the
25 time, because there were days when I did travels

1 with Crowley that I was skipping meals. But I
2 cannot recall specifically if on that trip we were
3 together all the time.
4   Q   So it looks like, looking at the expense
5 reports, Mr. Blanco would have expenses for some
6 meals and you wouldn't for the same day. But then
7 other days you would expense -- you would have
8 expenses for meals. So would you take turns who
9 would pay for the meals?
10   A   Most of the times.
11   Q   Do you recall ever having a meal with
12 Mr. Blanco on that trip where Evelyn was not there?
13   A   I don't recall.
14   Q   In the evenings when you would go to dinner,
15 would you all drink alcohol at all?
16   A   In the meals?
17   Q   Correct. During the meals, would you have
18 alcohol?
19   A   Possibly. Because he was always like -- not
20 because me or Evelyn was like, "Oh, we're going to
21 dinner, so bring me a couple of beers." No. It was
22 like something very often on him that he really
23 enjoyed drinking. And he didn't like to drink
24 alone.
25       So maybe on one of the dinners -- or maybe in

1 dinner there were occasions that we had no more than
2 two beers, because that's what Crowley approves.
3 And he was -- he was not interested in paying out of
4 his pocket the amount of money that you guys pay
5 here for a beer.
6   Q   So it's more expensive in the United States
7 than in El Salvador?
8   A   Correct.
9   Q   Yeah. So you would have -- if anything, he
10 would have a couple beers because he didn't want to
11 pay out of pocket for additional alcohol?
12   A   Correct. What he used to do is that he will
13 say, "We're going to Walmart." And he used to say,
14 "If you want your expenses approved, you better
15 bring not only your female shit. You need to bring
16 at least a six pack."
17       So it was like, "Okay."
18       I remember that it was occasions that I was
19 bringing, like, a six pack, and I just -- they were
20 left at the hotel. So they were accumulating
21 themselves in the mini fridge.
22   Q   Do you know on this trip -- I didn't see an
23 expensive report -- or expense reimbursement for
24 Walmart.
25       Do you recall on this trip whether you-all

1 went to Walmart and got beer or anything?
2   A   We do, but I'm not sure who paid.
3   Q   Did you-all drink it together?
4   A   Evelyn, to be honest, she was not interested
5 in drinking. It was -- I think it was going against
6 her religion.
7       And I remember that we went to the Walmart,
8 and he said about getting -- "You better bring a
9 drink."
10       And I remember that I helped Evelyn to look
11 for beers. I remember there were colored beers or
12 colored alcohol, but it was fancy bottles, like a
13 six pack. And there was no alcohol percentage on
14 it. So it was good because we were able to trick
15 him. And that day I grabbed a six pack of Corona.
16   Q   And that was on this trip?
17   A   Correct.
18   Q   And did you drink any of the Coronas with
19 Mr. Blanco?
20   A   I remember that after -- because if I'm not
21 in a mistake, the Walmart was near to the hotel.
22 So, basically, you could even walk to the Walmart.
23       I recall that we -- we were with the shopping
24 bags, and he said, "Oh, we can stay a little bit
25 here in the pool."

35 (Pages 134 - 137)

1    So we opened the pool door, and we sat down
2  at a picnic table. I don't know if that's the
3  proper word. But it was near to the pool.
4    So Evelyn took one of these colored drinks.
5  I got a Corona. And I think he had one. I cannot
6  recall. But I remember that Evelyn and myself took
7  one out.
8    After that, I cannot recall if he went to --
9  he went to his room, but I cannot recall if it was
10  because he was getting cold beers, because the ones
11  that he purchased were not cold enough, or if he was
12  getting his cell phone charged. I cannot recall,
13  but he went to his room.
14    And that's when Evelyn and myself were like,
15  "You know what? I'm not in the mood to drink. So
16  why we don't say anything and just go to our room."
17    But we knew the temper of Juan about you
18  being -- he used to call us pussy ladies because we
19  didn't want to spend time with him and get so drunk
20  that you will be vomiting. That's his main goal on
21  every single trip.
22    So I remember that Evelyn got that date an
23  iron that she paid with her money.
24    Q   She got what?
25    A   A straightener. I don't know if that's --

1    Q   A hair straightener?
2    A   A hair straightener from Walmart, paid by her
3  own pocket.
4    And she came with the idea of saying, "What
5  about if we tell him that -- so we can skip
6  drinking, that we're going to test my straightener,
7  that you will be -- I'm going to request you to do
8  my hair. And I'm going to say something about,
9  'Vanessa, can we do this now just in case that this
10  is not working I have a few hours next day before --
11  or coming -- returning to El Salvador to go to
12  Walmart and give -- they give me my money back or
13  get a new one?'"
14    So I was like, "Okay."
15    So when Juan returned, he was carrying his
16  beers. And that's when Evelyn put the plan on,
17  saying about, "Oh, I want to try this because I want
18  to make sure."
19    And so he was like, "Okay. See you bitches
20  in a bit." That's what he said. "See you bitches
21  in a bit."
22    Q   What night was that?
23    A   It was the night prior to our returning trip
24  to El Salvador.
25    Q   So it was -- November 9th was your last night

1  there.
2    A   I cannot recall the date, but it was the day
3  prior.
4    Q   Had you -- prior to that night, had you-all
5  gone to Walmart and got beer, or was that the only
6  night?
7    A   I cannot recall, but, every time we went to
8  Walmart, he was trying for us to bring some alcohol.
9    Q   When you say --
10    A   It was kind of mandatory.
11    Q   When you say "bring some alcohol," does that
12  mean you-all would get some and pay for it and he
13  would get some and pay for it?
14    A   No. He will pay for it with the corporate
15  card or with cash money, because, in Crowley, you
16  can either -- they give you cash or you can use the
17  corporate card in case that you are manager or
18  supervisor. I don't know who gets the corporate
19  card.
20    Q   And so it would -- so do you recall ever
21  paying for or buying beer yourself at Walmart or
22  making any purchases at Walmart when you were in
23  Jacksonville in November of 2017?
24    A   With my money?
25    Q   No, or that you asked reimbursement for from

1  the company?
2    A   I cannot recall if I was paying or if he was
3  paying, because, at the end of the day, it was the
4  same money.
5    Q   Right. Okay. So that night you-all -- you
6  and Evelyn, then, departed and went back to your
7  rooms?
8    A   He said -- he was mad. I remember. And he
9  was like, "Oh, you fucking lazy bitches. Then I'm
10  going to go out for some drinks because you don't
11  want to hang out with me. You're boring."
12    And -- but what we did next -- Evelyn and I
13  didn't care at that point, because the next day we
14  were going into the office for a bit, and then we
15  were going to El Salvador. So we were not worried
16  at that point for him to be giving us the dirty
17  looks. It was like, we can stand it for a couple
18  hours, his attitude, because we were not drinking.
19    And we grabbed our bags back, and we opened
20  the pool door to get into the hotel. And the next
21  thing I can -- I can remember I was bringing my bags
22  like this (demonstrating). Evelyn was walking in
23  front of me with her bags. I was walking behind --
24  behind Evelyn. And Juan was coming behind me. And
25  he smacked my ass when -- almost when the door went

1 open, the electric door.
2     I was so shocked and scared about the noise,
3 because it was like (demonstrating) in my jeans.
4 And I was like -- my reaction was run, run to
5 Evelyn. So with my bags here, I approach here, and
6 I put my hand like this to her (demonstrating).
7   Q  What bags were you carrying?
8   A  The Walmart bags.
9   Q  So what did you have in them?
10   A  I cannot recall exactly what I had, because
11 in Walmart you can find some beautiful things, not
12 just alcohol. You can get food or snacks, or maybe
13 I did purchase a personal purchase. So I cannot
14 recall what was in my bags.
15   Q  Did you have alcohol in your bags?
16   A  Yes. I was about to say that. The only
17 thing that I'm sure that I had was, it was five
18 Corona beers in one of the bags.
19   Q  So you had that and Evelyn had her bags?
20   A  Correct.
21   Q  About what time was this? Do you have any
22 idea?
23   A  I cannot recall the time, but it was dark.
24   Q  You-all had gone to dinner that night. It
25 looks like you -- you expensed $82 at North Beach

1 Fish Camp. Do you remember that restaurant?
2   A  I do not recall.
3   Q  So it would have been after dinner?
4   A  It would be after dinner that we went to
5 Walmart, because then we went to our room and we
6 didn't went out of the room anymore.
7   Q  So you don't remember what time it was that
8 you were walking back to your room?
9   A  I do not. I know that it was dark, so it
10 was...
11   Q  Okay. So did you and Evelyn -- did you go
12 help her with her hair, or did you each go back to
13 your own rooms?
14   A  I remember that she went into my room, and we
15 started -- she helped me to see if everything in my
16 luggage was fitting in. And I recall that she had
17 something to weigh the suitcase. So she -- we both
18 were helping to weigh and see that everything fits
19 in case that I needed to put something in her
20 luggage or vice versa.
21   Q  Did you have any of the beers that you
22 brought back?
23   A  No.
24   Q  Okay. And so approximately how long was
25 Evelyn in your room?

1   A  I don't recall the time because I was not
2 watching my -- my watch. But it was not -- it was
3 not that long because we both were very tired.
4     And we were like, "Okay. It's time to go to
5 sleep."
6     But I don't recall the time. I was not like,
7 "Oh, it's 10 o'clock. Now shoo shoo off my room."
8 No.
9   Q  So what happened next?
10   A  The next time -- the next thing I can recall
11 is that we said goodbye, goodnight. And I end up
12 hearing that the door of my room got closed, so I
13 was okay.
14   Q  Let me ask you this: Did you physically,
15 like, lock it --
16   A  No.
17   Q  -- after it closed?
18   A  No. I was still with my -- preparing my
19 stuff for the next -- for the next day to return
20 back home. And -- so she went out of the room, and
21 she was the one that let it close. And -- what
22 else?
23   Q  So then what happened next?
24   A  After she left, I heard that the door was
25 closed. I keep -- for a few more minutes, I did --

1 I finished to packing and accommodating everything.
2     And I went into my pajamas, brushed my teeth,
3 normal things that I do, go to the bathroom.
4     And I recall that I -- I really used to enjoy
5 to sleep with the hotel curtains because they are
6 really dark. So it's really -- it's really nice to
7 sleep with that type of curtains. I closed the
8 curtains and went to sleep.
9   Q  And do you recall what time you went to
10 sleep?
11   A  I don't recall.
12   Q  Did you call anybody or did anybody call you
13 before you went to sleep?
14   A  I don't remember.
15   Q  And so what's the next thing you remember?
16   A  I remember -- I don't know how you say it in
17 English, but in El Salvador we call it camison.
18 That is basically a pajama that is kind of like a
19 dress, but with really soft material. You have no
20 shorts or anything. It's just like a -- like a --
21   Q  Like a nightgown?
22   A  -- very fluffy, uh-huh, dress to sleep.
23     So I had one of those. I used to think about
24 what my grandma teach me from -- since I was little,
25 that you don't need to sleep with your underwear

1  because it will give you cancer. That's what --
2      Q  Your grandma taught you that?
3      A  My grandma, since I was little.
4      Q  Your grandmother in Miami?
5      A  Correct.
6      Q  Are you close to her?
7      A  I used to when I was little. I really
8  enjoyed spending time with her.
9          So at that time, I had just my pajama on, no
10  bra, no underwear.
11         I remember that I went to sleep as always,
12  with my face into the pillow and my tummy facing the
13  bed, not like this (demonstrating). It was all the
14  way around. I don't know if I'm explaining it
15  correctly.
16     Q  You are. You're doing fine.
17     A  And I remember that I went to sleep. And the
18  next thing I can recall is that I felt a lot of pain
19  in my private part. And it was kind of like a
20  friction, and it was hurting me. And -- sorry.
21     Q  It's okay. Take your time.
22     A  And I noticed -- because I was shocked. I
23  didn't know what was going on. I realized that my
24  mouth had a hand covering my mouth. And it was
25  really hard for me to breathe. So he was kind of

1  covering my nose as well. So I was trying to kick
2  to see if -- what was holding me.
3      Q  So this is -- you're on your stomach and
4  someone is behind you?
5      A  Correct.
6      Q  Okay.
7      A  And I felt this taste on the hand that it was
8  covering my mouth, Juan's hand, smelled or tasted
9  like dirt, pee, and a strong smell of cigarette. So
10  I was, like, tasting it.
11         I remember that I heard him -- like, he was
12  making noises like he was doing a lot of effort.
13  And I bit his hand, this part (indicating). I bit
14  his hand because I was not able to breathe.
15         And when I was able to get his hand out of --
16  his hand out of my face, I remember that I told him,
17  "Please stop. Please stop. You need to think about
18  your son. Think about mine. Please stop. What's
19  going on?"
20         And I remember that he was like -- I don't
21  know, but he went out of the bed and started saying,
22  "Vane, vieja, I'm so sorry. I'm so sorry. I don't
23  know what happened. I'm so sorry."
24         And I saw him, this part (indicating). He
25  was standing here, pulling his pants on, his boxers.

1  I also saw him taking out the condom and doing a
2  tie. And he throw it on my garbage. I can recall
3  his brown nipples.
4          And he said, "I'm so sorry. I'm so sorry."
5  And he left.
6      Q  Okay. Why don't you just take a second. I
7  have couple of questions for you, but just take your
8  time.
9      A  I'm so sorry.
10     Q  Don't say you're sorry. Are you okay?
11         Take your time. It's okay. Do you want to
12  take a break?
13     A  (Shakes head.)
14         I'm so sorry.
15     Q  Do you want some more water?
16         You have one? Okay.
17     A  Thank you.
18     Q  Take your time. Are you okay?
19         I'm going to ask you a couple of questions,
20  and I'm sorry -- I'll apologize in advance, but I
21  need to just get an understanding of exactly what
22  happened; okay?
23         So let me ask you this: He -- I'm assuming,
24  based on what you just described, he was having
25  intercourse with you?

1      A  Yes.
2      Q  Okay. And you testified that you closed the
3  drapes so you could make it very dark in the room.
4          So my question is: How were you able to see
5  things like his -- the color of his nipples and --
6  describe that for me.
7      A  Because in my room, there was the principal
8  door, the bathroom, and my bed was just in front
9  of -- behind the bathroom wall. And my bed -- my
10  bed was near to the -- to the hall for -- just give
11  baby steps, and you're in the principal door.
12         So I -- the light -- I was able to see it
13  because some of the lights in the hallway was coming
14  from behind the principal door.
15     Q  Coming from under the door?
16     A  Uh-huh.
17     Q  So you could see -- so you knew who it was?
18     A  I knew.
19     Q  How did you initially know who it was?
20     A  Because of the noises that he was doing. He
21  had a very -- I worked with him, so it was really
22  easy for me to recognize his voice. So...
23         But I was -- until he left, I was able to
24  see -- or to reconfirm for ten times that it was
25  him.

38 (Pages 146 - 149)

1    Q   So did he say anything to you before the time
2  you told me he started apologizing?
3    A   He did not.  He was just only making those
4  noises, like (demonstrating), like he was getting a
5  really hard struggle or something like that.
6    Q   And this is while he's having sex with you?
7    A   While he was penetrating me.  Yes.
8    Q   Did he -- did you hear -- you didn't hear him
9  come in the door?
10    A   I did not.
11    Q   And how much of his clothing did he take off?
12    A   Only -- as far as I was concerned, completely
13  off, the pants and his underwear.  Because the
14  T-shirt, it was a button T-shirt, so it was like
15  only, like, open, not completely taken off.  So...
16    Q   Was it the same clothes he had had on earlier
17  in the night when you saw him?
18    A   I cannot recall if they were the clothes that
19  he was wearing that day.
20    Q   Did he have shoes on?
21    A   I cannot recall.  I didn't notice his shoes.
22    Q   So he gets up and he starts apologizing to
23  you.  And you said that he had been wearing a
24  condom?
25    A   Yes.

1    Q   And he took it off and he tied it and threw
2  it on your bed?
3    A   No, not in my bed.  In the bathroom trash.
4    Q   In the bathroom trash can?
5    A   Uh-huh, because he did it -- he was, like,
6  pulling up his boxers and pants at the same time.
7  And when he got his pants up to here (indicating),
8  he was like -- he took the condom out.  He made a
9  tie.  Then he was like (demonstrating) to the trash
10  can.
11    Q   Could he reach -- did he have to walk over to
12  the bathroom?
13    A   No, because my bed, it was near to the
14  bathroom.  So since he was standing near to the
15  bathroom door and the principal door, it was easy
16  for him just to throw it away.
17    Q   Was there a bedside clock in your room?
18    A   A what?
19    Q   A clock.  Normally in hotels next to the bed
20  is a clock.
21    A   I cannot recall.
22    Q   You don't remember?  So do you have any --
23  you have no idea what time it was?
24    A   No.
25    Q   And after he got up and got dressed and was

1  apologizing, did you say anything to him?
2    A   I couldn't.
3    Q   Okay.  Did he say anything else to you?
4    A   No.  He just said, "Vane, vieja, I'm so
5  sorry.  I'm so sorry.  I don't know what happened."
6  And he left.
7    Q   And let me ask you this.  And I apologize for
8  asking you this.  But had you ever before had any
9  kind of intimate interaction with him?
10    A   No.
11    Q   Okay.  I just have to ask.  So no.
12      And so then he left?
13    A   Yes.
14    Q   What did -- is there anything else you can
15  remember about that event that you haven't told me?
16  Is there anything else you can remember between the
17  time he came in and the time he left?
18    A   I just remember that I was not able to sleep
19  anymore, so I took a shower.
20    Q   Okay.  Hang on.  I don't want you to go there
21  yet.
22      From the time he came in until the time he
23  left, anything else you can remember besides what
24  you've described?
25    A   I don't.

1    Q   Okay.  So he leaves.  What is is -- so what do
2  you do -- now he's left.  Now tell me what you did
3  next.
4    A   I remember that I turned on the light, and I
5  went to the bathroom, cleaned myself with a paper
6  towel.  And I took a shower, and there was a little
7  blood that it was coming from my vagina.
8      And I remember that shower so well because
9  that was the first time that I felt like the water
10  was running and it felt like it was going -- it was
11  just going by.  It was just going and going without
12  me feeling clean.
13      So I don't know how much -- how much time I
14  spent taking a shower, but I can -- but I remember
15  that when I got out of the bathroom, my fingers were
16  like old people fingers.
17    Q   Pruny?
18    A   Uh-huh.  And I just waited, sitting, for the
19  next day to come.
20    Q   Let me ask you this, Ms. Treminio.  In your
21  lawsuit, you've alleged that Mr. Blanco obtained a
22  key from the front desk and entered your room with a
23  key he obtained from the front desk.  How do you
24  know he obtained a key to your room from the front
25  desk?

1   A   Because I was told by Arthur. I didn't knew.
2   That -- that confirmation how he was able to go in
3   came from Arthur, not from me.
4   Q   Okay. So -- and we're going to talk about
5   your conversations with Arthur in a little bit.
6       So staying with that night, you don't -- you
7   don't know how he got in the room?
8   A   At that time I didn't knew how he was able to
9   go in.
10  Q   Did you still have both of your room keys?
11  A   No, I did not.
12  Q   How many of your room keys did you have? Did
13  you only have one?
14  A   I only had one at the time.
15  Q   So do you know what happened to the other
16  room key?
17  A   Yeah. I throw some -- I don't know. It was
18  trash that it was on my purse. So one of the key
19  cards went along with the little saving card. So I
20  know that I throw it away.
21  Q   So you accidentally threw one of them away?
22  A   Correct, because the other one was without
23  that little carton.
24  Q   So you still had the one key?
25  A   I still had one key.

1   Q   How -- do you know, how did Mr. Blanco know
2   what room you were in?
3   A   Because he was my supervisor. He was -- it
4   was my understanding that he -- as my supervisor, he
5   had all of this information and he was responsible
6   of me.
7       So what -- what I understood at the time,
8   when you were traveling, it was like, "Okay. What
9   room are you in, just in case that we have an
10  emergency to see where to start looking at you?"
11  Q   So did you tell him what room you were in?
12  A   I don't recall if I told him.
13  Q   So your travel itinerary doesn't say what
14  room you were in.
15  A   Correct.
16  Q   So other than assuming that because he was
17  your supervisor he would know, do you have any idea
18  how he came to learn what room you were in?
19  A   I don't recall.
20  Q   After he left your room, did you call anyone
21  or text anyone or contact anyone?
22  A   After what?
23  Q   After he left the room.
24  A   Immediately?
25  Q   In the -- you know, between the time he left

1   until the next morning, did you contact anyone?
2   A   Before arriving to Crowley?
3   Q   Correct.
4   A   I don't recall if I called anybody. I was in
5   shock. I was afraid. I had just been raped, so I
6   was not thinking about calling someone.
7   Q   Why didn't you call the police?
8   A   Because I had faith on Crowley's authorities,
9   and I didn't want to affect them. So I thought at
10  the time, "Okay. You are in another country that is
11  not yours. You don't know how the laws here works.
12  You could call the police, but how about I get the
13  company's name involved? What they going to think
14  about that?"
15      So I thought, "Okay. I'm in a business
16  travel. The right way to act will be go to Crowley
17  and report it to Crowley."
18  Q   So your grandmother was in Miami at the time.
19  Did you think about calling her?
20  A   No.
21  Q   Why not?
22  A   Because my grandma is a diabetic person. If
23  I say something like that and how old is she, she's
24  going to die. She doesn't know any about this.
25  Q   Okay. So she doesn't know anything about it?

1   A   Uh-uh.
2   Q   And so you didn't call the police, and you
3   don't know -- you can't remember -- you don't think
4   you called anybody else?
5   A   I don't think so.
6   Q   And so the next morning comes; right? Did
7   you have your passport with you and your visa?
8   A   All the time.
9   Q   And your flight was scheduled the next day.
10  According to this itinerary, it looks like --
11  A   On Friday.
12  Q   -- it was supposed to leave at
13  3:00-something, I believe -- 3:45.
14      Do you see that at the bottom? On the first
15  page, do you see where it says "United," right here
16  (indicating)?
17      Well, it might be on the next page. Look on
18  the next page. Maybe it's on the next one.
19      Right here, 3:45, do you see that?
20  A   Yeah. I remember it was a Friday.
21  Q   Okay. And so the next morning, tell me --
22  you woke up. Tell me what you did from the time you
23  woke up.
24  A   I didn't wake up because I didn't -- I was
25  not able to sleep --

1    Q   Okay.
2    A   -- the rest of the time because I was scared
3   about him to coming in again, because at that time I
4   didn't knew the way he got access to my room.  So I
5   was with the lights on just waiting for the next
6   day.
7        The next thing I can recall is that the next
8   morning he was waiting for us, Evelyn and myself, as
9   a regular day to -- he was smoking with a coffee.
10   Q   Did you meet -- I'm sorry to interrupt.
11       Did you meet Evelyn for breakfast the next
12  morning?
13   A   No.
14   Q   Did you say anything --
15   A   Not that I can recall.  I cannot recall.  I
16  was too -- I was too in shock.  I can't remember --
17  at that point I was only able to think, "Oh, my God.
18  I've just been raped."  And my main concern was at
19  that time, "Okay.  What happened if the condom
20  gets -- got broken?"
21       I had so many questions from the night prior
22  that I was not thinking about if I had food or --
23  I'm so sorry.
24   Q   That's okay.
25   A   I would like to say, but I don't remember.

1    Q   Did you say anything to Evelyn about what
2   happened?
3    A   No.
4    Q   So he was waiting outside, right, like usual?
5    A   (Nods head.)
6    Q   Is that correct?
7    A   Correct.
8    Q   So you went and you met with him and Evelyn
9   again that final morning?
10   A   I remember that I went down and I just looked
11  at him and keep walking straight to the car.
12   Q   Did you check out of your hotel that next
13  morning?
14   A   No.
15   Q   You didn't check out or anything?
16   A   I don't recall if it was -- if I was carrying
17  my luggage already or -- I don't recall.  I just
18  knew that I needed to go at Crowley's Regency office
19  to do a little bit of work, and then we will be
20  going to the airport to go back to our country.
21   Q   Okay.  So you -- you went together again in
22  Mr. Blanco's rented car to Crowley's offices that
23  next morning?
24   A   In the same car we were using.
25   Q   Right.  Do you remember about what time it

1   was that you went to the offices?
2    A   I cannot recall, but it had to be sometime
3   between 8:00 -- 8:00 a.m.  It was the time that it
4   was required for us to be at the Regency office.
5    Q   Was that pretty typical of every day, you
6   would meet and be at Regency's offices about
7   8:00 a.m. that week?
8    A   Yes.  It was mandatory for us to be at
9   Regency before 8:00 or at 8:00 a.m.
10   Q   The next morning, did you speak with anyone
11  about what happened to you the night before, your
12  sister, or did you call anyone that next morning?
13   A   No.  I didn't want to say anything to my
14  family.
15       What I did is that when we arrived to the
16  Regency office, I remember that I put my stuff in
17  the desk as a regular day.  And I approached Jose
18  Lopez's desk.  He was my manager.
19   Q   Right when you got there?
20   A   Right when I got there, I just put my purse
21  in the desk and then approached Jose.
22   Q   Okay.  And where was he at that time?
23   A   Where he used to be sitting.
24   Q   Was he in his cubical when you approached
25  him?

1    A   Correct.
2    Q   Okay.  And so what happened?
3    A   I remember that I went to him and I said, "Jose, I
4   really need to talk to you.  And I will request you
5   have an HR representative.  So can you help me?"
6        And he was like, "Okay.  Wait for me in that
7   conference room.  It was in a small conference
8   room."
9    Q   Where was Juan Blanco at this time?
10   A   He was in the office.  So he might saw me
11  going to talk to -- or request -- or at least say
12  something to Jose.
13   Q   And where was Evelyn at this time?
14   A   At the same place.
15   Q   With Juan?
16   A   We all three were doing the same thing that
17  we did for the last couple of days.  The only thing
18  that changed is that maybe he didn't thought or
19  maybe people didn't thought that it was normal for
20  me just to approach Jose and say, "Jose, I need to
21  talk to you and I need an HR representative."
22  And -- but that was it.
23   Q   Okay.  Did Evelyn see you go talk to Jose?
24   A   You should ask her.  I don't know.
25   Q   I'm just asking, do you know whether --

1    A   It's possible.  It's my understanding, but I
2   think the better person that can answer that
3   question is her.
4    Q   I know.
5    A   But we were -- we were in the same spot.  So
6   Jose was leading the hall, or the cubical.  So,
7   yeah, they saw that I was talking to Jose.
8    Q   Okay.  And so you -- keep going with your
9   story.  So you went and met with Jose in a
10   conference room?
11    A   I did.
12    Q   And who else was there?
13    A   He approached -- I requested an HR
14   representative, but it was a lady that she didn't
15   introduce herself.
16    Q   Was she in HR?
17    A   I don't know.  I know that I requested an HR
18   representative.  I just know that this lady was
19   coming with Jose.
20    Q   And she came in the conference room, too?
21    A   Correct.
22    Q   Tell me everything you remember about her.
23    A   She was skinny, short, blond, straight hair.
24    Q   How short?  Taller or shorter than you?
25    A   I cannot recall.  I didn't put myself next to

1   her to see her --
2    Q   When you say "short," I'm just trying to
3   understand what you mean.
4    A   It was not tall as -- it was not taller than
5   me, I think, because I'm not that short either.  But
6   people here in the United States used to be kind of
7   tall.
8    Q   Okay.  So skinny, short, blond, straight
9   hair?
10    A   Correct.
11    Q   About how old?
12    A   I cannot recall.
13    Q   Did she look, like, 20s, 50s?
14    A   Oh, no.  If I had -- if I had to say a
15   number, it would be between 20 and 40.  I don't
16   know.  People here used to look very young even
17   though you guys are sometimes older than what you
18   seem.  So I don't know.
19    Q   So anything else -- what was she -- do you
20   remember what she was wearing?
21    A   I do not.
22    Q   Did she say anything at all?
23    A   No.
24    Q   So she just stood there?
25    A   Correct.

1    Q   Did not introduce herself?
2    A   She didn't introduce herself.  She wasn't
3   bringing any laptop or any paper.  She just
4   basically was walking behind Jose.  They entered the
5   conference room and sit down in front of me, both of
6   them.
7    Q   And what did -- who spoke first?
8    A   Jose said, "So what's up?" something like
9   that.  "So what's up?"
10        And I remember that tears were coming from my
11   eyes, and I told him that Juan raped me the day
12   before, a couple hours ago.
13        I said, "Juan just raped me a couple hours
14   ago.  And I just want both of you to know."
15        And I don't recall what else that I said.  I
16   just remember that I was feeling so sad and
17   terrified.  And -- but I recall that I told him that
18   I was raped by Juan the night -- the night prior.
19        And he was not very interested in listening
20   to me, because he was like, "Whoa, whoa, whoa, whoa
21   whoa, whoa, Vanessa."  He's from Venezuela, so it's
22   kind of like -- I don't know.  The conversation
23   happened in Spanish and --
24    Q   Do you know whether the blond person in the
25   room understood Spanish?

1    A   I don't know.  She didn't talk.
2    Q   Did she look American?
3        MS. NOTARI:  Objection to form.
4   BY MS. DEGANCE:
5    Q   Did she look American?
6    A   I don't know.
7    Q   You don't know?
8    A   Because -- I won't say if she's American,
9   because some people are Americans and they don't
10   look like it.  They look like --
11    Q   I understand.  I'm just asking, visually,
12   right -- do you recall what color eyes she had?
13    A   I don't.  For me it was just like the skinny
14   girl that was there, blond, straight hair up to
15   here.  That was all.  I was not noticing, oh, my God
16   what beautiful eyes.
17        No.  I just wanted to talk to Jose and have
18   an HR representative to have, like, a witness about
19   what I was saying.
20    Q   Did she give you any indication that she
21   understood Spanish?
22    A   She never spoke.
23    Q   Okay.  I know.  But did she give -- she
24   didn't give any -- look, if -- I would just be
25   surprised that a woman would listen to this and have

42 (Pages 162 - 165)

1 zero reaction. And you're saying this woman had no
2 reaction whatsoever when you say that you had just
3 been --
4    A I didn't notice her reaction.
5    Q Let me finish.
6      When you said you had just been raped, she
7 had no reaction? She just stood there?
8    A I don't know if she had a reaction. I was
9 looking at Jose. He was the one that I was
10 interested in talking about. He was the one that --
11 the person that I knew.
12    Q But she said nothing?
13    A I don't recall if she did.
14    Q But you said that she --
15    A No, no, that -- if she was -- if she
16 understood. She didn't say anything, not introduce
17 herself. She didn't say "I'm so sorry" or "Let me
18 take actions" or (answering in Spanish). She didn't
19 say anything, not even in Spanish or English.
20 Nothing.
21    Q So -- keep going. So Jose Lopez says, "Whoa,
22 whoa, whoa, whoa." And what does he say from there?
23    A He said, "Whoa, whoa, whoa. Vanessa,
24 Vanessa, it's not a big deal. It's not like he
25 grabbed a virgin girl."

1    Q It's not like he what?
2    A "He grabbed a virgin girl."
3      He said in (answering in Spanish).
4 That means that I was a woman that already had a
5 kid, so I should knew what I was going for.
6      And he said that I should be proud for a man
7 with Juan's position to notice me because it was not
8 a big deal and that I should know better my worth.
9      So I was so shocked and disappointed again
10 that the third person at Crowley was like -- I
11 didn't want to give Crowley any more chances.
12      So the next thing I told him was, "Can you
13 take me to the police? Can I file a police report
14 then?"
15      And he said that -- that, no, because I could
16 get legal actions against me because I was put into
17 DF- -- because I will be putting the DFTS contract
18 in risk.
19    Q So let me ask you -- let me stop you for one
20 moment.
21      You said that -- I asked you earlier why you
22 didn't call the police, and you said you didn't call
23 the police because you were afraid to.
24    A Correct.
25    Q So what made you then ask Juan Lopez {sic} to

1 take you to the police?
2    A Because of the things he told me. I was not
3 willing to give Crowley another chance anymore.
4    Q So then why didn't you call the police
5 yourself --
6    A Because --
7    Q -- from Crowley's office?
8    A Because he was threatening me about legal
9 actions.
10      When I asked the police -- I told him, "Can
11 you take me to the police?" Because it was my
12 understanding that when a rape situation happens --
13 I don't know if here it works like that. But in
14 El Salvador, they take you to legal medicine
15 offices, and they do exams and recollect --
16    Q Sure.
17    A So I told him if he was able to take me to
18 the police. And instantly he threatens me about --
19 that if I -- "If you do that, then the company will
20 be involved, and you can get legal actions against
21 you because you will be putting in huge risk the
22 DFTS contract."
23    Q Why did he -- why -- do you have any idea --
24 did he explain how you possibly can put at risk the
25 DFTS contract?

1    A Because it was my understanding that when
2 they were in the litigation process, they said
3 something -- I think it was a town hall. I don't
4 know who said that. But it was a reunion where they
5 said that we needed to be improving ourself as the
6 way possible because the U.S. Government is really
7 cautious about who it works with. I don't know.
8    Q When you say "they said," who said?
9    A I don't recall the name. It was -- I had so
10 many town hall meetings. So I cannot recall who
11 said it.
12      But I recall that we were requested -- when
13 the DFTS was going on, that it was a huge thing at
14 Crowley to -- they asked us to act the best way
15 possible.
16      So I didn't knew what legal actions he meant
17 when he threaten about going legal actions for me to
18 put in the -- because he said that I was -- if I
19 filed the police report, my understanding was that I
20 will need to say, "Okay. What is the reason of your
21 travel," or something like that. At the end of the
22 day, the police will find out that I was there
23 because of Crowley.
24      So I'm not a lawyer, so for me, legal
25 reasons, it was -- legal actions? I'm sorry --

1 legal actions sounded very threatening and not
2 willing for me to say, "Okay. I'm going to take a
3 risk of putting" -- and my cell phone didn't have,
4 like, "Oh, let me call here in the United States."
5 If it's not with Wi-Fi, it didn't work.
6    Q   But you knew how to use a landline, didn't
7 you?
8    A   The what?
9    Q   You knew how to use a phone, like, in an
10 office?  You knew how to pick up a phone and use a
11 landline; correct?
12    A   Yes, but I was not taking the chance after he
13 threatened me about legal consequences or legal
14 actions.  I was not willing to do that in a country
15 that is not my country.  I don't know how the laws
16 work here.
17       Also, he said the same thing as Jacqueline
18 and Juan, that "I want for you to stop talking about
19 this."
20       The meeting was very short because he was not
21 interested in listening to me.  It seems to me -- my
22 perspective was that he already knew because he was
23 not willing to talk.
24    Q   Would it surprise you to learn that Jose
25 Lopez says that that meeting never happened?

1    A   That what?  Can you rephrase that?
2    Q   Would it surprise you to learn that Jose
3 Lopez has said that that meeting never happened?
4       MS. NOTARI:  Objection to form.
5 BY MS. DEGANCE:
6    Q   Does it surprise you?
7    A   A little bit.
8    Q   So you said the meeting didn't last long.
9 About how long did it last?
10    A   I cannot recall the time, but it was short,
11 because I was not able to get into too much details.
12 And, basically, he was -- after I told him that I
13 was raped and started crying, basically he ended the
14 conversation by what I just told you.
15       And he also said, "Make sure that this is the
16 last time that you're talking about this, because
17 the next time that you keep playing with the DFTS
18 contract, I'm going to make sure you're not able to
19 get another job in your fucking country."
20       I was like, "Okay."
21    Q   So he said the next time you play with the
22 DFTS contract?
23    A   Correct.
24    Q   And so then he said he told you you would
25 never get another job, too?

1    A   Correct.
2    Q   And the whole time, the blond lady was just
3 standing there not saying a word?
4    A   She didn't say a word.  I don't know what she
5 was doing.  I just know that she was in front of me,
6 because the only thing I can remember about her is
7 that she sat down next to Jose.  But my focus was
8 with Jose, not with her.
9    Q   And when you -- so you started crying during
10 that meeting?
11    A   Yes.
12    Q   When you came out of the office, did
13 anybody -- did you see anybody who noticed that you
14 were crying?
15    A   I don't recall.
16    Q   Did Evelyn notice that you were crying?
17    A   You should ask her.  I don't know.
18    Q   You keep ask -- you keep saying I should ask
19 her, and I'll ask --
20    A   Yeah.  It's just that I don't want to --
21    Q   Let me finish.  I'm sorry.
22       And I'm going to ask other people whatever I
23 choose to ask them, but right now I'm asking you
24 questions.  And so I understand and I'm perfectly
25 able to ask other people things, but right now I'm

1 asking you.
2       So I'm asking, to your knowledge, did Evelyn
3 notice that you were crying?
4    A   I don't know.  I didn't notice Evelyn.  I
5 just -- my immediate reaction was go outside.  I
6 went to grab my purse, and I went down to the
7 first -- to the first floor.
8    Q   What floor were you on?
9    A   I cannot recall, but I took the elevator.
10 That's what I can recall.  I went down to the first
11 floor because that is where the smoking area is.
12       So I sat down in a little table that they
13 have there.  And I just waited for the day to be
14 over so they can -- Evelyn and Juan could be out of
15 the office and we were going back to El Salvador.
16    Q   So then after you -- so you sat out there --
17 you sat outside until Juan and Evelyn came out to
18 leave for the day?
19    A   I sat down for a few hours and --
20    Q   For a few hours?
21    A   Correct.
22       I -- I was so terrified, powerless.  I felt
23 fear.  I was angry.  Because at the end of the day,
24 I was -- I felt like it was the third person --
25 because the HR lady didn't count.  It was the third

1  party -- it was the third person at Crowley that was
2  an authority that had the ability or the capa- --
3  capaci- -- capacitability --
4    Q  Capacity?
5    A  -- capacity to help me.
6    Q  Who was the -- who were the other people?
7  There was Jacqueline Nájera;
8    A  Jacqueline; Juan, that he was my aggressor,
9  but still you -- I think nobody expect for a
10  supervisor to do this.  So he betrayed my trust.
11   Q  So it was Juan, though, and Jacqu- -- it was
12  Jacqueline and Jose who you -- who say you
13  informed about different events?
14   A  Correct.
15   Q  And so you sat outside for a few hours.  And
16  then did Evelyn and Juan eventually come out?
17   A  Until it was time to leave, yes.
18   Q  And didn't Evelyn say to you, "Hey, why have
19  you been outside for the last few hours?  Where'd
20  you go?"
21   A  She did not.
22   Q  She never said a word to you about it?
23   A  I remember that in Crowley Regency they have,
24  like, the principal door.  And if you go a little
25  bit, like, doing a turn you can find a table.

1      So she approached -- she went out from the
2  principal door, and she said, "Vane, we're leaving."
3  That's my only interaction with her.
4    Q  And where did you go from there?
5    A  I cannot recall if it was to the hotel to
6  only pick up the bags because we already have them
7  ready or direct to the airport.  I cannot recall.
8    Q  You-all went, actually, and had lunch at Five
9  Guys, didn't you, a restaurant called Five Guys,
10  before you went to the airport?  Do you remember
11  that?
12   A  I don't recall if I went to lunch.
13   Q  And then you-all took your flight back that
14  day, same day, correct, that afternoon?
15   A  I cannot recall if Juan was there, but I can
16  recall that I was with Evelyn because I was trying
17  to get her as near as possible to me.  So I don't
18  even remember if Juan was there.
19   Q  If Juan was where?
20   A  At the airport on the flight.  I don't
21  recall.
22   Q  Well, on -- so you flew, it looks like,
23  from -- didn't you fly from Jacksonville to Houston
24  and then Houston to San Salvador?
25      Does that make sense?  Do you remember that?

1    A  I don't recall exactly.
2    Q  And on the Houston to San Salvador flight,
3  you and Mr. Blanco actually sat on an aisle right
4  across from each other.  Do you remember that?
5    A  I don't.
6    Q  You don't remember that?
7    A  I don't.
8    Q  Did you have any conversations with Juan
9  Blanco about what had occurred the night before?
10   A  No.
11   Q  Have you ever had a conversation with him
12  about it?
13   A  I did not.
14   Q  You do not what?  You have not?
15   A  I have -- I don't recall having a
16  conversation with him after that.
17   Q  How did you get home from the airport in
18  San Salvador?
19   A  My boyfriend at the time picked me up.
20   Q  And, again, it looks like you charged Crowley
21  for gas on November 4th, and then again on
22  November 10th --
23   A  Possibly.
24   Q  -- in San Salvador.
25      So you would have gotten gas both ways?

1    A  If I was using my card, yes, probably.
2    Q  Did you ever discuss the incident after that
3  at any point with Mr. Blanco?
4    A  I didn't have the chance, and I was not
5  willing to.  After the threat about Jose, that it
6  was a person that lives in Jacksonville, that it was
7  my understanding that if he was in a big position,
8  such a manager, threaten me about legal actions, I
9  was not willing to take the risk of having a lawsuit
10  here in the United States.
11   Q  When you got back to El Salvador, why didn't
12  you call the police and report it over there?
13   A  Because --
14      MS. NOTARI:  Objection to form.
15  BY MS. DEGANCE:
16   Q  Go ahead.
17   A  Because what El Salvador laws are going to do
18  about it?
19   Q  I don't know.  But why not report it?
20      MS. NOTARI:  Same objection.
21      THE WITNESS:  I was not thinking about
22  reporting it anymore, because if Crowley
23  authorities were not willing to help me, and the
24  last conversation they were mentioning -- Juan --
25  Jose Lopez was bringing to the table a new item,

1   saying legal actions, I was not willing to take
2   the risk.
3       What if -- try to put yourself one moment in
4   my shoes. What about if I get in trouble in the
5   U.S.? What happens to my son?
6       So it was like, I'm not taking the risk. I'm
7   not bringing this back again. Because if I file
8   a claim in the -- in El Salvador, eventually they
9   will find out about Crowley. "What if this goes
10  and they end up getting the DFTS contract in
11  freeze, and then they will say it was my fault.
12  What if I go to jail? What" -- so many ideas
13  came into my mind.
14  BY MS. DEGANCE:
15      Q  Who was the first person you told about this
16  event after you returned to San Salvador, about the
17  November -- and I'm talking about the November 9th,
18  2017.
19      A  Who did I told in San Salvador?
20      Q  Who is the first person -- who is the first
21  person that you told about the event once you
22  returned home to El Salvador?
23      A  That I was raped?
24      Q  Yes.
25      A  I didn't told anybody.

1       Q  For how long?
2       A  I cannot recall the specific time. But I'm
3   sure that I didn't bring it up, not to my mom, not a
4   friend, because my best friend from since we were
5   little, she didn't knew until a few years ago.
6       Q  What about your sister?
7       A  I did not told my sister.
8       Q  Okay. Anybody else? Who was the first
9   person -- I mean, it might not have been right
10  after, but who's the first person that you ended up
11  telling about the event once you returned?
12      A  Ayesha Diaz.
13      Q  Ayesha Diaz was the first person you told?
14      A  Yes.
15      Q  And when was that?
16      A  After my -- after this trip, I went to Puerto
17  Rico. So, basically, I stayed approximately two
18  days in El Salvador. And then Monday I had a
19  scheduled flight to Puerto Rico.
20      And I don't know how much time I spent in
21  Puerto Rico before Ayesha approached me and said,
22  "You are crying and you don't seem to be the Vanessa
23  that I used to work with in the past. So I want you
24  to be honest with me and tell me what's going on."
25      Q  When had you worked with Ayesha Diaz in the

1   past?
2       A  When I was in credit and collections.
3       Q  Didn't Ayesha always work in Puerto Rico?
4       A  Correct.
5       Q  So how did you work together in the past?
6       A  For the Puerto Rico account, if I needed some
7   help, for example, a customer not paying, I will
8   call Ayesha and say, "Hey, Ayesha, this is the
9   customer's statement. I'm not able to reach out to
10  the customer. By any chance can you help me?"
11      So sometimes she used to go to visit the
12  customers. So she was a main contact for some of
13  the accounts that I was handling. So our
14  interaction was via email, over the phone.
15      Q  And when's the first time you met Ayesha Diaz
16  in person?
17      A  I think -- I don't recall the exact date
18  when -- I don't know if she -- when I got into
19  Puerto Rico, I don't know if she seemed familiar
20  because I worked so much with her over the phone and
21  we end up being, like, really good -- a really good
22  teamwork, we support each other, or because she was
23  in Crowley's office in El Salvador someday.
24      Q  So it's possible the first time you met her
25  in person is when you went to Puerto Rico?

1       A  Possibly, but I don't want to assure anything
2   because she might went to the El Salvador's office.
3   But I cannot recall if she was -- I don't know if
4   because of the connection and so many times that we
5   worked together she -- she seemed familiar to me
6   when I knew her.
7       Q  So you told her about the -- what did you
8   tell her? Did you tell her about the rape? Is that
9   what you told her about?
10      A  She asked me to be honest with her. I
11  doubted for a few minutes. But she end up saying,
12  "If you're sad because of your kid and you want to
13  go home, I will be talking to your bosses. And --
14  so they can move your flight and put you on the next
15  flight to El Salvador. If they said no because you
16  already had a ticket, what I will do is that I'm
17  going to take it out of my own pocket so you can be
18  with your kid."
19      And when she told me that, it was very
20  important for me because she was -- she considered
21  my son. And for me, it was important.
22      And that's when I told her everything, since
23  Jacqueline, the elevator situation. I told Ayesha
24  everything.
25      Q  And what did she say? What was her -- did

1 she give you any advice?
2    A  Yes. She said that I needed to do something,
3 that it was my -- like, my duty. And she said, "I
4 think you should talk to Arthur LaMoureaux."
5      And I said, "Okay," but -- and she said, "I'm
6 going to get you his cell phone number."
7    Q  Did you know Arthur LaMoureaux?
8    A  I received one training in El Salvador with
9 him. I think he was leading one Crowley.
10    Q  Okay. So did you contact Arthur after Ayesha
11 gave you his contact information?
12    A  No.
13    Q  You did not. Okay.
14      Did she give you any other advice?
15    A  No. She just put the decision on the table,
16 and that was it.
17    Q  So who was the next person that you told
18 about the November 9th, 2017, assault?
19    A  Arthur.
20    Q  Okay. So -- you just said that you did not
21 contact him. Did you contact him?
22    A  I did, but not that day that she suggested
23 me.
24    Q  When did you contact him?
25    A  It wasn't until I received a call -- I was

1 working in Puerto Rico, and I received a call from a
2 conference room from El Salvador's office. And a
3 lady introduced herself. I don't know if I recall
4 the name correctly. But it was something about --
5 last name Matute or something like that.
6    Q  Senobia?
7    A  Senobia Matute.
8      She said that she was in El Salvador doing --
9 or helping an ethics investigation against Juan due
10 to claims that other peers put.
11      And she asked me, "Do you have something to
12 say about Juan?"
13      And I said, "No."
14      The reason why I said no, even though she was
15 mentioning that she was with the ethics -- she said,
16 "Hi, Vanessa, this is," blah-blah-blah, "Matute, and
17 I'm here with -- doing interviews with the ethics
18 department."
19      So what -- my understanding was that she was
20 with another person in the room belong -- that
21 belonged to ethics.
22      The reason why I didn't want to talk to her
23 is because, prior to her call, I already knew
24 that -- that an ethics investigation was going on.
25 Not because of my peers. Nobody told me. I didn't

1 put anything as proof. Because -- I knew because
2 Juan called Luis Santamaria and myself, because Luis
3 was in Puerto Rico as well. He called to the number
4 that they provide us in Jacksonville. And he said,
5 "Hey, guys, I just want for you to know that there
6 is an ongoing investigation on ethics, so I think
7 these human resources bitches are going to
8 El Salvador, according to what El Rubio told me."
9 He used to call El Rubio to Jose Lopez. "And I just
10 wanted to confirm if you guys have anything to say.
11 What will you -- what are you planning to say to --
12 to the HR bitches?"
13    Q  So Juan Blanco, you're saying, contacted who?
14    A  Me and Luis.
15    Q  Okay. So he called you -- called you?
16    A  He called to the cell phone that Luis and I
17 had to communicate in Puerto Rico. It was only one
18 cell phone.
19    Q  Were you and Luis on this call together?
20    A  Yes, on speaker.
21    Q  And he said, "There is an investigation.
22 What are you all going to say?"
23    A  Correct.
24    Q  Okay. So what did you say?
25    A  Luis and myself said, "We don't have anything

1 to say," because for -- as far as my understanding
2 was about the ethics department, is that when you
3 have a claim, the person that is getting
4 investigated shouldn't know about -- that you are
5 getting investigated.
6      And he said that Jose -- he used to say
7 El Rubio. So he said, "El Rubio told me that the HR
8 bitches are going -- are coming to El Salvador."
9    Q  So when Senobia called, then you said, "I
10 have nothing to say"?
11    A  Correct.
12    Q  Okay. But then why would you call Arthur,
13 who is also in ethics, if that was the case?
14      MS. NOTARI: Objection, form.
15      THE WITNESS: When Senobia called me and I
16 said no, I went to Ayesha's desk. And I told
17 her, "Can you believe that they are calling me to
18 ask me if I have something to say if he already
19 told me -- he already knows that he had an
20 investigation going on, so" -- I'm so sorry for
21 my expression, but, "How ballsy they have to call
22 me and say, 'Do you have something to say,' after
23 I have said so many things to me that they could
24 avoid."
25      And she was like trying to be the bigger

1  person, I think, because she said, "Vane, you
2  need to talk. I think I will say it again. I
3  think you -- if you don't want to talk to her
4  because she's from HR, that's fine, but I think
5  you should give Arthur LaMoureaux a chance. Will
6  you do that for me?"
7      And I was like, "Okay."
8      So she said, "Go outside so you can speak
9  peacefully."
10     I went outside of the Crowley Puerto Rico
11  office, and that's when I decided to call Arthur
12  LaMoureaux.
13  BY MS. DEGANCE:
14  Q  Approximately when was that?
15  A  I will say late November.
16  Q  Okay. And so how did -- so did she give you
17  his phone number?
18  A  She did the first time.
19  Q  And did you call him?
20  A  The first time I did not.
21  Q  No, but now we're -- she told you to go
22  outside. Did you call him then?
23  A  Yeah, the second time I called Arthur.
24  Q  And what did you say to him?
25  A  I told him that I was advised by Ayesha -- or

1  recommended by Ayesha to talk to him, and that the
2  reason what I wanted to talk to him is because I
3  didn't trust human resources anymore, and that
4  Ayesha told me that he was a trusted person for her,
5  so I was believing in Ayesha.
6      And I told him, "There is an ongoing
7  investigation in El Salvador. Matute just called me
8  and I said I had nothing to report. But I want to
9  report what happened to me to you."
10  Q  And so what did he say?
11  A  He said, "Can you give me a couple of
12  minutes?"
13     So I stayed on the line and -- I think maybe
14  I caught him in a meeting. I don't know. But he
15  took the time to get back over the phone. And he
16  was like, "Okay. I'm ready."
17     So I explained all the situation since
18  Jacqueline, the threats, the rape, the assault. I
19  told him about -- that I was a witness of all the
20  bad words or bad expression or sexual expression
21  that he used to say about women.
22     And I told him, "I don't trust that human
23  resources is going to do anymore -- nothing anymore,
24  so I'm telling you that you should go and put
25  yourself in front of this investigation, because

1  it's not just me that is suffering in that
2  department. There is a lot of persons that are
3  experiencing homophobic comments. They are
4  experiencing bad languages or sexual comments."
5      And he said that I was doing a huge
6  accusation and that it was not that he didn't
7  believe me.
8      And he also said, "I'm sorry for what
9  happened to you. I do believe you. But I want you
10  to understand that it's my duty to investigate -- to
11  do a -- to start an investigation because it's a
12  serious accusation. And I want your permission to
13  start this investigation and to get all the -- what
14  is required, the proof."
15     I don't know what he meant. And I said -- I
16  gave him my authorization to start the --
17  Q  Investigation?
18     So do you recall -- you don't recall telling
19  him that -- telling Arthur that you wanted to keep
20  it confidential?
21  A  I did not. I didn't say that.
22  Q  And did you ever tell Arthur that you
23  specifically did not want HR to find out about it,
24  that you did not want him to disclose it to anybody,
25  including HR?

1  A  I told him that I didn't want to speak with
2  HR anymore. I didn't told him that -- "Don't say
3  anything to -- to HR."
4  Q  Do you recall telling him that, actually,
5  that night in the hotel on November 9th, Juan Blanco
6  came to your room and was acting really loud out in
7  the hall and that you let him in your room because
8  you wanted to try to quiet him down?
9      MS. NOTARI: Objection, form.
10     THE WITNESS: No.
11  BY MS. DEGANCE:
12  Q  Did you ever say that to him?
13  A  No.
14  Q  Was your conversation with Arthur -- it was
15  by phone; correct?
16  A  Correct.
17  Q  Was it in English or Spanish?
18  A  Spanish.
19  Q  So you're testifying today that you gave him
20  permission to start an investigation?
21  A  Correct.
22  Q  And you do realize he was part of internal
23  audit, right, his job?
24     MS. NOTARI: Objection to form.
25  BY MS. DEGANCE:

1    Q   Did you know that he was part of internal
2  audit?
3        MS. NOTARI:  Same objection.
4        THE WITNESS:  What I knew about Arthur is
5  that he was the ethics vice president.  But I
6  have never -- I never looked his title up.
7  People used to know him by ethics vice president.
8  BY MS. DEGANCE:
9    Q   After that initial conversation with Arthur,
10 did you have any follow-up communications with him?
11   A   What do you mean?
12   Q   Did you -- well, Arthur is not someone you
13 would talk to in the course of your job; correct?
14   A   Correct.
15   Q   So after you had that initial conversation
16 with him, did you have any other communications
17 after that with him?
18   A   I did.
19   Q   Okay.  I'm going to show you -- and we'll
20 take a break in a few minutes.
21       I'm going to show you a document we'll mark
22 as Defendant's Exhibit No. 5.
23       (Defendant Crowley's Exhibit No. 5 was marked
24   for identification.)
25 BY MS. DEGANCE:

1    Q   And I'm going to ask you if you recognize
2  this.  This document is in Spanish, but I'm going to
3  ask you if you will -- I'm going to ask you some
4  questions about it in English, and I'd like you to
5  respond in English.
6        So this is a -- do you see this -- it's an
7  email exchange between you, it looks like, and
8  Arthur, December 19th, 2017.  Do you see that?
9        Do you see that this is an email exchange --
10 an email between you -- from Arthur to you, right,
11 on December 19th, if you look at the top?
12   A   Correct.
13   Q   And then right below, it looks like you sent
14 him an email, right, that same day?
15   A   Correct.
16   Q   Okay.  And it looks like you're talking to
17 him about a job that you're planning to apply for;
18 is that right?
19   A   Correct.
20   Q   And then he says, you know, "I'm sure you do
21 an excellent job."  He responds about the job.
22       So my question is:  Why were you reaching out
23 to Arthur for applying for this job?
24   A   Okay.  At this time, I felt really
25 comfortable -- or not comfortable, but I was looking

1  to continue my conversation with Arthur, because at
2  the end of the day, he was -- I felt relieved,
3  because, before this date, we had a second
4  conversation where he told me that -- the resolution
5  of his investigation.
6    Q   What did he -- tell me about that.  Did he
7  call you or did he email you?  How did he --
8    A   He called me.
9    Q   Okay.  Were you still in Puerto Rico?
10   A   Correct.
11   Q   Do you recall about when it was that he
12 called you?
13   A   I cannot recall exactly, but what I'm sure is
14 that it was before my birthday, that is
15 December 21st, because I was -- I was feeling very
16 relieved and I was excited about what he told me
17 during that conversation.
18   Q   So he called you, and what did he say to you?
19   A   He called me and asked me if I had -- if I
20 had time.
21       So I said, "Yes.  Just let me get out of the
22 office," because I was sitting at my Puerto Rico
23 desk.
24       I approached Ayesha and told her, "Arthur
25 just called me."

1        And she said, "Of course.  I'm going with
2  you."
3        So we both went out of the office.  We went
4  in the parking lot.  And there was two containers --
5  two or three containers that, after the hurricanes,
6  they were used as offices.  So we went there just to
7  make sure that nobody was listening.
8        And during that conversation --
9    Q   I'm sorry.  Was -- did you have it on speaker
10 or --
11   A   I did.
12   Q   Okay.  So you had the phone on speaker so
13 Ayesha could hear the conversation?
14   A   Correct.
15   Q   Okay.  Go ahead.
16   A   And I remember he told me, "Mi vida" --
17 that's how we -- how -- because he's Cuban, so he's
18 really -- he was really sweet in that call.
19       He said, "Mi vida, I'm so sorry for what
20 happened to you.  I want for you to know that I was
21 able to confirm what you told me.  And I want to say
22 thank you for being brave enough to speak up."
23       He said, "Thanks to your bravery, we were --
24 I was able to confirm five prior claims of other
25 women were true."

49 (Pages 190 - 193)

1  He also said that, "You don't need to worry
2  about working with Juan once you go back to
3  El Salvador. You don't have to worry about it
4  because you won't have to deal with him or anyone
5  involved." That's what he said.
6  And he also said that he wanted to ask me
7  that this -- that this investigation, to keep it as
8  confidential because I knew the effort that Crowley
9  put into the DFTS contract.
10  And he said, "This will be bad if it comes
11  into the public light. I just wanted to let you
12  know, trust me, you don't have anything to worry
13  because, once you go back to your country, you won't
14  have to deal with him anymore or anyone involved."
15  Q  So when you say he said "I was able to
16  confirm," was he talking about that there were prior
17  cases? Or are you saying he said I was able to
18  confirm that what you claim happened was true?
19  A  I think he was able to get the hotel cameras,
20  it was my understanding, because one of the things
21  that I told him, it was, "Arthur, I don't know how
22  he got into my room."
23  And during that call, he said that, "I was
24  able to confirm that he said that your room number
25  was him because" -- something about the corporate

1  card. I don't know. That's what he told me.
2  But -- and he said, "That's how he got an
3  access room to your room."
4  If that's true, I don't know. I don't know
5  how he got in. That's what Arthur told me.
6  Q  And when he referenced the other claims,
7  those were claims of sexual harassment; correct?
8  MS. NOTARI: Object to form.
9  BY MS. DEGANCE:
10  Q  Or do you know? Do you know?
11  A  I don't know. He just said five -- five
12  previous female claims.
13  Q  Are you aware of Mr. Blanco allegedly
14  sexually assaulting or raping anyone else?
15  A  I don't know.
16  Q  And so are you aware of whether that
17  investigation, those prior claims, had -- you don't
18  know if they had to do with sexual harassment or
19  what they had to do with? He didn't say?
20  A  I know he was -- it's just that I don't know
21  if the legal term includes assault, includes for me
22  to know that he was inappropriate with his comments
23  about his dick and stuff like that.
24  Q  Right.
25  A  That's what you mean?

1  Q  No. I mean assault, like a rape, like you --
2  like what you said happened to you.
3  A  No, I don't know if it happened to others.
4  Q  And you were never -- did you ever speak with
5  Senobia Matute again after she tried to call you
6  that one time?
7  A  Not that I recall.
8  Q  And is that -- that phone call you just
9  described with Arthur, was that the point that you
10  learned that Mr. Blanco was being terminated?
11  A  That was my understanding at the time of our
12  call.
13  MS. DEGANCE: Okay. Why don't we take a
14  break for a few minutes; okay? We can go off the
15  record.
16  THE VIDEOGRAPHER: Off the record, 1:45.
17  (Lunch break.)
18  (Attorney C. Michael Williams is not
19  present.)
20  THE VIDEOGRAPHER: We're back on the record,
21  2:39.
22  BY MS. DEGANCE:
23  Q  Ms. Treminio, before the break, we were
24  talking about conversations you had regarding the
25  November sexual assault that you alleged occurred.

1  And I wanted to just ask you -- you told me
2  about a conversation you had with Arthur, actually,
3  a couple conversations. And I think you said in the
4  final one you learned that Mr. Blanco, did you say,
5  was going to be terminated or had been terminated?
6  MS. NOTARI: Objection to form.
7  THE WITNESS: What he told me was, "Once you
8  go back to your country, you won't have to worry
9  about him or the people that got involved."
10  That's what he said.
11  BY MS. DEGANCE:
12  Q  And --
13  A  So it was my understanding that he would be
14  terminated.
15  Q  Okay. And you testified you believe that
16  that conversation with Arthur happened before your
17  birthday?
18  A  Yes, because I was relieved on my birthday.
19  Q  Did you have any conversations with anyone
20  else that we haven't already talked about regarding
21  the alleged assault that happened in November of
22  2017 prior to the time Mr. Blanco was terminated?
23  So from the time the alleged event happened
24  in November 2017 until the time Mr. Blanco was
25  terminated, did you have any other conversations

1  with anyone about the alleged rape, other than what
2  you've already described?
3     A  Before he was terminated, I spoke with Arthur
4  and Ayesha only.
5     Q  And so how did you learn that Mr. Blanco had
6  officially been terminated?
7        Or let me rephrase that.  When did you first
8  learn that Mr. Blanco had officially been
9  terminated?
10    A  After I went back to the office after my
11  Puerto Rico trip -- I cannot recall if I took some
12  days off or if I got there immediately.  But my
13  surprise was that he was still there.
14    Q  He was not?
15    A  He was.
16    Q  Oh, he was still there.
17    A  And I remember because that day I felt that I
18  was raped again, because I felt betrayed about -- I
19  started wondering did I understood correctly to
20  Arthur.  What did he meant "You shouldn't be worried
21  about him"?
22       Arthur knew that I was applying to another
23  position, because, since I didn't knew the
24  resolution about the investigation that he was
25  doing, I took my actions, and I didn't want to go

1  back to report to Juan.  So that's when I applied to
2  this position.
3     Q  So my question, though, was:  When did you
4  first learn that Mr. Blanco had been terminated?
5     A  I cannot recall the date, but it has -- it
6  has to be after February 2018, because I remember
7  that I was at the office and I saw Jacqueline
8  Nájera.  He went out of his cubical and was --
9  Jacqueline Nájera was the one that came up with the
10  box to pick up his stuff.  So that's what human
11  resources used to do when one was terminated.
12    Q  So did you see him actually leave, then, that
13  day with his things in his box?
14    A  I saw him walking.
15    Q  With his things in his box?
16    A  No.  That's not what I said.
17    Q  Did you see him at the office after that day?
18    A  I did not.
19    Q  Okay.  So do you believe that was the day he
20  was terminated?
21    A  Yes, because Jacqueline took his stuff in a
22  box.
23    Q  When was the last time you saw Mr. Blanco
24  after his termination?
25    A  That day.

1     Q  Did you -- didn't you attend a get-together
2  with some coworkers at or around the time he was
3  terminated that was like a going-away for him?
4     A  I remember that -- I can only recall Pedro
5  Espinoza, that he was trying to get a -- get a
6  gathering to say goodbye to him.
7     Q  And you attended that gathering?
8     A  I cannot recall.  I don't think so.
9     Q  Do you recall that it was -- actually
10  occurred in January 2018?
11       MS. NOTARI:  Objection to form.
12       THE WITNESS:  No.
13  BY MS. DEGANCE:
14    Q  And do you recall that you actually attended
15  that event?  It was at a place called Malibu.
16       MS. NOTARI:  Same objection.
17       MS. DEGANCE:  What's wrong with the form?
18       MS. NOTARI:  This is vague, ambiguous, and
19  it's facts that haven't been established.
20       MS. DEGANCE:  That's not a proper form
21  objection.
22  BY MS. DEGANCE:
23    Q  But go ahead.  Do you recall going to a work
24  event or an after-work event with a group of
25  employees in or around January 2018 at Malibu?

1     A  I think instead of Aloha, it was the Malibu.
2  I cannot recall the name.  But I know where the
3  place is in El Salvador.  But I think that the only
4  time that I was there, it was for his birthday.
5     Q  And when was that?
6     A  I don't -- I don't recall.
7     Q  So you recall Pedro Espinoza trying to
8  arrange a going-away get-together for Mr. Blanco?
9     A  I do not recall if he was the one who created
10  the idea.  I just recall that he was involved,
11  because he was furious about Juan leaving the
12  company.
13    Q  And you don't recall, as you sit here today,
14  whether you attended that event or not?
15    A  I cannot recall, but I don't think so.
16    Q  And you don't recall that event taking place
17  at Malibu?
18    A  I went to Malibu only once, as far as my
19  knowledge.  And it was only for his birthday,
20  because we went out early that day from the office.
21    Q  Did Erick Ramirez become your supervisor at
22  some point?
23    A  He was my last supervisor.
24    Q  After Juan Blanco?
25    A  No.

51 (Pages 198 - 201)

1   Q   Who was your supervisor after Juan Blanco?
2   A   Wendy Ponce.
3   Q   Wendy Ponce.  And then how long was Wendy
4   Ponce your supervisor?
5   A   I cannot recall.
6   Q   After Wendy Ponce -- well, did Wendy Ponce
7   leave the company?
8   A   She did.  She left once, and then she went
9   back to Crowley again.
10  Q   So when -- after Wendy Ponce was your
11  supervisor, did Erick Ramirez become your
12  supervisor?
13  A   Correct.
14  Q   Do you recall when Erick Ramirez became your
15  supervisor?
16  A   I cannot recall.
17  Q   Did you know Erick Ramirez before he became
18  your supervisor?
19  A   I did.
20  Q   How did you know him?
21  A   Because we used to work together as peers.
22  Q   And he was promoted?
23  A   He got promoted.
24  Q   What was your relations like -- relationship
25  like with Erick Ramirez?

1   A   I used to know Erick because we were peers,
2   and we had a good relation.  He was a nice
3   supervisor.
4   Q   Did you ever date him?
5   A   No.
6   Q   Have you ever socialized with Mr. Ramirez
7   outside of work?
8   A   When?
9   Q   Like, gone out for lunch by yourself with him
10  before?
11  A   When?
12  Q   At any point.
13  A   Up to today?
14  Q   Yeah.  At any point have you been -- have you
15  been out to lunch with Mr. Ramirez, just the two of
16  you for lunch?
17  A   At Crowley or at any point?
18  Q   At any time.
19  A   I have.
20  Q   Would you consider him a friend?
21  A   He's one of my best friends now.
22  Q   Have you ever been to his home?
23  A   Yes.
24  Q   And when's the last time you saw him?
25  A   I'll say probably a month ago.

1   Q   Okay.  So you still see him?
2   A   Yes.
3   Q   I'm going to show you a series of documents
4   that we'll -- that we will enter as Defendant's
5   Exhibit No. --
6   A   Can I take this one --
7   Q   6, Defendant's Exhibit No. 6.
8       (Defendant Crowley's Exhibit No. 6 was marked
9   for identification.)
10  BY MS. DEGANCE:
11  Q   And take a look at this.  These are some
12  messages between you and Mr. Ramirez.
13      Do you recognize these messages?
14  A   Yes, I do.
15  Q   And so at this point in time in 2018 when
16  these messages were exchanged, was -- would you
17  consider Mr. Ramirez a friend of yours?
18  A   Yes.
19  Q   So let me ask you:  Why within these
20  messages -- it looks like several times you-all call
21  each other baby.
22  A   Correct.
23  Q   What is -- what is that?
24  A   In El Salvador, it's very often that if you
25  have a friend of yours that is very close, you call

1   them bebe.  But it's not like a sentimental thing.
2   It's just -- instead of calling dude -- ladies,
3   right, because I cannot go, "Hey, dude."  So for
4   ladies.  And he treats me the same way.
5   Q   Okay.  And so -- but you're just friends?
6   A   Yes.
7   Q   Okay.
8   A   And we still are.
9   Q   Right.
10      Have you discussed your -- when did you --
11  let me ask you this:  Was there a point at which you
12  ever told Mr. Ramirez about your allegations against
13  Mr. Blanco?
14  A   I did.
15  Q   When was the first time you told Mr. Ramirez
16  about your allegations against Mr. Blanco?
17  A   I was getting into -- back in 2020, I got
18  into a very deep depression, the last couple of
19  months of 2020.
20      And since he was my friend, also, I told him
21  that I was not in a good position, that I felt like
22  I was more deep than in the ground.
23      And I told him, "I know that I'm not
24  performing my hundred percent, and I want for you to
25  know that I feel desperate, I feel sad, and I don't

1  know the reason why."
2      And he said, "I have noticed that you are not
3  the same person. Is there anything I can do to help
4  you?"
5      And I was like, "No. But just in case that
6  management tells you you need to let this person go,
7  don't go in the -- don't argue, because I don't want
8  you to get in trouble."
9      Q  So my question, though, listen carefully,
10 was: When did you first tell Mr. Ramirez about your
11 allegations against Mr. Blanco?
12     A  I cannot recall the first time.
13     Q  Okay. Do you know someone named Lennys
14 Campos?
15     A  I do.
16     Q  And how do you know her?
17     A  Because when Wendy Ponce was my manager, she
18 was the director of the DFTS.
19     Q  And do you recall in 2018 what Lennys Campos'
20 role was? Was she --
21     A  I recall that she was a director.
22     Q  Okay. What was your work relationship like
23 with Lennys Campos?
24     A  Normal. She was a very professional person
25 and -- as the same as Wendy.

1      Q  So --
2      A  Can I --
3      Q  Yeah. We're done with that one.
4      In the hierarchy, you reported to Wendy Ponce
5  and then Erick Ramirez. And then did they report or
6  did -- did Wendy Ponce report to Lennys Campos?
7      A  There was a point that both of them reported
8  to Lennys.
9      Q  So Lennys Campos was higher up in the company
10 than Wendy Ponce when you reported to Wendy Ponce?
11     A  She was the higher level?
12     Q  Yes.
13     A  Yes.
14     Q  Because she was a director?
15     A  Correct, based here in Jacksonville.
16     Q  I'm going to show you a document we'll mark
17 as Defendant's Exhibit No. 7.
18     (Defendant Crowley's Exhibit No. 7 was marked
19     for identification.)
20 BY MS. DEGANCE:
21     Q  Is this something that you recognize? This
22 looks like an email from you to Lennys.
23     A  Correct.
24     Q  And it's dated February 20th, 2018.
25     And so what were you asking her to consider

1  you for in this email?
2      A  I was asking her to -- just give me one
3  second to complete reading.
4      Q  Take your time.
5      A  (Reviewing document.)
6      Okay.
7      Q  And my question was: What were you asking
8  her to consider you for?
9      A  I was asking for her to consider me for the
10 onboarding process. So instead of being in inland,
11 she put me -- requesting me to go and work with her
12 directly in DFTS.
13     Q  So how did your job -- so did you go work for
14 her in DFTS?
15     A  I did.
16     Q  So what was the nature of your job when you
17 went to work for her in DFTS? What were your job
18 duties, generally?
19     A  Indexing, document management.
20     Q  Is it similar to what we talked about
21 earlier, where, if a signature was missing, you
22 would have to make sure that you would alert your
23 supervisor?
24     A  Correct. And I was also kind of in
25 preparation to become a supervisor.

1      Q  Okay.
2      A  Can I --
3      Q  Uh-huh.
4      I'm going to show you -- what was your
5  relation like with Wendy Ponce when you reported to
6  her?
7      A  Wendy has been one of the most incredible
8  leaders that Crowley used to have. She was very
9  professional, and she took care -- very well care of
10 their employees.
11     Q  Do you recall in June 2018 her having a
12 one-on-one with you to talk about -- something about
13 some observed behavioral issues and emotional issues
14 you seemed to be having?
15     A  Correct.
16     Q  Okay. I'm going to show you a document we'll
17 mark as Defendant's Exhibit No. 8.
18     (Defendant Crowley's Exhibit No. 8 was marked
19     for identification.)
20 BY MS. DEGANCE:
21     Q  Here you go.
22     A  Thank you.
23     Q  And if you'll take a look at that. And at
24 the bottom of that first page, it looks like an
25 email from Wendy to you.

53 (Pages 206 - 209)

1    Do you see that, on June 27th, 2018?
2    A  Correct.
3    Q  And it says.  "Here is a briefing on the
4  one-on-one we had."
5    So if you flip to the next page, is this a
6  document that -- did you receive this document that
7  was attached to the email that she sent?
8    A  I did.
9    Q  Okay.  And is this -- did she have a meeting
10  with you to talk about these items?
11    A  Lennys, myself, and Wendy.
12    Q  And what was the -- what was the purpose of
13  that meeting?
14    A  As far as my understanding goes, it was
15  because they were concerned that I was not acting
16  professional, because I used to cry a lot.  And they
17  wanted me to explain the reason why.
18    Q  Okay.  And what did you tell them?
19    A  At the very first, beginning, I doubt to say
20  something.  But Wendy did that -- Wendy did
21  something that day for me that really encouraged me
22  to be -- to feel safe in a secure zone.
23    She took my hand, because Lennys was over the
24  phone.  We were in a conference room, Wendy and
25  myself, and Lennys was over in the phone.  She

1  grabbed my hand, and she did like this
2  (demonstrating), like, you can talk.
3    And I end up saying to Lennys and Wendy that
4  I couldn't control my emotions because I was -- I
5  got raped.
6    Q  So you told Lennys and Wendy that day of this
7  meeting that you got raped?
8    A  Correct.
9    Q  And I don't see that in this document, where
10  they recapped their conversation with you.
11    A  No.  It's not a breakout.  Basically how a
12  one-on-one works is that they give you this paper in
13  writing, in Crowley's form.  They present it to you.
14  So this is the things that they wanted me to discuss
15  during the meeting.
16    And after you receive that document, you need
17  to send them back as an email saying that every
18  point was reviewed --
19    Q  And did you do that?
20    A  -- and that you compromise yourself to get
21  better.
22    Q  And did you send that document back to them?
23    A  I think so.
24    Q  Do you remember if you did?
25    A  I don't recall.

1    Q  And in that document that you think you might
2  have sent back, did you say in the -- did you
3  reference the alleged rape in the document?
4    A  I don't recall, because that meeting was --
5  at the end was really smooth, because they were
6  like, "Okay.  Now we understand the reason why you
7  are acting this way."
8    And they said something that I will never
9  forget.  They said, "We want our sunshine back, and
10  you deserve to smile again."  That's what -- that's
11  what Lennys said.
12    Q  Okay.  And --
13    A  So I did a compromise.
14    Q  Did they -- so at this point Mr. Blanco had
15  already been terminated; correct?
16    A  I cannot recall the day.
17    Q  This was in June of 2018.
18    A  By that time he should, yes.
19    Q  And did they -- what else -- did they say
20  anything else to you once you told them that you had
21  been raped?
22    A  They didn't ask me who, and I didn't want to
23  get into the legal actions that Jose told me.  So I
24  just told them that I was raped, but I didn't say
25  Juan because I didn't want to create a big issue.

1    I remember that when Lennys got off the
2  phone, I was about to go out of the conference room,
3  and Wendy Ponce approached me.  She grabbed both of
4  my hands.  Her laptop was waiting on the table.  And
5  she said, "Is this -- this has something to do with
6  Juan?  Did Juan hurt you?"
7    And I said, "Yes."
8    And she said, "He did -- I believe you
9  because he did something similar to me."
10    And we started crying, both of us, and we
11  hugged.
12    Q  You and Lennys?
13    A  No.  Me and Wendy.
14    Q  Oh, you and Wendy.
15    So Wendy said Juan did something similar to
16  her?
17    A  Uh-huh.
18    Q  Is that what you're saying?
19    A  She said -- she asked me if -- was Juan the
20  one that hurt me?
21    I said, "Yes."
22    And she said, "I believe you because he did
23  something similar to me."
24    Q  Did -- so that was -- but Lennys Campos
25  wasn't there at that time?

54 (Pages 210 - 213)

1 A No.
2 Q Okay. So you didn't tell Lennys Campos who
3 had raped you?
4 A No.
5 Q All right. I'm going to show you a document
6 we'll mark as Defendant's Exhibit No. 9.
7 (Defendant Crowley's Exhibit No. 9 was marked
8 for identification.)
9 BY MS. DEGANCE:
10 Q Take a look at this, if you will. And that's
11 an email from -- it looks like from you to Lennys
12 Campos in April of '19.
13 And you say, "Just stopping by to remind you
14 how much I love and miss you. Hope you and your
15 family are doing well."
16 So why did you send this email to Lennys
17 Campos?
18 A Because after that meeting, they were really
19 understanding with my situation. And even though I
20 needed to be -- if I was not doing something right,
21 they had the right to say something. But the way
22 that they were acting with me, I felt like a lot of
23 compassion from Lennys and Wendy. Both of them,
24 they treat me very well --
25 Q Good.

1 A -- during my process.
2 They were always like, "You can do this.
3 Let's bring the sunshine back. We want to see you
4 smile. You deserve it. Your son needs" -- I
5 remember Lennys told me once -- she called me. She
6 said, "Your son deserves a happy mom."
7 Q Okay.
8 A Can I --
9 Q Okay. Do you know Heitzel Monroy?
10 A I do.
11 Q How do you know her?
12 A She used to work with Arthur LaMoureaux in --
13 but she was based in El Salvador's office.
14 And times where I used to go to smoke, Juan
15 used to smoke as well. There were some times where
16 she and Juan used to be together. They used -- they
17 seemed to me like very close friends.
18 Q Did you ever socialize outside of work with
19 Heitzel and Juan? Did you ever go out with the two
20 of them?
21 A Not that I recall.
22 Q Have you ever been to her house?
23 A No.
24 Q How would you describe your work performance,
25 let's say, your last two years at Crowley?

1 A I'm not sure, because I tried to do my -- to
2 do my best, to keep it as professional as I could,
3 avoiding crying, getting mad, anxious, frustrated.
4 Even though Juan was not there, I felt
5 like -- that there was something still in the back
6 of my mind that it kept remembering me what I have
7 been through. Up to this day, I still have
8 consequences of that.
9 Q Okay. But let's stick to -- I'm asking about
10 your performance. How do you think your performance
11 was?
12 A Maybe it was not the greatest one.
13 Q So when did you get married? What month in
14 2019?
15 A It was -- my God, my husband is going to kill
16 me.
17 I think it was between September or
18 October 2019.
19 Q And then when was the birth of your youngest
20 child?
21 A March 2020.
22 Q Okay. So you were pregnant 2019-2020; right?
23 A Correct.
24 Q All right. And you had the baby in
25 March 2020?

1 A Correct.
2 Q How long were you out on leave after you had
3 the baby?
4 A I cannot recall the exact amount of days, but
5 it was between three or four months, or close to
6 four months.
7 Q Is that the standard amount of time that
8 you're given off with Crowley in El Salvador to have
9 a baby?
10 A That's by law in El Salvador.
11 Q Right. So that would be March until about
12 July 2020?
13 A Approximately.
14 Q After you had your second child in March, did
15 you suffer from any postpartum depression?
16 A I did not.
17 Q So let's go back to your performance. I'm
18 going to show you -- first of all, were you ever put
19 on any kind of performance improvement plan that you
20 know of?
21 A Not that I was aware of.
22 Q Did anyone ever tell you in your last two
23 years of employment that you were having performance
24 issues?
25 A Wendy and also, I think -- if I remember

1 correctly, I think Erick Ramirez also mentioned
2 something about -- he sent me an email, and he
3 called me right away after I received that email.
4    Q  So Wendy -- Wendy told you that you were
5 having some performance issues?
6    A  According to the email that I just saw, yes.
7    Q  Other than the email where she talks about
8 the behavioral issues, did she discuss with you any
9 other performance issues?
10    A  Not that I recall, but possibly.
11    Q  I'll show you a document we'll mark as
12 Defendant's Exhibit No. 10.
13      (Defendant Crowley's Exhibit No. 10 was
14   marked for identification.)
15 BY MS. DEGANCE:
16    Q  Take a look at this.  This is an email from
17 Erick Ramirez to you on November 16th, 2020.  It
18 looks like he had a one-on-one meeting with you on
19 October 7th, and it looks like he sent this after
20 that.
21      Is that correct?
22    A  Correct.
23    Q  And these topics that are in this email, are
24 these areas that he discussed with you during that
25 meeting?

1    A  Yes.
2    Q  Okay.  Did you -- during this meeting with
3 him that you had in October, did you complain to him
4 at all that you were being underpaid?
5    A  I cannot recall.
6    Q  I'm going to show you a document we'll mark
7 as Defendant's Exhibit No. 11.
8    A  Can I --
9    Q  Every time you can go ahead and just flip
10 them over.  Thank you.  I'll let you know if we need
11 to go back to it.
12      MS. NOTARI:  Excuse me just a second.
13      MS. DEGANCE:  Sure.
14      (Discussion held off the record.)
15      (Defendant Crowley's Exhibit No. 11 was
16   marked for identification.)
17 BY MS. DEGANCE:
18    Q  Okay.  This looks like an email from Angela
19 Smith -- do you know who Angela Smith is?
20    A  Yes.
21    Q  -- to Erick Ramirez.  And it says, "While you
22 were on vacation, I had this interaction with
23 Vanessa Treminio, which is a little concerning to
24 me, and I wanted to raise this to you for your
25 visibility and corrective action."  And then she has

1 a screenshot, it looks like.
2      Do you recall there being some issue with a
3 bond claim that Angela Smith was concerned about?
4    A  I cannot recall, but it's possible.  I don't
5 even know what bond claim anymore means.  So sorry.
6    Q  You don't know what a bond claim means
7 anymore?
8    A  Not anymore.
9    Q  But it was something that you would have
10 worked, I guess -- at the time you worked for
11 Crowley did you know what a bond claim was?
12    A  I think so.
13    Q  Okay.  Do you recall Erick Ramirez talking
14 with you at all about concerns that Angela Smith had
15 about your performance?
16    A  I don't recall.
17    Q  Did Lennys Campos ever talk with you about
18 your performance?
19    A  That they -- well, performance also includes
20 the professional attitude that you show.  So the
21 time that I spoke with Wendy, I can recall that
22 time.  But I cannot recall if there were other
23 times.  But it could be possible.
24    Q  Okay.  I'm going to show you a document we'll
25 mark as Defendant's Exhibit No. 12.

1      (Defendant Crowley's Exhibit No. 12 was
2   marked for identification.)
3 BY MS. DEGANCE:
4    Q  And this looks like an email from Lennys
5 Campos to you.  She copies Erick Ramirez.
6      And it looks like she says, "Hi, Vanessa.
7 You were the only person from the El Sal team (not
8 on vacation) that did not complete the assignment
9 below."
10      Do you see that?
11    A  Correct.
12    Q  Do you recall receiving this email?
13    A  It's possible, but I don't recall.
14    Q  Do you recall Ms. Campos discussing with you
15 this assignment that you did not complete?
16    A  It was an email asking for me to describe my
17 responsibilities and role.
18    Q  Okay.  Do you recall her discussing it with
19 you?
20    A  I don't recall, but it seems -- if my name is
21 on it, I think so.
22    Q  I'm going to show you a document we'll mark
23 as Defendant's Exhibit No. 13.
24      (Defendant Crowley's Exhibit No. 13 was
25   marked for identification.)

1 BY MS. DEGANCE:

2   Q If you would take a look at this document for

3 me. And this is an email from Erick Ramirez to you

4 on December 9th, 2020.

5     And he says, "I want to let you know my

6 concerns in regards to you not meeting expectations

7 in the senior specialist role. This is not only

8 from my observations, but based on team members'

9 feedback and productivity measures."

10     Do you see that?

11   A I do.

12   Q Do you recall receiving this email from Erick

13 Ramirez?

14   A This was the email that I received. And

15 after this email got into my mailbox -- Outlook

16 mailbox, he called me.

17   Q Okay.

18   A And he said that, "Bebe, I just want to let

19 you know that I just sent you an email."

20     And I was like, "Yeah, I saw that."

21     But I just saw the subject. I was not

22 digging into the email. And I remember that this

23 email was the one that he told me that these

24 concerns or email was written by Angela Smith, and

25 that since he was my immediate supervisors he needed

1 to send it to me directly.

2     But he said, "I want for you to know that

3 this is not coming from me." That's what he said.

4     And so I didn't -- I didn't take it

5 personally, because, at the end of the day, it was

6 work and because he had the kindness of calling me

7 and saying, "I want to explain to you that it's not

8 me."

9   Q It says in the bottom full paragraph that

10 he -- he's asking you to give your immediate

11 attention to this matter, including a list of

12 actions/plan to address the concerns.

13     Did you create that list?

14   A Which list?

15   Q Of actions/plan to address the concerns.

16   A I cannot recall. But if my supervisor

17 requested, maybe I did.

18   Q Okay. Do you recall whether you responded to

19 that email in writing?

20   A I cannot recall, but it's possible.

21   Q I'm going to show you a document we'll mark

22 as Defendant's Exhibit 14.

23     (Defendant Crowley's Exhibit No. 14 was

24   marked for identification.)

25 BY MS. DEGANCE:

1   Q Did you -- is it possible that you asked him

2 to actually provide you some examples of how you

3 weren't meeting expectations?

4   A It sounds like me. I was always looking for

5 improvement.

6   Q So if you look at this, it looks like the

7 same email at the bottom; right?

8   A Correct.

9   Q And then -- and then it looks like he sends

10 another email at the top.

11     And it says, "Per your request, adding some

12 of the emails for your reference."

13     Do you see that?

14   A I do.

15   Q Do you recall receiving this email?

16   A I do.

17   Q Okay. Did you review the emails that were

18 attached?

19   A I did.

20   Q Okay. And did you -- did you agree that

21 there were some performance deficiencies based on

22 these emails?

23   A I did. I was not in a good mental state at

24 that point. I was already receiving the

25 psychological assistance, I think.

1   Q So at this point in 2020, you were aware,

2 then, in December 2020 that at least some of your

3 superiors thought you were having performance

4 issues; is that correct?

5   A Correct.

6   Q Did you request a transfer, then, to another

7 area or to another role within Crowley at this time?

8   A I cannot recall.

9   Q Okay. Let me show you this document we'll

10 mark as Defendant's Exhibit No. 15.

11     (Defendant Crowley's Exhibit No. 15 was

12   marked for identification.)

13 BY MS. DEGANCE:

14   Q Take a look at this.

15   A Oh, yes.

16   Q It says -- it's an email from you to Erick

17 Ramirez and Beatriz Ayala, and it looks like someone

18 else.

19     And you say, "Please find attached my

20 promo/transfer request."

21     So where is it you were trying to transfer?

22   A They published an accounting GPS supervisor

23 position, and all employees at Crowley are able to

24 apply through to the position through their

25 promo/transfer request form.

57 (Pages 222 - 225)

1    Q   And why did you want to transfer to another
2  position?
3    A   At that point, because I already had two kids
4  and I needed to improve my salary and I needed to
5  keep growing.
6    Q   Would this have been a promotion?
7    A   Yes.
8    Q   Did you apply for it?
9    A   I did.
10    Q   Did you receive it?
11    A   No.
12    Q   Were you interviewed for the job?
13    A   I cannot recall.
14    Q   You were married at this time; right?
15    A   Yes, and with my baby.
16    Q   So you were not successful in obtaining this
17  position; correct?
18    A   Correct.
19    Q   Okay.  Did you raise the idea around this
20  same time of voluntarily resigning from Crowley?
21    A   I did.
22    Q   And when did you first raise that idea?
23    A   I received -- well, I received a call from --
24  I don't know if she's still working at Crowley, but
25  I received a call from some colleague at -- here in

1  Jacksonville and --
2    Q   Who was it?
3    A   Her name is Vanessa, but I don't recall her
4  last name.
5    Q   Was she in your same department?
6    A   Correct.
7        And she said, "Amiga," because that's what
8  she used to call me, even though she is from here.
9  She doesn't speak Spanish.
10        She said, "Amiga, what's going on?  Are you
11  leaving?"
12        I was like, "What do you mean?"
13        "Angela just told me that I needed to learn
14  from your duties.  So I want to know if you will
15  be moving."
16        And I said, "Not that I know, because I
17  haven't got another position."
18        And she said, "Oh, okay."
19        And she asked me what would be the best time
20  to -- to set up a training meeting.  And I don't
21  recall the times and if we did.  But she -- she was
22  the one that told me that it was requested by Angela
23  Smith to learn as much as she could from me.
24    Q   What was Angela Smith's role at the time?
25    A   At that time she was the inland supervisor

1  for Jacksonville.
2    Q   Okay.  So -- and who were you -- you were
3  reporting to Erick Ramirez then?
4    A   Yes.
5    Q   And then -- and Erick Ramirez was reporting
6  to Lennys Campos?
7    A   No, to Angela.
8    Q   Okay.  So he was reporting to Angela?
9    A   It was my understanding.
10    Q   But this Vanessa that calls you, she lives in
11  the United States?
12    A   In Jacksonville.
13    Q   Was she going to continue living here, or was
14  she planning to move to El Salvador?
15    A   What was my understanding at the time is that
16  she will stay here.  I don't think --
17    Q   Okay.
18    A   -- someone from here wants to go to
19  El Salvador.
20    Q   Okay.  I'm just asking.
21        I'm going to show you a document we'll mark
22  as Defendant's Exhibit No. 16.  This document was
23  originally in Spanish.  It's been translated to
24  English.  And just for the record, there's a
25  certification from the translator also included with

1  the exhibit.
2        (Defendant Crowley's Exhibit No. 16 was
3        marked for identification.)
4  BY MS. DEGANCE:
5    Q   So take a look at that document, if you
6  would.  There's a Spanish version, too, if you
7  prefer to read it in Spanish.
8        But is this something -- is this a document
9  that you sent to Claudia Moran?
10    A   I did.
11    Q   So this is a document you sent.  And this was
12  around the time, wasn't it, that you were -- you
13  were trying to work out a voluntary resignation?
14    A   I was.
15    Q   And why did you specifically reach out to
16  Claudia Moran?
17    A   Because I sent an email to Arthur.  At this
18  point I think I was already receiving 911 emergency
19  line at Crowley Health Advocate, if I'm not making a
20  mistake.  I was receiving help from them because I
21  had an attempt of suicide.  So I started with them,
22  with a psychologist.
23        And since Arthur knew about my case, I
24  remember I sent him an email back in December.  I
25  think it was this same date.  Because, as you can

1 see the time, I was on vacation, if I remember
2 correctly. And I remember that when I received
3 Arthur's call, I was in a car. So I wait until I
4 got home to send this message. And what Arthur -- I
5 sent that email saying, "I want to talk to you." I
6 told him the psychologist told me that it would be
7 better for my mental health to put in my
8 resignation, because she -- her thoughts was that
9 working at Crowley was not good for my mental health
10 because I was suffering.
11 Q But my question was: Why reach out to
12 Claudia Moran?
13 A Because Arthur told --
14 Q Told you to?
15 A Well, he asked me to talk first with Tiffany
16 King, vice president of human resources. And I
17 called Tiffany. He gave me the number, I think.
18 And after I spoke -- no. Scratch that. I remember.
19 He said, "I'm going to reach you back." And
20 he said, "I already spoke to Tiffany, and Tiffany
21 know -- and Tiffany told me that Claudia Moran knows
22 about this and that you can contact her."
23 Q Okay. So that's why you reached out to
24 Claudia?
25 A Correct.

1 Q Okay. I'm going to show you a document we'll
2 mark as Defendant's Exhibit No. 17.
3 (Defendant Crowley's Exhibit No. 17 was
4 marked for identification.)
5 BY MS. DEGANCE:
6 Q This looks like an email sent from you to
7 Lennys Campos.
8 Are these messages? This format, are
9 these -- do these look like messages?
10 What kind of messages are these? Do you
11 recognize them?
12 A I don't recall where did I send them, but it
13 seems like those are mine.
14 Q Do you recall sending these various messages
15 to Lennys Campos?
16 A I -- I think so.
17 Q Okay.
18 A Yeah, because here I'm explaining her -- I'm
19 apologizing for not being a top performer, that I
20 was receiving medical assistance and psychological
21 assistance due to depression, and basically saying,
22 "I want to say thank you for the opportunity."
23 I was -- now I'm expressing that HR -- that I
24 felt like -- that I was feeling betrayed after many
25 years.

1 Q Right.
2 A Because HR could have avoided the situation
3 of the rape.
4 Q Okay. You don't need to read them all to me.
5 I wanted to know if you recognize sending them. And
6 then I'm just going to ask you a couple specific
7 questions --
8 A Okay.
9 Q -- okay, just to save some time.
10 You mention on the -- if you look at the very
11 bottom, you see how there's numbers at the bottom of
12 each page?
13 A Correct.
14 Q Can you go to 668.
15 And see how you say, "The doctor explained to
16 me that I'm going through post-traumatic stress"?
17 Do you see that?
18 A Correct.
19 Q Which doctor was that?
20 A The -- I was told by the neurologist and also
21 by the psychologist of Health Advocate at Crowley.
22 Q So you were seeing a neurologist at this time
23 that said that you were suffering from
24 post-traumatic stress disorder?
25 A The psychologist recommended for me to visit

1 at a neurologist so they can provide me medicine for
2 the depression.
3 Q So my question is: Were you seeing a
4 neurologist at this time?
5 A Yes, I was.
6 Q And who is that? What is your neurologist's
7 name?
8 A I cannot recall.
9 Q When's the last time you saw the neurologist?
10 A It was just one time.
11 Q What about the psychologist? You said that a
12 psychologist referred you to the neurologist. What
13 is the psychologist's name?
14 A If I remember correctly, the last one that
15 was treating me was Elena at that time.
16 Q And spell that for me.
17 A E-l-e-n-a.
18 Q What is her last name?
19 A I cannot recall.
20 Q Where were you seeing the psychologist?
21 A It was from the Health Advocate at Crowley.
22 Q Crowley doesn't have psychologists. So are
23 you saying someone referred you to a psychologist
24 from Crowley?
25 A Well, Crowley has a program that -- it's

59 (Pages 230 - 233)

1 Health Advocate. And when you call there -- that is
2 24-7. That is free. That's where I went.
3    Q So you called a number?
4    A Correct.
5    Q And you were connected with a psychologist?
6    A No. After my attempt of suicide, what I did
7 the next day, I called the emergency line that
8 Crowley used to send us in an email saying, "If you
9 need help, call the Health Advocate line."
10     I spoke with several people there until they
11 said, "We're going to transfer your case to a
12 specific psychologist."
13     And the first interaction I had with her was
14 that she sent me a WhatsApp message saying, "Hi,
15 this is Elena, your psychologist."
16    Q Did you ever meet in person with Elena?
17    A She -- she's based -- or was based at that
18 time in Costa Rica. They explain you that.
19    Q How many -- so you met with her via --
20    A Sometimes she used to call me to my WhatsApp
21 so we can do a video call. And I cannot recall if
22 we used another platform.
23    Q How long -- so did you ever have any kind
24 of -- you did video calls with her, you said?
25    A All the time.

1    Q How often would you have video calls with
2 her?
3    A I think it was about -- at least three times
4 per week she was calling me.
5    Q For how long?
6    A I started to -- seeking help around the end
7 of November 2020, and I think it ended on December
8 or January.
9    Q And you don't know Elena's last name?
10    A I don't. She didn't introduce fully name.
11    Q Did -- what was the doctor that -- you
12 mention in here taking controlled medication.
13    A Okay.
14    Q Who -- first of all, in December 2020, what
15 controlled medication were you taking?
16    A Controlled pills to sleep.
17    Q What were they called?
18    A I don't recall. I was taking three
19 medications. One was for anxiety, another one for
20 depression, and another one to be able to sleep.
21    Q And you don't remember the names of any of
22 the medications?
23    A I don't recall.
24    Q Who prescribed them for you?
25    A The neurologist.

1    Q And you don't know the neurologist's name?
2    A I don't have it in the top of my mind. I
3 only went once because, after I got fired, I knew
4 that I won't be able to afford the expensive
5 medication.
6    Q So if you only went one time, how many pills
7 were you provided, because you would have had to go
8 back to get refills?
9    A I got one time pills, and I didn't even
10 finish them.
11    Q Okay.
12    A I was just saving them in case I had an
13 emergency.
14    Q Okay. I'm going to show you the next
15 document, which will be Defendant's Exhibit 18.
16     (Defendant Crowley's Exhibit No. 18 was
17     marked for identification.)
18 BY MS. DEGANCE:
19    Q If you will take a look at this document for
20 me, please.
21     And at the bottom it looks like an email that
22 you sent to Arthur; is that correct?
23    A Correct.
24    Q And is this the email you were referring to a
25 little while ago that you told me you sent Arthur?

1    A Correct.
2    Q When you say, "Today the psychologist let me
3 go see a doctor in person so they can give me
4 medicine for my depression," was that the
5 neurologist?
6    A Correct.
7    Q And you have no -- do you know where the
8 person was -- where the doctor was located?
9    A I took his name because the -- I did knew
10 where the location was.
11    Q And it's near where you live in El Salvador?
12    A No.
13    Q Where was it?
14    A It was like an hour driving from my home to
15 there.
16    Q Do you still have any of the medication
17 bottles that you were given?
18    A I don't.
19    Q What did you do with them?
20    A They got expired, so I throwed them away.
21    Q And you said before he gave you one
22 prescription one time?
23    A Correct. I didn't want to take any more
24 medication.
25    Q I'm going to show you a document we'll mark

60 (Pages 234 - 237)

1  as Defendant's Exhibit No. 19.
2      (Defendant Crowley's Exhibit No. 19 was
3    marked for identification.)
4  BY MS. DEGANCE:
5    Q  Take a look at that, please.
6      And this looks like some messages between
7  you -- that you sent to Claudia Moran; is that
8  correct?
9    A  Correct.
10    Q  So, again, are these -- what type of messages
11  are these?  Are these through, like, Crowley's
12  personal -- is it like an instant-messaging app at
13  Crowley, or what is -- what types of messages are
14  these?
15    A  I think it was through Teams.
16    Q  It was through Teams?  They were just
17  messages through Teams?
18    A  Correct.
19    Q  Did she respond to them, because all of these
20  look like they're from you to her?
21    A  I don't think so.
22    Q  But you recall sending these?
23    A  No.  Every time that I sent writing to her
24  via email or phone, what she used to do is just
25  calling me.

1      I remember one time that I requested for my
2  coverage -- covering my back, if I was able to
3  record the Teams meeting conversation between her
4  and me.  And she said no.  So she never left nothing
5  important in writing.  She always called me.
6    Q  Well, my question is:  Did you send these
7  messages to her?
8    A  I did.
9    Q  I'm going to show you what we'll mark as
10  Defendant's Exhibit No. 20.
11      This is another document that was originally
12  in Spanish that was translated, and there's a
13  certificate of translation on the back page.
14      (Defendant Crowley's Exhibit No. 20 was
15    marked for identification.)
16  BY MS. DEGANCE:
17    Q  So take a look at that document.
18      And this looks like an email that you sent to
19  Claudia Moran and Beatriz Ayala.
20      Do you remember sending this email?
21    A  I do.
22    Q  And it looks like -- you say here you want to
23  make a counteroffer.  What does that mean?
24    A  A what?
25    Q  On the second -- see where it says, "Taking

1  into consideration what we discussed, I would like
2  to make a counteroffer"?
3    A  Okay.
4    Q  So what did you mean by that?
5    A  What we spoke during our conversation was
6  that -- I basically told them, "I know that because
7  you know about me speaking with a psychologist about
8  my rape, it seems to me that you want me to be out
9  of the company because I'm not a trusted person
10  anymore."
11      And they offered me to -- in El Salvador,
12  when it's the last few days of December, they give
13  you your indemnisation.  Basically you sign a
14  contract -- you -- basically they fire you through a
15  letter and they hire you the same day.
16    Q  And you sign a release, right, and then you
17  start another annual contract?
18      MS. NOTARI:  Objection.  You've got to let
19    her finish testifying.
20  BY MS. DEGANCE:
21    Q  Did you finish that part of your answer?
22    A  I wasn't, but now I don't know.
23    Q  Go ahead.
24    A  So what I was telling them is that I was
25  willing -- because at the end of the day Crowley was

1  my house for so many years, I wanted to go
2  peacefully.  And what I was asking -- as you can see
3  on the email, I was not asking something crazy.  I
4  was just asking for help to cover -- to put my
5  resig- -- my voluntary resignation so I can not
6  continue affecting my job performance due to my
7  emotional stress.  And because I -- for me, the
8  image that I left at Crowley was really important at
9  that time.  And that's where I told them to help me
10  with the expenses.
11    Q  So that's what your counteroffer was, which
12  was my original question, just to explain what -- so
13  that's why you were making a counteroffer?
14    A  Yes, because she said, "If you want to put
15  your voluntary resignation in, you will go with
16  nothing."
17    Q  Right.  It says here that you were asking for
18  a cancellation of the outstanding amount of
19  university expenses.
20      Do you see that?
21    A  Correct.
22    Q  How much did you owe in outstanding
23  university expenses?
24    A  I think it was -- I was waiting for the
25  reimbursement that I had submitted one or

1  two months.  And they didn't make the deposits, so I
2  was asking them to consider to speed up the process
3  because I already gave the bills and my grades.  So
4  it was the right thing to do.
5      Q   Did you --
6      A   They were taking so long.
7      Q   Did you receive that reimbursement for those
8  education --
9      A   I did.
10     Q   Let me finish.
11         Did you receive the reimbursement for those
12  education expenses?
13     A   I did.
14     Q   I'm going to show you a document we'll mark
15  as Defendant's Exhibit No. 21.
16         (Defendant Crowley's Exhibit No. 21 was
17     marked for identification.)
18  BY MS. DEGANCE:
19     Q   And here -- is this where you're asking -- I
20  guess one of the emails where you're asking them to
21  approve your educational assistance?
22     A   It seems like.
23     Q   Okay.  And you testified they actually did
24  approve it; correct?
25     A   Correct.

1      Q   How were you first informed that your
2  employment was being terminated?
3      A   Because Erick told me.
4      Q   I'm sorry?
5      A   Erick told me.
6      Q   Okay.  And do you recall approximately when
7  he told you?
8      A   The day prior they did.
9      Q   Did he tell you verbally or in writing?
10     A   He went to my house.
11     Q   Had he been to your house before?
12     A   Yes.
13     Q   So it wasn't uncommon for him to come to your
14  house?
15     A   No.
16     Q   Because you were friends?
17     A   Yes.
18     Q   And what did he say to you?
19     A   He called me.  First he asked me, "Are you
20  home?"
21     I said, "Yes."
22         It seems weird to me the next thing he told
23  me was like, "I'm five minutes away from your
24  house," because he used to live more than an hour
25  away from my house.

1         And I was like, "Okay."
2         He asked me, "Do you have cigarettes?"
3         And I was like, "No.  Do I need them?"
4         And he said, "I think you will.  I'm going to
5  go into a gas station."
6         So after a few minutes he arrived to my home.
7  My husband was down in the first floor.  And Erick
8  told him, "I need to speak with her privately.  Can
9  you give us some time?"
10         And my husband went to the second floor, and
11  we went to my backyard.  And then we had the
12  conversation.
13     Q   What did he say?
14     A   He said that he wanted to apologize with me
15  because there was nothing to do -- there is nothing
16  he would be able to do, that the next day I will be
17  receiving a call from him and an HR representative
18  to let me know that my contract was terminated.
19         He said that Claudia Moran told him that I
20  was -- keep bringing my rape situation on the table
21  and that I was not a trusted person and I was a
22  possible issue to the image of the company.
23         He said, "I'm coming to your house to let you
24  know about this because I think it's unfair because
25  they know that you are not okay mentally, and it's

1  because of what happened to you.  So now I'm taking
2  my leader or super- -- my supervisor hat with you
3  and I'm being a friend to you because I know that
4  you are on medication and just in case you need to
5  take any precautions."
6         And he also said, "I cannot tell you much,
7  but just when you are requested to go to the office
8  to give your equipment, please make sure to read
9  what you are about to sign.  I cannot tell you
10  anything else."
11     Q   What -- and you said it was the day before
12  you --
13     A   Correct.
14     Q   What day were you terminated?
15     A   I was terminated on January 14th.
16     Q   2021?
17     A   Yes, 2021.
18     Q   Were you given any indication as to who made
19  the decision to terminate you?
20     A   No.  He just told me what Claudia Moran told
21  him, so...
22     Q   So the next day, did you receive a phone
23  call?
24     A   I did.
25     Q   From who?

62 (Pages 242 - 245)

1    A   I received a phone call at 6:00 a.m.
2  El Salvador time from Erick Ramirez and Beatriz
3  Ayala.
4    Q   And did Beatriz Ayala also live in
5  El Salvador?
6    A   Yes.
7    Q   And they called you at 6 o'clock in the
8  morning?
9    A   Correct.
10    Q   Were you awake?
11    A   Yes, because that was my starting time.
12    Q   Oh, you started work at 6:00 a.m.?
13    A   Yes.
14    Q   Okay.  And when they called you, you were
15  still at home?
16    A   I was working from home.
17    Q   Okay.  What did -- so it was the two of them
18  on the call with you?
19    A   Correct.
20    Q   And who spoke?
21    A   If I recall correctly, both of them did.
22    Q   What do you recall being said to you on the
23  phone?
24    A   That they were letting me go due to poor
25  performance.

1    Q   And do you recall anything else being said on
2  the call?
3    A   I was requested to go to the office.  I
4  cannot recall if it was the same day.  And I told
5  them I cannot go today because I needed to take my
6  equipment, my computer, and every Crowley stuff that
7  they gave me.
8        And that's when Beatriz Ayala asked me, "When
9  can you come?"
10        And I don't remember the date that I told
11  her, but I went to the office that date that we
12  agreed.
13    Q   Okay.  I'm going to show you a document we'll
14  mark as Defendant's Exhibit No. 22.
15        (Defendant Crowley's Exhibit No. 22 was
16  marked for identification.)
17  BY MS. DEGANCE:
18    Q   Do you recall receiving this email from
19  Beatriz Ayala following the phone call with me?
20    A   No, I don't.
21    Q   You don't recall receiving this?
22    A   No.
23    Q   But you did have a phone call with her;
24  correct?
25    A   Yes, because at 6:00 a.m. that I tried to log

1  in -- I used to log in, like, ten minutes prior to
2  6:00, just to prepare every tool that I needed to
3  use.  So that day I already knew that I was getting
4  fired, but I still tried to log in.  And it was up
5  successful, so I never received this email.
6    Q   During your employment at Crowley, was it
7  ever brought to your attention by human resources
8  that any employees had made complaints against you?
9    A   Against me?
10    Q   Uh-huh.
11    A   I cannot recall, but possible.
12    Q   So it's possible that employees made
13  complaints against you; you don't recall?
14    A   Not that I can remember, but I don't know if
15  they never told me, or maybe they told me and I
16  don't remember.
17    Q   Do you know a former colleague of yours named
18  Andrea Meza?
19    A   Yes.
20    Q   And how do you know her?
21    A   Because we traveled together to the Miami
22  trip with customized brokers.
23    Q   And you worked together?  Did you work
24  together with her?
25    A   Yes.

1    Q   Do you recall her making a complaint about
2  you?
3    A   Not that I know.
4    Q   Do you recall a situation where Andrea Meza
5  was talking to Oscar, who I think you mentioned
6  earlier as someone that worked there?
7    A   Oscar?
8    Q   Uh-huh.  Did you know someone named Oscar?
9    A   Oscar who?
10    Q   I don't have his last name with me, but I
11  have it.
12        But you don't recall anyone named Oscar?
13    A   Let me think, because I knew a lot of people
14  at Crowley for so many years.
15        He was based in El Salvador?
16    Q   I believe so.
17    A   Oscar Montano?
18    Q   Yes.
19    A   Okay.  Yes.  I know Oscar.
20    Q   So you know someone named Oscar Montano.
21        And do you recall a situation where Oscar
22  Montano was speaking with Andrea Meza one day, and
23  you walked by and made a derogatory remark about
24  Andrea?
25    A   About -- I did what?

1  Q  So -- and just tell me if this is -- if you
2  recall this or not.
3      But I'm aware of a situation where -- and I'm
4  asking you about it -- Oscar Montano she was talking to
5  Andrea Meza, and you allegedly walked by and said to
6  Oscar, "You shouldn't be talking to such loose
7  women."
8  A  Such a --
9  Q  Loose women?
10  A  What is "loose women"?
11  Q  That was the allegation.
12  A  Not that I recall.
13  Q  And you don't recall Andrea Meza making a
14  complaint to human resources about you?
15  A  Not that I knew from her.  I -- we used to
16  work together, and I know she had a lot of troubles
17  in the department with so many people, because she
18  used to spend -- I can recall that she was being --
19  the supervisor was always saying, "Andrea, don't go
20  there.  You're wasting your time," and -- because
21  she used to wear really short stuff that Crowley
22  didn't allow.
23      And it was one in specific person that she
24  used to get a lot of trouble with Bessie and
25  Fernando Lievano, that it was for Eduardo Aviles

1  Q  I'm going to stop you.  My question is:  Do
2  you -- do you recall Andrea Meza ever making a
3  complaint about you?
4  A  No.
5  Q  Do you recall anyone else making a complaint
6  about you to HR?
7  A  Not that I knew.
8  Q  Other than what we talked about today, right,
9  have you made any complaints to HR about any other
10  employees?
11  A  I cannot recall.
12  Q  Didn't you make a complaint one time to HR
13  that you thought an employee smelled bad and it
14  bothered you?
15  A  I remember that -- I remember I brought that,
16  but it was not from me.  I was a team lead at the
17  time.  When people used to escalate situations
18  to a team lead or a supervisor, it was my
19  understanding that you needed to go to HR and report
20  it so they can take actions on them.
21  Q  So there was a complaint -- or a complaint
22  reported about someone smelling poorly?
23  A  Yes.
24  Q  Did you make any other complaints on behalf
25  of yourself or anyone else to HR during your

1  employment?
2  A  Possibly.  I cannot recall.
3      Yeah, but that situation about the smelling
4  was something that it was brought as a team for a
5  specific person.  And I thought that it would be
6  better for me to go to HR so they can have a chat
7  with the lady, instead of me going, because I didn't
8  want to make her feel bad.
9  Q  Where are you currently employed?
10  A  Right now -- right now I am working in a
11  U.S.-based company.
12  Q  What's the name of it?
13  A  PGS360.
14  Q  And you work -- you work remotely from
15  El Salvador?
16  A  I do.
17  Q  What type of job is it?
18  A  I am a billing coordinator.
19  Q  Billing coordinator?
20  A  Uh-huh.
21      Yes.
22  Q  Are you paid hourly or by salary?
23  A  By salary.
24  Q  What is your annual salary?
25  A  I don't know my annual salary.  I can give

1  you the monthly salary.
2  Q  Sure.  How much do you make per month?
3  A  I have been there for five months, and I get
4  $1,800.  I don't know if it's out or with taxes,
5  because I -- it's $1,800, and they discount, like,
6  the bank fee or something like that.  So it's less.
7  Q  Do you know how much you take home each
8  month?
9  A  Do you know what?
10  Q  How much you actually take home, what is your
11  take-home pay each month?
12  A  Around $1,700.
13  Q  And you've been working there for five
14  months?
15  A  Correct.
16  Q  Where did you work prior to that?
17  A  I worked for a company named Car Body Lab.
18  Q  Car Body --
19  A  Body Lab, L-a-b, as in boy.
20  Q  And where is that company located?
21  A  In California, too.
22  Q  And what was your job for Car Body Lab?
23  A  Sales representative.
24  Q  Was it online?
25  A  What do you mean "online"?

1    Q   Was it online or was it -- were you an
2   in-person sales representative?  Did you go to an
3   office, or did you work from home?
4    A   Through chats.
5    Q   And how long did you work for Car Body Lab?
6    A   Like, two months.
7    Q   Why did you only work there for two months?
8    A   I don't -- I don't know.  I just quit.
9    Q   Why did you quit?
10   A   Because when I start to feel like I'm about
11  to -- getting too deep in an emotional situation,
12  I'd rather go by leaving a good impression than
13  allow them to fire me as Crowley did.
14   Q   How much were you making at Car Body Lab per
15  month?
16   A   I cannot recall, but it was between 1,000 and
17  $1,200.
18   Q   And so you quit that job?
19   A   Correct.
20   Q   And prior to Car Body Lab, where did you
21  work?
22   A   I worked at Black Hawk.
23   Q   Black Hawk?
24   A   Correct.
25   Q   Is that a U.S. company?

1    A   Correct.
2    Q   What was your job with Black Hawk?
3    A   I was an accountant.
4    Q   Do you have an accounting degree?
5    A   I don't.
6    Q   Okay.  But you worked as an accountant?
7    A   Correct.
8    Q   Was it an in-person job?  Did you go to an
9   office?
10   A   It was remotely.
11   Q   Where is Black Hawk headquartered?
12   A   I think it's in California, too, but they
13  have a location in El Salvador.
14   Q   Who was your direct supervisor at Black Hawk?
15   A   I think Lenora Smith.
16   Q   Lenora Smith?
17   A   I think it was her last name.  I just know
18  Lenora.  I cannot recall her --
19   Q   How long did you work at Black Hawk?
20   A   One year.
21   Q   Did you resign or were you fired?
22   A   I resigned.
23   Q   Why did you resign?
24   A   Because I was not in a good mental state, and
25  I used to take it -- I didn't want to work anymore.

1    Q   How much money did you earn per month at
2   Black Hawk?
3    A   $1,500 monthly.  After taxes -- so it was
4   around $1,100 after taxes.
5    Q   Do you recall, when did you first start
6   working at Black Hawk?
7    A   It was June --
8    Q   2021?
9    A   I think so.
10   Q   Did you have any jobs prior to Black Hawk
11  after leaving Crowley?
12   A   I did.
13   Q   Where did you work?
14   A   I -- it was my first time working for PGS.
15  So this is my second time.
16   Q   Okay.  PGS30?
17   A   360.
18   Q   360?
19       Did you work as a billing coordinator?
20   A   Yes.
21   Q   How much money did you earn, then, with
22  PGS360?
23   A   I think it was between 1,000 and $1,200, I
24  think.  I don't recall exactly.
25   Q   How long did you work for PGS360 before

1   leaving again?
2    A   Around three to five months.
3    Q   Why did you leave?
4    A   Because Black Hawk came in the picture, and
5   they were offering me law benefits, that they were
6   important to me at the time.
7    Q   Who's your current supervisor with PGS360?
8    A   Renato Martinez.
9    Q   R-e-n-a-t-o?
10   A   Correct.
11   Q   Martinez?
12       Where is he based?
13   A   In El Salvador.
14   Q   And he's your supervisor.  He was your
15  supervisor before as well?
16   A   Correct.
17   Q   How long after your termination from Crowley
18  did you start working at PGS360?
19   A   I was in another place that it was -- after
20  Crowley fired me, I received help from a former
21  Crowley employee.
22   Q   Who is that?
23   A   Rene Salas.
24   Q   Who?
25   A   Rene.

1　Q　Can you spell it?
2　A　R-e-n-e, last name S-a-l-a-s.
3　Q　So you worked for Rene Salas?
4　A　Not directly. He was the one that helped me
5　go through a contact center again. And he helped me
6　get an HR position for $500 per month.
7　Q　What was the name of that company?
8　A　SkyCom.
9　Q　SkyCom?
10　A　Uh-huh.
11　Yes.
12　Q　And you worked there -- how long after your
13　termination from Crowley did you start working at
14　SkyCom?
15　A　Approximately a month, I think. I'm not
16　sure.
17　Q　Did you quit?
18　A　I did.
19　Q　And did you quit because you got the job at
20　PGS360?
21　A　No.
22　Q　Why did you quit?
23　A　Because there was -- that was -- I needed to
24　go to the office, and there was a guy that seems
25　like Juan Blanco. So I was feeling uncomfortable by

1　seeing him every day. So I was honest and said, "I
2　need to leave." And I explained the situation to my
3　boss, that it was nothing personal about the job or
4　anything. It was just for me, I didn't want to look
5　a person (inaudible).
6　Q　I'm going to show you a document --
7　THE COURT REPORTER: Say that again.
8　THE WITNESS: I didn't want to see a person
9　that it was similar to him.
10　So sorry.
11　THE COURT REPORTER: That's okay.
12　BY MS. DEGANCE:
13　Q　I'm going to show you a document we'll mark
14　as Defendant's Exhibit Number 23.
15　(Defendant Crowley's Exhibit No. 23 was
16　marked for identification.)
17　BY MS. DEGANCE:
18　Q　This looks like an email, it looks like, to
19　you from a lawyer at Mayora & Mayora.
20　A　Uh-huh.
21　Q　Do you recall receiving this?
22　A　Correct.
23　Q　You do?
24　A　I do.
25　Q　Are you currently seeing a psychologist or

1　any other type of mental health counselor?
2　A　I am.
3　Q　And who is -- who is that person?
4　A　You want my psychologist's name?
5　Q　I want to know everybody you're currently
6　seeing for any type of mental health treatment.
7　A　Right now I'm just with my psychologist.
8　Q　And who is that?
9　A　Patricia, and her last name is spelled R-i-v,
10　as in victory, a-s.
11　Q　How long have you been -- and she's a doctor?
12　A　She's a psychologist.
13　Q　Okay. So how long have you been seeing
14　Dr. Rivas?
15　A　Approximately two months.
16　Q　Why did you begin seeing her two months ago?
17　A　Because the suicide thought came along again.
18　Q　You started having suicidal thoughts?
19　A　Yes.
20　Q　When's the very first time you ever had
21　suicidal thoughts?
22　A　The first time was some -- sometime between
23　November, December 2020. And, lately, approximately
24　two months ago.
25　Q　When's the very first time in your life

1　you've ever seen a psychologist or any type of
2　mental health counselor?
3　A　My first psychologist was the Health Advocate
4　psychologist, and now this one.
5　Q　So you mentioned the Health Advocate earlier,
6　and now you mentioned Patricia Rivas.
7　A　Correct.
8　Q　Have you seen any other psychologists or
9　mental health counselors in your entire life?
10　A　No.
11　Q　And Patricia Rivas you started seeing two
12　months ago. So that would have been around January
13　of this year?
14　A　Correct, approximately. I don't know.
15　Q　Did she put you on any type of medication?
16　A　Right now in El Salvador, psychologists are
17　not allowed to prescribe medication. They refer you
18　to a psychiatrist.
19　Q　Right. Has she referred you to a
20　psychiatrist?
21　A　She did the recommendation, but she knows
22　that I cannot afford going into a psychiatrist
23　because it's too expensive. And the medicine as
24　well is very expensive, due to the experience I
25　already had by getting medication.

1   Q   So you haven't -- you're not on any
2   medication currently?
3   A   No.
4   Q   You mentioned earlier that a neurologist
5   prescribed you medication one time; correct?
6   A   Correct.
7   Q   Other than that time, have you ever been --
8   have you ever before or after been on any kind of
9   medication for depression/anxiety?
10  A   No.
11  Q   So you've only been on medication in your
12  whole life for any type of mental health issue that
13  one time, as prescribed by the neurologist?
14  A   Correct.
15  Q   And after seeing the neurologist up until two
16  months ago when you started seeing Dr. Rivas, had
17  you had any type of medical treatment for any mental
18  health issues?
19  A   I haven't yet.
20  Q   Do you currently -- I'm not sure if
21  El Salvador works the same way, so forgive me.  But
22  do you currently have health insurance through your
23  job?
24  A   I don't.
25  Q   But your husband works for Crowley; correct?

1   A   Correct.
2   Q   Isn't it possible for him to carry you on his
3   health insurance?
4   A   Possible.
5   Q   Does he?
6   A   No.
7   Q   Do you have any records or receipts or any
8   type of documentation showing that you're a patient
9   of Patricia Rivas?
10  A   I do.
11  Q   And have you turned that over to your lawyer?
12  A   I have.
13  Q   And do you have any type of documentation,
14  receipts, medical records, related to your visit to
15  that neurologist that we discussed?  Any
16  documentation from your visit with that neurologist
17  that we talked about?
18  A   What --
19  Q   Remember how you testified that you saw a
20  neurologist?
21  A   Correct.
22  Q   Okay.  Do you have any documentation or
23  receipts or records related to your visit with him?
24  A   I do.
25  Q   And did you turn those over to your lawyer?

1   A   Correct.
2   Q   And do you have any records or receipts or
3   documents related to your web visits that you had
4   with the psychologist back in 2020?
5   A   Say that again.
6   Q   So you know how you told me that when you saw
7   the neurologist you also saw a psychiatrist named
8   Elena and you can't remember her last name?
9   A   It was over the phone.
10  Q   Okay.  So do you -- so the answer might be
11  no, but do you have any type of documentation or
12  records related to your phone calls with Elena?
13  A   No, because they -- when you go to the Health
14  Advocate, they ask you for your Crowley employee
15  information, email address, extension number, direct
16  number of your country.  So...
17  Q   I understand.  So you don't have any
18  documentation or emails from Elena, anything like
19  that?
20  A   Everything was on Crowley's email.  I don't
21  have any in my personal email.
22  Q   And how often are you seeing the psychologist
23  currently?
24  A   Once or twice per week.
25  Q   Once or twice per week?

1   A   Correct.
2   Q   This is Patricia Rivas once or twice per
3   week?
4   A   Correct.
5   Q   And is she in El Salvador?
6   A   Yes.
7   Q   Is she close by to where you live?
8   A   Not that much.
9   Q   For your visits with her, are they in person?
10  A   Not right now.
11  Q   How do you meet with her?
12  A   Through Google Meet or Zoom or WhatsApp
13  calls, video calls.  Or when I have, like, a crisis,
14  I just call to her direct number at any time.
15  Q   How -- how do you pay for your visits with
16  her?
17  A   Via transfer.  Wire transfer.
18  Q   Okay.  And how much does she charge?
19  A   $55 per hour.
20  Q   $55 per hour?
21  A   Correct.
22  Q   She charges you, and you pay for her, I
23  guess, in wire transfer?  So insurance is not paying
24  any of it?
25  A   Insurance doesn't cover mental health.

67 (Pages 262 - 265)

1   Q   Do you have -- I'm sorry if I asked you this.
2       Do you have health insurance with your
3   current employer?
4   A   I don't have with my current employer.  I
5   have personal insurance.
6   Q   And how do you -- who is your personal
7   insurance through?  How do you obtain that?
8   A   It was the same company that provided the
9   service when I was in Crowley.
10  Q   So you continued the coverage after that?
11  A   No.
12  Q   You went back to the same company?
13  A   I went to the insurance lady and told her I
14  wanted nothing to do with Crowley, that I wanted a
15  personal pol- --
16  Q   Policy?
17  A   -- policy.
18  Q   And so that's what you're doing, but it's not
19  through your husband; is that correct?
20  A   No.
21  Q   Have you ever told your sister about what
22  occurred with Juan Blanco?
23  A   Yes.
24  Q   When did you tell her?
25  A   When the psychologist Elena, Health Advocate,

1   told me that I needed to speak with my family and be
2   honest.
3   Q   So you disclosed it to her at that time?
4   A   Yes.
5   Q   She continues to work for Crowley?
6   A   Yes.
7   Q   Has she talked about leaving Crowley because
8   of it?
9   A   No.
10  Q   And when did you first tell your husband
11  about what occurred with Juan Blanco?
12  A   Since at the end of 2020 I didn't told
13  anybody in my family, not including my dad or mom,
14  after the recommendation of the psychologist, I told
15  them that I wanted to get together for my birthday.
16  And I was planning a dinner at my house.  And we
17  were eating, my husband, my sister, my two brothers.
18  And I just told them that I was under medical
19  treatment and I was suffering or thinking about
20  suicide and that I wanted to be completely honest in
21  case -- in any case that I was not there anymore to
22  explain what happened to me.
23  Q   So was that the first time you told your
24  husband what happened with Juan Blanco?
25  A   Yes.

1   Q   Has he talked about leaving Crowley as a
2   result?
3   A   No.
4   Q   Why not?
5   A   Because when I told them, I request to my
6   sister and my husband not to take it personally,
7   that I knew that we were family, but we were not
8   hired at the same time or we were not under the same
9   contract and that they needed to go on, because I
10  cannot desire or interfere in their professional
11  career, and that it was something that was my
12  internal fight, nothing to do with them.  So I tried
13  to not tell them many stuff or try to not to get
14  them involved, because I don't want for what I tell
15  them to interfere with their duties or their vision
16  of the company.
17  Q   So even though you said that, your husband,
18  nevertheless, did not want to leave Crowley at that
19  point because of what happened to you?
20  A   I don't know if he thought about it, but I
21  didn't give him the chance to express that to me.
22  In the same dinner, I told -- I request both of them
23  to -- that it was my internal fight and it has
24  nothing to do with both of them.
25  Q   When's the last time -- now, aside from your

1   husband and your sister, who I know work there,
2   when's the last time you've spoken with a current
3   employee of Crowley?
4   A   Current?  I don't recall.
5   Q   Do you keep in touch with current employees?
6   A   Probably.
7   Q   When's the last time you spoke -- who do you
8   keep in touch with who's still a current employee?
9   A   Not as a friend, but if I have them on social
10  media and if I see something, I react or say,
11  "That's a nice picture," or what they choose to send
12  me, messages like "Hi."  I don't recall.
13  Q   Have you spoken about this case with any
14  current employees of Crowley other than your sister
15  and husband?
16  A   I think one time I spoke with Glenda
17  Oreamuno.
18  Q   Can you spell her last name?
19      MS. NOTARI:  O-r-e-a-m-u-n-d-o [sic].
20  BY MS. DEGANCE:
21  Q   You discussed the case with her?
22  A   I'm not sure if the case, but I remember that
23  she sent me a message over Facebook.  And I was in a
24  very emotional suffering that day, and I cannot
25  recall the things that I told her exactly.  But she

1 ended up saying that she was very sorry and that she
2 wished for me the best.
3    Q   When's the last time you've spoken with a
4 former employee of Crowley?
5    A   Including my sister and my husband?
6    Q   No.  They're current employees of Crowley.
7       When's the last time you spoke with a former
8 employee of Crowley?
9    A   I cannot recall, maybe a month ago that I saw
10 Erick.  He's a former Crowley employee.
11    Q   What other former employees do you keep in
12 touch with?
13    A   Marlon Miranda.
14    Q   Who's that, Marlo?
15    A   Marlon.
16    Q   Marlon?
17    A   Uh-huh.
18    Q   And what's the last name?
19    A   Miranda, M-i-r-a-n-d-a.
20    Q   Have you discussed your case with Marlon
21 Miranda?
22    A   Not the case, but they know that there's
23 something going on due to that this became public.
24    Q   What other former employees have you kept in
25 touch with?

1    A   Erick Ramirez.
2    Q   Who else?
3    A   Nelson Martinez.
4    Q   Who's that?  Nelson?
5    A   Nelson.
6    Q   Martinez?
7    A   Correct.
8    Q   Have you discussed your case with Nelson
9 Martinez?
10    A   No, not discussed.  It became public, and
11 they know I have a lawsuit, but I'm not able to
12 discuss information with them.
13    Q   What other former employees?  Do you keep in
14 touch with Luis Santamaria?
15    A   I think since we left, like two or three
16 times only.
17    Q   Anyone else?
18    A   I have spoke with Ayesha Diaz.
19    Q   When's the last time you spoke with Ayesha
20 Diaz?
21    A   I cannot recall.  Maybe this year or December
22 last year.  I cannot recall.
23    Q   So you haven't spoken or heard from, text
24 message, in any form -- spoken -- you have not
25 communicated with Ayesha Diaz in any form since

1 December or January?
2    A   I cannot recall the exact date, but my
3 communication with her has going down due to the
4 case right now.
5    Q   Why is that?
6    A   Because I know I cannot discuss any other
7 information or talk about my case right now.
8    Q   Have you spoken -- that you recall, have you
9 kept in touch with any other former employees since
10 you left Crowley?
11    A   I cannot recall that.  Those are the ones
12 that are on the top of mind, because Erick, Marlon,
13 Nelson are my closest friends after inland.  And
14 Ayesha Diaz, she has been my go-to person since my
15 visit to Puerto Rico.
16    Q   Have you asked any of them to be a witness
17 for you in your lawsuit?
18    A   I'm not sure.
19    Q   I'm going to show you some documents we'll
20 mark as Defendant's Exhibit Number 24.
21       And these, again, are a set of messages that,
22 actually, you produced in Spanish.
23       MS. DEGANCE:  They were translated to
24    English, and there is a certification that's
25    going to go with these as well for the

1    translation that we need to make part of the
2    exhibit, Renee.
3       (Defendant Crowley's Exhibit No. 24 was
4    marked for identification.)
5 BY MS. DEGANCE:
6    Q   And so I want you to just take a look at
7 these, and I just have a couple of questions for
8 you.
9       Here you go.
10       So these look like some messages that were
11 exchanged with you and Ayesha Diaz; is that right?
12    A   They seem like it.
13    Q   Are these text messages, or were they sent
14 some other way?
15    A   I think they are WhatsApp messages.
16    Q   So is that how you primarily have kept in
17 touch with Ayesha Diaz, through WhatsApp?
18    A   That's how I kept -- my communication with
19 her?
20    Q   Correct.
21    A   Most of the time.
22    Q   Do you ever text each other with your cell
23 phones?
24    A   My -- not -- with my cell phone, I don't
25 think so.

1    Q   How else have you kept in touch with her
2   other than through WhatsApp?
3    A   Maybe she liked a photo on Facebook or
4   Instagram, but our conversations are -- most of them
5   are through WhatsApp.
6    Q   When is the first time -- so these text --
7   these messages -- well, first of all, did you
8   produce all of the messages that you have between
9   you and Ayesha Diaz through WhatsApp?
10   A   To who?
11   Q   To your lawyer.
12   A   I did.
13   Q   And if you look at this page, it looks
14  like -- the first page isn't dated, but the first
15  date on these documents that we can tell is, like,
16  four pages in, and it's January 16th, 2021.
17   A   It was --
18   Q   If you go four pages in, you'll see at the
19  top January 16, 2021.
20       Do you see that?
21   A   I was requested to provide all my
22  communication to her -- proof of all my
23  communication from ten years ago, I think it was.
24   Q   Okay.  So you've produced all of them.  So
25  you don't have any messages with Ayesha Diaz before

1   these -- before this date?
2    A   Not in my cell phone.
3    Q   Do you have them anywhere else?
4    A   Not that I recall.  It's my understanding
5   that after some start of time, you get your message
6   deleted by the application.  I don't know.  Or it
7   could be because the last cell phone I had a few
8   years ago, my son dropped it on -- the baby -- my
9   baby dropped it, like, around one or two years ago
10  into duck's water.
11   Q   Right.  But that wouldn't impact your
12  WhatsApp messages.  It might impact your cell phone
13  messages, but not your WhatsApp.
14       So my question is:  Do you have any WhatsApp
15  messages with Ayesha Diaz before January 16th, 2021?
16   A   I do.
17   Q   You don't?
18   A   That's the oldest conversation I have.
19   Q   Did you delete any messages between you and
20  Ayesha Diaz?
21   A   I haven't.
22   Q   If you look on -- I just want to ask you a
23  few questions.
24       If you go to the third page, it says here --
25  you say to her that you went to the Ministry of

1   Labor.
2    A   Correct.
3    Q   And on Monday, they will go investigate.
4        Why did you go to the Ministry of Labor?
5    A   Because Crowley had my last paycheck
6   retained, my month -- the money that I worked for,
7   along with the indemnisation.  And that is against
8   the law, according to what the Ministry of Labor
9   told me.
10   Q   Okay.
11   A   So they make them separate the checks.
12   Q   Now, if you -- if now go to -- hang on one
13  second.
14       Did you say -- have you talked to Luis
15  Santamaria about your case?
16   A   With who?
17   Q   Luis Santamaria.
18   A   About my case, I think I might say something,
19  because he saw it on the news.  And he told me that
20  he was really proud, something like that.
21   Q   How many times have you been to the United
22  States since your employment with Crowley ended?
23   A   Since my employment ended, I think this is
24  the first time.
25   Q   This is the first time?

1    A   I think so.  Yeah.  Let me think.
2        It ended on 2021; right?  Yes, this is the
3   first time.
4    Q   Okay.  It looks like in these messages you
5   reached out to several lawyers when you were looking
6   for a lawyer; is that correct?
7    A   Correct.
8    Q   Including Denise Benz's lawyer.  Scott
9   Fortune and Kirsten Doolittle you mentioned in here
10  as lawyers you reached out to.  Do you remember
11  that?
12   A   I did contact several lawyers.
13   Q   How did you find your current lawyers?
14   A   I saw a -- I don't know if I said journal.
15  But I saw an information about a woman claiming that
16  she filed a lawsuit against people that raped her,
17  and the company was claiming that -- I cannot recall
18  exactly, but my understanding was that she was --
19  they were -- the company claimed that she was drunk
20  and they wanted for people to think that that's why
21  she got raped on a ship.  And I saw the contact
22  information.  I contacted my lawyer, Ryan.  I
23  didn't --
24   Q   And don't tell me -- I don't want you to tell
25  me about any conversations you had with Mr. Melogy

1 or Ms. Notari. It is privileged. I'm just curious.
2     So you found them through an article; is that
3 what you said?
4     A   Correct.
5     Q   Do you recall when you first hired them?
6     A   I don't recall, but I think we have been
7 together more than a year.
8     Q   So if you look -- so at the bottom of the
9 pages, do you see how it says, like, 43-1, 43- -- do
10 you see how there's numbers?
11    A   Correct.
12    Q   Can you go to 43-31.
13        And you see how it's November -- it looks
14 like this is November 2021?
15    A   Yes.
16    Q   And so at the top, you say, "They're some
17 tough lawyers"; right?
18    A   Correct.
19    Q   Then on the next page, you talk about, on
20 November 23rd, 2021, "The power of attorney and the
21 contract has been signed."
22        So is that on or around the time -- are you
23 referring to the contact with your current lawyers?
24    A   I think so.
25    Q   Okay. So that's around the time you hired

1 them?
2     A   Correct.
3     Q   On page -- if you'll turn to 43-73.
4     A   43?
5     Q   Yes, 43-73.
6         Do you see down here 43-73?
7     A   I see the numbers, but it goes 43-1.
8     Q   Well, go -- you went too far. So there's --
9 the Spanish version is underneath it. So you're
10 going to want to go here.
11        You don't see 43-73?
12        That's interesting. I don't know why you
13 don't have that.
14        Okay. Let me ask you this -- I have a
15 different copy.
16        Let me ask you this. You say in here that
17 tomorrow you begin training for a press conference.
18 And it says, "I will be traveling to do it in the
19 next few days." This was in January of 2022.
20        Did you travel to train for a press
21 conference?
22    A   I did not.
23    Q   And then you say, in February 2022, that
24 you're going to start taking your meds again.
25        Did you actually start taking medication

1 again in 2022?
2     A   I took the expired ones before I throw them
3 out.
4     Q   So these documents, I think -- I think you do
5 have 43-73. They were not produced to us in the
6 right date order, and so the numbers are not in the
7 right order. So I just want to see if you have
8 43 --
9     A   You can take --
10        MS. NOTARI: There's no 43-73 in my copy
11 either.
12        MS. DEGANCE: At all? They're not in order.
13        MS. NOTARI: 43-66 --
14        MS. DEGANCE: I know. The way you produced
15 them to us, the dates were all mixed up. And so
16 we had the translator put them in date order, but
17 it means your numbers at the bottom are not in
18 order, because we needed them to be in
19 chronological order.
20        Do you have that in yours?
21        MS. BERDECIA: I'm looking right now.
22        MS. NOTARI: Oh, yeah. I've got it. 43-73.
23        MS. DEGANCE: It's right before 43-38,
24 believe it or not.
25        THE WITNESS: 43?

1         MS. DEGANCE: Yeah. Go to 30- -- go to page
2 38.
3         MS. NOTARI: She can take my copy.
4         MS. DEGANCE: Okay. Just look at that copy
5 real fast.
6         THE WITNESS: Thank you.
7         MS. DEGANCE: We're going to need that one
8 because it has the certification in it.
9         MS. NOTARI: Just trying to move it along.
10 BY MS. DEGANCE:
11    Q   All right. So that's what I was asking you
12 about, 43-73.
13        You didn't go to the training for the press
14 conference?
15    A   No. I think at that time I was not
16 emotionally okay. And, also, I always speak to my
17 lawyers, try -- the most of my conversation, and
18 most at the beginning was in English.
19        MS. NOTARI: Please don't -- don't testify
20 about anything that you discussed with your
21 lawyers. That's privileged. She instructed you
22 and I'm repeating that. Don't --
23        MS. DEGANCE: Yeah.
24        MS. NOTARI: I don't want you to testify
25 about that.

1 BY MS. DEGANCE:
2   Q  Yeah. I'm just -- I'm just asking if you
3 trained for the press conference.
4   A  No.
5   Q  What did you mean here on the same page when
6 you ask Ayesha, "How long did the negotiations with
7 Denise take?"
8   A  What did I meant?
9   Q  Yeah. What does that mean?
10   A  I knew that it was a case about Denise, and I
11 wanted to see if -- how long, like, this whole
12 process about going into a lawsuit in the United
13 States approximately lasts.
14   Q  Okay. So if you go to the -- to 43-46, which
15 is -- it's around January 10th, 2023.
16   A  Okay.
17   Q  Do you see how you have January 10th, 2023,
18 and, before that, it looks like your last
19 correspondence, if you go to the page before, was in
20 May 2022?
21     So did you have any correspondence with
22 Ayesha between May 2022 and January 2023? Because
23 it seems like a long time.
24   A  I don't think so.
25   Q  And then page 43-48, which is a couple of

1 pages back --
2   A  Okay.
3   Q  -- it says that you started taking medication
4 again.
5     Was that the expired medication that you
6 talked about?
7   A  Yes.
8   Q  If you go back a little bit further to
9 43-54 -- if you just keep going, you'll find it.
10 It's January 11th, 2023.
11   A  I haven't found it yet.
12   Q  Okay.
13     MS. NOTARI: 54?
14     MS. DEGANCE: Yeah. They go in date order.
15     MS. NOTARI: Oh, here.
16     MS. DEGANCE: You got it? Okay.
17 BY MS. DEGANCE:
18   Q  You see that TikTok that's referenced?
19   A  Correct.
20   Q  Do you know the person that created that
21 TikTok?
22   A  Personally I don't.
23   Q  Do you know someone who knows the person?
24 You say "personally."
25   A  I have seen her TikToks.

1   Q  Right. Do you know -- but you don't know who
2 she is?
3   A  Only for the videos that --
4   Q  Right.
5   A  -- are on TikTok. Personally, in person, I
6 don't -- I don't know her.
7   Q  Do you know anybody who knows her?
8   A  I don't recall.
9   Q  You don't recall?
10   A  No.
11   Q  If you go back to 43-59, which is
12 January 25th, 2023 --
13   A  Okay.
14   Q  -- you say, "Look at what I got from town
15 hall today."
16     Do you see that?
17   A  Correct.
18   Q  Who sent you that information from the
19 Crowley town hall?
20   A  I recorded it.
21   Q  How did you record it if you no longer worked
22 there?
23   A  Because my husband and my sister work
24 remotely as well. And my desk and my access to the
25 house is completely. So I saw that they were in a

1 town hall, and I just recorded it.
2   Q  So you went and you actually recorded the
3 town hall?
4   A  Yes.
5   Q  How many times have you done that?
6     MS. NOTARI: Objection to form. That
7 mischaracterizes her testimony.
8 BY MS. DEGANCE:
9   Q  How many times have you recorded town halls?
10   A  Just that one, because I knew that they will
11 be talking about the case, because there is some
12 section about answering questions with Tom Crowley.
13 So I was curious about -- to see how they will
14 perform handling that question -- a question --
15   Q  And so how did you --
16   A  -- on my case.
17   Q  How did you record it specifically?
18   A  With my cell phone, just like this
19 (indicating).
20   Q  So you held it up and recorded it?
21   A  What do you mean holded it?
22   Q  You recorded what was being said during this
23 town hall so you could play it back?
24   A  Correct.
25   Q  And who have you played that for?

1    A   I sent it to Ayesha and to my lawyers.
2    Q   Do you have access to -- and we haven't
3  received that audio recording in discovery, and we
4  definitely asked for it.
5       You did provide it to your lawyers?
6    A   As an exhibit, I don't --
7    Q   You said you provided it to your lawyers;
8  right?
9    A   The date that I recorded, yes, I sent it.
10    Q   Have you -- have you accessed anything else
11  on Crowley's -- from Crowley through either your
12  husband or your sister's Crowley accounts?
13       MS. NOTARI:  Objection, form.
14       THE WITNESS:  What do you mean?
15  BY MS. DEGANCE:
16    Q   Have you -- so you -- you said that -- let's
17  back up.
18       To record this town hall, right --
19    A   Right.
20    Q   -- were you logged on through your
21  sister's --
22    A   No.
23    Q   -- Crowley account or your husband's?
24    A   I saw it on my husband's computer.
25    Q   And my question is:  Have you read anything

1  else or have you looked at Crowley's system through
2  your husband's account at any other time?
3    A   No.
4    Q   So you just happened to record this one town
5  hall?
6    A   Yes, because I was curious about how they
7  will handle if this lawsuit situation was brought to
8  the table.  And I was very disappointed.  So, yeah.
9    Q   And no one's told you it's illegal, at least
10  in the state of Florida, to record someone without
11  their consent?
12       MS. NOTARI:  Objection, form.
13       THE WITNESS:  I'm not a lawyer, so I didn't
14  knew.
15  BY MS. DEGANCE:
16    Q   Were either your sister or your husband --
17  actually, was your husband aware that you recorded
18  the town hall?
19    A   I don't know.  I don't know if he was aware.
20       I know what I did.  I took fully
21  responsibility of it.
22    Q   Was he already logged into the account when
23  you recorded the town hall, or did you log in to his
24  Crowley system?
25    A   No, I did not log in to the Crowley system.

1    Q   He was already logged on?
2    A   He was watching the town hall.
3    Q   Oh, he was watching it -- so he was watching
4  it with you while you were --
5    A   No.  He was watching the town hall as any
6  employee.  And my desk and his desk used to be
7  together.  So after that day, I knew it was not the
8  right thing to do, and I didn't want to compromise
9  myself to be interested on any other -- on gathering
10  another information, because I don't -- after that
11  day I don't care how they handle it anymore.  So
12  what my husband did is that he moved his desk.  So
13  now I'm alone.
14    Q   Well, you said your husband watched the town
15  hall; right?
16    A   Yes.
17    Q   And you were in the room; correct?
18    A   Yes.  We were together, near.
19    Q   And at what point did you record the town
20  hall?
21    A   While he was playing the town hall.
22    Q   So as he's playing it out loud --
23    A   It was live.
24    Q   Okay.  And he's playing it -- he didn't have
25  headphones on?

1    A   No.
2    Q   So he's playing it out loud, and you were
3  recording it?
4    A   I think so.
5    Q   Did he know you were recording it?
6    A   I don't know.
7    Q   Did you tell him that you were recording it?
8    A   I didn't tell him, "I'm going to record
9  this."
10    Q   Did you tell him --
11    A   Not that I recall.
12    Q   Have you told him that you recorded it?
13    A   I'm not sure.  I don't think so.  I don't
14  know.
15    Q   Who all did you send the recording to?  You
16  sent it to Ayesha?
17    A   Yes.
18    Q   And you sent it to your lawyers.  Anyone
19  else?
20    A   No, not that I recall.
21    Q   And you said that you haven't recorded
22  anything else?
23    A   No.
24    Q   And you've never accessed Crowley's --
25    A   Credentials?

1 Q -- website through your husband's --
2 A No.
3 Q -- credentials?
4 A No. I don't know their passwords.
5     It was just me being curious about the
6 situation and to see how -- how will they handle
7 this situation. And I ended up seeing Parker
8 Harrison laughing about it, about the situation. So
9 it was kind of disappointing to me. And I said I
10 won't do this anymore because I'm torturing myself,
11 because I was expecting something else about
12 Crowley's reaction.
13 Q You saw Parker Harrison laughing about what?
14 A About the question.
15 Q What was the question you saw her laughing
16 about?
17 A I don't recall the exact question, but she
18 said, "Oh, you gave me the tough question, Tom,"
19 something like that. I don't recall specifically.
20 And he was like, ha-ha-ha, "This is just
21 allegations. This is just an allegation." And I
22 don't recall what else she said.
23     I didn't play it anymore, because, for me, I
24 expected something else about Parker, because I
25 know -- when I was at Crowley, she was a wisdom

1 member. So she was always, like, caring about
2 women. And the reaction she had, not showing
3 respect and saying, "Oh, they are allegations," and,
4 "You gave me the tough one," I don't think it was
5 handling in a respective way.
6 Q And she was referring to your case?
7 A Correct, because I think that was the
8 question.
9 Q How did you know that your case was going to
10 be discussed at the town hall?
11 A I didn't knew, but I -- I guessed at the time
12 because the lawsuit came public. So...
13 Q Are you aware of -- there was an anonymous, I
14 guess, question that was posted, and I guess that's
15 probably what you're saying Parker responded to.
16     Are you aware of who posted that anonymous --
17 A No.
18 Q -- question?
19     Was it your husband?
20 A No.
21 Q Was it your sister?
22 A No.
23 Q Was it you?
24 A No.
25 Q Have you -- your last exchange with Ayesha is

1 January 27th, 2023.
2     Have you spoken to her in any form since
3 then?
4 A I don't think so. No. It's only through
5 WhatsApp messages.
6 Q And you don't have any beyond January 27th,
7 2023?
8 A No.
9 Q When was the last time your sister was in the
10 United States; do you know?
11 A I don't.
12 Q Is your sister -- your sister's not married?
13 A No.
14 Q And so she lives with you?
15 A Yes.
16 Q And your husband?
17 A Correct.
18 Q How long has she been living with you and
19 your husband?
20 A Since we got married.
21 Q When's the last time your husband was in the
22 United States?
23 A I think this year.
24 Q I'm going to show you a document we'll mark
25 as Defendant's Exhibit No. 25.

1     (Defendant Crowley's Exhibit No. 25 was
2     marked for identification.)
3 BY MS. DEGANCE:
4 Q And let me give this to you.
5     So take a look at this. And I'm just going
6 to ask you a couple of questions.
7     What format are these messages?
8 A WhatsApp.
9 Q And who's Jose Mario?
10 A It's Jose Mario Quinteros. He's a high-level
11 director in Crowley El Salvador.
12 Q And is he a current employee of Crowley?
13 A I'm not sure.
14 Q Have you kept in touch with him?
15 A No.
16 Q So you say here -- you sent this to him, and
17 it looks like you say that -- you're talking about
18 your case; right? And you say at some point towards
19 the bottom -- it looks like you say, "I think that
20 with the case of Denis Benz versus Crowley a few
21 years ago, it was possible to see that when there
22 are strong cases against large companies, the media
23 are the first to want to know the full story."
24     Do you see that?
25 A Yes.

1    Q   What did you mean by that?
2    A   That the -- that I was able to saw a few
3  videos about Denise Benz's case, and the media seems
4  very interested about her case.
5    Q   Were you threatening to go to the media --
6       MS. NOTARI:  Objection, form.
7       THE WITNESS:  No.
8  BY MS. DEGANCE:
9    Q   -- if Crowley didn't settle with you?
10   A   No.
11   Q   Did Mr. Mario respond to you?
12   A   I don't think so.
13   Q   Do you know when you sent this?
14   A   I don't recall.
15   Q   I'm going to show you some documents we'll
16  mark as Defendant's Exhibit No. 26.
17      MS. DEGANCE:  So make sure on the Ayesha
18  stack that --
19      Okay.  Thanks.  Thank you.
20      (Defendant Crowley's Exhibit No. 26 was
21  marked for identification.)
22  BY MS. DEGANCE:
23   Q   Take a look -- this has an English -- it's a
24  translated version, but there's also the Spanish
25  version underneath.

1       These are some messages that were sent from
2  you to -- it looks like to Claudia Moran; is that
3  right?
4    A   To Claudia Moran, no.  This is Claudia
5  Kattan.
6    Q   Okay, Claudia Kattan.
7       And what's Claudia Kattan's role?
8    A   She is a vice president.
9    Q   She's a vice president?  And do you recall
10  when you sent these?
11   A   Wait, wait, wait, wait, wait.  Just give me
12  one second, because --
13   Q   Take your time.
14   A   -- it seems like the first pages, they are
15  to -- yes, it's Claudia Kattan.
16   Q   Okay.  And do you recall when you sent these
17  to her?
18   A   I did.
19   Q   You do know or you don't?
20   A   I know I sent those messages.
21   Q   When did you send them?
22   A   I think it was prior to my email to Tom
23  Crowley.
24   Q   But after your termination?
25   A   After my termination.

1    Q   Okay.  I have to ask you a couple of
2  questions about these.
3       You say on page -- if you look at the bottom,
4  there are page numbers.  If you go to 403 --
5    A   Okay.
6    Q   -- you say in that first message that your
7  dismissal was not due to poor performance, it was
8  due to retaliation; right?
9    A   Correct.
10   Q   Why do you believe you were terminated in
11  retaliation for something?
12   A   Because on the team conversation I had with
13  Claudia Moran, she said that I was not a trusted
14  person anymore.  She said that to me.  And Erick
15  reconfirmed that when he went to my house saying
16  that I was getting fired the next day.
17   Q   But -- okay.  But I believe you testified you
18  don't know who made the termination decision;
19  correct?
20   A   Not -- no.
21   Q   And you had been told prior to your
22  termination about some performance issues; right?
23   A   Yes.
24   Q   Towards -- in that next message, you say
25  something about -- let me see.

1       I'm sorry.  On the next page, you talk about
2  controlled meds -- controlled medications.  Are
3  those the same ones we already discussed?
4    A   Correct.
5    Q   All right.  So on page 404, the middle
6  message, you say, "They have such a poor human
7  resources director here in El Salvador that when I
8  presented my case to her at the request of Arthur
9  LaMoureaux, who was the person to whom I entrusted
10  everything, -- and that is why I went to him and he
11  ended up talking with Tiffany King and her
12  addressing with me -- her addressing me with Claudia
13  Moran."
14      Do you see that?
15   A   I do.
16   Q   So you say here that you entrusted Author
17  LaMoureaux with everything; right?
18   A   Correct.
19   Q   And I asked you earlier, "Isn't it true that
20  you told him you wanted him to keep this
21  confidential?"  And you said it was not true; is
22  that right?
23   A   Correct.
24   Q   Why do you say you entrusted Arthur with
25  everything when, according to your testimony, you

75 (Pages 294 - 297)

1 had already told other people prior to telling
2 Arthur?
3   A  Can you rephrase that?
4   Q  In other words, what did you entrust Arthur
5 with?
6   A  Arthur was the one that got the details about
7 the rape.  I told him what I was able to solve
8 during my stay in inland at the time.  I also told
9 him the homophobic comments that I was able to
10 witness the first time I traveled with Luis.  I also
11 told him that Juan Blanco -- because I was the only
12 one that first time that had a little terrace on my
13 room, he said that we will be spending time in my
14 room.  So we were Luis, Juan, and myself.  And
15 because he said that he wanted to see Luis so drunk
16 until he vomited, and he threatened Luis about, "If
17 I don't see you vomiting about the wasted -- as
18 wasted as you can, I'm going to make you drive from
19 Jacksonville to Miami."
20   Q  Okay.
21   A  And that's when he started to knock on my
22 door, because we invented an excuse with Luis to
23 take him out of my room.  And we never let him in.
24 So he kept knocking and making noises outside.
25   Q  Who did?

1   A  Who did what?
2   Q  Who kept knocking and making noises?
3   A  Juan.
4   Q  Which trip was that?
5   A  The first trip with Luis.
6   Q  Okay.  So let's -- if you flip to the next
7 page, okay, you say on the second message, "The
8 Crowley case knew about it since it happened, and
9 what did they do?  Nothing, since 2017.  And they
10 have done nothing -- or not done anything.  And I
11 have endured it by myself.  For me, Crowley was my
12 home.  My family did not want to hurt him.  And
13 that's why I shut up.  I did not tell anyone but
14 Arthur."
15     Do you see that?
16   A  I do.
17   Q  Okay.  So why do you say you did not tell
18 anyone but Arthur if, in fact, you had already told
19 Jose Lopez and Jacqueline Nájera?
20   A  I don't know.  I think I just -- I was mad at
21 the situation.  I was not going to say, "I told
22 Jose.  I told Jacqueline."  Because at the end of
23 the day, the person that knew all the details and
24 that provide me a resolution was Arthur.
25   Q  In these messages to Claudia, why don't you

1 mention the alleged assault that happened in the
2 elevator?
3   A  Because I sent her a bunch of messages while
4 I was pissed off about a positive pride woman thing
5 in LinkedIn.  So I just started sending a message.
6   Q  On the last page, page 407, at the top, you
7 say, "I wish they had raped a gringa."
8     Why do you say that?
9   A  404?
10   Q  407.
11   A  Let me look.  It says -- no.  That
12 translation -- what I meant, it was not that I wish.
13 It was something more like, I would like to see how
14 the company or someone in the United States reacted
15 to see a raped woman here, because I felt like they
16 were devaluating me because I was Latin and they
17 didn't take the proper care.  That's what I meant to
18 say.
19   Q  Okay.
20   A  Not that I wish a gringa was raped.
21   Q  All right.  I'm going to show you a document
22 we'll mark as Defendant's Exhibit 27 -- well, yeah,
23 27.
24     (Defendant Crowley's Exhibit No. 27 was
25     marked for identification.)

1 BY MS. DEGANCE:
2   Q  Tell me if you recognize this.  This looks
3 like an email exchange -- an email that you sent to
4 Wendy Ponce.
5     Do you see that?
6   A  I do.
7   Q  Is this another job that you were applying
8 for?
9   A  I think -- I think so.  It seems like.
10   Q  And on that next page where it says "Crowley
11 Promotion/Transfer Request Form," did you fill that
12 out?
13   A  I did.
14   Q  So that's your -- you typed in the responses
15 there on that application?
16   A  I did.
17   Q  Is that a job that you ended up being
18 offered, or no?
19   A  No.
20   Q  And then I'm going to show you this document
21 we'll mark as Defendant's Exhibit 28.
22     (Defendant Crowley's Exhibit No. 28 was
23     marked for identification.)
24 BY MS. DEGANCE:
25   Q  This is a Spanish version of a code of

1  conduct that I believe -- well, I can tell you -- it
2  looks like you sent to yourself while you were
3  employed at Crowley to a personal email.  I just
4  want to ask you about it.
5      So do you recognize this?
6  A  I think so.
7  Q  Why did you send it from your work email to
8  your -- is that a personal email, ██████████?
9  A  Yes.  It's my personal email.
10  Q  Why did you send it to your personal email?
11  A  Oh, I remember.  It was because I had a
12  school homework and -- for my university, so I used
13  to work -- basically, all my university homework's
14  about Crowley.
15  Q  Okay.  So that's why you emailed it to
16  yourself?
17  A  Correct.
18  Q  So you, I mean --
19  A  I didn't even recall about this.
20  Q  All right.  I'll show you a document we'll
21  mark as Defendant's Exhibit No. 29.
22      (Defendant Crowley's Exhibit No. 29 was
23      marked for identification.)
24  BY MS. DEGANCE:
25  Q  Tell me if you recognize this document.

1  Q  And when did you meet him?
2  A  He went to El Salvador's office.  I think it
3  was when we recently moved to the new offices in
4  San Salvador.  And I took a picture with him.
5  Q  Okay.  So you met him that time.  When was
6  that?
7  A  I don't know.  I can't recall.
8  Q  And you took a picture with him?
9  A  Yes.
10  Q  Have you met him any other time?
11  A  I went into hallways when -- I think once or
12  twice when I -- in one of my visits to Crowley
13  Jacksonville Regency.
14  Q  And you passed him in a hallway?
15  A  We did say "Hi."
16  Q  Okay.  Any other time that you've met him?
17  A  Not that I recall.
18  Q  Did he respond to this email that you sent?
19  A  He did not.
20  Q  Have you ever had a conversation with Tom
21  Crowley about any of your allegations in this
22  lawsuit?
23  A  No.
24  Q  I'll mark this document as Defendant's
25  Exhibit No. 30.

1      Is this the email that you sent in June 2021
2  to the leadership team at Crowley?
3  A  Correct.
4  Q  And who drafted this?
5  A  I did.
6  Q  These are your words?
7  A  My words.
8  Q  Did Ayesha Diaz help you draft it?
9  A  No.
10  Q  And you mention -- you mention on the second
11  page that they can feel free to contact your lawyer
12  Johanna Lopez.  Who is that?
13  A  She was in El Salvador.
14  Q  She was an El Salvador lawyer?
15  A  Correct.
16  Q  She doesn't still represent you?
17  A  Not anymore, because in El Salvador, after I
18  got my -- the paycheck for the days that I worked at
19  Crowley prior of my dismissal, there was nothing to
20  do in El Salvador.
21  Q  You direct this email to Tom Crowley, among
22  other senior leaders; correct?
23  A  Correct.
24  Q  Have you ever met Tom Crowley?
25  A  I have.

1      (Defendant Crowley's Exhibit No. 30 was
2      marked for identification.)
3  BY MS. DEGANCE:
4  Q  Look at this, if you will.  Tell me if you
5  recognize it.
6      This was an email sent August 2021.  Do you
7  recall sending this?
8  A  If I recall?
9  Q  Yes.
10  A  I do.
11  Q  Okay.  And did -- did you receive a response
12  to this email?
13  A  I have emails from this legal law firm.
14  Q  Did -- but you didn't receive a response from
15  Tom Crowley?
16  A  Not from Tom Crowley.
17  Q  Have you ever met Parker Harrison?
18  A  I have.
19  Q  When did you meet her?
20  A  I met her when we were part of -- when I was
21  traveling in the Regency for the diversity and
22  inclusion counsel and -- because at that -- at some
23  point she used to be my sister's boss.  And the date
24  that I saw her in the D&I meeting, she told me, "Oh,
25  Treminio.  You are Milena's sister; right?  I love

1  Milena."
2    Q   And have you spoken with her any other time?
3    A   No, I haven't.
4    Q   I'm going to make this next document, just
5  for efficiency, just to be done sooner, a composite
6  exhibit.  And we'll make it No. 31.  And I'm going
7  to show them to you, but I'm going to have to split
8  them up because I have them separated as different
9  exhibits.  So --
10       MS. NOTARI:  Do we need a break?
11       THE WITNESS:  No.
12       MS. NOTARI:  Sorry to interrupt.
13       MS. DEGANCE:  Let's just take a quick break
14  and let me -- because I'm almost done.  And I --
15  let's take a quick break.
16       THE WITNESS:  Oh, okay.
17       MS. DEGANCE:  So I can just get these -- this
18  one exhibit organized, and then I'll be able to
19  go on and finish.
20       THE VIDEOGRAPHER:  We'll go off the record,
21  4:56.
22       (Brief break.)
23       THE VIDEOGRAPHER:  Back on the record, 5:10.
24       (Defendant Crowley's Exhibit No. 31 was
25  marked for identification.)

1  BY MS. DEGANCE:
2    Q   I'm going to show you a document,
3  Ms. Treminio, that we've marked as Composite Exhibit
4  No. 31; okay?
5        And they're a series of releases.  The date
6  is at the top, in the right-hand corner.  They start
7  at 2017 and go through 2020.
8        And I just want to ask you if that's your
9  signature at the bottom of each page.
10        For all of them?
11   Q   Yes.  Is that your signature at the bottom of
12  each page?
13   A   It seems like, yes.
14   Q   It is?
15   A   It seems like, yes.
16   Q   Earlier we talked about -- I asked you who
17  you disclosed -- who did you tell, right, about the
18  alleged sexual assault by Juan Blanco.  And I asked
19  you from the time it happened until the time Juan
20  Blanco was terminated, remember, who did you
21  disclose it to, and you gave me your answer.
22        So I'm curious, from the time Juan Blanco was
23  terminated until, we'll say, the time your lawsuit
24  was filed -- well, we'll say from the time Juan
25  Blanco was terminated until the end of your

1  employment with Crowley, who, if anyone else, did
2  you tell about your allegations against Mr. Blanco?
3    A   Besides the people I already mentioned, I
4  cannot recall.
5    Q   So other than who we've talked about, you
6  don't recall disclosing the allegations to anyone
7  else?
8    A   Not that I recall.  I can't recall at this
9  time.  I made a bunch of friends at Crowley, former
10  and current employees.
11   Q   Do you recall -- I'm going to show you a
12  document, and they're your answers to
13  interrogatories.  And I just want to ask you quickly
14  about whether you've seen these before.  Take a look
15  at these.
16        I'll just go ahead and mark them.
17        Have you seen these before?  We'll mark them
18  as Defendant's Exhibit 32.
19   A   It seems like, yes.
20        (Defendant Crowley's Exhibit No. 32 was
21  marked for identification.)
22  BY MS. DEGANCE:
23   Q   Do you recall -- do you know whether -- in
24  responding to these questions, did you actually type
25  the answers, or did someone else type the answers?

1    A   I told my story to my lawyers.
2    Q   Okay.
3    A   I told my story, and they put it in writing.
4    Q   Okay.  And that's your signature on the very
5  last page?
6    A   It is.
7    Q   Did you review all of the answers before you
8  signed this?
9    A   I think so.
10   Q   And was everything in here accurate?
11   A   As far as my understanding, it was, because
12  there is -- there are a lot of legal terms or very
13  big, confusing words in English.  As far as my
14  understanding, yes.
15   Q   Do you understand all of the answers to every
16  question in here?
17   A   I do.
18   Q   Okay.  And they're all accurate?
19   A   As far as my concerns go, yes.
20        MS. DEGANCE:  Okay.  I don't have any more
21  questions today.
22        I will say that we asked for information,
23  including documents supporting her psychological
24  treatment, medical treatment, and we were told in
25  the discovery responses that plaintiff would

1  supplement. We haven't been provided any of
2  those.
3  We also weren't provided with the audio that
4  Ms. Treminio testified she recorded from the town
5  hall meeting.
6  So once we get all of that information, we
7  may have additional questions. We'll cross that
8  bridge when we come to it, if so.
9  But for that reason, I'm finished today, but
10 I may -- I'm not going to close the deposition.
11 MS. NOTARI: Well, obviously we object.
12 MS. DEGANCE: Sure.
13 MS. NOTARI: But, like you said, we'll cross
14 that bridge when we get to it.
15          CROSS-EXAMINATION
16 BY MS. NOTARI:
17 Q  Okay. Ms. Treminio, I have a few questions
18 for you based on what you've testified so far today
19 with defense counsel representing Crowley.
20 So these are a couple of questions that I
21 have just to clarify things that you testified
22 earlier -- to clarify them for the record, because,
23 as you know, the court reporter has been taking down
24 a lot of information, everything that has been said;
25 okay?

1  A  Okay.
2  Q  So now you're going to answer questions from
3  me.
4  A  Okay.
5  I'm sorry.
6  Q  Ms. DeGance asked you about a situation --
7  let's call it a situation, or an event, where Juan
8  Blanco was knocking on a hotel room door during a
9  business trip -- knocking on your hotel during a
10 business trip.
11 Do you remember when we were talking about
12 that?
13 A  I do.
14 Q  Can you tell me more about that situation,
15 because it wasn't exactly clear.
16 What -- first of all, what business trip was
17 this during?
18 A  I think she mentioned or I saw that it was
19 September, the trip that I did with Luis Santamaria.
20 So I think that was the trip.
21 Q  Okay. So this episode that we're talking
22 about when Juan Blanco was knocking on the hotel
23 room assigned to you, that was during the
24 September 2017 trip with Luis Santamaria, Juan
25 Blanco, and yourself?

1  A  Correct.
2  Q  And that was the one that you flew in and out
3  of Miami and drove from Miami to Jacksonville; is
4  that correct?
5  A  He did. Yes.
6  Q  So this episode of Juan Blanco knocking on
7  your hotel room, did that happen during the 2017
8  business trip during which you allege that the rape
9  occurred?
10 A  Can you rephrase that?
11 Q  Sure. This -- the testimony that you gave
12 earlier answering questions about whether Juan
13 Blanco was knocking on your hotel room door -- do
14 you remember you were asked about that?
15 A  Yes.
16 Q  There were a couple of trips that were close
17 to each other, so this is why I need to clarify that
18 for the record.
19 Did that -- that episode where Juan Blanco
20 was knocking on your door to enter your hotel room,
21 was that during the November 2017 business trip to
22 Jacksonville, which is the subject of this -- of the
23 rape?
24 A  No. It happened the first trip that I did
25 with him. I think it was September, according to --

1  Q  With Luis Santamaria?
2  A  Correct.
3  Q  Not the trip in November?
4  A  With Evelyn.
5  Q  Not the trip with Evelyn Vasquez. Okay.
6  Thank you.
7  Another question I had is: You were asked
8  about whether you had knowledge of prior sexual
9  assaults at Crowley. This came up during the
10 questioning about the second conversation that you
11 had with Arthur LaMoureaux where he thanked you and
12 he said that he was able to also verify allegations
13 of five prior women.
14 Do you remember answering questions about
15 that?
16 A  Yes.
17 Q  And do you have any knowledge of prior sexual
18 assaults at Crowley?
19 And then I'm going to ask you if you have
20 knowledge of prior sexual assaults at Crowley that
21 were reported.
22 But those are two different things for the
23 purposes of my question.
24 So at that time when you were having that
25 conversation with Arthur LaMoureaux, did you have

1  knowledge of prior sexual assaults at Crowley?
2   A  I did.
3   Q  Okay.  And do you know if Juan Blanco was
4  involved in those prior sexual assaults at Crowley?
5   A  Yes.
6   Q  You were asked about -- just one of the last
7  exhibits, 31, I think it was.
8    MS. NOTARI:  May I borrow this?
9    THE COURT REPORTER:  Sure.
10  BY MS. NOTARI:
11  Q  Yes.  Okay.  Exhibit 31, please, Vanessa.
12   Okay.  Do you remember being asked about
13  these questions -- about these documents, rather?
14  A  If my signature was on?
15  Q  Yes.
16  A  Yes.
17  Q  What were the circumstances where these
18  documents were given to you to sign them?
19  A  What this represents is that -- in
20  El Salvador, what Crowley does to every employee is
21  that, at the end of the year, they -- in order for
22  you to get your indemnisation, you need to sign this
23  document, that it was the one that I told Kelly
24  about, that basically you get fired and rehired the
25  same day.

1   So these are something that you need to sign
2  every single day.  You have to.  Every single
3  employee.
4   Q  Did anybody explain to you what this was?
5   A  What do you mean?
6   Q  When you were told to sign this at Crowley,
7  did anybody explain to you what this document was
8  that you were signing?
9   A  Like a lawyer?
10  Q  Well, did anybody explain to you, "Okay, this
11  document means this.  This document has the
12  significance of that"?  Did anybody explain to you
13  what the significance of this document was?
14  A  My only knowledge was that -- that you get
15  your (answering in Spanish), that it's the
16  indemnisation and a new contract renewed every
17  single day.  But nobody told me why.  I don't know
18  the reason why they do that.
19  Q  So you don't know the reason why -- you don't
20  know what this meant?
21  A  No.
22  Q  Did anybody --
23  A  It's just for me to get the money.
24  Q  Did anybody advise you to consult with a
25  lawyer before you sign this document?

1   A  No.
2   Q  Did anybody tell you, "Why don't you take
3  this document home and review it before you sign
4  it"?
5   A  No.
6   Q  Did you have an opportunity to take it home
7  and review it before you signed it?
8   A  You are not allowed to.
9    Can I put it here?
10  Q  Yes.
11   We were talking about this -- during this
12  trip when you were with -- we're going to call it
13  the December 2017 trip with Luis Santamaria and Juan
14  Blanco, as opposed to afterward there was a
15  November 2017 trip with Evelyn Vasquez and Juan
16  Blanco.  Two separate trips; okay?  So bear with me.
17  And if you don't know which trip I'm talking about,
18  just please ask so we're clear; okay?
19  A  Okay.
20  Q  This door-knocking incident, when Juan Blanco
21  was knocking or banging on your door in your hotel,
22  and you just clarified for us that it was in
23  September of 2017, on the trip with Luis Santamaria
24  and yourself --
25  A  Correct.

1   Q  -- did you tell Arthur LaMoureaux about that?
2   A  The day that I spoke with Arthur, I told the
3  behavior that I saw during my trip in September, the
4  one in November 2017, both dates, and I also told
5  him about the conduct or the comments I was able to
6  witness two other persons, that they were sexually
7  inappropriate.
8   Q  Okay.  So when you were telling Arthur
9  LaMoureaux about this September 2017
10  door-banging/door-knocking incident, where Juan
11  Blanco was knocking on your hotel room, why was Juan
12  Blanco banging on your hotel room?
13  A  So the situation was that he wanted for me
14  and Luis to drink.  And he said, "We will be
15  gathering in Vanessa's room," because, as I
16  mentioned, I had a little terrace, so he will be
17  able to smoke while drinking.
18   I remember that he put some music on my
19  television.  And he threatened Luis about, "If I
20  don't see you wasted until you vomit, I'm going to
21  make you drive from Jackson- -- all the way back
22  from Jacksonville to Miami," because he knew Luis
23  was afraid of driving in the U.S.
24   So --
25  Q  So like a punishment?

80 (Pages 314 - 317)

1    A  Like a punishment.  Thank you.  I didn't know
2 the word.
3    Q  Because Luis Santamaria is --
4    A  Afraid.
5    Q  -- gay or homosexual?
6    A  He did it like in a punishment because he
7 wanted to get Luis wasted.
8       So Luis was very scared at the time.  And I
9 remember that he was acting very drunk -- Juan
10 Blanco was acting very drunk.  So we created a plan
11 with Luis, and I told Juan, "Hey, I want some snacks
12 or you're running out of cigarettes, just as an FYI
13 if you want to go and get some."
14       So he went out of my room at that time.  So
15 what we did with Luis is that we did this
16 (indicating).  Pour, it's called?
17    Q  Yeah, pour.
18    A  So we poured all the alcohol that he brought
19 into my room, my hotel room.  And we put the music
20 loud, Luis and myself.
21       And we said, "If he comes back, we're going
22 to act like we are so drunk that we're not able to
23 hear him so we don't have to open the door.  And we
24 will wait for him to leave so you can go to your
25 room."

1       And that's what we did.  The next day, I
2 remember that he was so upset.  And when we were on
3 our way to go back to El Salvador -- well, to the
4 airport -- not to that airport.  To the car to drive
5 from Jacksonville to Miami, he throw Luis the keys.
6 And he told Luis, "You're driving, you faggot."  I
7 don't know if that's the correct word.  But he said
8 "maricón" in Spanish.  So he threw the keys.
9       And that's when I interfered and I told him,
10 "No, no, no.  You said that if Luis was wasted until
11 he vomit then he wouldn't -- you won't punish him
12 about driving because you know he's scared.  And I
13 am a witness that he threw because he ended up
14 throwing up in my bathroom."  That's what I said, so
15 that way we were able to get that punishment out of
16 the table.
17    Q  Okay.  And so what was Juan Blanco upset
18 about that he was banging on the door?
19    A  Because we didn't open the door.  He was
20 banging for us to let him in.  So we put the music
21 on while he was gone.  And we were -- so he could
22 think that we were drunk, that -- so drunk that we
23 were not able to hear him knocking.  And we
24 disconnect my hotel phone number as well -- my hotel
25 phone as well.

1    Q  And did you tell this story to Arthur
2 LaMoureaux?
3    A  I did.  I did.  I told Arthur about that, the
4 rape, and also the inappropriate comments, because
5 it was easier because he speaks Spanish.  So it was
6 easier for me to translate -- to tell him all the
7 nasty comments and threats that I heard during my --
8 I don't -- I don't know if connection is the right
9 word, but, meanwhile -- in the middle part where I
10 knew Juan Blanco.
11    Q  While you were working for him and he was
12 your super- --
13    A  Yeah.  I told everybody --
14    Q  Okay.
15    A  -- everything.  I'm sorry.
16    Q  And that's clear because you mentioned before
17 that he spoke Spanish.
18       There were questions about an EthicsPoint
19 investigation or EthicsPoint.
20       So for people who don't know, what is your
21 understanding of EthicsPoint?
22    A  What I knew?
23    Q  What is it?
24    A  For me, Ethics was a third-party
25 investigation that Crowley used to pay so you can

1 advocate yourself in case that you have some case
2 that you don't feel like you have proper resolution
3 with your human resources at Crowley, you can
4 advocate to -- to this tool or communication
5 channel.
6    Q  Okay.  But in your mind, it was third-party?
7    A  Yes.
8    Q  Who told you that?
9    A  I remember that I saw a few communications,
10 and also in town halls they used to say that it was
11 totally confidential.  And they used to explain to
12 you about -- that if you put a claim into
13 investigation and you put it anonymous, maybe you
14 won't get the resolution because there's no way for
15 him to contact you because they don't -- they will
16 not know.
17       And if you put a claim in it, you were
18 requested -- not your personal information.  It was
19 your Crowley information, so they can contact you
20 and ask more questions, or to provide you a
21 resolution that -- what was the status of the
22 investigation.
23    Q  So you were told that EthicsPoint was a
24 third-party and not conducted by Crowley employees;
25 is that right?

1    A   It was a third-party, to my understanding.
2    Q   So it was --
3    A   Nothing to do with Crowley.
4        MS. NOTARI:  I have no other questions.
5            REDIRECT EXAMINATION
6  BY MS. DEGANCE:
7    Q   I just have one follow-up from what your
8  lawyer asked you.
9        You testified that you were aware of prior
10  sexual assaults involving Juan Blanco.
11       Were those reported to the company or not?
12   A   I'm not sure.
13   Q   And what prior sexual assaults are you aware
14  of?
15   A   The inappropriate comments he used to say,
16  most of the comments were to women.
17   Q   I'm going to stop you right there.  When I
18  say "sexual assault," okay, I'm talking about a
19  rape, or like the incident -- like a physical
20  touching of some sort, like what you alleged
21  happened in the elevator; okay?
22   A   Okay.
23   Q   Are you aware of any -- any assaults, so
24  either rapes or where there was, like, a physical
25  touching by Juan Blanco?

1    A   I only knew one.
2    Q   And who was that?
3    A   It was the day that Wendy and I had the
4  one-on-one conversation, that she told me -- well,
5  she confirmed that he did something similar to me.
6    Q   Did she give you any detail at all?
7    A   Not that I recall.
8    Q   Did she tell you whether she reported it or
9  not?
10   A   No.
11   Q   Okay.  So when you testified with your lawyer
12  that you were aware of these other sexual assaults,
13  were you referring to other claims of sexual
14  harassment, which would be the comments -- the
15  inappropriate comments, that sort of thing, but not
16  actual -- an actual rape or physical grabbing?
17   A   What I meant, it was about the sexual
18  comments he used to make.
19   Q   And is that what you talked about earlier
20  when I asked you questions and you were talking
21  about the various comments he used to make that you
22  overheard -- is that what you were talking
23  about?
24       Earlier you testified -- way earlier this
25  morning you testified about witnessing inappropriate

1  comments that Juan Blanco would make, that sort of
2  thing.  Is that what you're referring to?
3    A   Right now?  Yes.
4    Q   Are you aware of any other times other than
5  Wendy Ponce -- are you aware of any other times that
6  Juan Blanco committed any type of sexual assault?
7    A   So "assault," you mean physically touching or
8  rape?
9    Q   I mean something more than just comments.
10   A   I was just able to witness sexual comments --
11   Q   Okay.
12   A   -- against all the women and to the gay
13  community.
14   Q   And you don't know whether any of those
15  comments were reported?
16   A   Not that I have them in front of me.  I knew
17  what the chats used to say because I was part of the
18  chat.  But I didn't get any report.
19   Q   Right.  But do you know whether any of those
20  people reported those behaviors to the company?
21   A   He was in an -- in an ethics investigation,
22  so it might.
23   Q   Right.
24   A   But I'm not sure.
25   Q   Okay.

1    A   I don't have access to it.
2        MS. DEGANCE:  All right.  I have no further
3  questions.
4        MS. NOTARI:  Neither do I.
5        THE VIDEOGRAPHER:  Would you like to read or
6  waive?
7        MS. NOTARI:  We're going to read.
8        THE VIDEOGRAPHER:  We'll go off the record,
9  5:32.
10       (Witness excused.)
11       (And at 5:32 p.m., taking of the above
12  deposition was concluded.)
13            - - -
14
15
16
17
18
19
20
21
22
23
24
25

C E R T I F I C A T E   O F   O A T H

STATE OF FLORIDA )
COUNTY OF DUVAL )

I, Renee B. Farhat, Registered Professional Reporter, Notary Public, State of Florida, certify that VANESSA TREMINIO personally appeared before me on the 27th of March, 2023, and was duly sworn.

WITNESS my hand and official seal this 13th day of April, 2023.

Renee B. Farhat
RENEE B. FARHAT
Notary Public State of Florida
My Commission No. GG 314860
Expires: MAY 26, 2023

Personally Known_____
OR Produced Identification_____xx_____
Type of Identification Produced (El Salvador)

C E R T I F I C A T E

STATE OF FLORIDA )
COUNTY OF DUVAL )

I, Renee B. Farhat, Registered Professional Reporter, certify that I was authorized to and did stenographically report the deposition of VANESSA TREMINIO; that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 13th day of April, 2023.

Renee B. Farhat
RENEE B. FARHAT, RPR

ADRIA G. NOTARI, Esq.
anotari@notarilaw.com

April 14, 2023

RE: VANESSA TREMINIO v. CROWLEY MARITIME CORPORATION, et al.
3-27-2023/VANESSA TREMINIO/5755199

The above-referenced transcript is available for review.

(The witness/You) should read the testimony to verify its accuracy. If there are any changes, (the witness/you) should note those with the reason on the attached Errata Sheet.

(The witness/You) should, please, date and sign the Errata Sheet and email to the deposing attorney as well as to Veritext at Transcripts-fl@veritext.com and copies will be emailed to all ordering parties.

It is suggested that the completed errata be returned 30 days from receipt of testimony, as considered reasonable under Federal rules*, however, there is no Florida statute to this regard.

If the witness fails to do so, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

*Federal Civil Procedure Rule 30(e)/Florida Civil Procedure Rule 1.310(e).

VANESSA TREMINIO v. CROWLEY MARITIME CORPORATION, et al.
3-27-2023/VANESSA TREMINIO

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____
PAGE_____ LINE_____ CHANGE_____
_____
REASON_____

Under penalties of perjury, I declare that I have read the foregoing document and that the facts stated in it are true.

_____   _____
(WITNESS NAME)          DATE