# UNITED STATES DISTRICT COURT

# FOR THE MIDDLE DISTRICT OF FLORIDA

# JACKSONVILLE DIVISION

|  |  |
|---|---|
| VANESSA TREMINIO,<br><br>        **Plaintiff,**<br><br>v.<br><br>CROWLEY MARITIME<br>CORPORATION, and JUAN EMILIO<br>BLANCO,<br><br>        **Defendants.** | **3:22-cv-00174-CRK**<br><br>**OPINION AND ORDER RE:<br>MOTION TO EXCLUDE EXPERT<br>TESTIMONY** |

## INTRODUCTION

Before the Court are two motions to exclude expert testimony.  The first motion, filed by Defendant Crowley Maritime Corporation ("Crowley") and joined by Defendant Juan Emilio Blanco ("Blanco") (collectively "Defendants"), seeks to exclude the introduction of Plaintiff Vanessa Treminio's expert testimony by Dr. Barbara Ziv. See [Crowley]'s Mot. to Exclude Testimony of Pl.'s Expert Witness at 1, Aug. 2, 2023, ECF No. 87 ("Def.s' Mot."); [Blanco]'s Mot. to Exclude Testimony of Pl.'s Exp. Witness, Joining In and Adopting Arguments In [Crowley]'s Mot. to Exclude at 1, Aug. 2, 2023, ECF No. 91; see also Pl.'s Discl. of Exp. and Hybrid Witness at 5–8, Apr. 17, 2023, ECF No. 87-2 ("Pl.'s Exp. Discl.").  The second motion, filed by Plaintiff, seeks to exclude Defendant Crowley's expert testimony by Dr. Roy Lubit. See Pl.'s Mot. to Exclude [Def.'s] Exp. at 1, Aug. 2, 2023, ECF No. 92 ("Pl.'s Mot."); see also [Crowley]'s

Case No. 3:22-cv-00174-CRK-PDB

Designation of Exp. Witness and Discl. of Exp. Rep.'s at 1–2, May 15, 2023, ECF No. 92-2 ("Def.'s Exp. Discl.").  For the following reasons, Defendants' motion is granted in part and denied in part, and Plaintiff's motion is granted.

## BACKGROUND

The instant motions are filed in connection with Plaintiff's action against Defendants Crowley and Blanco, alleging sex trafficking and forced labor under the Trafficking Victims Protection Reauthorization Act ("TVPRA"),[1] 18 U.S.C. §§1591, 1589, and tort claims against Defendant Blanco.  See Am. Compl. ¶¶ 101–169, Mar. 30, 2022, ECF No. 14.  Plaintiff's first count alleges Defendant Blanco engaged in sex trafficking in violation of the TVPRA in his role as Plaintiff's supervisor while both worked for Crowley's "Inland Department," when he transported Plaintiff from El Salvador to Florida with the plan to sexually attack her.  Id. ¶¶ 101–13.  Plaintiff's second count alleges that Crowley, the private vessel management and service company that employed Plaintiff and Blanco, is liable for sex trafficking in violation of the TVPRA under venture and principal liability theories as Plaintiff and Blanco's

---

[1]  The Trafficking and Victim's Protection Act ("TVPA") has been reauthorized and amended numerous times since its implementation in 2000.  See Human Trafficking: Key Legislation, U.S. Dep't of Just. (Aug. 23, 2023), https://www.justice.gov/humantrafficking/key-legislation#:~:text=The%20TVPRA%202008%20expanded%20the,potential%20victims%20of%20human%20trafficking.  In 2003, Congress reauthorized and amended the TVPA with the Trafficking Victims Protection Reauthorization Act of 2003, which refined the criminal provisions against trafficking and included a civil remedy actionable by victims against their traffickers in federal court.  See id.; see also Pub. L. No. 108-193.  Because Plaintiff sex trafficking and forced labor claims rest upon the civil action remedy created by the 2003 amendment, see Am. Compl. ¶¶ 102, 115, 155, the applicable statute will be referred to as the Trafficking and Victims Protection Reauthorization Act ("TVPRA").

Case No. 3:22-cv-00174-CRK-PDB

employer.  <u>Id.</u> ¶¶ 114–39.  Plaintiff's third and fourth counts allege that Blanco, in his capacity as a supervisor, committed sexual battery and false imprisonment against Plaintiff.  <u>Id.</u> ¶¶ 140–52.  Plaintiff's final claim alleges forced labor in violation of the TVPRA by Crowley.  <u>Id.</u> ¶¶ 153–69.

To support her allegations against Defendants, Plaintiff disclosed that she would call Dr. Barbara Ziv as an expert witness at trial.  Pl.'s Exp. Discl. at 5–8.  Plaintiff introduced a report prepared by Dr. Ziv upon which she will base her testimony at trial.  <u>See</u> <u>generally</u> Sexual Assault: Current Literature and Perspectives, Apr. 6, 2023, ECF No. 87-1 ("Dr. Ziv Rep."); <u>see</u> <u>also</u> Pl.'s Exp. Discl. at 5–8.  Plaintiff seeks to introduce Dr. Ziv's expertise as a trained forensic psychiatrist to testify regarding the dynamics and impacts of sexual violence upon victims, as well as the "rape myths" widely held by society as to a victim's behavioral responses to trauma.  Pl.'s Exp. Discl. at 5–8.  Moreover, Plaintiff plans to introduce Dr. Ziv's knowledge and experience as "blind" expert testimony.[2]  Pl.'s Resp. to Def.s' Mot. to Exclude Testimony of Pl.'s "Blind" Exp. at 7–9, Aug. 23, 2023, ECF No. 102 ("Pl.'s Resp.").

---

[2]  A "blind" expert is an expert who serves to "educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case."  <u>See</u> Fed. R. Evid. 702 advisory committee's note to 2000 amendments; <u>see</u> <u>also</u> Christopher Tarver Robertson, Blind Expertise, 85 N.Y.U. L. Rev. 174, 205–14 (2010). Here, Plaintiff has not provided Dr. Ziv with any information or details specific to Plaintiff or to the lawsuit.  <u>See</u> Def.s' Mot. at 3 n. 4; Pl.'s Resp. at 7–9.

OPINION AND ORDER - 3

Case No. 3:22-cv-00174-CRK-PDB

In response, Defendant Crowley disclosed it intends to introduce the testimony of Dr. Roy Lubit to evaluate Dr. Ziv's conclusions.[3]   Def.'s Exp. Discl. at 1–2. Specifically, Defendant Crowley plans to offer Dr. Lubit's testimony to rebut Dr. Ziv's through his critiques of her report, which Crowley alleges will aid the jury in determining Dr. Ziv's credibility.  [Crowley]'s Resp. in Opp. to Pl.'s Mot. to Exclude the Testimony of [Def.]'s Exp. Witness at 2–4, Aug. 23, 2023, ECF No. 101 ("Def.s' Resp.").

The Plaintiff and Defendants now move to exclude opposing party's proposed expert testimony under Federal Rule of Evidence 702.[4]  See Def.s' Mot. at 1; [Blanco]'s Mot. to Exclude Testimony of Pl.'s Exp. Witness, Joining In and Adopting Arguments In [Crowley]'s Mot. to Exclude at 1, Aug. 2, 2023, ECF No. 91; Pl.'s Mot. at 1.  Both parties responded in opposition to each other's motions to exclude on August 23, 2023. See generally Pl.'s Resp.; Def.s' Resp.

## DISCUSSION

Defendants argue that Dr. Ziv's proposed testimony should be excluded as generalized conclusions untethered to the facts of this case, unsupported opinions and

---

[3]  Defendant Blanco did not join or adopt Defendant Crowley's disclosure of Dr. Roy Lubit's Testimony.  See Def.'s Exp. Discl. at 1–3.  Blanco also did not join Crowley's response in opposition to Plaintiff's motion to exclude Dr. Lubit.  See [Def.]'s Resp. in Opp. to Pl.'s Mot. to Exclude the Testimony of [Def.]'s Exp. Witness at 2–4, Aug. 23, 2023, ECF No. 101.

[4]  Defendant Blanco joined and adopted Defendant Crowley's Motion to Exclude Dr. Ziv's testimony rather than submitting a substantive brief of his own.  [Blanco]'s Mot. to Exclude Testimony of Pl.'s Exp. Witness at 1, Aug. 2, 2023, ECF No. 91. Accordingly, Crowley's Motion to Exclude Dr. Ziv's testimony will be referred to here after as "Defendants' Motion."

Case No. 3:22-cv-00174-CRK-PDB

conclusions, and impermissible "leaps of faith." See Def.s' Resp. at 4, 6–11, 13–21, 23–24. Thus, Defendants argue the testimony is irrelevant, unhelpful to the jury, and prejudicial to the Defendants. See id. at 4, 6–11, 13–21, 23–24; see also Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993); Fed. R. Evid. 702. Plaintiff contends that the proposed testimony of Dr. Roy Lubit should be excluded because it is unreliable, prejudicial, confusing, and will not assist the jury. Pl.'s Mot. at 1; see Fed. R. Evid. 702; Daubert, 509 U.S. at 597.

## I.   **Legal Standard**

Courts may permit an expert witness to testify where: (1) the expert's knowledge—be that scientific, technical, or otherwise specialized—will aid the jury to understand the evidence presented or a fact in issue; (2) the expert's opinions and conclusions are adequately based in fact or on data; (3) the expert formed her opinions in accordance with reliable principles and methods; and (4) such principles and methods are reliably applied to the facts of the case. Fed. R. Evid. 702; Daubert, 509 U.S. at 697.

When determining expert admissibility, courts consider: (1) the qualifications of the expert to competently testify to the matter at hand; (2) the methodologies underlying the conclusions conform with Daubert;[5] and (3) the testimony's scientific,

---

[5] In Daubert, the Court provided for additional considerations, namely: "whether the expert's methodology has been tested or is capable of being tested; whether the theory or technique used by the expert has been subjected to peer review and publication; whether there is a known potential error rate of the methodology; and whether the technique has been generally accepted in the relevant scientific community." Daubert, 509 U.S. at 593–94; see also United Fire & Cas. Co. v. Whirlpool Corp., 704

Case No. 3:22-cv-00174-CRK-PDB

technical, or specialized nature will be helpful to the jury to understand a fact in issue. United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004). These factors are illustrative, and each factor will not necessarily apply in every case. Fed. R. Evid. 702 advisory committee's note to 2000 amendment. See also United States v. Valdes, 682 F. App'x 874, 881 (11th Cir. 2017) (stating the Daubert factors were inapplicable when evaluating an expert's methodology that involved experience in gun identification and comparison).

Expert testimony may include "blind" expert testimony, allowing an expert to educate the jury on general principles without applying the principles to the facts of the case. Fed. R. Evid. 702 advisory committee's note to 2000 amendment; see also United States v. Chapman, 839 F.3d 1232, 1238 (10th Cir. 2016) (admitting expert testimony despite the fact that the expert never met the victim nor personally evaluated her); Bocanegra v. Vicmar Servs., Inc., 320 F.3d 581, 589 (5th Cir. 2003) (allowing an expert to opine on general principles regarding effects of marijuana on the ability to operate a motor vehicle); Vogler v. Blackmore, 352 F.3d 150, 154 (5th Cir. 2003) (affirming district court's admission of grief expert's testimony on general theories of grief despite the expert not personally interviewing or evaluating the plaintiff). The standard to admit such generalized testimony requires that: "(1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony 'fit'

---

F.3d 1338, 1341 (11th Cir. 2013). District courts are "given broad latitude" in reviewing and determining the reliability of an expert opinion. United States v. Abreau, 406 F.3d 1304, 1307 (11th Cir. 1999).

Case No. 3:22-cv-00174-CRK-PDB

the facts of the case."[6]  Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

When assessing the reliability of expert testimony, considerations pertinent to "hard" science are inapplicable to social sciences that require expertise through knowledge and experience. Carrizosa v. Chiquita Brands Int'l, Inc., 47 F.4th 1278, 1318 (11th Cir. 2022); Tyus v. Urb. Search Mgmt., 102 F.3d 256, 263 (7th Cir. 1996). Therefore, social science experts must be evaluated by examining "other indicia of reliability" including "professional experience, education, training, and observation." Carrizosa, 47 F.4th at 1318 (distinguishing the methodologies for the social and hard sciences); see also Does 1-4 v. Red Roof Inns, Inc., No. 1:21-CV-04278-WMR, 2023 WL 5444260, at *5 (N.D. Ga. Aug. 21, 2023) (finding a clinical psychologist specializing in women and trauma was qualified given her extensive professional experience of hands-on observations and treatment of sexual abuse victims, as well has her past experience as a testifying expert).

Although Rule 702 requires expert opinions be formed with reliable principles and methods, different methodologies will be appropriate in different cases.  For example, resorting to academic literature accepted in the professional community at issue and similar observations through practical experience as bases for the testimony can be an appropriate methodology.  See United States v. Azmat, 805 F.3d

---

[6]  Whether testimony "fits" the case is a question of relevance, examining whether the expert testimony offered "is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." Daubert, 509 U.S. at 591 (citing United States v. Downing, 753 F.2d 1224, 1242 (3rd Cir. 1985)); see also Orbital Eng'g, Inc. v. Buchko, 578 F. Supp. 3d 736, 740 (W.D. Pa. 2022).

Case No. 3:22-cv-00174-CRK-PDB

1018, 1041 (11th Cir. 2015) (finding the district court adhered to its gatekeeping function by "assessing the reliability of [the expert's] methodology based on the cited sources"). Opinions grounded in professional literature can form the basis of an expert's opinion where the opinions are rationally and consistently drawn from those accepted texts. Azmat, 805 F.3d at 1041; see also Bocanegra, 320 F.3d at 587 (allowing expert testimony based on an accepted scientific study in the field that, when viewed in conjunction with the expert's personal training and experience on the subject, formed a reliable opinion). But the court may not simply accept an expert's assertion that the methodology used is reliable. Azmat, 805 F.3d at 1041. Nor may the court assume that practical experience alone supports the opinions. Frazier, 387 F.3d at 1261 ("[t]he trial court's gatekeeping function requires more than simply 'taking the expert's word for it'") (quoting Fed. R. Evid. 702 advisory committee's note to 2000 amendment). Thus, it is incumbent upon an expert to explain the methodology used and make clear why that methodology is reliable. Hendrix ex rel. G.P. v. Evenflo Co., 609 F.3d 1183, 1194 (11th Cir. 2010) ("[when evaluating expert testimony] the trial court is free to 'conclude that there is simply too great an analytical gap between the data and the opinion proffered'") (quoting Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)); Cooper v. Marten Transp., Ltd., 539 F. App'x 963, 966 (11th Cir. 2013) (excluding experience-based expert testimony because it was not derived from scientific method). Likewise, a court must assess the sources cited and draw the connection between those sources and the opinions given. Frazier, 387 F.3d at 1262.

OPINION AND ORDER - 8

Case No. 3:22-cv-00174-CRK-PDB

Even where an expert's qualifications are not in dispute, a proponent of expert testimony bears the burden to establish that the testimony is reliable.[7]  <u>Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.</u>, 326 F.3d 1333, 1341–42 (11th Cir. 2003).  A 2023 amendment to Rule 702 and the Committee Note makes clear the proper procedure governing a party's burden to introduce expert testimony.[8]  <u>See</u> Proposed Am. Fed. R. Evid. 702 advisory committee's note to 2023 amendment.  Specifically, the proponent must demonstrate that it is more likely than not that the proposed expert testimony will meet the admissibility requirements of Rule 702, as governed by Rule 104(a).[9]  <u>See id.</u>  ("The amendment clarifies that the preponderance standard applies

---

[7] Nonetheless, the burden is to establish that the methodology is reliable, not that its conclusion is scientifically correct.  <u>Allison v. McGhan Medical Corp.</u>, 184 F.3d 1300, 1312 (11th Cir. 1999); <u>see also</u> <u>Cartwright v. Home Depot U.S.A., Inc.</u>, 936 F. Supp. 900, 904 (M.D. Fla. 1996).

[8] On April 24, 2023, the Supreme Court ordered amendments to the Federal Rules of Evidence, including Rule 702, would take effect on December 1, 2023.  <u>See</u> Order of the Supreme Court of the U.S., Apr. 24, 2023, https://www.uscourts.gov/sites/default/files/2023_congressional_package_april_24_2023_0.pdf; <u>see also</u> Letter from John G. Roberts Jr., U.S. C.J., to Kevin McCarthy, Speaker of the H. of Rep. (Apr. 24, 2023) https://www.uscourts.gov/sites/default/files/2023_congressional_package_april_24_2023_0.pdf.  Although the amendment will not take effect until December 1, 2023, the purpose of the amendment is to clarify the standard under Rule 702.  <u>See</u> Proposed Am. Fed. R. Evid. 702 advisory committee's note to 2023 amendment.

[9] Rule 702, as revised by the 2023 amendment taking effect December 1, 2023  reads as follows (with the changes *italicized*):

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise *if the proponent demonstrates to the court that it is more likely than not that:*

(a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) The testimony is based on sufficient facts or data;

Case No. 3:22-cv-00174-CRK-PDB

to the three reliability-based requirements added in 2000—requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard").  The amendment also stresses the importance that an expert's opinion must "stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology" under Rule 702(d).  Id.  ("[the amendment] does not permit the expert to make claims that are unsupported by the expert's basis and methodology").

Finally, even if the expert is qualified and the methodology is reliable, a court may still exclude testimony if "its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury." Daubert, 509 U.S. at 595 (citing Fed. R. Evid. 403).  In deciding whether the expert testimony will be helpful to the jury, the court must evaluate whether the proposed testimony is "relevant to the task at hand. . . i.e., that it logically advances a material aspect of the proposing party's case." Allison, 184 F.3d at 1312 (citing Daubert, 509 U.S. at

---

(c) The testimony is the product of reliable principles and methods; and

(d) The *expert's opinion reflects a reliable application of the* principles and methods to the facts of the case.

Proposed    Am.    Fed.    R.    Evid.    702, https://www.uscourts.gov/sites/default/files/2022_scotus_package_0.pdf (last visited Nov. 8, 2023).  The Committee Note stresses that the proponent of expert testimony must demonstrate that the testimony meets the admissibility requirements set by a preponderance of the evidence.  Further, it notes that where courts "have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility," they have been incorrect.  Proposed Am. Fed. R. Evid. 702 advisory committee's note to 2023 amendment (citations omitted).

Case No. 3:22-cv-00174-CRK-PDB

597).  The proffered evidence must have a "valid scientific connection to the pertinent inquiry."  Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp., 582 F.3d 1227, 1232 (11th Cir. 2009).  If the "opinions offered amount to no more than the ipse dixit of an expert witness, they must be excluded."  Haller v. AstraZeneca Pharmaceuticals LP, 598 F. Supp.2d 1271, 1299 (M.D. Fla. 2009) (holding that an expert's opinion would not assist the trier of fact because the testimony related to general knowledge of causation and not to the specific case).  The court's role in the relevance inquiry is to "keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, potential to create confusion, and its lack of probative value."  Allison, 184 F.3d at 1311–12.

## II.     Defendants' Challenges to Dr. Ziv

First, Defendants assert global challenges to Dr. Ziv's testimony, claiming that: as a "blind" expert, Dr. Ziv's report lacks relation to the facts of Plaintiff's claims; the issues raised by Dr. Ziv will not assist the jury's factual determinations; and Dr. Ziv does not employ any methodology.  Def.s' Resp. at 5–11.  Second, Defendants challenge each section of Dr. Ziv's report, claiming that the sections contain improper "leaps of faith," that they are unreliable, unhelpful, and not relevant.  Def.s' Mot. at 11–23.  Lastly, Defendants argue that Dr. Ziv's report should be excluded under Rule 403.  Id. at 23–24.

### A.     Global Challenges to Dr. Ziv's Testimony

Defendants first challenge Dr. Ziv's testimony as inadmissible because it is generalized and fails to address and apply the conclusions it draws to the facts of the

Case No. 3:22-cv-00174-CRK-PDB

case. Def.s' Resp. at 9–11. Dr. Ziv's status as a "blind" expert does not preclude her testimony.[10]   As discussed, Rule 702 permits experts to testify regarding general principles where (1) the expert is qualified; (2) the testimony addresses a subject that helps the jury in its factual determination as explained by the expert; (3) the testimony is reliable; and (4) the testimony "fit" the facts of the case. Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

Parts of Dr. Ziv's report will more likely than not assist the jury's factual determination. Plaintiff seeks to introduce Dr. Ziv's testimony about a victim's behavior during and after experiencing sexual assault and violence, specifically discussing the concepts of "rape trauma" and "rape myths" that may be "counter-intuitive to what outside observers expect." Pl.'s Exp. Discl. at 6. This testimony relates to Plaintiff's claims against the Defendants, providing context to various issues that may be outside of a layperson's understanding. See generally Am. Compl.; Red Roof Inns, Inc., 2023 WL 5444260, at *5 (finding that generalized, "blind" testimony of an expert doctor would aid the jury in making its determinations of fact because it was outside of the knowledge of a layperson). Additionally, the generalized nature of the testimony does not undermine its reliability where the opinions are otherwise supported.

---

[10] Defendants do not dispute that Dr. Ziv is qualified. See Def.s' Resp. at 4. Dr. Ziv's curriculum vitae indicates that she holds a medical degree from Northwestern University Medical School, that she has been certified by the American Board of Psychiatry and Neurology since 1992. See C.V. of Barbara Ziv, M.D., Aug. 23, 2023, ECF No. 102-2. She has worked with both sexual offenders and victims of sexual abuse as part of her academic career and private practice, including over 1000 patient and offender evaluations and treatment. Id., see also Pl.'s Exp. Discl. at 6.

Case No. 3:22-cv-00174-CRK-PDB

The contours and reliability of Dr. Ziv's methodology are lacking at several points in her report. Although Rule 702 permits expert testimony based upon firsthand professional experience, see Carrizosa, 47 F.4th at 1318 (allowing testimony of an expert with expansive first-hand professional experience of the subject matter in which he opined); an expert must explain exactly how her experience supports her conclusion. See Azmat, 805 F.3d at 1042 ("[a] district court cannot simply accept that an opinion is reliable because the expert says that his methodology is sound") (citing Hughes v. Kia Motors Corp., 766 F.3d 1317, 1331 (11th Cir. 2014). Likewise, an expert may rely upon the works of others and compile information as a methodology, but there must be a connection to the issue at hand. Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995) (on remand) ("[the court] must ensure that the proposed testimony . . . logically advances a material aspect of the proposing party's case"); see also Hendrix ex rel. G.P. v. Evenflo Co., 609 F.3d at 1194 (affirming the district court's conclusion that the analytical gap between the expert's purported supporting authority and the conclusions drawn was too wide and therefore inadmissible). It is for the Court to determine that where an expert has relied upon academic literature, that the literature is accepted by the relevant professional community and indeed supports the assertions made. See Azmat, 805 F.3d at 1042 (finding sufficiently reliable methodology where the expert based his opinion on valid and accepted sources). Given the paucity of explanation regarding the relevance of Dr. Ziv's practical experience or the explanation

Case No. 3:22-cv-00174-CRK-PDB

concerning the collection of sources, the court must conclude Plaintiff has failed to meet its burden to demonstrate reliability under Rule 702 for much of Dr. Ziv's report.

Nonetheless, there are portions of the report where Dr. Ziv engages with the literature and provides sufficient support within that literature such that the court can conclude that her opinions are more likely than not reliable and helpful. The court addresses each section of the report in light of its reliability and helpfulness concerns and the specific challenges asserted by the Defendants below.

**B.   Specific Challenges to Dr. Ziv's Testimony**

**1.   "Definitions and Statistics" Section**

Defendants challenge the section of Dr. Ziv's report titled "Definitions and Statistics" as not relevant and lacking both reliability and helpfulness. Def.s' Mot. at 11–12; see also Dr. Ziv Rep. at 1. Here Dr. Ziv's reliance on the CDC is an appropriate methodology. Defendant does not claim that the CDC is a source that would not be accepted by professionals in the field. The three CDC definitions of "Consent," "Inability to Consent," and "Inability to Refuse" in the "Definitions and Statistics" are admissible because they are derived from a resource provided by the CDC, which in turn formulated the definitions with its own use of authority. See Daubert, 509 U.S. at 593–94 (emphasizing the importance of peer reviewed publications for findings of reliability); see also Dr. Ziv Rep. at 1. The definitions are relevant and helpful because they define three key terms pertaining to every claim by Plaintiff—her sex trafficking accusations against Blanco and Crowley, the tort allegations against

Case No. 3:22-cv-00174-CRK-PDB

Blanco, and the forced labor claims against Crowley—that will assist the jury in evaluating such claims.[11]  See Allison, 184 F.3d at 1312.

However, the section regarding statistics from the RAND National Defense Research Institute and the Department of Defense is inadmissible because it is not relevant and not helpful.  Although the statistics may be accurate, and come from a published and respected source, their potential to confuse and mislead the jury is great.  See Fed. R. Evid. 403.  None of the allegations that gave rise to Plaintiff's claims involve active members of the armed forces.  See generally Am. Compl. Allowing Dr. Ziv to testify on such an unrelated topic may be prejudicial to Defendants and it may distract from or mislead the jury in making factual determinations on Plaintiff's claims.  Accordingly, the CDC definitions are admissible, but the military statistics are inadmissible.

### 2.    Challenge to "Sexual Assault Myths"

Defendants next challenge the "Sexual Assault Myths" section of Dr. Ziv's report.  Def.s' Mot. at 12–15.  Specifically, Defendants argue that the section is filled with broad, unsupported and irrelevant conclusions.  Id. at 12.  Defendants are correct that many of Dr. Ziv's assertions are unsubstantiated and lack a sufficient connection to Plaintiff's claims.  Where the report lacks sources, there appears to be no methodology to assess.

---

[11]  Defendants challenge Dr. Ziv's testimony regarding capacity to consent and the behavioral impacts of sexual assault, asserting that they are not at issue in Plaintiff's claims.  Def.s' Mot. at 10–11.  Defendant's claims are incorrect, as sections 1589 and 1591 of the TVPRA both involve "threats of force" and "threats of harm," and section 1591 includes "coercion."  18 U.S.C.A. §§ 1589, 1591.

Case No. 3:22-cv-00174-CRK-PDB

For example, Dr. Ziv makes the following statements in her report:

> (1) Males who make a cognitive connection between power and sexuality hold attitudes tolerant of sexual offending.
>
> (2) If women who are in a situation where they may be raped by a stranger do not actively fight back but use a wide variety of communications and behaviors to try to get out of the situation, it is not surprising that victims of acquaintance, institutional, workplace or acquaintance [sic] sexual assault/harassment rely even more on indirect means to avoid sexually aggressive behaviors. In these circumstances, the assailant often has the power to negatively impact the victim's livelihood, reputation, as well as other relationships that are important to the victim. All of this information is simultaneously processed in real time as women are sexually assaulted or harassed. In these circumstances, a woman must weigh whether the violation of her body is ultimately less humiliating, degrading, and destructive to her life than is a situation where the offender will violate the essence of her life: her ability to earn a living, her position in society, and her sense of self. This judgment is made in seconds, when the victim is frightened, confused, and is in the midst of a traumatic experience. Obviously, decisions made under these conditions cannot truly be considered a choice.

Dr. Ziv Rep. at 3–4.  The report fails to identify the basis of the research on which these opinions are founded and how it is that Dr. Ziv, in her work or experience, reached these conclusions.  Neither Dr. Ziv nor Plaintiff offer any additional support showing that it is more likely than not that these unsupported assertions are reliable. Proposed Am. Fed. R. Evid. 702 advisory committee's note to 2023 amendment (clarifying that a preponderance of the evidence standard is imposed against a party proffering expert testimony when assessing the reliability of that expert).  Where Dr. Ziv does reference authority, many of such sources were authored four- to five-decades ago.  See Dr. Ziv Rep. at 13–16.  Indeed, opinions regarding societal beliefs of the year 2023 are not supported by an article published in the 1970s or 1980s.  The

Case No. 3:22-cv-00174-CRK-PDB

assertions must be excluded in the absence of supporting sources showing valid principles and methods or updated statistics.  See Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("[t]he trial court's gatekeeping function requires more than simply 'taking the expert's word for it'") (citations omitted); see also Daubert, 509 U.S. at 592–93.  That the statements reflect Dr. Ziv's conjectures about a hypothetical situation too far removed from any basis in her own experience make them inadmissible.  Daubert, 509 U.S. at 592–93.

Many of Dr. Ziv's claims also amount to impermissible "leaps of faith," as argued by Defendants.  Def.s' Mot. at 4.  For example, Dr. Ziv also concludes the following:

> However, there is scant literature that contradicts the notion that society negatively judges women who have been sexually assaulted or harassed.

Dr. Ziv Rep. at 2.  Dr. Ziv's statement is an example of the logical fallacy argumentum ad ignorantium (argument from ignorance), which reasons that the absence of contrary evidence is sufficient grounds for accepting that statement as true.  See RUGGERO J. ALDISERT, LOGIC FOR LAWYERS 190-91 (1997); see also Guice v. Brennan, No. 8:15-CV-2846-T-MAP, 2017 WL 11459521, at *5 (M.D. Fla. Oct. 13, 2017) (defining and rejecting an argumentum ad ignorantiuam argument by the plaintiff); Pitt v. Alabama Pub. Serv. Comm'n, No. 2:13-CV-180-MEF, 2014 WL 3654883, at *3 n.1 (M.D. Ala. July 23, 2014) (defining argumentum ad ignorantiuam in a discrimination lawsuit and rejecting its use).  Dr. Ziv's false dichotomy is improperly speculative and fails to consider the possibility of an insufficient investigation into

OPINION AND ORDER - 17

Case No. 3:22-cv-00174-CRK-PDB

the matter, or that the answer is possibly unknowable.   Therefore, the statement must be excluded as not reliable.   Accordingly, Dr. Ziv is precluded from offering her opinion on the remaining opinions and conclusions reflected in "Sexual Assault Myths" except as identified below.

Some conclusions are admissible because Dr. Ziv has employed a methodology of relying upon a sufficient number of published scholarly articles and has based her conclusions on a review of that work.  Dr. Ziv states the following in her report:

> Researchers have examined [blaming victims of sexual assault], and determined that there are societally held beliefs, "sexual assault myths," that serve to deny, trivialize or justify sexual violence exerted by men against women.  [Research has] defined attitudes embodied in these fallacies, noting that they contain elements of denial of the incident(s), shifting of responsibility onto the victim, and minimizing the adverse consequences of sexual harassment. . . .
>
> Further, in circumstances involving acquaintance sexual/harassment, victims are more likely to be seen as sharing responsibility for the offense.  One hypothesis for these findings is that society accepts gender-scripted roles around sexual activity; it is acceptable for men to be sexual aggressors and women are responsible for holding both men and themselves in check. This theory has been supported by research: individuals who endorse traditional gender role stereotypes blame victims and justify the sexual interactions more frequently, especially in cases of acquaintance sexual assault. . . .
>
> The reasons for [a women's hesitancy to say "no" to unwanted sexual advances] are complex: a woman may fear that a direct communication may anger a man; a woman may be concerned that the man would feel insulted; a woman may believe that the man is drunk or otherwise impaired and does not know what he is doing; a woman may not want to draw attention to the situation, hoping that she can change the dynamic without confrontation; a woman may believe that refusing was useless. . . .

Case No. 3:22-cv-00174-CRK-PDB

> Sexual refusals include combinations of direct non-verbal, indirect non-verbal as well as direct and indirect verbal cues. Direct non-verbal interactions refer to behaviors such as turning away or moving a hand and indirect non-verbal communications can involve gestures such as crossing legs or refusing to make eye contact as well as even more subtle cues, "I showed signs of discomfort," "I didn't kiss them or touch them back," "I didn't act interested." Direct verbal refusal cues generally include some version of the word "no," but indirect statements are more complicated. These may contain components of timing, (e.g. pauses or delays in speech), as well as qualifying phrases, (e.g. "I don't know," "Well," "Maybe.") Often these less overt communications are followed by excuses or justifications (e.g., "I'm tired," "I have to be someplace," "I have my period.") for why the woman does not want the interaction to proceed rather than an outright rejection.

Dr. Ziv Rep. at 2–4 (citations omitted).

The opinions in the above referenced portions of Dr. Ziv's report are admissible. Dr. Ziv supports her opinions with reference to scholarly articles, journals, and books. Dr. Ziv Rep. at 13–16. The assertions are supported with ample references to authority from the psychology and psychiatry communities which in turn demonstrates a sufficiently reliable methodology in the formulation of Dr. Ziv's opinions. See Azmat, 805 F.3d at 1041 (finding that expert testimony grounded in accepted scientific literature was a permissible showing of reliable methodology); see also Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("[the 2000 amendment] requires that expert testimony be based on sufficient underling 'facts or data.' The term 'data' is intended to encompass the reliable opinions of other experts"); United States v. Woods, No. 1:17-CR-01235-WJ, 2020 WL 6508909, at *3 (D.N.M. Nov. 5, 2020) (finding the methodologies of an expert opining on sex trafficking to be sufficiently reliable when it was primarily based on "numerous

Case No. 3:22-cv-00174-CRK-PDB

publications contain[ing] intellectual rigor" that was "tied scientifically to qualitative experience" of her own); See also Carrizosa, 47 F.4th at 1318; C.V. of Barbara Ziv, M.D., Aug. 23, 2023, ECF No. 102-2.

Dr. Ziv's methodology in formulating the admissible opinions in "Sexual Assault Myths" is illustrated by reference to peer reviewed scholarly papers favoring its admissibility.  For instance, Dr. Ziv states, "[a]lthough under some circumstances, women simply 'just say no' to men who are pursuing undesired sexual interaction, under many conditions, this blunt approach is not used."  Dr. Ziv Rep. at 4.  The statement is followed with the conclusion that the reasons for this phenomenon are complex and varied, including that "a women may fear that a direct communication may anger a man; a woman may be concerned that the man would feel insulted; a woman may believe that the man is drunk or otherwise impaired and does not know what he is doing; a woman may not want to draw attention to the situation, hoping that she can change the dynamic without confrontation; a woman may believe that refusing was useless."  Id.  These purported reasons for a woman's hesitancy of outright refusal towards unwanted sexual attention are supported by an article regarding "rape myths" on college campuses, published in the Journal of Interpersonal Violence and found in the National Library of Medicine.  See id. at 16; see also Sasha Canan et al., Sexual Assault Supportive Attitudes: Rape Myth Acceptance and Token Resistance in Greek and Non-Greek College Students From Two Univ. Samples in the U.S., Nat'l Lib. Of Med. (Nov. 2018), https://pubmed.ncbi.nlm.nih.gov/26944340/.  Dr. Ziv's assertion, supported by peer-

Case No. 3:22-cv-00174-CRK-PDB

reviewed authority, coupled with her professional concentration on and practical experience with victims of sexual and physical abuse, provide a sufficient basis to conclude that it is more likely than not that her opinions are reliable and have a sufficient supporting basis. See Fed. R. Evid. 702 advisory committee's note to 2000 amendment; see also Jenkins v. United States, No. CV 120-033, 2022 WL 4237499, at *6–8 (S.D. Ga. Sept. 14, 2022) (finding the expert's conclusions were adequately supported by the authority from which it was drawn).

Furthermore, the sections are both relevant and helpful to the jury. Dr. Ziv's opinions on the behavioral tendencies of both victims and perpetrators of sexual assault relates to four of the five claims against Defendants, consisting of the sex trafficking allegations against both Crowley and Blanco and the tort allegations against Blanco.[12] It is more likely than not that Dr. Ziv's opinions regarding societal "sexual assault myths" that are reductive and dismissive of a victim's sexual assault claims will aid the jury's determination of whether Crowley appropriately responded to the complaints Plaintiff filed against Blanco. Am. Compl. ¶¶ 24–46, 47–53, 58–73. Additionally, Dr. Ziv's discussion regarding the reasons underlying a victim's course of action in response to an assault, as well as the methods and behavioral cues one uses to refuse a sexual advance, will more likely than not aid the jury in assessing

---

[12] For example, Dr. Ziv's opinions regarding a sexual assault victim's behavior could shed light upon Plaintiff's actions after the alleged assault in Florida, as well as the reasons for why she felt pressured to travel to Florida in the first place. See Am. Compl. ¶¶ 136–39. Dr. Ziv's testimony is also more likely than not helpful to the jury to understand the nature of Plaintiff's conduct in relation to Blanco, in light of the fact that Blanco was Plaintiff's superior, and why she felt compelled to continue her employment at Crowley despite her allegations. Id. ¶¶ 119–121.

OPINION AND ORDER - 21

Case No. 3:22-cv-00174-CRK-PDB

Plaintiff's behavior during and after the alleged assault by Blanco in the elevator.  Id. ¶¶ 21–36.  Thus, her opinions regarding how a victim may actually respond to sexual assault trauma versus what society might expect her to do could naturally and logically bridge material claims by Plaintiff to the facts at issue.  See Allison, 184 F.3d at 1312.

### 3.   "Capacity to Consent" Section

Defendants allege that Dr. Ziv's conclusions regarding "Capacity to Consent" are not reliable or helpful to the jury and therefore must be excluded.  Def.s' Mot. at 15.  Although Defendants are correct in alleging that most of the assertions in the section are inadmissible, one conclusion is nonetheless adequately supported and reliable.  Dr Ziv states the following:

> As noted above, CDC [sic], "Sexual violence involves a lack of freely given consent as well as situations in which the victim is unable to consent or refuse."

Dr. Ziv Rep. at 5 (citations omitted).

The support from the CDC provides Dr. Ziv with a sufficient indicium of reliability to support her conclusion.  See Fed. R. Evid. 702.  The conclusion is reliable because it is entrenched in support from an accepted, authoritative source.  See Dr. Ziv Rep. at 16–17; see also Azmat, 805 F.3d at 1042 (allowing expert testimony that relied on "published sources generally accepted" by the medical community).

However, the remaining conclusions in the "Capacity to Consent" section are inadmissible.  Dr. Ziv's conclusions are speculative and unsupported by any references to authority, and instead offer opinions that provide a possible course of

Case No. 3:22-cv-00174-CRK-PDB

thought for a hypothetical victim of sexual assault.  For example, Dr. Ziv's writes, when explaining the thought process of one processing a sexual assault, "[m]any things occur at once, the first being '[w]hat is happening?' or '[w]hat just happened?' This initial discombobulation, combined with fear, typically persists for minutes and is followed by the reflexive thought, '[w]hat do I do?'" Dr. Ziv Rep. at 5.  Dr. Ziv offers no grounds for which she bases these conjectures, neither in reference to her own professional experience nor any support from authority.  The report sheds no light into the methods Dr. Ziv used to form these descriptions of victim behavior, rendering a reliability analysis impossible.  Additionally, it is unclear how these sorts of descriptions will aid the jury in evaluating Plaintiff's claims.  Moreover, even where there is support, Dr. Ziv's conclusions regarding the technical science of brain chemistry will not assist the jury.  In fact, it is more likely to distract or confuse than it is to aid the factfinder in its duty.  Accordingly, the opinions must be excluded.

Additionally, the assertion contained in the last three sentences of the section is inadmissible.  Dr. Ziv opines:

> Another definition of capacity is the power to do something. This aspect of capacity is one that is commonly overlooked and involves the consequences of saying no. If a man or woman may suffer physical, economic, social, reputational, occupational, or other harm if he/she refuses to submit sexual activity, he/she does not have the capacity to consent.

Dr. Ziv Rep. at 5.  Dr. Ziv's conclusion that one's capacity to do something is destroyed in the face of pressure or consequence is overly broad and conclusory.  Dr. Ziv offers no supporting basis for reaching such a sweeping assertion.  The report points to no additional evidence that might suggest it is more likely than it is not that the

Case No. 3:22-cv-00174-CRK-PDB

conclusions are reliable.  Proposed Am. Fed. R. Evid. 702 advisory committee's note

to 2023 amendment ("the preponderance standard applies to the three reliability

based requirements [of 702]").  Accordingly, the section "Capacity to Consent" is

admissible to the extent identified above.

### 4.   "Reporting Sexual Assault" Section

Defendants aver the "Reporting Sexual Assault" section of Dr. Ziv's report is

neither reliable nor helpful under <u>Daubert</u>.  Def.s' Mot. at 16.  Defendants challenge

Dr. Ziv's conclusions about: the motives for reporting or not reporting sexual assault;

credibility determinations of those reports; societal biases against victims; the

psychological consequences on a victim; and coping strategies.  <u>Id.</u> at 16–19.

Defendants assert the conclusions lack support or descriptions of any methodology.

<u>Id.</u> at 17.

Here, some portions of "Reporting Sexual Assault" are admissible.  Specifically,

Dr. Ziv makes the following assertions:

> The National Violence Resource Center (NVRC) estimates that 63
> Percent of sexual assaults are not reported to police, making this
> the most "under-reported crime." A paper analyzing victims of
> sexual assaults between 1995 and 2013 found that only between
> 20 and 32 percent of victims between the ages of 18 and 24
> reported assaults to police. Other literature finds that the rate of
> formal reporting of sexual assaults ranges between five and 35
> percent. Studies have also shown that victims of sexual assault
> similarly do not report the event to mandatory reporters,
> including physicians, counselors, teachers, or clergy.

Case No. 3:22-cv-00174-CRK-PDB

When a victim does decide to make a formal report of sexual misconduct, delayed reporting is the norm, not the exception.[13] . . . The reasons for delayed or absent reporting are numerous; victims want to avoid the stigma that is associated with being sexually assaulted, they wish to avoid retaliation, they are hesitant to cause pain to others, including the perpetrator, and/or they do not trust the systems that are designed to protect them.

While the discussion above reveals many reasons why women do not report sexual assault, other research has identified more nuanced disincentives to disclosure. Victims of sexual assault are members of society who carry some of the unsupported biases inherent in rape myths. It is not uncommon for women who have been sexually assaulted by someone known to them to question whether it constitutes a crime. Like others, victims tend to view sexual assault as an act perpetrated by a stranger. . . .

A June 2016 report released by the U.S. Equal Employment Opportunity Commission titled "Select Task Force on the Study of Harassment in the Workplace" found:

*Common workplace-based responses by those who experience sex-based harassment are to avoid the harasser, deny or downplay the gravity of the situation, or attempt to ignore, forget, or endure the behavior. The least common response to harassment is to take some formal action – either to report the harassment internally or file a formal legal complaint. Roughly three out of four individuals who experienced harassment never even talked to a supervisor, manager, or union representative about the harassing conduct. Employees who experience harassment fail to report the harassing behavior or to file a complaint because they fear disbelief of their claim, inaction on their claim, blame, or social or professional retaliation.*

The EEOC report detailed why victims' fears about reporting sexual assault/harassment are well-founded:

---

[13] Dr. Ziv pronounces that delayed reporting "has no bearing on whether an allegation is credible or not." Dr. Ziv Rep. at 6. This pronouncement is independent from the points she makes that are supported and is not itself supported or a necessary inference from the previous statement that delayed reporting is the standard rather than the exception. Therefore, there is too great an analytical gap between the pronouncement and her supported statement, and the conclusion is inadmissible without additional support. See Joiner, 522 U.S. at 148.

Case No. 3:22-cv-00174-CRK-PDB

> *Employees who experience harassment fail to report the behavior or to file a complaint because they anticipate and fear a number of reactions – disbelief of their claim; inaction on their claim; receipt of blame for causing the offending actions; social retaliation (including humiliation and ostracism); and professional retaliation, such as damage to their career and reputation. The fears that stop most employees from reporting harassment are well-founded. One 2003 study found that 75% of employees who spoke out against workplace mistreatment faced some form of retaliation. Other studies have found that sexual harassment reporting is often followed by organizational indifference or trivialization of the harassment complaint as well as hostility and reprisals against the victim. Such responses understandably harm the victim in terms of adverse job repercussions and psychological distress. Indeed, as one researcher concluded, such results suggest that, in many work environments, the most "reasonable" course of action for the victim to take is to avoid reporting the harassment.*

It is not uncommon in the days, weeks, months, or even years after an experience of sexual assault or harassment that a victim will downplay the seriousness of the event(s) and attempt to "move on." This coping strategy is not unique to victims of sexual misconduct: most people want to believe that they can overcome a negative experience, whether it has psychological, physical, economic, or social consequences. A reluctance to acknowledge the negative impact that sexual assault or harassment had on an individual neither implies that the event(s) was insignificant nor that it was consensual. Denial is not an uncommon defense mechanism and people who are hurting often "suffer in silence." Victims of sexual assault/harassment frequently describe themselves as putting on a false front to the world, allowing them to work and live in a manner that does not reveal inner conflict or struggle. They attempt to emotionally and psychologically cordon off the experience and push forward with their lives. Many victims believe the false narrative that the negative impact of sexual assault/harassment is less psychologically damaging when the perpetrator is known to the victim, contributing to both the reluctance to acknowledge the damage done and the hesitation to seek treatment.

Dr. Ziv Rep. at 6–7 (citations omitted).

Case No. 3:22-cv-00174-CRK-PDB

The opinions and statements pertaining to a victim's choice to report or not report an assault are supported by the sources she invokes in the "Sexual Assault Myths" section.  See id. at 2–4.  Additionally, the studies by the NVRC and the EEOC are reliable, statistical reports, compiled by experts across the employment and academic communities, that gauge the number of victims who choose to report sexual assault to their employers or the police.  It is more likely than not that the testimony could aid the jury in its factual determinations, as the conclusions implicate key issues disputed by both parties, such as the factual circumstances surrounding Plaintiff's allegations of sex trafficking and tortious conduct against Defendants.  See Daubert, 509 U.S. at 591 (clarifying that testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue" under Rule 702); Allison, 184 F.3d at 1312 (conveying that expert testimony must logically advance a key aspect of the proposing party's case).  Specifically, the studies and conclusions supported by authority could aid the jury's factual determinations by a preponderance of the evidence by explaining Plaintiff's choice to immediately report the alleged encounter with Blanco to Crowley rather than the Jacksonville police while in Florida.  Am. Compl. ¶¶ 40–53.  Accordingly, Dr. Ziv's opinions and conclusions appropriately based in peer-reviewed sources are admissible.

The remaining conclusions in the "Reporting Sexual Assault" section, however, are inadmissible.  Again, Dr. Ziv fails to support her statements with any citations to authoritative sources, and she does not explain how she formed the conclusions she draws.  For example, Dr. Ziv leads the section with the assertion "[v]ictims of sexual

abuse are subject to intense scrutiny and judgement." Dr. Ziv Rep. at 5. Dr. Ziv then offers no support for this statement or for any of the following conclusions in the paragraph, such as that the victimization process is "debilitating, humiliating, and degrading," that women who report sexual harassment are subject to more scrutiny than others, or that reporting sexual harassment has been disincentivized. Id. at 5–6. Dr. Ziv fails to make known whether she is basing these opinions upon any professional experience, whether these conclusions are generally accepted in the field, or whether the claims are based in methodologically tested studies. Because of these fundamental deficiencies in the report, it is impossible to conduct a reliability analysis for Dr. Ziv's remaining assertions. Accordingly, the remaining portions of the "Reporting Sexual Assault" section must be excluded.

### 5.   "Sequelae of Sexual Victimization" Section

Defendants argue that the "Sequelae of Sexual Victimization" section contains baseless conclusory statements that are unreliable, irrelevant, and prejudicial. Def.s' Mot. at 19–22. Dr. Ziv's statements in the report are admissible to the extent they are supported. Portions of the first, third, and fourth paragraphs of the section read:

> Erroneous beliefs about sexual assault serve to allow men to rationalize or justify their behavior and permit women to have a false sense of invulnerability. However, these wide-spread beliefs have profound and negative consequences for victims of both sexual abuse and sexual harassment. The studies regarding the psychological sequelae of rape are well known. What is less commonly understood is that unwanted sexual interactions of many types also cause both long- and short-term problems with emotion, self-image, productivity, cognition, physical health and economic well-being. Sexual harassment has been associated with posttraumatic stress symptoms, depression, somatic symptoms, and general psychological distress. Not only does sexual

Case No. 3:22-cv-00174-CRK-PDB

> harassment negatively impact psychological and physical health,
> research has shown that it can have far reaching impact on many
> aspects of a victim's life, including, job performance, job
> satisfaction and career opportunities. That these outcomes can be
> severe, and damaging, has been demonstrated in several meta-
> analytic studies. More subtle problems are also seen in victims of
> sexual abuse and/or harassment. Self-blame, with resulting poor
> self-esteem, social isolation, avoidance of new situations, and
> difficulty maintaining relationships have also been identified
> these individuals. . . .

> Sexual harassment has been associated with posttraumatic stress
> symptoms, depression, somatic symptoms, anxiety disorders,
> agoraphobia and general psychological distress. Further, even
> victims who do not develop a full-blown psychiatric disorder as a
> consequence of their experiences, frequently report mental health
> problems such as an anxiety or depressed mood, irritability,
> anger, and uncontrolled crying. Physical problems associated
> with sexual harassment include weight loss, fatigue, and
> gastrointestinal problems.

> Not only does sexual harassment negatively impact psychological
> and physical health, research has shown that it can have far
> reaching impact on many aspects of a victim's life, including, job
> performance, job satisfaction and career opportunities. That these
> outcomes can be severe, and damaging, has been demonstrated in
> several meta-analytic studies.

Dr. Ziv Rep. at 8–12 (citations omitted). The portions of the three paragraphs are

adequately supported by numerous authorities. The portions also provide insight on

pertinent information to Plaintiff's claims, including the effects of societal beliefs on

both perpetrators and victims of sexual assault and the long- and short-term

consequences to a victim's mental health. Id. at 8. The conclusions are also more

likely than not helpful to the trier of fact, as they implicate key factors that may shed

light on aspects of Plaintiff's behavior. The potential long- and short-term effects may

relate to Plaintiff's conduct after Blanco's alleged assault in the elevator through

OPINION AND ORDER - 29

Case No. 3:22-cv-00174-CRK-PDB

Crowley's termination of her employment. Am. Compl. ¶¶ 20–100. Accordingly, the above stated portions of paragraphs one, three, and four in the "Sequelae of Sexual Victimization" section of Dr. Ziv's report are admissible.

The remaining portions of the "Sequelae of Sexual Victimization," however, are inadmissible. Defendants are correct in asserting that the remaining sections, particularly pages nine and ten, contain conclusions that are not supported by authority and instead rely on adages, anecdotes, and rhetorical questions.[14] Dr. Ziv's conclusions lack rationality and logic, resulting in inferences that improperly deviate from supporting authority.[15]

Moreover, the assertions regarding sexual harassment constituting a form of workplace discrimination and suicide as a consequence of sexual violence are topics

---

[14] Dr. Ziv's opinions and conclusions in the remaining portions of "Sequelae of Sexual Victimization" differ from the previous admissible sections of her report. Dr. Ziv Rep. at 8–12. Dr. Ziv strays into speculative assertions that are not readily discernible or apparent as logical steppingstones from the previous train of thought. See Joiner, 522 U.S. at 148 ("a court may conclude that there is simply too great an analytical gap between the data and the opinion proffered"). Indeed, these sorts of assertions are found throughout the remaining portions of the section, from rhetorical questions (e.g. "Is it really 'intuitive' to believe that when a person has been violated in the most personal and private aspect of her life that she should be expected to also give up her job? Her relationship with others who are connected to the offender? Her position in her community?") to possible, but purely conjectural, future avenues of behavior are inferences that are too attenuated from logic or supporting authority. Id. at 9.

[15] For example, Dr. Ziv opines at the beginning of a paragraph, "[t]he potential negative consequences for a woman who has been sexually assaulted or harassed extends beyond the psychological realm. Dr. Ziv Rep. at 10. She then states at the end of that same paragraph, without any references to practical experience or authority, that "the damage to areas outside of [a victim's] control—like professional reputation–may be irreversible. Given this reality, continued interaction, especially friendly, positive, supportive, admiring contact, should be expected, not used as a way to discredit a victim." Id. Dr. Ziv fails to convey any basis as to the methods she used to form such sweeping conclusions.

OPINION AND ORDER - 30

Case No. 3:22-cv-00174-CRK-PDB

that are not within the scope of the case and lack relevance. Dr. Ziv Rep. at 11–12. Plaintiff does not allege workplace discrimination against Defendants, and suicide does not factor into any of Plaintiff's claims. See generally Am. Compl. Inclusion of the subject matter would not help the trier of fact in making any determinations necessary to Plaintiff's claims. Allison, 184 F. 3d at 1312 ("the court must 'ensure that the proposed expert testimony is "relevant to the task at hand" … i.e., that it logically advances a material aspect of the proposing party's case'") (quoting Daubert, 43 F.3d at 1315 (on remand)). Therefore, these sections must be excluded from Dr. Ziv's testimony.

### 6. "Conclusion" Section

Defendants argue that the "Conclusion" section of Dr. Ziv's report should be excluded because it highlights the notion that Dr. Ziv's report is not tailored to Plaintiff's specific situation. Def.s' Mot. at 23. Here, Dr. Ziv's conclusory paragraph of the report is inadmissible. Dr. Ziv's broad summary of general themes in the report offers no new information, opinions, or conclusions, which in turn will not clarify issues or aid the jury in its factual determination regarding Plaintiff's claims. Thus, Dr. Ziv's conclusion carries no probative weight. Allison, 184 F.3d at 1312 (explaining the trial court's role to exclude irrelevant information that will not assist the jury). Accordingly, the "Conclusion" of Dr. Ziv's report is inadmissible.

### 7. 403 Challenge

Lastly, Defendants contend that Dr. Ziv's testimony should be excluded under Rule 403 because it is prejudicial, it will mislead the jury, and it is devoid of probative

Case No. 3:22-cv-00174-CRK-PDB

value. Def.s' Mot. at 23–24. Rule 403 provides that a court "may exclude relevant evidence if its probative value is substantially outweighed" by a range of considerations, including "unfair prejudice" and "misleading the jury." Fed. R. Evid. 403. "Unfair prejudice" in this context means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Fed. R. Evid. 403 advisory committee's notes on proposed rules; <u>Carter v. Hewitt</u>, 617 F.2d 961, 972 (3d Cir. 1980). District courts have wide discretion in evaluating evidence under Rule 403, and the balance "should be struck in favor of admission." <u>United States v. Finestone</u>, 816 F.2d 583, 585 (11th Cir. 1987); <u>see also</u> <u>Ellicott v. Am. Cap. Energy, Inc.</u>, 906 F.3d 164, 172 (1st Cir. 2018). Additionally, a court must consider the potential effectiveness provided by a limiting instruction when making a 403 determination. Fed. R. Evid. 403 advisory committee's notes on proposed rules.

Here, the probative value of Dr. Ziv's admissible testimony is not substantially outweighed by the danger of unfair prejudice or misleading the jury. As discussed, some of Dr. Ziv's report contains reliable and relevant insights that may aid the jury in making its factual determinations. Certain portions of Dr. Ziv's generalized observations and opinions regarding the behavior of sexual assault victims and the psychological effects after a traumatic encounter have probative value to assessing Plaintiff's claims. Moreover, all sections that will not aid the jury have been precluded as inadmissible. Accordingly, Defendants' 403 challenge fails.

Case No. 3:22-cv-00174-CRK-PDB

## III.   Plaintiff's Challenge to Dr. Lubit

Plaintiff challenges the admissibility of Dr. Lubit's testimony by Crowley to rebut Dr. Ziv's report under Rule 702.  Pl.'s Mot. at 1.  Specifically, Plaintiff alleges that Dr. Lubit's opinions are not reliable, helpful, or relevant.  Id. at 1–9.  Further, Plaintiff argues that they are prejudicial and may confuse the jury.  Id.  Plaintiff does not challenge Dr. Lubit's qualifications as an expert in psychiatry.

### A.   Reliability of Dr. Lubit's Report

Plaintiff first argues that Dr. Lubit's testimony should be excluded because it is speculative and unreliable.  Id. at 3.  Plaintiff alleges that Dr. Lubit's conclusions are not supported by facts or data, and that his report lacks "plausibly sufficient level of intellectual rigor."  Id. at 4.  Plaintiff then challenges the reliability of six conclusions found in his report.  Id. at 4–6.  Here, it is unnecessary to specifically address the challenges to the six conclusions because the entirety of Dr. Lubit's report fails Rule 702 and Daubert.  Dr. Lubit responds to Dr. Ziv's claims with brief but sweeping rejections of her conclusions.  See Dr. Lubit Report at 1–3, Apr. 29, 2023, ECF No. 92-1 ("Dr. Lubit Rep.").  These broad rejections are unaccompanied by any citations to authority, but for a single report from 1977.  Id. at 2.  The Court cannot assess the reliability of an assertion about the nature of reporting sexual assault in the year 2023 based upon a paper authored in 1977.

Additionally, Dr. Lubit's report contains hypotheticals and conjectures offered to explain a possible reason for a sexual assault victim's conduct yet fails to identify any support for such conjectures.  See Groover v. Polk Cnty. Bd. of Cnty. Comm'rs,

Case No. 3:22-cv-00174-CRK-PDB

570 F. Supp. 3d 1134, 1159 (M.D. Fla. 2021), <u>appeal dismissed</u>, No. 21-14277-AA, 2022 WL 2063978 (11th Cir. Apr. 7, 2022) (discussing that improper extrapolation by an expert is a sufficient ground for exclusion). Crowley fails to demonstrate Dr. Lubit's opinions meet Rule 702's reliability threshold by a preponderance of the evidence. Proposed Am. Fed. R. Evid. 702 advisory committee's note to 2023 amendment (providing that a proposing party must demonstrate reliability a Rule 104(a) standard). That Dr. Lubit is a qualified psychiatrist does not render his opinions reliable. <u>See</u> <u>Frazier</u>, 387 F.3d at 1261 ("that an expert may be qualified by experience does not mean that experience, standing alone, is sufficient foundation rendering any conceivable opinion the expert may express") (emphasis omitted); <u>Quiet Tech. DC-8, Inc.</u>, 326 F.3d at 1341 ("while an expert's overwhelming qualifications may bear on the reliability of his proffered testimony, they are by no means a guarantor of reliability"). Accordingly, Dr. Lubit's report is inadmissible as it fails the reliability prong of Rule 702.

### B. Helpfulness of Dr. Lubit's Report

Dr. Lubit's testimony also fails the helpfulness prong of Rule 702. Dr. Lubit's report does not logically advance Crowley's defense, as it resorts to alternate theories of possible behavioral responses to sexual assault that lack valid scientific connections to the inquiry at hand. <u>See</u> <u>Boca Raton Cmty. Hosp., Inc.</u>, 582 F.3d at 1232 ("[t]he party offering the expert testimony has the burden of demonstrating that the testimony is 'relevant to the task at hand' and 'logically advances a material aspect' of its case") (quoting <u>Daubert</u>, 509 U.S. at 597); <u>McDowell v. Brown</u>, 392 F.3d

Case No. 3:22-cv-00174-CRK-PDB

1283, 1299 (11th Cir. 2004) ("Under <u>Daubert</u>, scientific testimony does not assist the trier of fact unless the testimony has a justified scientific relationship to the pertinent facts").  The anecdotal hypotheticals merely state broad, sweeping, opinions ipse dixit to those of Dr. Ziv.  <u>See</u> <u>generally</u> Dr. Lubit Rep.   Such contrasting opinions, unfounded in any authority or cited personal experience to the matter, have been consistently rejected.  <u>See</u> <u>Joiner</u>, 522 U.S. at 148  (holding that precedent does not require a court to admit opinion evidence connected to existing evidence only by the ipse dixit of the expert); <u>Frazier</u>, 387 F.3d at 1284 (Barkett, J. concurring) (stating that ipse dixit of an expert in a given field is insufficient to determine admissibility); <u>Haller</u>, 598 F. Supp. 2d at 1299 (rejecting admission of testimony on the sole grounds it was ipse dixit of an expert witness in the case).  Accordingly, Dr. Lubit's testimony is inadmissible because it is not helpful to the jury.

### C.    Relevance, Prejudice, and Confusion of Dr. Lubit's Report

Lastly, Plaintiff asserts Dr. Lubit's testimony is not relevant, is prejudicial, and may lead to confusion.  Pl.'s Mot. at 9.  According to Plaintiff, certain conclusions of Dr. Lubit's report, such as the discussion regarding dating and relationship pressures in the work environment, are irrelevant to Plaintiff's claims.  <u>Id.</u> at 10; <u>see</u> Dr. Lubit Rep. at 1–3.  Here, specific portions of Dr. Lubit's report are indeed irrelevant.  There are no allegations presented by any of the parties that such testimony would be beneficial to the jury in making its determinations.  Additionally, and in light of the previous discussions, further inquiry into the matter is

Case No. 3:22-cv-00174-CRK-PDB

unnecessary.  Accordingly, Dr. Lubit's report on matters unrelated to litigation are inadmissible.

**CONCLUSION**

For the foregoing reasons, it is

**ORDERED** that Defendants' motion to exclude the testimony of Plaintiff's expert witness Dr. Ziv, <u>see</u> ECF No. 87 and No. 91, is granted in part and denied in part; and it is further

**ORDERED** that Dr. Ziv is **permitted** to testify to or offer an opinion on the following topics in the "Definitions and Statistics" section of Dr. Ziv Rep., <u>see</u> ECF No. 87-1:

1. The definitions of "Consent," "Inability to Consent," and "Inability to Refuse" as defined by the CDC.

   And it is further,

**ORDERED** that Dr. Ziv is **permitted** to testify to or offer an opinion on the following topics in the "Sexual Assault Myths" section of her report:

1. The societally held beliefs known as "sexual assault myths" that serve to justify, deny, or trivialize sexual violence exerted by men against women, and the elements of denial, shifting responsibility, and minimizing consequences that accompany such myths.
2. Whether victims are more likely to be seen as sharing responsibility in sexual assault and harassment by an acquaintance.
3. The hypothesis, supported by research, that society accepts gender-scripted roles around sexuality that men are typically seen as the sexual aggressor, and that women are responsible for holding both men and themselves accountable.
4. Whether women use the "just say no" approach to undesired sexual interactions, and the reasons underlying such a decision.
5. The types of sexual refusals, including direct non-verbal, indirect non-verbal, and direct and indirect verbal cues.

   And it is further,

Case No. 3:22-cv-00174-CRK-PDB

**ORDERED** that Dr. Ziv is **permitted** to testify to or offer an opinion on the following topic in the "Capacity to Consent" section of her report:

1. The CDC supported statement regarding sexual violence and whether it involves a lack of freely given consent.

And it is further,

**ORDERED** that Dr. Ziv is **permitted** to testify to or offer an opinion on the following topics in the "Reporting Sexual Assault" section of her report:

1. The NVRC statistics and the supporting studies regarding percentages of women who report sexual assault to the police and mandatory reporters such as physicians, counselors, teachers, and clergy.
2. The underlying reasons for whether delayed reporting of sexual assault is the norm or exception.
3. The research regarding the "more nuanced disincentives" for disclosing sexual assault, including whether a woman knows that the act committed against her is a crime and whether women in general tend to view sexual assault as an act perpetrated by a stranger.
4. The EEOC's "Select Task Force on the Study of Harassment in the Workplace," the explanation of its findings, and the conclusions drawn based upon the findings.

And it is further,

**ORDERED** that Dr. Ziv is **permitted** to testify to or offer an opinion on the following topics in the "Sequelae of Sexual Victimization" section of her report:

1. The long- and short-term problems associated with unwanted sexual interactions that affect a victim's emotion, self-image, productivity, cognition, physical health, and economic well-being.
2. Whether sexual harassment has been associated with posttraumatic stress symptoms, depression, somatic symptoms, and general psychological distress.
3. Whether research supports the conclusion that sexual harassment impacts a victim's job performance, satisfaction, and career opportunities, and the degree of severity of these effects.
4. Whether those who do not develop a psychiatric disorder may nonetheless report frequent mental health problems, and the physical and emotional symptoms such mental health problems entail.

OPINION AND ORDER - 37

Case No. 3:22-cv-00174-CRK-PDB

5. The severity of damage to a victim's psychological and physical health when one is sexually harassed, and the meta-analytic studies that support such findings.

And it is further,

**ORDERED** that Dr. Ziv is **not permitted** to testify to or offer an opinion on

the following topics in the "Definitions and Statistics" section of her report:

1. The Department of Defense and the RAND National Defense Research Institute studies regarding the prevalence of sexual assault, sexual harassment, and gender discrimination in the military.

And it is further,

**ORDERED** that Dr. Ziv is **not permitted** to testify to or offer an opinion on

the following topics in the "Sexual Assault Myths" section of her report:

1. Whether most members of society, including victims, believe some of the stereotypes upon which sexual assault myths are founded, and the problems a victim might encounter that stem from these beliefs.
2. Whether men are more likely to view a woman's character and behavior as contributing factors to sexual assault and harassment.
3. Whether males in social positions of influence, dominance, or prominence are more likely than other groups to positively associate power and sex.
4. Whether males hold attitudes tolerant of sexual offending.
5. Whether there is almost always a power differential between the sexual offender and the victim, and whether confident or assertive men become insensitive to others' feelings that enables them to view sexual advances as welcomed.
6. Whether males are more likely than females to endorse attitudes that blame victims for the perpetrator's behaviors, or whether there is limited gender bias in attributing blame to victims.
7. Whether society negatively judges sexual assault victims.
8. The expected behavior of women during experiences of unwanted sexual attention or behavior.
9. Whether a woman will generally fight back in verbal or physical ways if she does not want sexual interactions with a man.
10. The statistics from literature showing that between 6–18% of women utilize aggressive physical resistance during a sexual assault, and that aggressive verbal resistance is not utilized by the majority of women in cases of rape.

Case No. 3:22-cv-00174-CRK-PDB

11. The study by Woodhams, et al. analyzing the behavior displayed by victims as they were raped by strangers and any opinions based on that study, i.e. whether women must weigh the harms against her body versus the harms against her life, the timeline for making such judgments, and whether the decisions made under the conditions constitute a choice.
12. Whether there is any typical behavior of a woman who faces or is in the midst of sexual assault, and whether a woman will resort to learned patterns of behavior in their conduct, attempt to minimize the worst possible outcome, or reflexively respond to the situation.

And it is further,

**ORDERED** that Dr. Ziv is **not permitted** to testify to or offer an opinion on

the following topics in the "Capacity to Consent" section of her report:

1. The neurological changes in the circulating hormones of the brain when a victim is sexually assaulted.
2. The term "consent" in the context of the CDC definition, including the neurological nature of capacity and its fluid state that may change depending on internal and external circumstances.
3. Whether impairing an individual's ability to understand risks, benefits, and alternatives impedes capacity to consent, and whether sexual assault is one such external circumstance that affects the hypothalamic-pituitary-adrenal axis.
4. The cognitive and behavioral changes that accompany the neurological changes in the brain, including the self-reflective questions and internal monologues a victim may experience when faced with unwanted sexual encounters, and whether a victim has cognitive capacity to consent during an actual or threatened sexual situation.
5. The commonly overlooked definition of capacity to consent as "the power to do something," and whether capacity to consent is destroyed if there is any degree of harm to one's physical, economic, social, reputational, occupational, or other aspect of life if sexual advances are refused.

And it is further,

**ORDERED** that Dr. Ziv is **not permitted** to testify to or offer an opinion on

the following topics in the "Reporting Sexual Assault" section of her report:

1. Whether victims of sexual abuse are subject to intense scrutiny or judgement, including assessments on appearance, sexual identity, choices, or the "wide variety of other issues."

OPINION AND ORDER - 39

Case No. 3:22-cv-00174-CRK-PDB

2. Whether the process of being sexually victimized is debilitating, humiliating, or degrading in general.
3. That women in general are uncomfortable about verbalizing to others the acts they are forced to endure, and whether this is true for all types of sexual victimization or specifically for women who have experienced, and reported, sexual harassment.
4. Whether women who have experienced or reported sexual harassment are often doubted and portrayed as schemers and liars, and whether this belief provides a disincentive for reporting workplace sexual misconduct.
5. Whether women are often assaulted by someone they know.
6. Whether personal and private details may be publicized in a report, and how these implications impact a woman's decision to report sexual assault or harassment to authority figures.
7. Whether delayed reporting of sexual assault affects a victim's credibility.
8. Whether the psychological consequences of sexual assault may further serve as a barrier to disclosure, and whether blame by family members or friends in the assault affects the probability that the victim will report the assault.
9. That even if a victim's account is believed or proven, society will criticize the victim for not acting in accordance with societal expectations.
10. Whether allegations of sexual misconduct cause society to judge the victim's appearance, honesty, motivations, choices, and general conduct.
11. Whether silence in reporting sexual assault is the norm or exception.

And it is further,

**ORDERED** that Dr. Ziv is **not permitted** to testify to or offer an opinion on

the following topics in the "Sequelae of Sexual Victimization" section of her report:

1. The erroneous beliefs about sexual assault that allow men to rationalize or justify their behavior and permit women to have a false sense of invulnerability, and the impact these beliefs have on victims.
2. The "well-known" psychological sequalae of rape.
3. The subtle problems associated with victims of sexual assault and harassment, including self-blame, poor self-esteem, social isolation, avoidance of new situations, and difficulty maintaining relationships, and whether these phenomena are linked to victims who delay reporting, minimize their experience, or deny that sexual assault occurred altogether.
4. The experiences of sexual assault survivors who are blamed, doubted, or victimized by authorities to whom they reach out for assistance, and the negative experience called "second assault" or "secondary victimization."
5. Whether a victim, who's needs are not met or refuses to self-identify as a victim, suffers from more severe forms of physical or psychological problems

OPINION AND ORDER - 40

Case No. 3:22-cv-00174-CRK-PDB

than those who do not experience disbelief, scorn, shame or an inability to obtain services.

6. Any reference to or acceptance of the adage "keep your friends close; keep your enemies closer," and how it relates in any capacity to victims of sexual assault.

7. Whether allegations of sexual victimization place a "scarlet letter" on the victim, and how that characterization might affect the victim's relationship to society or whether that is linked to the #MeToo movement.

8. Whether victims attempt to salvage relationships with peers or the perpetrator in the workplace.

9. Whether a victim continues contact with the perpetrator, and how a victim might behave in accordance with that decision.

10. Whether sexual assault and harassment are powerful demonstrations of dominance and any sources discussing the assertion.

11. Whether women learn harsh truths about their powerlessness and lack of value after being subjected to unwanted sexual interactions, and whether that is a universal experience for women in subordinate positions to the offender.

12. Any references to specific individuals or their conduct, including Bill Cosby, Harvey Weinstein, Matt Lauer, and their victims.

13. Whether decisions and behavior after unwanted sexual interactions are premeditated and whether there is a normal path of behavior.

14. Whether a victim seeks understanding of the sexual assault, including by emailing, texting, calling, or talking in person with the offender in an attempt to understand the motives underlying the assault or to undo its damage.

15. Whether the potential negative consequences for a victim of sexual assault extends beyond the psychological realm, and whether men further degrade the victim or act in harmful capacities towards the victim's personal life and professional reputation, relationships, and career.

16. Whether a victim can overcome their personal psychological and emotional responses to sexual assault and harassment through therapy, and whether other damages, such as reputational harm, can be remedied.

17. Whether continued interactions with the perpetrator, especially positive ones, can be used to discredit the victim or if continued interactions are expected behavior.

18. The negative impacts of sexual harassment or coercion in the workplace to one's personal identity, including any long-term consequences like substance abuse or depression.

19. Whether sexual harassment in the workplace is a form of discrimination, and any opinions and conclusions that reference or relate to this notion.

20. Any opinions, conclusions, or statistics referencing or relating to suicide and its connection to sexual assault.

And it is further,

Case No. 3:22-cv-00174-CRK-PDB

**ORDERED** that Dr. Ziv is **not permitted** to testify to or offer an opinion on the "Conclusion" section of her report; and it is further

**ORDERED** that Plaintiff's motion to exclude the testimony of Crowley's expert witness Dr. Lubit, <u>see</u> ECF No. 92, is granted.

/s/ Claire R. Kelly
Claire R. Kelly, Judge[*]

Dated:        November 17, 2023
              New York, New York

---

[*] Judge Claire R. Kelly, of the United States Court of International Trade, sitting by designation.

OPINION AND ORDER - 42